```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3                         ---

 4        THE HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

 5


 6


 7   United States of America,          )

 8                      Plaintiff,      )

 9                                      )

10   vs.                               )   Case No.

11                                      )   ED CR 08-172(B)-VAP

12   Vinod Chandrashekm Patwardhan,     )

13                      Defendant.      )

14   _____    )

15

16

17         REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

18                       Day 4

19              Los Angeles, California

20              Friday, May 1, 2009

21

22   Pamela A. Seijas, CSR, FCRR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446
```

UNITED STATES DISTRICT COURT

```
 1   APPEARANCES:

 2

 3     FOR THE GOVERNMENT:     OFFICE OF THE UNITED STATES ATTORNEY

 4                             BY:  JOSEPH B. WIDMAN

 5                                  ASSISTANT UNITED STATES ATTORNEY

 6                                  JERRY A. BEHNKE

 7                                  ASSISTANT UNITED STATES ATTORNEY

 8                             3880 LEMON STREET

 9                             SUITE 210

10                             RIVERSIDE, CA  92501

11

12

13

14     FOR DEFENDANT:          BIRD, MARELLA, BOXER, WOLPERT,

15                             NESSIM, DROOKS & LINCENBERG

16                             BY:  BENJAMIN GLUCK

17                                  JEAN RHEE

18                             1875 CENTURY PARK EAST

19                             23RD FLOOR

20                             LOS ANGELES, CA  90067-2561

21

22

23

24

25
```

*UNITED STATES DISTRICT COURT*

```
 1              Los Angeles, California, Friday, May 1, 2009

 2                            1:22 P.M.

 3                            -oOo-

 4                          (Jury Out)

 5          THE COURT:  On the record, outside the presence of the

 6  jury.

 7          MR. BEHNKE:  I'm sorry, Your Honor.  Before we start

 8  we will ask the witness to step out.

 9          THE COURT:  You may be seated.  While Ms. Dillard is

10  bringing the jury down the hallway, having reviewed the rule and

11  the authorities just a bit more, I am going to sustain the

12  Government's objection to the questions that counsel for the

13  Defense wish to ask Ms. Yip on the subject.  So with that, you

14  can bring the witness back in.

15          Did you have any further questions about what you're

16  allowed to ask?

17          MR. GLUCK:  I had somewhat of a compromised position

18  that I discussed with Mr. Behnke in the hallway and perhaps it

19  might be worth raising.  If I were to ask Ms. Yip, "Did

20  Dr. Patwardhan tell you not to declare it" -- okay.  "Did he

21  tell you not to declare it," and she were to say no, and then I

22  were to ask her, "At the time you came in from the Philippines,

23  did you believe that when he brought in drugs, he declared

24  it" --

25          THE COURT:  I don't think I have a problem with the
```

*UNITED STATES DISTRICT COURT*

```
 1    first question.
 2              MR. GLUCK:  Okay.
 3              THE COURT:  I would permit you to ask that first
 4    question.
 5              MR. GLUCK:  Okay.
 6              THE COURT:  The second question I would sustain the
 7    objection.
 8              MR. GLUCK:  You would sustain it?
 9              THE COURT:  Yes.
10              MR. GLUCK:  Okay.  I understand the Court's --
11              THE COURT:  Thank you.  So the witness can come in.
12                        (Jury In)
13              THE COURT:  Good afternoon.  Let the record reflect
14    the presence of the members of the jury, all counsel are present
15    and the witness on the witness stand.  I apologize for keeping
16    you waiting this afternoon, ladies and gentlemen.
17              You may resume your examination, Mr. Gluck.
18              MR. GLUCK:  Thank you, Your Honor.
19                    CROSS-EXAMINATION RESUMED
20    BY MR. GLUCK:
21    Q.   Ms. Yip, near you on the counter or maybe on the little
22    shelf is a set of binders, and would you please find the binder
23    that has Exhibit 100 in it.  It would be the third of three.
24    A.   Binder 3 of 3?
25    Q.   Yes.  Binder 3 of 3.
```

```
 1              Do you have that in front of you?

 2   A.    I have the binder.

 3   Q.    Would you turn to Tab 100 in there, please.

 4   A.    Tab 100.

 5   Q.    Do you see the document in there?  Would you turn, please,

 6   to the last page of that document.  Tell me if you see your

 7   signature there.

 8   A.    Page 15?

 9   Q.    Yes.  On page 15.

10   A.    Yes.

11   Q.    That is your signature?

12   A.    That is my signature.

13         MR. GLUCK:  The Defense moves Exhibit 100 into

14   evidence and asks permission to publish it.

15         THE COURT:  Objection?

16         MR. WIDMAN:  The United States does not object.

17         THE COURT:  Thank you.  Exhibit 100 is ordered

18   admitted, and you may publish.

19         MR. GLUCK:  Thank you, Your Honor.

20         (Defendant's Exhibit 100 was received.)

21   BY MR. GLUCK:

22   Q.    Okay.  So this is a document entitled "Amended Plea

23   Agreement for Defendant Velma Yip."  Do you see this?

24   A.    Yes.

25   Q.    And just to -- what we were talking about earlier, Page 15,
```

*UNITED STATES DISTRICT COURT*

| | |
|---|---|
| 1 | that's your signature there above where it says "Velma Yip"? |
| 2 | A.   That is my signature. |
| 3 | Q.   And down at the bottom is the signature of your attorney, |
| 4 | Mr. Kevin Riva? |
| 5 | A.   That's correct. |
| 6 | Q.   And you -- when you came into this courtroom and entered a |
| 7 | guilty plea to the accusation that we talked about earlier, you |
| 8 | understood that your guilty plea was governed by this Plea |
| 9 | Agreement; correct? |
| 10 | A.   Correct. |
| 11 | Q.   I want to talk about some of the provisions in this Plea |
| 12 | Agreement.  So let me first -- well, the first question I'll ask |
| 13 | is was it your understanding that this Plea Agreement involves |
| 14 | you pleading guilty to the accusation that we discussed earlier |
| 15 | today? |
| 16 | A.   The accusations? |
| 17 | Q.   Earlier today we discussed the document -- I'll put it back |
| 18 | on.  It's Exhibit 244.  This document that says information on |
| 19 | it.  Do you recall discussing that? |
| 20 | A.   Yes. |
| 21 | Q.   And we discussed that this is a document accusing you of |
| 22 | committing a crime; correct? |
| 23 | A.   Correct. |
| 24 | Q.   Specifically it's a document accusing you of committing a |
| 25 | Class A misdemeanor? |

*UNITED STATES DISTRICT COURT*

```
1    A.    That is correct.

2    Q.    The Plea Agreement that I just showed you involves your

3    agreement to plead guilty to this accusation; am I right?

4    A.    That is correct.

5    Q.    So now I have put the Plea Agreement back on the projector.

6    And I'd ask you -- you can either look at the projector or the

7    book in front of you.

8              If you turn to the fifth page of the Plea Agreement --

9    A.    The amended Plea Agreement?

10   Q.    Yes.  The fifth page of the amended Plea Agreement.  Do you

11   see the paragraph that has a 9 in front of it or Paragraph 9?

12   A.    Yes.

13   Q.    Do you see that?  It starts off "Defendant."  "Defendant"

14   is you; correct?

15   A.    That's correct.

16   Q.    And you -- and the USAO -- do you know what the USAO is?

17   A.    United States Attorney Officer.

18   Q.    United States Attorney's Office?

19   A.    Office.

20   Q.    So that means the prosecutors; right?

21   A.    Correct.

22   Q.    So "Defendant and the USAO agree and stipulate to the

23   following applicable Sentencing Guidelines factors."  And it

24   says Base Offense Level 6.

25              Is it your understanding that this paragraph is a
```

*UNITED STATES DISTRICT COURT*

```
 1   discussion of the appropriate -- or the possible sentence that

 2   you will receive pursuant to this Plea Agreement?

 3            MR. WIDMAN:  Objection, Your Honor.  Lack of

 4   foundation.  Vagueness.

 5            THE COURT:  The objection is overruled.

 6            THE WITNESS:  Could you repeat that question.

 7   BY MR. GLUCK:

 8   Q.   Let me take a step back.  Do you know what the Sentencing

 9   Guidelines are?

10   A.   I was informed about it, yes.

11   Q.   Is it your understanding that the Sentencing Guidelines

12   give an advisory recommendation as to what the sentence should

13   be in criminal cases?

14   A.   Yes.

15   Q.   And depending on the case -- I'm sorry.  I'll start again.

16            Depending on the offense and various factors, the

17   Guidelines give an advisory recommendation of the particular,

18   for example, term in prison?

19   A.   The Guidelines, yes.

20   Q.   And so this paragraph here is an agreement between you and

21   the Government that the following Guidelines factors apply, and

22   it says Base Offense Level 6.  Do you see that?

23   A.   Yes.

24   Q.   Do you have an understanding as to what the advisory

25   punishment is for a Base Offense Level 6?
```

*UNITED STATES DISTRICT COURT*

```
 1   A.   I have an idea, yes.

 2   Q.   What is your understanding that the punish -- the advisory

 3   punishment level is for a Base Offense Level 6?

 4   A.   For that misdemeanor charge that I was -- I had done.

 5   Q.   Let me ask it this way.  You do understand that this

 6   agreement here in paragraph 9 is an agreement about the advisory

 7   punishment level that you will receive?  Do you understand that?

 8   A.   That's correct, yes.

 9   Q.   What is your understanding as to the advisory punishment

10   level that you will receive in this case?

11           THE COURT:  Mr. Gluck, the problem with that

12   question --

13           MR. GLUCK:  Okay.

14           THE COURT:  There are significant problems with that

15   question.

16           MR. GLUCK:  All right.  Let me ask it this way.

17   Q.   Is it your understanding, Ms. Yip, that putting aside other

18   things that might influence the out -- the actual punishment

19   imposed, is it your understanding that a Base Offense Level of 6

20   equates to 0 to 6 months imprisonment on the advisory

21   Guidelines?

22           THE COURT:  It depends on the criminal history

23   category.

24           MR. GLUCK:  The Court -- thank you.

25           THE COURT:  Since this has been brought up -- because
```

1  it's the Court's obligation to explain the law to the jury, let

2  me take a few moments and explain a couple of things to the

3  jury.

4          First of all, remember that as I said to you

5  earlier -- and this is very important -- for reasons that I'm

6  sure one side or the other will argue to you at the appropriate

7  time, that is, during closing argument, it may be appropriate

8  for counsel to cross-examine in this area as to Ms. Yip.  That

9  is as to under the terms of the Plea Agreement what sentence she

10  could be facing for the crime that she has pled guilty to, which

11  is a misdemeanor.

12          But remember that you are not to consider the question

13  of potential punishment as to the defendant in determining at

14  the end of this case -- as to deliberating on the question of

15  guilt or innocence, all right, as to Dr. Patwardhan.  So the --

16  the questions that Mr. Gluck is asking relate only to this

17  witness, and you don't consider punishment or potential

18  punishment in making your -- deciding on your verdict in this

19  case.

20          In very general terms, when a federal judge decides a

21  sentence in a criminal case, he or she is charged with looking

22  at a number of different things.  One of those things is what

23  has been referred to right now, and that is the Sentencing

24  Guidelines that are issued by the United States Sentencing

25  Commission.  It's only one of the things that we look at.

```
1           The Guidelines apply two things:  an offense level and
2    a defendant's criminal history category.  A criminal history
3    category -- the Court determines what that is, of course, after
4    listening to everything from both sides, but a criminal history
5    category that a defendant falls into depends on what they've
6    been convicted of in the past, what offenses they have been
7    convicted of in the past and how recently.
8           So that's a very quick overview of what some of the
9    terms that have you been talking about.  It's important, again,
10   to keep in mind that all of this only relates to the questions
11   that are being asked of this witness.
12           Thank you, Mr. Gluck.
13           MR. GLUCK:  Thank you, Your Honor.
14   Q.   Ms. Yip, let me try to ask the question a different way.
15           Do you have an understanding as to what the maximum
16   punishment -- let me back up.  You have not been sentenced for
17   the crime you admitted; correct?
18   A.   Not yet.
19   Q.   Not yet.  Do you have an understanding as to what the
20   maximum sentence you could face is?
21   A.   Yes.
22   Q.   What do you understand is the maximum sentence you could
23   face for the guilty plea that you have entered?
24   A.   Maximum?
25   Q.   Yes.
```

UNITED STATES DISTRICT COURT

```
 1   A.    Is jail time.

 2   Q.    Of how long?

 3   A.    I -- I have to look at this thing.  It's somewhere in here,

 4   and I've read it.

 5   Q.    Is it correct that it's jail time of up to one year?  Have

 6   you heard that?

 7   A.    I believe so, yes.

 8   Q.    Do you have an understanding as to what the minimum

 9   sentence of jail time would be in your case or could be in your

10   case?

11             MR. WIDMAN:  Objection, Your Honor.  Improper form.

12             THE COURT:  Sustained.

13   BY MR. GLUCK:

14   Q.    Ms. Yip, is it true that you're hoping to avoid jail time

15   at all?

16   A.    I would not want jail time.

17   Q.    Right.  And you -- do you -- do you understand that you

18   will not necessarily go to jail because of your guilty plea?

19   A.    Yes.

20   Q.    It's possible that you could avoid --

21   A.    It's possible that I will not go to jail.

22   Q.    Thank you.

23             Would you turn, please, to Page 7 of the document --

24   actually, you know what?  Let me start with Page 6.  If you

25   would turn to Page 6 of the document that I just put in front of
```

*UNITED STATES DISTRICT COURT*

1    you or -- I'm sorry -- that you do have in front of you.  I'm

2    going to put it on the projector.

3              There is a section there that says "Defendant's

4    obligations."  Do you see that?

5    A.    Yes.

6    Q.    Okay.  And this is what -- this is your side of the

7    agreement; correct?  This is what you have to do?

8    A.    Correct.

9    Q.    Now, if you look down at the bottom, do you see the last

10   sentence there?  Well, actually, I'm sorry.  Let me start with

11   Paragraph C that I'm pointing to here.  All right.

12             One of your obligations is to not knowingly and

13   willfully fail to appear for court appearances etc.  Do you see

14   that there?

15   A.    I do.

16   Q.    Do you see under it you're also agreeing on Paragraph E,

17   the very last line there, to not knowingly and willfully fail to

18   be truthful at -- and then carries over onto the next page on

19   Page 7 -- at all times with Pretrial Services, the U.S.

20   Probation Office and the Court.  Do you see that?

21   A.    Yes.

22   Q.    So as part of your agreement, you have an obligation to be

23   truthful with the Court?  Do you understand that?

24   A.    It's my obligation to tell the truth.

25   Q.    Okay.  Now, look at Paragraph 14, please.  If you look at

1    Paragraph 14, "Defendant further agrees to cooperate fully with

2    the USAO," and that's the prosecutors; correct?

3    A.    Correct.

4    Q.    "The FDA, U.S. Immigration and Customs Enforcement, U.S.

5    Customs and Border Protection and as directed by the USAO, any

6    other federal, state, local or foreign law enforcement agency."

7              So you have agreed as part of this agreement that you

8    will, quote, cooperate fully with the Government and the

9    Government agencies; correct?

10   A.    That's correct.

11   Q.    And this cooperation, if I -- if you go further down the

12   page, requires you to, A, be truthful.  Do you see that --

13   A.    Yes, uh-huh.

14   Q.    And you have been truthful, haven't you?

15   A.    I've been truthful, yes.

16   Q.    It also requires you under B to show up at meetings, Grand

17   Jury and trials; correct?

18   A.    That's correct.

19   Q.    Including today; right?

20   A.    Yes.

21   Q.    And C, to produce any documents relating to the matter that

22   the U.S. Attorney's Office asks for; correct?

23   A.    Correct.

24   Q.    Okay.  So to summarize, you have agreed -- well, is it your

25   understanding that this was part of what you agreed to do in

*UNITED STATES DISTRICT COURT*

```
 1    order to get the Government to give you something in return?

 2    A.    I agreed to tell the truth.  That's my responsibility.

 3    Q.    And in return for that, the Government also made some

 4    agreements; right?

 5    A.    Yes.

 6    Q.    Okay.  So the Government has some obligations to you;

 7    correct?

 8    A.    They have obligations, correct.

 9    Q.    Among the Government's obligations are, if you turn to Page

10    8 -- it's a very long paragraph, so I'll ask generally about

11    your understanding of Paragraph C.  It can't even fit on this

12    screen.  Okay.

13          Do you have an understanding, Ms. Yip, that the

14    Government has agreed that it won't offer as evidence against

15    you certain statements that you might make in the course of your

16    cooperation, subject to some exceptions as stated in Paragraph

17    C?  Do you have any understanding on that?

18    A.    Certain statements?

19    Q.    You know what?  I'm going to move on from this paragraph.

20    A.    Yes.

21    Q.    All right.

22          Let's talk about Paragraph G on Page 9.  Do you see

23    that, Ms. Yip?

24    A.    Page 9, yes.

25    Q.    Paragraph G says, "If the USAO," which is again the
```

1   prosecutors; correct?

2   A.   I'm there.

3   Q.   When it says -- in Paragraph G when it says the USAO,

4   that's the prosecutors?

5   A.   Uh-huh.  Yes.

6   Q.   Say -- okay.  "If the USAO determines in its exclusive

7   judgment that defendant has complied" -- I'm sorry -- "has both

8   complied with her obligations under Paragraph 15 and 16 above

9   and provided substantial assistance to law enforcement in the

10  prosecution or investigation of another" -- and then there is a

11  parenthetical, and in quotes it says "substantial assistance,"

12  and it continues "to move the Court pursuant to USFG 5K1.1 to

13  fix an offense level and corresponding Guideline range below

14  that otherwise dictated by the Sentencing Guidelines and to

15  recommend a sentence within this reduced range."

16          This paragraph, Paragraph G, do you understand that

17  depending on your cooperation, the Government may make a motion

18  to reduce your sentence?

19  A.   Yes.

20  Q.   And that means, as you understand it, that it would be less

21  than what we looked at earlier, the Sentencing Guidelines range?

22          MR. WIDMAN:  Objection, Your Honor.  For the grounds

23  set forth by the Court before.

24          THE COURT:  Sustained.

25  BY MR. GLUCK:

```
1    Q.    Ms. Yip, what do you understand -- well, at Paragraph G,

2    the very first sentence, the very first line says "In its

3    exclusive judgment."  Do you see those words?

4    A.    Yes.

5    Q.    What do you understand that to mean?

6    A.    It's the judgment of the USAO.

7    Q.    The prosecutors?

8    A.    Correct.

9    Q.    So if they decide that they don't want to make that motion,

10   is it your understanding that anyone can force them to make that

11   motion?

12   A.    My understanding, sir, is my obligation and my

13   understanding is to tell the truth up here.

14   Q.    Okay.  And what I'm asking -- well, I'm asking you if --

15   about your understanding of what happens afterwards.  If the

16   Government declines to make that motion, can anybody force them

17   to make that motion?

18   A.    I wouldn't know.

19   Q.    You read this document before you signed it, Ms. Yip?

20   A.    Yes.

21         MR. WIDMAN:  Objection, Your Honor.  Asked and

22   answered.

23         THE COURT:  Sustained.

24   BY MR. GLUCK:

25   Q.    Let's just turn to Page 10, please, Paragraph D, and this
```

1    paragraph -- do you see where it says, "At this time, the USAO

2    makes no agreement or representation as to whether any

3    cooperation that defendant has provided or intends to provide

4    constitutes substantial assistance."  Do you see that?

5    A.   Yes.

6    Q.   So is it your understanding that the Government hasn't made

7    up it's -- well, is it your understanding, Ms. Yip, that there

8    has been no representation to you that the Government has made

9    up its mind already about whether you provided substantial

10   assistance?

11   A.   Rephrase it, please.

12   Q.   I'm sorry.  Let me ask you this.  Do you understand that

13   the Government may decide not to make this motion for

14   substantial assistance?

15              MR. WIDMAN:  Objection, Your Honor.  Lack of

16   foundation.

17              THE COURT:  Sustained.

18   BY MR. GLUCK:

19   Q.   Let me try -- let me start again.

20              Ms. Yip, you're hoping that when it comes to

21   sentencing, the Government will make a motion asking the Court

22   to sentence you at a lower range; isn't that correct?

23   A.   I am hoping that, yes.

24   Q.   You understand that whether or not they make that motion

25   depends in part on whether you provide them with substantial

1   assistance; correct?

2   A.    That is correct.

3   Q.    And you also understand that they haven't told you yet

4   whether they think you have done so?

5   A.    I'm not understanding your question.

6   Q.    Ms. Yip, is that issue still up in the air as to whether

7   you have provided substantial assistance?

8   A.    All I know, sir, is I come here and I have to, under oath,

9   answer questions truthfully.

10  Q.    But you're also hoping that your answers to the questions

11  will cause the Government to make that motion; right?

12          MR. WIDMAN:  Objection, Your Honor.  Asked and

13  answered.

14          THE COURT:  Sustained.

15  BY MR. GLUCK:

16  Q.    Ms. Yip, you -- well, you said your obligation is to answer

17  all questions truthfully; correct?

18  A.    Correct.

19  Q.    And you've done so?

20  A.    Yes.

21  Q.    Did Dr. Patwardhan ever tell you to not -- let me take you

22  back to the Philippines, the medicine you brought from the

23  Philippines in April 2008.  We discussed that this morning.

24          You discussed the fact that you didn't declare it on

25  your customs form?

```
 1    A.    That's correct.
 2    Q.    Did Dr. Patwardhan tell you not to declare it on your
 3    customs form?
 4    A.    No.
 5    Q.    He did not say that to you?
 6    A.    He did not say that to me.
 7    Q.    Did Dr. Patwardhan tell you where -- where to carry the
 8    medicine in your suitcase or in your pocket or anything like
 9    that?
10    A.    He did not.
11    Q.    Ms. Yip, how much was the medicine -- well, you brought it
12    back; correct?
13    A.    I brought it from the Philippines back to the
14    United States, yes.
15    Q.    And eventually you gave it to Jessica Young; correct?
16    A.    I gave it to Jessica.  I was told to give it to Jessica
17    Young, yes.
18    Q.    And you did so?
19    A.    I did not hand it to Jessica Young.  I handed it to a
20    medical -- an office manager that was working with us at that
21    time, with the understanding that she will give it to Jessica
22    Young.
23    Q.    What was the name of that office manager?
24    A.    I believe her name is Mary Lou.
25    Q.    Do you recall her last name?
```

*UNITED STATES DISTRICT COURT*

1    A.    No.

2    Q.    But you gave it to her and gave her some kind of

3    instruction to give it to Jessica?

4    A.    Yes.

5    Q.    At some point you got reimbursed for the cost of the

6    medicine; is that right?

7    A.    That's correct.

8    Q.    Is it correct that the total reimbursement was somewhere

9    around -- somewhere around 600 or $650?

10   A.    Somewhere around $600, that's correct.

11   Q.    You did not get reimbursed for your plane ticket, did you?

12   A.    To the Philippines, no.

13        MR. GLUCK:  May I have just a moment, Your Honor?

14        THE COURT:  Certainly.

15   BY MR. GLUCK:

16   Q.    When you came into the country on April -- I don't remember

17   the exact date, but in April 2008 when you brought the medicine

18   from the Philippines, were you subject to a secondary inspection

19   at customs?  Let me ask it a different way.

20        When you came into the country in April of 2008 from

21   the Philippines, did a customs officer take you to the side and

22   look through your baggage?

23   A.    My baggage?  No.

24   Q.    You just walked through, gave them that piece of paper we

25   have seen --

1    A.    My hand-carry, yes.

2    Q.    Do you have an understanding as to whether the Government

3    is currently satisfied with your testimony?

4    A.    I don't know.

5              MR. GLUCK:  May I have just a moment, Your Honor?  I

6    think I may be finished.

7              THE COURT:  You may.

8    BY MR. GLUCK:

9    Q.    You testified earlier -- Mr. Widman asked you about the

10   trip -- you know, Your Honor, I'm finished.  I have no further

11   questions.

12             THE COURT:  Redirect examination?

13             MR. WIDMAN:  The United States has no further

14   questions for this witness.

15             THE COURT:  Thank you.  You may step down.  And the

16   Government may call its next witness.

17             MR. BEHNKE:  Excuse me, Your Honor.  The Government

18   calls Sylvia Thomas.

19             THE CLERK:  Please raise your right hand.

20        Sylvia Thomas, Government's witness, was sworn

21             THE CLERK:  Please be seated.  Right there, please.

22   Please state your full name and spell it for the record.

23             THE WITNESS:  My full name and what?

24             THE CLERK:  Spell it, please.

25             THE WITNESS:  Sylvia Ann Thomas.  S-Y-L-V-I-A, A-N-N,

*UNITED STATES DISTRICT COURT*

```
 1   T-H-O-M-A-S.

 2            THE COURT:  Thank you.  You may proceed.

 3                      DIRECT EXAMINATION

 4   BY MR. BEHNKE:

 5   Q.   Ma'am, by whom are you employed?

 6   A.   I'm employed by the U.S. Food and Drug Administration.

 7   Q.   What is your position with the FDA?

 8   A.   I'm a Supervisory Consumer Safety Officer.

 9   Q.   Where do you work?

10   A.   I work at the Los Angeles Airport office of the FDA.

11   Q.   And what are the duties that you have in your position?

12   A.   My job is to monitor products that enter the United States

13   via LAX, and we screen FDA regulated products to make certain

14   that they meet U.S. Health and Safety Standards.

15   Q.   How long have you held that position with the FDA?

16   A.   Supervising?

17   Q.   Yes.

18   A.   Five years.

19   Q.   And prior to attaining your supervisory position, what did

20   you do?

21   A.   I was a Consumer Safety Officer.

22   Q.   Where did you work as a Consumer Safety Officer?

23   A.   At the Los Angeles Harbor, dealing with ocean freight.

24   Q.   So for the last five years, have you been at LAX as a

25   supervisor?
```

1   A.    Yes.

2   Q.    Now, do you have other inspection officers that work under

3   you at LAX?

4   A.    Yes.  I supervise 12 Consumer Safety Officers.

5   Q.    Now, do the inspection officers who work under you and

6   yourself, for that matter, have any interaction with Customs

7   agents that work at Los Angeles International Airport?

8   A.    Yes.  We have daily interaction with U.S. Customs.

9   Q.    Is there a system in place whereby Customs inspectors who

10  are inspecting passengers entering through Los Angeles

11  International Airport may be referred to FDA for drug-related

12  matters?

13  A.    Yes.

14  Q.    How does that work?

15  A.    Usually a customs agent will contact us and let us know

16  about the shipment.

17  Q.    So if a customs inspector working the terminal at

18  Los Angeles encounters a passenger with drugs in their

19  possession, there's a mechanism where the Customs inspector

20  could make a referral to FDA?

21  A.    Correct.

22  Q.    And that would come to your office?

23  A.    Yes.

24  Q.    If a Customs official working the terminal encounters a

25  passenger with drugs and they make a referral to FDA, would you

1    or one of your inspectors make contact and deal directly with

2    the passenger there at the terminal?

3    A.    No.

4    Q.    How does that work?

5    A.    What we will do is I will assign an investigator to go out

6    to the location where the product is being held by U.S. Customs

7    and then they would collect evidence and photographs labeling

8    and assess the shipment.

9    Q.    Now, what do you mean when you say Customs holds the

10   product?

11   A.    Usually when Customs is holding it, stops a shipment of

12   drugs like this, they would hold them in U.S. Customs' custody,

13   and the passenger would continue, and we would deal directly

14   with the shipment.

15   Q.    Do you -- where would they actually hold the drugs?

16   A.    Various locations around the airport.  Usually some kind of

17   warehouse facility that has a Customs bonds.

18   Q.    So the passenger would have to post a bond and leave the --

19   leave the drugs -- leave the drugs with Customs?

20   A.    I'm not certain of the exact -- I'm not certain about the

21   procedures that Customs uses with the passenger.

22   Q.    All right.  But Customs in some fashion would retain the

23   drugs, and then you or one of your inspectors would go out and

24   check out the drugs?

25   A.    Correct.

1  Q.    Now, when you refer to shipment, would this procedure also

2  apply if we're talking about drugs that a passenger is bringing

3  in in their luggage?

4  A.    Correct.

5  Q.    Now, once -- once a referral is made to your office that

6  Customs has encountered a shipment of drugs, is one of the

7  factors that you and your inspectors look for to determine

8  whether to allow the drugs into the country or not whether those

9  drugs have been approved by the FDA?

10  A.    Correct.  If they are approved by the FDA, we will not

11  allow them to proceed.

12  Q.    What happens to drugs that are not approved by the FDA?

13  A.    If -- when we go out and examine a shipment, we find that

14  the drugs appear to be unapproved, what we do is request a

15  formal entry of the importer so they make a formal declaration,

16  and then we will pass our case with all of the evidence we've

17  collected to a Compliance Officer, and that Compliance Officer

18  will detain the product which allows the importer an

19  opportunity -- it opens a hearing period where the importer has

20  an opportunity to prove to the FDA that the products are

21  approved.

22  Q.    When you say you require a formal entry, what do you mean

23  by that?

24  A.    It means that they have to post a bond with U.S. Customs

25  and hire a customshouse broker and make a formal declaration.

*UNITED STATES DISTRICT COURT*

```
1   Q.   When you say the importer, are you referring to the

2   passenger?

3   A.   Yes.  The individual that is causing the product to move

4   into the country.

5   Q.   I believe you also used a term customhouse broker.  What do

6   you mean by that?

7   A.   Those are specially licensed firms that interface with the

8   U.S. government.  Basically they interface between an importer

9   and the U.S. government to make sure that all the applicable

10  laws are -- and all the information the U.S. government needs is

11  provided.

12           MR. BEHNKE:  May I have one moment, Your Honor?

13           THE COURT:  Yes.

14           (Government counsel confer off the record)

15           MR. BEHNKE:  Thank you, Your Honor.  Nothing further.

16           THE COURT:  Thank you.  Cross-examination?

17           MS. RHEE:  Your Honor, may I approach?

18           THE COURT:  Approach to hand documents, you mean?

19           MS. RHEE:  Yes.

20           THE COURT:  Yes, you may.

21           MR. GLUCK:  Judicial notice.

22           THE COURT:  Well, hand what it is you wish the Court

23  to take judicial notice to your opponent and then to the clerk.

24           (Sidebar conference commenced.)

25           MS. RHEE:  We have brought this up before.  It has the
```

UNITED STATES DISTRICT COURT

```
 1    URL on it and please just let us now how you would like us to

 2    proceed.

 3              THE COURT:  Okay.  Can I have a copy for me?

 4              MS. RHEE:  Yes, of course.

 5              THE COURT:  What is the Government's position?

 6              MR. BEHNKE:  In terms of the policy itself and the

 7    foundational issues, the Government doesn't have any issue.  The

 8    Government's only objection to this is relevance.  This is a

 9    policy that is very specific, relates only to the importation of

10    small quantities of drugs for personal use by the person

11    bringing the drug in.  I think there is also references in the

12    document to limitations to situations where drugs that are not

13    available in the United States for serious conditions, no more

14    than a three-month supply of drugs, and again at the end of the

15    day, what this pertains to is policies that the FDA has in place

16    for drugs for personal use.

17              There is no evidence in this case of any shipments of

18    drugs that came through LAX were for personal use.

19              THE COURT:  I don't really see the relevance.

20              MS. RHEE:  Your Honor, we have gone over this multiple

21    times, but, for example, in the policy itself, it specifically

22    states it generally does not represent more than a three-month

23    supply, but as the document sets forth only guidance, it is not

24    a requirement --

25              THE COURT:  It's still a requirement for personal use.
```

*UNITED STATES DISTRICT COURT*

```
 1    The three-month limitation relates to a personal use limitation.

 2         MS. RHEE:  Right.  Your Honor, our argument is that

 3    personal use is interpreted in various different ways.  It could

 4    be interpreted in a different way in this case.  For example, on

 5    the Customs form itself, it defines as commercial use anything

 6    that is not for personal use.  So technically even Ms. Yip

 7    bringing home gifts could constitute commercial use.

 8         So our argument really is that personal use,

 9    commercial use in this context have very, you know -- they are

10    terms of art --

11         MR. GLUCK:  May --

12         THE COURT:  Only one of you gets to argue.

13         MR. GLUCK:  I'm sorry.

14         MS. RHEE:  May I consult with him?

15         THE COURT:  Not at the sidebar, not with this limited

16    amount of time.  I am going to sustain the objection.  In any

17    event, the policy on the face of it and I think really the

18    Court's -- the Court will sustain the objection just based on

19    the relevancy issue because --

20         MS. RHEE:  Your Honor --

21         THE COURT:  I am not persuaded by the distinction

22    that -- the argument you are making trying to raise a

23    distinction between personal use and commercial use, but even on

24    the first page of the document --

25         MS. RHEE:  Your Honor, it says that all of these are
```

*UNITED STATES DISTRICT COURT*

1   just discretionary factors.  It says that they are not meant to

2   be binding.

3          MS. RHEE:  It specifically says the factors noted in

4   the guidance are not mandatory requirements.  They are intended

5   to guide.

6          THE COURT:  It also says this guidance document is not

7   a license for individuals to import unapproved and therefore

8   illegal drugs for personal use into the U.S.  It even --

9          MS. RHEE:  But --

10         THE COURT:  Let me finish.  Even if all the factors

11  noted in the guidance are present, the drugs remain illegal and

12  the FDA may decide that such drugs should be refused to enter.

13  This is clearly a policy that relates to personal use.  The

14  objection is sustained.

15                 (Sidebar conference ended.)

16         MS. RHEE:  May I have a minute, Your Honor?

17              (Defense counsel confer off the record)

18                      CROSS-EXAMINATION

19  BY MS. RHEE:

20  Q.   Good afternoon, Ms. Thomas.

21  A.   Hello.

22  Q.   You are the supervisor of the FDA office at Los Angeles

23  International Airport; is that correct?

24  A.   Yes.

25  Q.   And when you were testifying earlier, you stated that you

```
 1  and the officers below you interact daily with Customs; is that
 2  correct?
 3  A.    Yes.
 4  Q.    But by that, you -- what did you mean by that?
 5  A.    I mean that throughout the airport operations area, we have
 6  constant contact with Customs either on the phone or in certain
 7  other facilities where we work side by side with them.
 8  Q.    But by that you didn't mean that the FDA agents who work in
 9  your particular office go to the passenger terminal on a daily
10  basis and screen all the passengers arriving from overseas
11  directly; correct?
12  A.    No.  We are not stationed at the passenger terminals.
13  Q.    So to the extent that you interact with the Customs, you
14  interact with them on an as-needed basis, but it's not as though
15  you are actually at the arrival terminals screening passengers?
16  A.    Not at the baggage terminals, no.
17  Q.    And, in fact, the only time the FDA offices at the airport
18  get involved with passengers is when Customs chooses to make a
19  referral; is that correct?
20  A.    Yes.
21  Q.    So the FDA post entering warehouse procedures that you
22  testified about just now, those only kick in if and when Customs
23  makes the referral; is that correct?
24  A.    Yes.
25  Q.    And the same is true of the requirement that formal entry
```

UNITED STATES DISTRICT COURT

```
 1    be made of medicines; is that correct?  That that kicks in after
 2    Customs makes the referral?
 3    A.   Are you speaking specifically about passenger and baggage?
 4    Q.   Yes.  I am speaking specifically about passengers arriving
 5    from overseas.
 6    A.   We would only request -- FDA would only request a formal
 7    entry after Customs has referred the shipment to us, if it is
 8    only coming in through passenger or baggage.
 9    Q.   So, in other words, you don't require Customs to formal
10    enter any and all medicines that they might encounter when
11    they're screening -- when they are, you know, pre-screening
12    passengers; it's just the passengers that they decide to refer
13    to your office for further assessment?
14    A.   We don't require Customs to do anything.  They are a
15    separate agency.  They do enforce our laws.
16    Q.   And then with respect to the -- but the formal entry -- so
17    it's something that you request that Customs do after they have
18    made a referral?
19    A.   Yes.
20    Q.   Because you don't -- I believe you testified earlier it's
21    because you don't hold the passenger.  You process it after
22    they've left?
23    A.   Yes.
24    Q.   So Customs officers are the ones who take the first cut, so
25    to speak, at determining whether medicines can come into the
```

*UNITED STATES DISTRICT COURT*

1  country?

2  A.    Again, are we speaking -- in what mode of transportation

3  are you discussing?

4  Q.    Thank you.  I'll just clarify it.  All of my questions will

5  be directed at just passengers arriving from Los Angeles

6  International Airport on commercial airlines.

7  A.    Passengers and baggage.

8  Q.    Yes.  --

9  A.    They are very specific differences in how we approach

10  different modes of transportation is why I am trying to be

11  specific.

12  Q.    Yes.  So then all my questions will be about passengers

13  arriving from overseas with baggage, yes.

14  A.    Okay.

15  Q.    So should I repeat the question?

16  A.    Please do.

17  Q.    Of course.  My question was Customs officers are the ones

18  who take the first cut at determining whether medicines they

19  encounter when dealing with passengers arriving on commercial

20  airliners with baggage -- they get to decide whether the --

21  those medicines can come into the country --

22  A.    Yes.

23  Q.    -- at the airport?  And any medicines that Customs decides

24  at that point should come in get through without your hearing

25  about it; right?

```
1    A.    Normally, yes.

2    Q.    And that can include foreign medicines that Customs decides

3    to allow in; correct?

4              MR. BEHNKE:  Objection.  Calls for speculation.

5              THE COURT:  Sustained.

6              MS. RHEE:  May I have a minute, Your Honor?

7              THE COURT:  Yes.

8                  (Counsel confer off the record)

9    BY MS. RHEE:

10   Q.    Are you aware that Customs allows any medicine at all to

11   enter the country?

12   A.    I leave those determinations up to the Customs office

13   officials at the passenger cargo.  I don't want to make any --

14   I'm not there, so I don't know exactly what is being done.

15   Q.    So you're not there and if -- but if a Customs officer at

16   first blush dealing with a passenger with baggage has found

17   medicines or the passenger shows -- declares the medicines, that

18   Customs officer has discretion to examine those medicines on the

19   spot and make a determination as to whether or not they are

20   admissible; is that correct?

21   A.    I -- I can't tell you what the Customs officer has

22   discretion on because I am not privy to what their -- what their

23   supervisors require of them.

24   Q.    Well, with respect to the FDA requirements then, with

25   respect to whatever it is the FDA has delegated to Customs, your
```

*UNITED STATES DISTRICT COURT*

1    understanding is that that gives Customs officers discretion?

2    A.    If delegated to Customs, yes.

3    Q.    But you're just saying you don't know what their

4    supervisors then tell them to do with it?

5    A.    Correct.

6    Q.    Okay.  But with respect to what the FDA itself requires,

7    your understanding is that the FDA gives Customs officers the

8    discretion to decide at the first encounter whether or not drugs

9    are admissible?

10              MR. BEHNKE:  Objection.  Asked and answered and lack

11   of foundation.

12              THE COURT:  Sustained.

13              MS. RHEE:  May I have a minute, Your Honor.  I think

14   I'm --

15              THE COURT:  You may.

16              (Defense counsel confer off the record)

17              MS. RHEE:  Nothing further, Your Honor.

18              THE COURT:  Thank you.  Redirect examination?

19              MR. BEHNKE:  No questions, Your Honor.  Thank you.

20              THE COURT:  Thank you.  You may step down and the

21   Government may call its next witness.

22              MR. WIDMAN:  Your Honor, the next witness relates to

23   the matter we discussed outside the presence of the jury during

24   the morning session.

25              THE COURT:  Well, there were several of those.

*UNITED STATES DISTRICT COURT*

```
1              MR. WIDMAN:  Concerning records.

2              THE COURT:  What's the witness's name?

3              MR. WIDMAN:  Commander Melisa Armijo.

4              THE COURT:  Fine.  You can approach.

5                   (Sidebar conference commenced.)

6              THE COURT:  I'm sorry.  What I meant was there was

7    more than one subject we discussed.

8              MR. WIDMAN:  I didn't want to --

9              THE COURT:  I reviewed the documents.  There are no --

10   there is -- I reviewed all of them as to Cuevas, Armijo and the

11   training documents.  There is nothing in the personnel records

12   of either Cuevas and Armijo to -- that come within -- I think

13   everything has been turned over, but there is nothing to be

14   turned over or discovered.  There is nothing that is

15   discoverable.

16             MR. GLUCK:  So that's to say they never received

17   training on the FDA --

18             THE COURT:  That's as to the commendations, the

19   discipline.

20             MR. GLUCK:  He has worked for the government and

21   hasn't received the --

22             THE COURT:  Within the -- training accommodations,

23   etc.  We don't need to see all the medical exams.

24             MS. RHEE:  No, absolutely.

25             THE COURT:  You are not asking for it.  As to the
```

```
 1    basic -- the Government has received the -- with regard to the
 2    training, it wasn't exactly what I thought I was getting or was
 3    asking for.  I'm not sure what I remember I told you to give me.
 4          MR. WIDMAN:  I wrote it into an email.
 5          THE COURT:  What I have here is what -- the training
 6    that Cuevas got.
 7          MR. WIDMAN:  There is one for Ms. Armijo as well.
 8          THE COURT:  There is?
 9          MR. WIDMAN:  I believe so.
10          THE COURT:  I think I only got Cuevas.
11          MR. WIDMAN:  This is Armijo.  I don't believe this is
12    all I gave Your Honor.
13          THE COURT:  No.  There is one other packet.  That's
14    right.  That's right.  But other than the general -- it shows
15    what the training -- it shows the training classes she went to
16    which are just the very basic the physical condition, the
17    training about --
18          MR. WIDMAN:  How --
19          THE COURT:  What you are allowed to do in terms of
20    carrying a weapon, things like that.  Personal protection and so
21    forth.  How to -- how to control a subject.  Whether they are
22    compliant and how to control when non-compliant which I would
23    like to go to someday, and the Practical Pistol Course, but I --
24    I don't think any -- it just shows that she has attended those
25    basic courses.  There is nothing in here that indicates any
```

```
1    specific training in the areas of the importation of these
2    controlled substances.  I think, if I remember correctly, that
3    that was what I wanted to be ordered turned over.  I don't see
4    anything that indicates they took specialized training.
5              MR. GLUCK:  That's correct as far as Armijo goes.  I
6    should point out I'm not sure how long Agent Armijo is going to
7    be on the stand, but I was told that cross of Armijo was not
8    going to be today.
9              THE COURT:  It looks like it might.  Do you have any
10   other witnesses today?
11             MR. WIDMAN:  No.  But it's going to be a lengthy
12   witness.
13             MR. GLUCK:  I was up at 3:00 this morning.  I just
14   went to sleep.
15             THE COURT:  Your not prepared to --
16             MR. GLUCK:  I am not prepared to cross Agent Armijo
17   this afternoon.
18             THE COURT:  You don't have any other witnesses here
19   today?
20             MR. WIDMAN:  Ms. Armijo is a substantial witness, and
21   I think it will take some time.
22             THE COURT:  All right.  I won't let you or make you do
23   your cross today.
24             MR. GLUCK:  Thank you, Your Honor.
25                  (Sidebar conference ended.)
```

UNITED STATES DISTRICT COURT

```
 1                    THE COURT:  So Ms. Armijo can come in.
 2               MR. WIDMAN:  The United States calls Commander Melisa
 3   Armijo.
 4               THE COURT:  Let's put on the record that we just
 5   reached -- that we will have no more sidebars during the course
 6   of this trial so that you're not making me a liar in front of
 7   this jury.  Remember, I told them at the beginning of this case
 8   we don't have sidebars.  That's our last one; right?
 9               MR. GLUCK:  Yes, Your Honor.
10               THE COURT:  Thank you.
11               MR. WIDMAN:  Yes, Your Honor.
12               THE COURT:  Thank you.
13               MR. WIDMAN:  Your Honor, may I have permission to see
14   what's going on?
15                    (Mr. Widman leaves the courtroom)
16               THE COURT:  Next I am going to have to send you out to
17   find your colleague.  And then next will be Mr. Gluck to find
18   the two prosecutors.
19               THE CLERK:  Stand by the court reporter, please.
20   Please raise your right hand.
21          Melisa Armijo, Government's witness, was sworn
22               THE CLERK:  Please be seated.  Please state your full
23   name and spell it for the record.
24               THE WITNESS:  Melisa, middle initial C, last name
25   Armijo.  M-E-L-I-S-A, middle initial C, A-R-M-I-J-O.
```

*UNITED STATES DISTRICT COURT*

```
 1              THE COURT:  Thank you.  You may inquire.

 2                      DIRECT EXAMINATION

 3   BY MR. WIDMAN:

 4   Q.   Good afternoon.

 5   A.   Good afternoon.

 6   Q.   What is your title?

 7   A.   I'm a Chief Customs and Border Protection Officer.

 8   Q.   So it would be Chief Armijo?

 9   A.   Yes.

10   Q.   I realize the suspense has been eliminated, but where are

11   you employed?

12   A.   At Los Angeles International Airport.  I am employed by

13   Customs and Border Protection.

14   Q.   Can you please us your full time?

15   A.   Yes.  I am officer for United States Custom and Border

16   Protection.  I have been doing this job for about 18 years.

17   Actually this month makes 18 years.

18   Q.   What was your first position in Customs and Border

19   Protection?

20   A.   For the first four years, I did clerical for what was

21   formerly known as U.S. Customs, and then in 1995 I became an

22   officer for U.S. Customs, and we have now merged since.  After

23   9/11 we are now U.S. Customs and Border Protection.  So I'm a

24   Chief Officer.

25   Q.   So what was your first position as an officer?
```

1    A.    My first position was in passenger operations at the

2    Los Angeles Airport in the Tom Bradley International Terminal.

3    Q.    The Tom Bradley International Terminal.  Is that the only

4    international terminal at Los Angeles International?

5    A.    We have five international terminals at LAX.

6    Q.    Thank you.  So after -- you mentioned that you are in

7    passenger processing.  What was your next position?

8    A.    My next position was still within U.S. Customs.  I was on

9    the Anti-Terrorism Team for the Contraband Enforcement Team at

10   Los Angeles International Airport.  We inspected cargo.

11   Q.    Could you tell us what cargo is or how that is defined in

12   your world?

13   A.    Yes.  Cargo is the commodity that comes off the aircrafts

14   and in bulk quantity, and that would be anything from clothing

15   to handbags and things like that.  On a passenger aircraft

16   besides bringing passengers, they bring cargo which is the

17   merchandise.

18   Q.    So if a passenger is traveling on a commercial airliner and

19   he or she has bags with him or her, would you consider that

20   cargo?

21   A.    That would be personal effects for passengers.

22   Q.    Thank you.

23         So you mentioned that you worked in the -- examining

24   cargo.  What was your title in that role?

25   A.    I was a -- a Senior Officer.  That was my role.

UNITED STATES DISTRICT COURT

1   Q.   And what was your next position?

2   A.   My next position I was a supervisor and I went back into

3   the passenger environment.

4   Q.   When did you become a supervisor?

5   A.   In 2003.

6   Q.   And when you said you went back into, I think, you said the

7   passenger environment, what do you mean by that?

8   A.   I went back to processing passengers.  I moved from just

9   dealing with cargo, now we're dealing with passengers.  If you

10  were are an arriving passenger into the United States, I had an

11  opportunity to determine if you needed an examination on your --

12  your personal baggage that you were bringing back or yourself.

13  Q.   Were you working at any particular terminal or a variety of

14  terminals?

15  A.   We were assigned to any five terminals on any given day.

16  Q.   Were any of those terminals international terminals?

17  A.   They are all strictly international terminals for just

18  international passengers arriving into the United States.

19  Q.   Thank you.

20       What was your next position?

21  A.   In 2007 I was promoted to a Chief Officer.

22  Q.   What does that involve?

23  A.   My current position is I am a watch commander at the

24  Los Angeles Airport.  There are two of us assigned to that

25  position.  On any given day, we have -- we supervise over 300

1    officers.

2    Q.    And what -- the officers you supervise, what are -- could

3    you just explain a little bit more about the operation that you

4    supervise?

5    A.    Yes.  There are several different areas that you can be

6    assigned to on any given day.  If you were an arriving passenger

7    into the United States, you would first come into an area that

8    we call primary processing.  That's where you would basically

9    hand over any document that you are bringing with you.  If you

10   are a U.S. citizen, you would hand over your U.S. passport, and

11   then we would process you.  So that's one process of -- of the

12   area that I supervise.

13          The next process would be baggage inspection.  From

14   that point we can inspect your baggage.  The next process after

15   that would be an agricultural inspection.  If you were selected

16   to have your baggage looked at for any type of agriculture

17   products, we would send you there.

18          Another area that we would send you to would be we

19   call it admissibility review.  If we needed to determine that

20   your documents were valid if you are not a U.S. citizen, we

21   would send you back to that area.

22          And the final area would be a Counter-Terrorism Team.

23   There we interview passengers for possibilities of connection to

24   terrorism.

25   Q.    Thank you.

```
 1              Could you generally describe for the jury what's the
 2   purpose of Customs and Border Protection at LAX.
 3              MR. GLUCK:  Objection.  This is not an expert witness.
 4              THE COURT:  The objection is sustained.
 5   BY MR. WIDMAN:
 6   Q.   Let's turn a little bit to the process for international
 7   travelers arriving at LAX.  What is the first step in that
 8   process?
 9   A.   I'm sorry?
10   Q.   What is the first step in that process?
11              MR. GLUCK:  Objection.  Because this is not an expert,
12   it needs to be narrowed.
13              THE COURT:  The objection is sustained.  You may
14   reword the question.
15              MR. WIDMAN:  Thank you, Your Honor.
16   Q.   Now, passengers arriving to the United States Customs at
17   Los Angeles Airport, Los Angeles International Airport, they
18   receive a declaration form on -- at some point, do they not?
19   A.   Every passenger receives a --
20              MR. GLUCK:  Objection.  Foundation.
21              THE COURT:  Overruled.  Refrain from leading
22   questions, however.
23              MR. WIDMAN:  Thank you, Your Honor.
24   Q.   I was asking about declarations.
25   A.   A Customs declaration is a form that's given to every
```

*UNITED STATES DISTRICT COURT*

1    passenger on the aircraft.  If you were traveling in a family

2    and -- an example, if you are a family of four, you would only

3    be required to fill out one Customs form, and you present that

4    form when you're processed on primary along with your passport

5    or any other documents that you have to admit yourself into the

6    U.S.

7    Q.    From whom do passengers receive the Customs form?

8    A.    Each airlines is responsible for passing out that form to

9    the passengers on the aircraft.

10   Q.    Thank you.

11         And I assume that is before or after the aircraft

12   lands?

13   A.    That has to be before the aircraft lands.

14   Q.    Thank you.

15         I would like to show you an exhibit which has already

16   been entered into evidence as Government's Exhibit 59, which I'm

17   now placing on the overhead projector.  Agent Crawford, has this

18   been entered into evidence?

19         THE AGENT:  It has.

20   BY MR. WIDMAN:

21   Q.    Do you recognize this, Chief Armijo?

22   A.    Yes.  That's a Customs form.

23   Q.    Okay.  And then it says here at the bottom -- there is a

24   date on it.  Do you see that?

25   A.    Yes.  That's the 01/04.  There is currently a new version

```
 1   of that that went out in '07.

 2   Q.    So what does this 01/04 refer to?

 3   A.    That was a valid form for that year and any year prior up

 4   until '07.  There is a new form.

 5   Q.    Okay.  And I'd like you to take a look in the binders,

 6   Binder No. 2 of 3 -- it may be that one that is open in front of

 7   you there.  I'm not sure.  Yeah.  That binder.  If you just look

 8   at the back of the binding of binder, you can figure out which

 9   binder it is.  The back of it.  This part.

10   A.    Oh, sorry.  Yes.  This one is 3 of 3.

11   Q.    Okay.  I think this should be in Exhibit 60.  So I think

12   that's in No. 2.  So it's not in that binder.  It's in the

13   binder that is labeled on the binding 2 of 3.

14   A.    Okay.  You I've got No. 2.

15   Q.    Please turn to Tab No. 60 which contains Exhibit No. 60.

16   A.    I'm there.

17   Q.    Okay.  Do you recognize that?

18   A.    Yes.  That's the Customs form.

19   Q.    Does it -- is there any difference in terms of the date of

20   the form than the one that we were just looking at?

21   A.    Yes.  That's the newer version which on here it's 10 of

22   '07.

23            MR. WIDMAN:  The United States moves to have

24   Exhibit 60 entered into evidence.

25            THE COURT:  Any objection?
```

*UNITED STATES DISTRICT COURT*

```
 1              MR. GLUCK:  We would ask for the same stipulation that
 2   we had for Exhibit 59.  In the scanning it appears that --
 3              THE COURT:  There is a pink line.
 4              MR. GLUCK:  Apparent pink -- well, not on your copy.
 5   Something is highlighted.
 6              MR. WIDMAN:  To the extent there is any pink line
 7   underneath that portion that says "residence," the Government
 8   and defendant stipulate that no such line appears on the
 9   original form.
10              THE COURT:  All right.  With that stipulation and
11   understanding, ladies and gentlemen -- Exhibit 62 is it?
12              MR. WIDMAN:  60, Your Honor.
13              THE COURT:  -- is ordered admitted and you may
14   publish.
15              MR. WIDMAN:  Thank you.
16              (Government's Exhibit 60 was received.)
17   BY MR. WIDMAN:
18   Q.   Can you please explain to the jury the significance of this
19   number down at the bottom.
20   A.   CBP Form 6059B -- the CBP is for Customs and Border
21   Protection, and our form number is 6059, B which refers to the
22   Customs declaration, and the date 10/07 that is the current form
23   that the airlines have to give to the passengers while they are
24   on board the aircraft prior to entering our facility.
25   Q.   Thank you.
```

```
 1              Now, let's take a look at the form.  I'll use this one
 2   because it doesn't have the pink line.  Let's take a look at
 3   this portion of the form concerning -- I will let you tell us
 4   what it's concerning.
 5              Starting on Lines 10 to 14, can you tell us what
 6   these -- what these involve?
 7              MR. GLUCK:  Objection, Your Honor.  This is not an
 8   expert, and her understanding is irrelevant.
 9              THE COURT:  The objection is sustained.
10   BY MR. WIDMAN:
11   Q.   I'd like you to take a look at No. 14.  I have or we have
12   commercial merchandise, articles for sale, samples used for
13   soliciting orders or goods that are not considered personal
14   effects, and then to the right you see "yes" or "no."  What
15   happens if someone checks a "yes"?
16   A.   If a "yes" is checked on that, if you're saying you have
17   commercial merchandise, a lot of times we'll have people that
18   are a businessman that is bringing back a lot of times -- an
19   example that I will use will be shoes.  If someone is bringing
20   back shoes, there is a law that if you are bringing more than
21   $2,000 of shoes, that's considered a commercial shipment, but
22   you can also bring a commercial shipment in for under $2,000 of
23   any type of commercial merchandise, but you would consider it
24   commercial.
25              So at this point, if this -- if somebody was bringing
```

```
 1    shoes in, it would have to be -- you would only be allowed to
 2    bring in one type of shoe, and it would have to have a hole in
 3    it, and we would consider it commercial.  And it can be any type
 4    of commodity.
 5           Another example would be if you -- you were a jeweler
 6    and you brought in gems, then you were bringing gems back for
 7    business, that would be considered commercial.
 8    Q.    Thank you.
 9           Turning now to this portion here No. 15, residence,
10    the total value of all goods, so on and so forth that I or we
11    have acquired or brought and are bringing to the U.S., and then
12    there is a dollar figure and a blank space.  Now, what is the
13    significance if someone -- what is the significance of the
14    number that is listed there to the declarations process?
15           MR. GLUCK:  Same objection as earlier.
16           THE COURT:  To the -- the objection is sustained to
17    the question in the -- the objection is sustained.
18    BY MR. WIDMAN:
19    Q.    Can I ask you this.  What are passengers supposed to write
20    there?
21           MR. GLUCK:  Objection.  Same objection.  Percipient
22    witness.
23           THE COURT:  The objection is sustained.
24    BY MR. WIDMAN:
25    Q.    What happens if a passenger enters something there, a value
```

*UNITED STATES DISTRICT COURT*

```
 1  greater than $2,000?
 2          MR. GLUCK:  Same objection.  Calls for speculation.
 3          THE COURT:  Overruled.
 4          MR. WIDMAN:  Well, do you know -- excuse me,
 5  Your Honor.
 6  Q.   Do you know what happens if a passenger lists a declaration
 7  $2,000 or greater?
 8  A.   Yes.  Then we would consider that higher than just the
 9  commercial value that you can carry as a passenger into the
10  passenger environment, and from that point, we would ask you to
11  get -- to post enter it, get an informal type entry or a formal
12  entry for that based on the value of the goods that you are
13  bringing back in.
14  Q.   You said post enter.  What did you mean by that?
15  A.   Because you would need a broker to clear your shipment
16  based under laws for Customs and Border Protection.  The 2,000
17  now is that considered a commercial shipment, so it's not the
18  value that you can bring into a passenger not environment.  So
19  that would be more of a type of shipment that you were bringing
20  in on an aircraft for cargo.
21          So we would post enter that for the airlines.  That
22  means the airlines is responsible for bonding whatever you were
23  bringing in with you that day as far as merchandise.  Not your
24  personal effects, but the stuff that we're considering the
25  commercial merchandise, and the airlines would come over, we
```

*UNITED STATES DISTRICT COURT*

Case 5:08-cr-00172-VAP   Document 156   Filed 05/08/09   Page 51 of 121   Page ID #:1617

51

1    would fill out a form, they would take your information down as

2    far as you name and your address, and the airlines would be

3    responsible for taking your shipment and holding it in their

4    warehouse until you actually obtained a broker to help you clear

5    that, or in some cases you can clear that yourself with the help

6    of a Customs agent.

7    Q.   Thank you, Chief Armijo.

8              There is a lot of terminology that you used there.  I

9    am going to ask you to explain a couple of the terms you used.

10   You used the phrase "post entered."  What did you mean by that?

11   A.   That we're -- we're entering your goods after the fact of

12   you arriving in.  So it's being held.  That's just the name of

13   the form.  It's called a post entry.

14   Q.   It means the passenger already left the airport, but

15   whatever they were trying to bring across is still there?

16   A.   Yeah.  It would no longer stay with us in the passenger

17   environment.  We would turn it over to the airlines that brought

18   you into the U.S.

19   Q.   But the passenger leaves the airport without his or her --

20   A.   Merchandise.

21   Q.   -- merchandise.  And you mentioned a broker.  What did you

22   mean by that?

23   A.   There are Customs brokers that you can obtain to help you

24   facilitate your cargo shipments through U.S. Customs and based

25   on an entry that they have to file.

*UNITED STATES DISTRICT COURT*

1    Q.    Thank you.

2          Now, based on your experience working at Los Angeles

3    International Bradley Terminal, do you know whether passengers

4    are required to complete this form?

5          MR. GLUCK:  Objection.  Same objection as earlier.

6          THE COURT:  The objection is overruled.

7    BY MR. WIDMAN:

8    Q.    Now, you told us about your experience working at

9    Los Angeles International Airport, did you not?

10   A.    Yes.

11   Q.    Do you know, based on that experience, whether or not

12   passengers are required to complete a declarations form?

13   A.    Your first process is you would see a primary officer, and

14   the forms -- and the documents that you should have when you see

15   a primary officer is your passport and your Customs form.  If

16   you do not have a Customs form, we send you back over to the

17   airlines to assist you to help you fill out this form.  If you

18   don't have one in your possession, then we have some that are

19   available in our area for you to fill out.

20         THE COURT:  All right.  Just a moment.

21         MR. GLUCK:  Objection to the narrative, Your Honor.

22   The non-responsive and --

23         THE COURT:  The objection is sustained because the

24   question -- actually the witness's answer was not responsive to

25   the question about the declaration form.

*UNITED STATES DISTRICT COURT*

```
 1            MR. WIDMAN:  Thank you, Your Honor.
 2   Q.    Chief Armijo, my question is do passengers -- if a
 3   passenger is coming into the country from overseas on an
 4   airplane coming into Bradley Terminal or -- Bradley Terminal,
 5   are they required to fill out one of these forms?
 6   A.    Yes.
 7   Q.    Is it possible that they could get through the Customs
 8   system there --
 9   A.    No.
10   Q.    -- without filling one out?
11   A.    No.
12   Q.    And they are required to sign the form; is that right?
13   A.    Yes.
14   Q.    Okay.  So the passenger receives the form on the airplane.
15   Who do they give the form to?
16            MR. GLUCK:  Objection.  Same grounds as earlier.
17            THE COURT:  The objection is overruled.
18   BY MR. WIDMAN:
19   Q.    Who does -- first of all, let me ask you this.  Let me ask
20   that question again.
21            Who does a traveler coming in give that form to?
22   A.    That form is seen by several processes through the -- the
23   international airport that you're in, so the first officer that
24   would see it would be the primary officer and the last officer
25   to see that would be the officer at the exit point prior to
```

UNITED STATES DISTRICT COURT

1    departing the Federal Inspection Area.

2    Q.    Thank you.

3          And just for purposes of clarification, I realize I

4    refer repeatedly to Bradley Terminal at LAX.  These procedures

5    regarding Customs and what -- your testimony, does it apply to

6    only Bradley Terminal or does it apply to the other

7    international terminals at LAX Angeles Airport?

8    A.    It would apply to all five terminals at Los Angeles

9    Airport, international airport in our facility.

10   Q.    Does your supervisory responsibility extend only to Bradley

11   or does it extend to other international airports at LAX?

12   A.    I am responsible for all five terminals.

13   Q.    Thank you.

14          Now, you mentioned the first person that the passenger

15   gives the form to.  Who was that?

16   A.    That's the primary officer.

17   Q.    Where does the passenger see the primary officer?

18   A.    That's the first officer they will encounter into the

19   Federal Inspection Area.

20   Q.    Okay.  I would like to show you a few pictures and ask you

21   a few questions about them.

22   A.    Yes.

23   Q.    I'd like you to look into the very first binder of 3.

24   Exhibit 61.  Excuse me.  I am told that it's actually Binder 2.

25   Can you take a look at Exhibits 61-A through 61-T.  Just briefly

1   look them over and familiarize yourself with them.

2   A.    I've looked them over.

3   Q.    Okay.  Do they appear to be locations just outside and

4   inside of Los Angeles -- LAX's Bradley Terminal?

5   A.    Yes.

6   Q.    Do they fairly and accurately represent what they purport

7   to represent?

8   A.    Yes.

9   Q.    Thank you.

10          Your Honor, the United States moves to have Exhibits

11   61-A through 61-T entered into evidence and for permission to

12   publish.

13          MR. GLUCK:  Your Honor, to the extent these exhibits

14   are going to be described and discussed by the witness, we don't

15   object to any of them.  To the extent they're not, we don't

16   think that they ought to be just bulk admitted into evidence.

17          THE COURT:  Well, counsel -- well let's just solve it

18   like this for the moment.  Are you going to ask her some

19   questions about this exhibit?

20          MR. WIDMAN:  Yes.  I intend to ask her a question

21   about each and every picture in this pile.

22          MR. GLUCK:  Then we have no objection.

23          THE COURT:  Fine.  That's Exhibit --

24          MR. WIDMAN:  61-A through 61-T.  For the record, I

25   left out 61 plain.

```
 1            THE COURT:  All right.  Thank you.  61-A through T are
 2    ordered admitted, and you may publish.
 3            MR. WIDMAN:  Thank you, Your Honor.
 4        (Government's Exhibits 61-A through 61-T were received.)
 5    BY MR. WIDMAN:
 6    Q.    I am now placing on the overhead protector Exhibit 61-A.
 7    What is -- what does this appear to be, Chief Armijo?
 8    A.    That's the jetway.  That would be the entry or exit that is
 9    pulled up to the aircraft in order for you to deplane the
10    aircraft.
11    Q.    So when a passenger gets off the airplane, they walk
12    through something like this or this?
13    A.    Yes.
14    Q.    Thank you.
15            And at that point, the passenger has the declaration
16    form with them?
17    A.    Yes.
18    Q.    Thank you.
19            I'm now placing on the overhead projector
20    Exhibit 61-B.  Could you please -- could you please tell the
21    jury what we're looking at here.
22    A.    That's just another area into the Federal Inspection Area.
23    Q.    Is that near the jetway we were just talking about?
24    A.    It's after the jetway.
25    Q.    Thank you.
```

*UNITED STATES DISTRICT COURT*

```
 1              Now turning to Exhibit 61-C, what are we looking at
 2    here?
 3    A.    That's the corridor that will lead you into the Federal
 4    Inspection Area.
 5    Q.    Thank you.
 6              And turning now to Exhibit 61-D, could you please tell
 7    us what this is.
 8    A.    That's the same picture that you have seen prior but with
 9    passengers.
10    Q.    Okay.  And what is this -- what is on this sign right here?
11    A.    Those are gates to where the gates are, depending on what
12    gate you block on.
13    Q.    That's designed for passengers traveling in the opposite
14    direction; is that right?
15    A.    No.  That would be on the arrival area, but these are just
16    for all passengers arriving in.  Some of the numbers for those
17    are for when our officers have to respond to the gates, they can
18    see which way to go.
19    Q.    Okay.  I understand.  So when you said "our officers
20    respond to the gates," you mean when CBP officers -- what did
21    you mean by that?
22              MR. GLUCK:  Objection.  Relevance.
23              THE COURT:  Sustained.
24    BY MR. WIDMAN:
25    Q.    I am putting this picture on -- this is 61-E like "Edward."
```

UNITED STATES DISTRICT COURT

1    What are we looking at here?

2    A.    That is signage located in the corridor prior to entering

3    the FIS area.

4    Q.    When you say FIS, what do you mean?

5    A.    The Federal Inspection Area.

6    Q.    And is that where U.S. Customs is located, in the Federal

7    Inspection Area?

8    A.    Yes.

9    Q.    Let's take a look at this one now.  Okay.  Now, where is

10   this sign located?

11   A.    We -- we have several of those signs located throughout the

12   corridors because we have gates that start from 101 on one side

13   that end to 123 on the opposite side of the Tom Bradley

14   International Terminal, so those signs are visible for

15   passengers to see basically their way to get into the Federal

16   Inspection Area.

17   Q.    Thank you.

18         I'm now placing Exhibit 61-G on the overhead

19   projector.  Now, is this the same sign we were just looking at?

20   A.    Yes.

21   Q.    And where is this sign located?

22   A.    There is two in the -- on each corridor, north side and

23   south side of the Tom Bradley International Terminal.

24   Q.    Thank you.

25         Okay.  I'm placing Exhibit 61-H on the overhead

*UNITED STATES DISTRICT COURT*

1   projector.  And could you please explain or tell the jury what

2   we are looking at here.  I'm going to auto focus this.  Okay.

3   What are we looking at here?

4   A.   It's the same corridor.  It's just the end of the corridor

5   so you will almost be nearing the Federal Inspection Area.

6   Q.   Now, what is this that I'm pointing to here, the middle of

7   the picture?

8   A.   That's more signage for passengers.

9   Q.   Now, is that the same exact sign we were just looking at?

10  A.   It's one of the same.  That's an older version.

11  Q.   They appear in the same hallway?

12  A.   Yes.

13  Q.   The Government -- I'm placing on exhibit -- placing on the

14  overhead projector Exhibit 61-I.  It's a little closer look.

15  Let me ask you, what is this?

16  A.   That's an older version of the sign because the Bradley

17  Terminal has been under construction so that hasn't been updated

18  to the blue version that you saw earlier.

19  Q.   Thank you.

20       Now I'm placing Exhibit 61-J on the overhead

21  projector.  Is this the same sign that we were just looking at?

22  A.   It's the same sign, old version.

23  Q.   Old version.  When you say old version, is this sign still

24  at Los Angeles International Airport, Bradley Terminal today?

25  A.   I'm not sure if they finished that section of the corridor

1     so it could be replaced by the blue version.

2     Q.    I'm now placing on the overhead projector Exhibit 61-K.

3     Can you tell us what this is?

4     A.    It's the same sign.

5     Q.    That we were just looking at?

6     A.    Yes.

7     Q.    Is this the older version?

8     A.    That's the old version.

9     Q.    Okay.  I'm now placing exhibit -- well, actually I'll hold

10    off on that for a moment.

11          Once you get to the end of the hallway, what happens

12    next?

13    A.    You'll either come --

14          MR. GLUCK:  Objection.  Vague.

15          THE COURT:  Sustained.

16          MR. WIDMAN:  Thank you, Your Honor.

17    Q.    Where does the passenger go after the hallway ends?

18    A.    It leads to stairs or an escalator that will take you down

19    into the Federal Inspection Area.

20    Q.    Now, the Federal Inspection Area, are there different

21    lines, or is everyone in the same line?

22    A.    There are several -- there are two lines, one for U.S.

23    citizens and one for non-U.S. citizens.

24    Q.    Thank you.

25          Now, when people stand in that line, what do they do?

UNITED STATES DISTRICT COURT

1    Do they do anything there, or do they just wait?

2    A.    That's where you get admitted into the United States.

3    Q.    I'm going to place on the overhead projector Exhibit 61-L.

4    Could you please tell us what we're looking at here.

5    A.    Those are the lines that you will enter prior to seeing an

6    officer before you -- before you're processed into the

7    United States.

8    Q.    Okay.  Now, is this the line, if you can tell, for U.S. --

9    for U.S. citizens or non-U.S. citizens?

10   A.    The signage there says U.S. citizens.

11   Q.    Thank you.

12         And this is now Exhibit 61-M.  Can you please tell us

13   what we see here.

14   A.    That's the Federal Inspection Area and the signage area for

15   U.S. citizens.

16   Q.    Now, would this be the first line that passengers get on

17   after they get off the airplane?

18   A.    Yes.

19   Q.    And who do they -- what is the purpose of standing in that

20   line?  What happens at the end of the line?

21   A.    The end of the line is actually the beginning of the line

22   for us.  You'll see a primary officer where again you will be

23   admitted into the United States or be referred to a secondary

24   area if you are not admitted into the United States.

25   Q.    And are you required to present anything to the -- let me

UNITED STATES DISTRICT COURT

```
 1   ask you -- strike that.
 2           Do you see any CBP representative once you get to the
 3   end of that line?
 4   A.   Yes.  You will see a -- each passenger sees a CBP officer
 5   to be processed into the United States.  You have to produce
 6   your U.S. passport, or if you are not a U.S. citizen, the
 7   passport that you are bringing into the country that day, and
 8   you have to have your Customs form with you.  And if you are a
 9   U.S. citizen, those are the only two documents you would need.
10   If you are not a U.S. citizen, you would need another form
11   called an I-94.
12   Q.   Okay.  For purposes of my question today, I'm focused only
13   on U.S. citizens arriving -- returning to the United States from
14   abroad.  Okay?
15   A.   Yes.
16   Q.   Is the -- other than the declaration and the passport, is
17   the traveler ever asked to provide additional information at the
18   primary inspection point?
19   A.   Yes.  If their -- if their Customs form is not completely
20   filled out, they'll be asked to -- those questions that are on
21   the form, and they will be asked to complete that form prior to
22   being processed.
23   Q.   And what does the primary officer do during the inspection?
24   A.   He completes the initial inspection for you to be processed
25   into the United States.
```

UNITED STATES DISTRICT COURT

1    Q.    Okay.  Is there any decision-making that has to be made by

2    he or her -- he or she?

3    A.    Yes.  He determines either, one, you are admitted into the

4    United States from the point that he -- he or she sees you or he

5    can -- he or she can refer you at that point for an inspection.

6    Q.    An inspection by whom?

7    A.    An inspection by another CBP officer.

8    Q.    Do you know what the word "secondary" means?

9              THE COURT:  Why don't we take our afternoon recess

10   now.

11             MR. WIDMAN:  Certainly, Your Honor.

12             THE COURT:  Thank you.  Ladies and gentlemen, we will

13   take a recess for 15 minutes this afternoon until 3:15 by the

14   courtroom clock.

15             Remember, don't discuss the case, don't communicate

16   about the case or anything having to with the case, the

17   testimony of the witnesses, any of the other participants, don't

18   read any reports about the case, do any research about the case,

19   and don't make up your minds about the case or any issue

20   involved in the case.

21             Thank you.  You're excused.

22                        (Recess taken)

23                        (Jury Out)

24             THE COURT:  You may be seated.  Chief Armijo, you may

25   step down.  My law clerk is waiting outside or will be waiting

*UNITED STATES DISTRICT COURT*

```
 1   outside to take your picture so make sure she gets a chance to
 2   do that during the recess.  We're in recess.
 3                       (Recess taken)
 4                        (Jury In)
 5           THE COURT:  Let the record reflect the presence of all
 6   members of the jury, all counsel and the witness present.  You
 7   may continue.
 8           MR. WIDMAN:  Thank you, Your Honor.
 9   Q.  Chief Armijo, I believe before we took the break we were
10   talking about the primary inspection point.  Do you remember
11   that?
12   A.  Yes.
13   Q.  Now, after the primary inspection point, the passenger goes
14   to the baggage carousel; is that right?
15   A.  Yes.
16   Q.  I am placing on the overhead projector Exhibit 61-N in
17   evidence.  Could you please tell us what we're looking at here?
18   A.  Passengers waiting for their baggage.
19   Q.  Turning now to Exhibit 61-O, which I am placing onto the
20   overhead projector, what are we looking at here?
21   A.  Signage located up above a baggage carousel.
22   Q.  Does it appear on both sides of the carousel or only one
23   side?
24   A.  Both sides of the carousel.
25   Q.  Thank you.
```

1    Where does the passenger go after the baggage

2    carousel?

3    A.   They form another line to see a baggage screener, which is

4    another officer.

5    Q.   What does the baggage screener do?

6    A.   The baggage screener -- you'll hand your Customs form to

7    the baggage screener, and he will determined if you have

8    declared anything on that form.  If you say "yes" to an

9    agriculture product, he will refer you to agriculture secondary.

10   If you say "yes" to the currency question, he'll refer you to

11   baggage secondary.  If he determines that you haven't marked

12   anything on your dec, he can, one, either send you to the exit

13   or, two, he can still determine you warrant a secondary exam.

14   Q.   You mentioned dec.  What did you mean by that?

15   A.   I'm sorry.  Customs form.

16   Q.   Is "dec" short for "declaration"?

17   A.   Declaration, correct.

18   Q.   Now, aside from the information on the secondary, does the

19   officer have -- can the officer send them on their own

20   initiative somewhere to one of the secondaries?

21   A.   Yes.

22   Q.   What would make an officer do that?

23        MR. GLUCK:  Objection.  Not an expert witness.

24        THE COURT:  The objection is overruled.  The question

25   calls for the witness to state what her experience is in this

1    regard, or I am going to construe it that way and you should

2    construe, unless you are otherwise instructed, that the witness

3    is testifying about what her own experiences are in her

4    employment as an employee of the -- what was formerly the U.S.

5    Customs Service and now the Customs and Border Protection

6    Agency.

7    BY MR. WIDMAN:

8    Q.    In your experience, why would -- first of all, what is the

9    person called at the front of this line?

10   A.    It's a screener.

11   Q.    And they -- they work for Customs and Border Protection?

12   A.    It's an officer.  It's just another assignment that you can

13   be assigned to.

14   Q.    Okay.  Now, based on your experience, why would one of the

15   screeners send someone to one of the secondary examination

16   points that you mentioned?

17   A.    Based on my experience and actually my position as a

18   screener, before I would refer somebody to a secondary

19   examination, one, if you're coming from a country known for

20   maybe narcotics, I would refer you.  You if you have a lot of

21   travel based on looking at your -- your passport or if I am

22   trying to determine if you're carrying currency more than

23   $10,000 and you're not reporting it, I would refer you for a

24   secondary exam, or I can also send you to agriculture even if

25   you have answered "no" to the agriculture question and I feel

1    that you warrant an examination.

2    Q.    What do they do at agriculture?

3    A.    They look for prohibited fruits, meats, plants or

4    vegetables.

5    Q.    I am going to place on the overhead projector Exhibit 61-P

6    entered into evidence already.

7              Can you please tell the jury what we are all looking

8    at here?

9    A.    Sure.  It's a baggage carousel, and in the stanchions where

10   the passenger is standing, from that point he is into a line

11   where he will reach the baggage screeners which are the officers

12   that are in the podiums.

13   Q.    Could you please -- the screen actually is able to -- it's

14   like a touch screen so if you just touch, it you can indicate to

15   the jury where your referring to the stanchions?

16   A.    Sure.  These are stanchions here where you will form a line

17   and the passengers will proceed on to the baggage screeners.

18   There is one on each side and there are two located on the

19   opposite side, depending on which baggage carousel you are

20   using, and the screeners will be responsible for looking at your

21   Customs form and your passport to determine if you are going to

22   either exit or if they're going to refer you to a secondary area

23   which is located where the X is.

24   Q.    So when the person reaches the screening officer, they

25   have -- they already have their checked luggage; is that right?

A.    Yes, they do.

Q.    Turning now to Exhibit 61-Q, which I'm going to place on

the overhead projector -- by the way, Chief Armijo in order to

clear those pink marks -- there you go.

A.    Sorry.

Q.    Now taking a look at Exhibit 61-Q, could you please tell us

what this picture depicts.

A.    This is the picture just from the opposite angle.  These

are the baggage screeners.  You will actually see this woman

here is a flight attendant, and her form is being checked by the

baggage screeners.  These two officers are both baggage

screeners.

Q.    Okay.  Thank you.

      Turning to Exhibit 61-R, which I'm placing on the

overhead projector, what are we looking at here?

A.    This is the exit point out of the Tom Bradley International

Terminal, and when those passengers exit, they have to turn in

their Customs form prior to exiting the facility.  If you're

traveling by yourself, the form will say 1 on top.  If you're

traveling with a family of 4, the 4 -- a 4 should be written on

the top so it means that only 4 people will be allowed to exit

on that one declaration.

Q.    What's on the other side of the exit once you walk through?

A.    It's a hall that will lead you out to the public, and your

family are waiting for your arrival.

1    Q.    Thank you.

2          Turning now to Exhibit 61-C -- excuse me.   S.   61-S

3    like "Sam" which I'm placing on the overhead projector, what is

4    this?

5    A.    That's the agriculture secondary area.

6    Q.    Which I believe we already discussed.   Ordinarily is it

7    empty like this?

8    A.    No.

9    Q.    Thank you.

10         Turning now to Exhibit 61-T which I'm placing on the

11   overhead projector.   Chief Armijo, what are we looking at here?

12   A.    This is the baggage secondary area where you would have

13   your baggage inspected or your persons inspected.

14   Q.    Okay.   Now, during your time with the Customs and Border

15   Protections and formerly just Customs, did you ever have

16   occasion to be an inspector at secondary?

17   A.    Yes.

18   Q.    Baggage secondary?

19   A.    Yes.

20   Q.    During that time if a passenger was coming up to you, what

21   would happen?

22   A.    I would ask them for their passport and their Customs form.

23   You should always obtain those two documents, and then I would

24   get what I -- what you call an oral declaration.   It's just a

25   repeat of the questions that are on your Customs declaration.

```
 1   Q.   What do you mean?  Can you explain what you mean by the
 2   oral declaration?
 3   A.   Yes.  First you want to obtain ownership of the passenger's
 4   luggage.  The first question I would ask is, "Do these bags
 5   belong to you?"  The next question is, "Are you carrying
 6   anything for anybody else today?  Do you have any plants,
 7   fruits, meats or vegetables with you?"  You want to obtain the
 8   agriculture question.  You want to ask the currency question.
 9   "Are you carrying more than $10,000 with you?"  And the other
10   question would be, "Are all the goods you're bringing in
11   today -- belong to you and are they over $800?"
12             MR. GLUCK:  Objection on relevance as to this
13   particular witness and her experience.
14             THE COURT:  Well, what's the relevance as to the
15   agriculture section?
16             MR. WIDMAN:  The agriculture section mostly is just to
17   distinguish it from the baggage section.  It's not centrally
18   relevant.
19             THE COURT:  The objection is otherwise overruled.
20             MR. WIDMAN:  I'm sorry?
21             THE COURT:  The objection is overruled.
22             MR. WIDMAN:  Thank you.
23             THE COURT:  The witness's answer may stand.
24             MR. WIDMAN:  Thank you.
25   Q.   Had you completed your answer, Chief Armijo?
```

*UNITED STATES DISTRICT COURT*

1   A.   Yes.

2   Q.   Now, when you were conducting your secondary inspections,

3   did you rely on what the passenger was telling you?

4   A.   No.

5   Q.   How do you mean?

6   A.   Well, you did several things.  You obtained the declaration

7   and listened to the passenger's answers, and you also observed a

8   passenger to determine if you believed that the answers they

9   were giving you were truthful.  So from that point, besides

10  doing an oral interview, you also wanted to do an examination on

11  the luggage, the baggage that you're bringing in today, so we

12  would ask the passenger to open up.  If you're bringing two

13  bags, open up two bags, and we would inspect all the contents

14  inside the luggage and at times even the luggage itself for any

15  kind of contraband.

16  Q.   Did you always inspect all of the luggage?

17  A.   Not every single time.

18  Q.   Can you explain.

19  A.   As an officer, it's your determination if you feel that the

20  exam is finished after opening one bag and you believe that the

21  passenger is a valid passenger and they have no prohibited

22  items, you can end your examination from there and then let the

23  passenger proceed, or you can determine if you need to open all

24  the bags, or even at that point sometimes even search a

25  passenger to see if they have any prohibited items on them.

1    Q.    So how -- when you were the officer, how did you decide

2    whether to search all the bags or not?

3              MR. GLUCK:  Objection.  Relevance.  Not an expert.

4              THE COURT:  Sustained.

5    BY MR. WIDMAN:

6    Q.    Now, you mentioned the formal entry before.  I believe you

7    mentioned it in passing.

8    A.    Yes.

9    Q.    Do you remember that?

10   A.    Yes.

11   Q.    What did you mean by that?

12   A.    A formal entry -- while you were doing an examination on a

13   passenger if you determine that in that passenger's luggage on

14   one of its baggage is actually personal belongings but on the

15   other baggage they're bringing in T-shirts but it's a commercial

16   quantity of T-shirts, then we can post enter that, and from that

17   point, depending on the value of it, it would be considered a

18   formal entry or, one, an informal entry if it's under the value

19   but it still requires you to declare it.

20   Q.    And who decides whether a formal entry is necessary or not?

21   A.    You decide as an officer based on what you're taught as far

22   as the laws.

23   Q.    What -- when you were an officer, what did you do to

24   determine the value of items that were presented to you at

25   secondary?

```
 1              MR. GLUCK:  Same objection.
 2              THE COURT:  The objection is overruled.
 3   BY MR. WIDMAN:
 4   Q.   When you were an officer conducting secondary inspections,
 5   how would you determine the value of items in the passenger's
 6   possession?
 7   A.   Based on my experience, my training, I would determine the
 8   value is two hundred -- $2,000 limit for commercial merchandise.
 9   If it's under 2,000, you can clear it in your -- there on the
10   spot.  If it's more, then it would require for you to post enter
11   it.
12   Q.   Did you ever ask for any documentation?
13   A.   Yes.  You would actually ask for any type of invoices that
14   the passenger had in -- and if doing your inspection you
15   discovered any invoices, you can also use those if it matched
16   the merchandise that you were bringing in for that day.
17   Q.   Now, you mentioned the formal entry.  What did you do when
18   you decided a formal entry was necessary?
19              MR. GLUCK:  Same objection.  And relevance.
20              THE COURT:  Well, Mr. Widman, what's the relevance --
21   what are you offering this witness's testimony and experience --
22   for what purpose since she has not been designated to give
23   opinion testimony.
24              MR. WIDMAN:  It's to familiarize the jury with this
25   process, and so they -- I would be happy to explain it in
```

UNITED STATES DISTRICT COURT

```
 1   further detail at a sidebar, if the Court would want.

 2              THE COURT:  You didn't designate her as an expert.

 3              MR. WIDMAN:  That's true, Your Honor.  We believe that

 4   her experiences are relevant as a factual matter to the issues

 5   in this case.

 6              THE COURT:  The objection is overruled.

 7              Do you remember what the last question was?

 8              THE WITNESS:  No.

 9              THE COURT:  Would you ask the question again.

10              MR. WIDMAN:  Yes, Your Honor.

11   Q.   I believe the question was if you decide -- if, in your

12   experience, you decided that the -- a formal entry was required,

13   what would you do?

14   A.   If a formal entry was required, we would ask the passenger

15   to separate their personal belongings from the commercial

16   merchandise, and we'd call over the airlines to bring their

17   form.  It's called a post entry form, and the airlines would be

18   responsible for obtaining information from the passenger as far

19   as a valid address and telephone number.  From that point the

20   airlines would take possession of the commodity, and they would

21   post enter it into their warehouse.

22   Q.   In your experience as an officer, if you found items that

23   the passenger did not declare but should have, would you provide

24   any guidance?

25              MR. GLUCK:  Same objection, Your Honor.  It's a
```

*UNITED STATES DISTRICT COURT*

```
 1   percipient witness.
 2              THE COURT:  You may have a standing objection.
 3              MR. GLUCK:  Thank you.
 4              THE COURT:  Thank you.  The objection is overruled.
 5   BY MR. WIDMAN:
 6   Q.   My question, Chief Armijo, was based on your experience
 7   conducting secondary examinations of baggage, if you discovered
 8   that the passenger didn't declare something that he or she had
 9   acquired abroad, would you provide any guidance regarding that
10   issue?
11   A.   Yes.  If it was a prohibited type item -- for example, I
12   have seized narcotics based on being prohibited and not being
13   declared.  I have seized merchandise, counterfeit merchandise.
14   If you were bringing in a counterfeit purse that was a Gucci
15   purse and you were bringing more than three of them, we can
16   seize them.
17              You couldn't bring in counterfeit merchandise based on
18   trademark violations.  We have seized -- not seized prescription
19   drugs, but we have actually had prescription drugs.  Codeine is
20   a big commodity that comes in that we either seize or turn over
21   to another agency.
22   Q.   Thank you.
23              Based on your experience, does the officer have the
24   ability to indicate in the system that the person should be
25   subjected to baggage secondary in the future?
```

1   A.   Yes.

2   Q.   And what kind of record -- what do you call that record if

3   there is such -- if there is a name for it?

4   A.   We call it a TECS record.   Treasury Enforcement

5   Communications Systems Record.

6   Q.   That actually segues into the next topic that I wanted to

7   discuss with you which concerns record keeping at Customs and

8   Border Protection at the international terminals that you

9   supervise.

10          You mention the TECS.   System Treasury -- I'm sorry.

11   What does TECS mean again?

12   A.   Treasury Enforcement Communications Systems.

13   Q.   Okay.   Now what is that?   What is TECS?

14   A.   TECS is a variation of several different systems.   First

15   example would be if you're coming in and you're a passenger on

16   the airlines, I can go into the system and look at every

17   passenger that's coming in to the international terminal for

18   that day so that's one system.

19          Another system would be if you warranted a secondary

20   exam, I can check that system to see if you have any other prior

21   exams.

22   Q.   Okay.   Now, with respect to the declaration forms which we

23   were looking at the blank forms before, how long does Customs

24   and Border Protection at the airport retain those records after

25   the passenger has completed their travel?

*UNITED STATES DISTRICT COURT*

```
1   A.    Three years.

2   Q.    Where -- where are they ordinarily kept?

3   A.    The -- we keep our records at each -- at five -- five

4   international terminals that we have.  We keep them there, and

5   if after a few months it's too many boxes, we keep them in a

6   cold storage area in the Tom Bradley International area.

7   Q.    The declarations are kept in a cold storage area?

8   A.    Yes.

9   Q.    Now, if a duty is levied on a passenger, how long -- how

10  long is the passenger's declaration kept?

11  A.    I'm not sure of the approximate time, but those are longer

12  than three years.

13  Q.    How long are records of formal entries kept?

14  A.    Those are kept in the system for formal entries, so those

15  can be kept for -- for longer periods of time.  I can go back

16  and check something from 1999.

17  Q.    Okay.  So do you know of any cutoff where the records are

18  no longer available?

19  A.    No.

20  Q.    Now, if -- if the Customs officer detains items -- well,

21  actually -- in your experience as supervising and being an

22  officer at the international terminals at LAX, did you ever

23  encounter officials from the Food and Drug Administration?

24  A.    Yes.

25  Q.    In what circumstances?
```

UNITED STATES DISTRICT COURT

1    A.    Mostly for prescription medication.

2    Q.    Okay.  Now, if an officer -- if an -- if you detained items

3    for inspection by the Food and Drug Administration, FDA, would

4    any record of that be retained?

5    A.    No.  Just on paper.

6    Q.    Okay.  When I say any record retained, I mean anything on

7    paper, anything in the computer system.

8    A.    It can be both.  If you as you -- myself as an officer, if

9    I completed an examination on you, I can put remarks into a

10   secondary examination record stating that I had turned over any

11   commodity to any -- to any agency.  It's just tracking for

12   record keeping and future targeting.

13   Q.    Do you know of any cutoff where records regarding referrals

14   to the FDA are, you know, discarded?

15   A.    No.

16   Q.    If a passenger filed a formal entry for an item and the

17   item was not permitted into the country, how long would a record

18   of that be maintained?

19   A.    That would be in the -- in the TECS system so that could be

20   maintained for a long period of time.

21   Q.    Okay.  Now that we have gotten a little of that groundwork

22   out of the way, I would like to ask you a few questions about

23   your involvement in investigating or learning about this case.

24         Have you conducted any research into travel records in

25   this case?

A.    Yes.

Q.    What have you done?

A.    I have actually, based on a name that was provided to me --
I have conducted research as far as looking at travel in and out
of the country.  And I have also conducted secondary examination
records which means if you were sent to any type of secondary,
baggage secondary or agriculture secondary, I can pull up a
record to see what time you were processed and if your luggage
was examined and any remarks that were input by the examining
officer.

Q.    Have you of ever heard of something called the Automated
Commercial System?

A.    Yes.

Q.    And what is that?

A.    That's another system into the -- it's another system that
is used by us at Customs and Border Protection.  When you filed
an entry, a formal entry, we can go into the system and track
your system based on a record ID number that is produced by you,
or if you're clearing it by your name, then -- or even a social
security number.

Q.    Now, you mentioned that you did queries on different
people.  Did you do queries on the defendant in this case,
Dr. Patwardhan?

A.    Yes.

Q.    Did you do queries on Jessica Young?

```
 1    A.    Yes.

 2    Q.    Velma Yip?

 3    A.    Yes.

 4    Q.    Supriya Mhaskar.

 5    A.    Yes.

 6    Q.    Thank you.

 7          And in what systems have you conducted those queries?

 8    A.    The Treasury Enforcement Communications Systems, as well as

 9    the Automated Commercial System.

10    Q.    Now, in which systems are border crossings contained?  In

11    which system is border crossings records contained?

12    A.    That's in the Treasury Enforcement Communicates Systems.

13    Q.    And records regarding searches, arrests and seizures?

14    A.    Yes.

15    Q.    How do you mean?  I can repeat the question.

16          In which system is records regarding searches, arrests

17    and seizures maintained?

18    A.    That's in the Treasury Enforcement Communications System as

19    well.

20    Q.    Which system for secondary exam and information?

21    A.    The Treasury Enforcement Communications Systems.

22    Q.    What about commercial entries?

23    A.    That would be in the Automated Commercial System.

24    Q.    And have you ever heard of an query called SQAD?

25    A.    Yes.  That's in the Treasury Enforcement Communication
```

1    System.

2    Q.    What is that?

3    A.    That's an query on an address.

4    Q.    Okay.

5          I'd like to turn to certain documentation and ask you

6    some questions about it.

7          If I could just have a moment, Your Honor.

8          THE COURT:  You may.

9    BY MR. WIDMAN:

10   Q.    Chief Armijo, could you please peruse in your binders

11   Exhibits 46 and 47.  Okay.  Now, you have looked so far -- I

12   believe I asked you to look at Exhibits 46 and 47.  Have you

13   looked at those?

14   A.    Yes.

15   Q.    What do those appear to be -- excuse me.  What is

16   Exhibit 46?

17   A.    46 are what we consider border crossings, and that would be

18   your inbound flight and your outbound flight for a passenger.

19   Q.    And do these records -- does this record pertain to any

20   particular passenger?

21   A.    Yes.  Mr. Patwardhan.

22   Q.    And are these the records that you or someone acting on

23   your behalf pulled?

24   A.    Yes.

25         MR. WIDMAN:  Your Honor, the United States moves to

1  have Exhibit 46 entered into evidence.

2          THE COURT:  Any objection to Exhibit 46?

3          MR. GLUCK:  None, Your Honor.

4          THE COURT:  46 is ordered admitted.  You may publish.

5          MR. WIDMAN:  Thank you, Your Honor.

6          (Government's Exhibit 46 was received.)

7  BY MR. WIDMAN:

8  Q.   This exhibit is actually like 7 pages long, for the record.

9  Actually 8 pages.

10          Looking at the first sheet here, can you please

11  explain what we are all looking at here.

12  A.   Yes.  Again it says -- where it says crossing line, those

13  are what we call border crossings, and then it has this -- the

14  name of the passenger, and then it will go down to date of

15  birth, and then below is a time frame of the request made for

16  the crossings.

17  Q.   Do you recall who made this request?

18  A.   Yes.

19  Q.   Who was that?

20  A.   Agent Fernandez.

21  Q.   Do you know what agency Agent Fernandez is employed with?

22  A.   Yes.  He is with ICE, Immigration and Customs Enforcement.

23  Q.   Thank you.

24          Turning to Page 1, Bates stamped 2688, can you --

25  there is a lot of information apparently on this form.  Can you

1    try to explain to the jury what these different codes and what

2    this information means, maybe starting here with the top one.

3    A.    Yes.  Again, it's the passenger's name.  Below it the

4    5/26/08 would be the date of travel.  Sorry.  I'll try to point.

5    Right here, that's what they consider a location code.  Right

6    here Montreal.  If you look at the "I" right here, that's

7    relative because that's an inbound flight.  So -- and then this

8    part here says inbound to LAX coming from UYL so that's in

9    Montreal.  That's what we call an airlines code or country code.

10   Sorry.

11   Q.    Okay.  Now, turning to this next one that I just moved my

12   pen, the second entry, could you explain what those codes mean.

13   A.    Yes.  That would be passenger's name, that would be -- the

14   8/13/07 would be the travel date.  Coming back the "0" would be

15   an outbound flight, meaning from -- to Singapore, departing LAX.

16   Q.    Okay.  And this next one.

17   A.    Next one, passenger's name again.  8/19/07 is the inbound

18   date, date of travel.  "I" again is for an inbound flight.

19   Arriving airport would be LAX.  Departure airport, they left

20   Narita into LAX.

21   Q.    Now, who reports this information into the TECS?

22   A.    This information is transmitted by data transcribers based

23   on the Customs declaration and also the entry into the TECS

24   system.

25   Q.    By -- the entry into the TECS system, what do you mean by

UNITED STATES DISTRICT COURT

```
 1   that?

 2   A.    Every airlines is responsible for manifesting a passenger's

 3   name so when you reach a primary officer and your document is

 4   swiped, then you as an officer confirm if that passenger is on

 5   that flight or not.  So once you're confirmed, then that

 6   information transmits into the TECS communication system which

 7   produces this -- your border crossings.

 8   Q.    So the information in here comes from swiping people's

 9   passports and information provided by the airlines; is that

10   right?

11   A.    Yes.

12   Q.    Thank you.

13         I'd like to show you -- and I'm not going to walk

14   through every single entry in all these records with you.  I

15   would like to show you a couple on this page, though, however.

16         Let's take a look at this one right here.  Do you see

17   where I'm referring?  It's the bottom of the second page of the

18   report which is Bates stamped 2689.  Do you see that?

19   A.    Yes.

20   Q.    Could you please walk us through the dates of travel,

21   destination, etc., like you did before for the other records.

22   A.    Sure.  I'll -- I'll start from this entry here.  Subject's

23   name, travel date was 4/3/05.  It's an inbound flight.  Departed

24   Singapore into LAX.

25   Q.    Okay.  Can you tell which terminal at LAX?
```

A.    Yes.  A-273 is the site code for a terminal and that's the

Tom Bradley International Terminal.

Q.    That's the same terminal we were just looking at in the

pictures?

A.    Yes.

Q.    What about this entry right below it?

A.    The entry below -- it's a departure flight based on the "O"

for outbound.  Departure date was 3/29/05.  Departed LAX,

arriving airport was Singapore.

Q.    So we have 3/29/05 to 4/3/05.  Thank you.

      Okay.  And the remainder of that record contains the

same sorts of codes reflecting travel as you described?

A.    Yes, for both inbound and outbound flights.

Q.    Thank you.

      I'd like to turn now to the next exhibit, which is

Exhibit 47.  So if you would just look that over, and when you

are done, just look up at me.  Thank you.

      What were you just looking at there.

A.    These are secondary examination records that are into the

Treasury Enforcement Communication Systems.

Q.    And what kind of information is in those?

A.    They're secondary exam records that are based on your

secondary exam either in baggage 0 or it can even be

agriculture.  The information that's obtained on here, some of

it is taken from your passport, and if it's not from your

```
 1    passport, it's input by the officer itself based on the
 2    secondary examination.  It will give the carrier that you came
 3    on, your flight number.  It will tell what airport you departed,
 4    what -- where you're arriving and then it will list if your bags
 5    were examined, yes or no, if you had a personal search completed
 6    on you, that would be a yes or no, and it gives you an
 7    opportunity to put remarks in there based on your examination
 8    results.
 9    Q.    So the secondary inspector has a place in there to write
10    remarks?
11    A.    Yes.
12    Q.    I'd like -- well, first of all, are these records that you
13    either pulled or someone on your behalf pulled in connection
14    with your involvement in this case?
15    A.    Yes.  I did actually -- I was able to pull several
16    secondary exam records from 2002 through 2008.
17    Q.    Okay.  And do these all appear to be records that are
18    maintained in the TECS system as you described?
19    A.    Yes.
20    Q.    Thank you, Chief Armijo.
21              Your Honor, the United States moves to have Exhibit 47
22    entered into evidence and for permission to publish?
23              THE COURT:  Any objection to 47?
24              MR. GLUCK:  None.
25              THE COURT:  Thank you.  47 is ordered admitted, and
```

```
 1    you may publish.

 2              (Government's Exhibit 47 was received)

 3    BY MR. WIDMAN:

 4    Q.    I would like to draw your attention to a few particular

 5    pages here in this exhibit.  First I would like to draw your

 6    attention to -- I believe it should be the fourth page in.  It

 7    has a little number at the bottom right that reads 002682.  Do

 8    you see that?

 9    A.    Yes.

10    Q.    I'm going to place that on the overhead projector.  Would

11    you please explain what these codes and the information in this

12    document mean.  Why don't we start here at the top.  What is

13    this, where my pen is pointing at?

14    A.    Yes.  This would be the passenger's name that had the

15    secondary examination conducted on them.  So it would be the

16    passenger's first and last name.  Something of relevance, too,

17    would be the inspection date which would be up here.  The

18    4/3/2005 would be the inspection date.

19    Q.    Okay.  Is the inspection location listed anywhere on this

20    form?

21    A.    Yes.  That would be again what we call a Site ID Code, the

22    A-273, and then the terminal would say the Bradley airport is

23    the Bradley Terminal.

24    Q.    Can you explain to us what these codes here mean, and I'm

25    directing my finger at the words "bag exam."
```

A.    Baggage exam means -- was the baggage that the passenger

was bringing, was that actually inspected, and "Y" means "yes"

and "N" would be for "no."

Q.    Thank you.

I'm now going to put up the next sheet in sequence,

which is Bates stamped 002683.  And can you please clear the

screen.

Could you please explain to us what this means.

A.    Yes.  Based on the previous screen, the previous screen, if

you hit a function on your keyboard that would be like a P-F --

Shift P-F-2, you would be able to obtain the name of the officer

that conducted the exam, and this is what this -- this screen is

a screen that you would get, so this says that it was conducted

by inspector and last name would be Cuevas and that would be the

first initial of the officer's name.

Q.    Now, do you know Inspector Cuevas?

A.    Yes, I do.

Q.    What is his first name?

A.    Alfredo.

Q.    Thank you.

I'm now going to place the next page in this exhibit

on the overhead projector, which is Bates stamped 003645 on the

overhead projector.

Now, before at te outset, I have to note there are

some holes -- well, there are some circles.  Are these -- and

1    outlines of circles on the document at the top.  Do you have any

2    explanation for why these are here, these circles?

3    A.    It's -- it's probably a copy, and they were in a binder.

4    Q.    Now, can you explain to us what we're looking at here in

5    this form?

6    A.    This would be the inspection results that you would

7    complete based on the two prior screens we saw that was the

8    secondary inspection screen.  This would be the second screen

9    that you can get to put your remarks in.

10   Q.    What was the date of this secondary inspection?

11   A.    That was 2005.  04/03/2005.

12   Q.    That means April 3rd, 2005?

13   A.    Yes.

14   Q.    Thank you.  Here it just says AX.  Do you have any idea

15   based on your experience what that means?

16   A.    Yes.  That would just be an abbreviation.  It should say

17   PAX for passenger.

18   Q.    And it looks like it got cut off at some point by the

19   holes?

20   A.    Yes.

21   Q.    Now, it says, "PAX was in India to visit his family for

22   one month.  PAX is a doctor."  When you were an officer, did you

23   ever ask passengers how long they had been traveling?

24   A.    Yes.

25   Q.    Thank you.

*UNITED STATES DISTRICT COURT*

1    Turning now to exhibit -- turning now to Exhibit 48 --

2    actually, why don't you just leaf through Exhibits 48, 49, 50,

3    51, 52, and 53.  Just leaf through, familiarize yourself with

4    them, and when you are done, look up, please.

5         What are those exhibits that you were just looking at?

6    A.   Those are exhibits -- are the same type of travel for

7    inbound and outbound border crossings and secondary inspection

8    records on a few passengers.

9    Q.   Which passengers are you referring to?

10   A.   I'm referring to passenger Young, first name Jessica; Yip,

11   first name Velma; Mhaskar, first name Supriya, and that was the

12   last passenger.

13   Q.   Thank you, Chief Armijo.

14        Now, these are records that are kept in the TECS

15   system?

16   A.   Yes.

17   Q.   And these are records that you or someone on your behalf

18   collected in connection with this case?

19   A.   Yes.

20        MR. WIDMAN:  Thank you.

21        Your Honor, the United States moves to have Exhibits

22   48 through 53 entered into evidence and published to the jury.

23        THE COURT:  Any objection?

24        MR. GLUCK:  Your Honor, I hate to do this late on a

25   Friday afternoon, but we would object.  To the extent the

1    witness is not going to explain what they are, we think they are

2    pretty confusing.  I'm not asking that every page be gone

3    through.

4              THE COURT:  Well, I'm going to order them admitted,

5    but we'll take up separately the issue of what actually out of

6    each page has to be admitted of each document, and I will take

7    that up with counsel as to exactly what I mean by that later.

8              So right now they are conditionally admitted, 48

9    through 53 are conditionally admitted for the time being so you

10   may continue to examine and publish them.

11             MR. WIDMAN:  Thank you, Your Honor.

12             THE COURT:  You're welcome.

13   (Government's Exhibits 48 through 53 were conditionally

14   received.)

15   BY MR. WIDMAN:

16   Q.   Now I'm going to place on the overhead projector

17   Exhibit 48.  What is this page?

18   A.   Again, this is the name of the passenger that you're

19   querying, last name Young, first name Jessica, the date of

20   birth, and below here would be the time frame that you're

21   requesting.

22   Q.   Thank you.  Can you please clear the screen.

23             Okay.  Let's just walk through this.  I promise to go

24   a little bit more summary fashion with respect to this form.

25             Let's take a look at this first one right here.  Can

1    you please interrupt these codes for the jury.

2    A.    Yes.

3    Q.    I am going to zoom out a little.

4          THE COURT:  When you say these codes, for the purpose

5    of the record, Mr. Widman, are you referring to the third --

6    what would be the third column if they were in a clearly

7    demarcated column.

8          MR. WIDMAN:  If they were, I would.

9          THE COURT:  So does that mean that if they are, you

10   are.  If we imagine them to be in a clearly demarcated column,

11   that's what you are referring to?

12         MR. WIDMAN:  Perhaps I can rephrase, Your Honor.

13         THE COURT:  My question?

14         MR. WIDMAN:  No.

15         THE COURT:  I sustain your objection to my question.

16   Go right ahead.

17         MR. WIDMAN:  Thank you, Your Honor.

18         THE COURT:  You're welcome.

19   BY MR. WIDMAN:

20   Q.    Let's take a look at the first row right here where my pen

21   is pointing.  And I realize the columns are a little unaligned.

22   But could you please explain to the jury what this information

23   means in the first row.

24   A.    Sure.  It's passenger's name, Young.  Right here would be

25   Jessica.  Travel date would be 09/05/05.

1    Q.    Do you know where, from where --

2    A.    It's the --

3    Q.    -- to where the passenger was traveling?

4    A.    That would be the A-535 represents Houston International

5    Terminal.  IAH would be the arriving airport.  TGU I'm

6    unfamiliar with.

7    Q.    Do you know what TGU is?

8    A.    It's another country code.

9    Q.    Do you know what IAH is?

10   A.    Yes.  That's Houston Airport's code.

11   Q.    That's the George Bush International Airport in Houston,

12   Texas?

13   A.    Yes.

14   Q.    Thank you.  I'd like now to refer to the record.  I think

15   it's several in.  It's Bates stamped 002718 on this same

16   exhibit, and can you please clear the screen.

17          Let's take a look at what appears to be the second

18   row, the second travel here.  The second time the name Young

19   appears from the line straight across the page.

20          Could you please explain what this entry means?

21   A.    Yes.  Again, passenger's name.  11/19/09 would be the

22   travel.  The A-534 would be Houston.

23   Q.    From where to where?

24   A.    It would be an inbound flight from IAH -- coming into

25   Houston from TGU.

UNITED STATES DISTRICT COURT

1  Q.    And you're not familiar with which airport TGU refers to?

2  A.    Correct.

3  Q.    Okay.  Thank you.  Okay.

4        Turning now to Exhibit 50, which has already been

5  entered into evidence conditionally, could you please just

6  briefly tell us what we're looking at here?

7  A.    Yes.  It's a request for again passenger's name,

8  passenger's date of birth, and the time frame that you're making

9  the request.

10 Q.    And we're now looking at the second page Bates stamped

11 002724, and can you please clear the screen, Chief Armijo.

12 Directing your attention to the second row, the second time the

13 word Yip appears after the horizontal line, could you please

14 explain to the jury what that information means.

15 A.    Yes.  Passenger's name, Yip; date of travel, 03/25/08.

16 Q.    Do you know where the passenger was traveling from and to

17 where?

18 A.    Arrival code is Guam.  Left LAX.

19 Q.    So was it from Guam to LAX or the other way around?

20 A.    It departed LAX.  So that's an actual outbound flight.

21 Q.    Thank you.

22       And can you please interpret for the jury the one

23 directly above that, closer to the top of the page.

24 A.    The one where I just marked --

25 Q.    Yes.

```
 1   A.    Yes.  Passenger's name again.  Travel would be 04/05/08.
 2   Location code would be A-273, Los Angeles, Bradley Terminal, and
 3   it was an inbound flight arrived at LAX and departed Manila.
 4   Q.    Thank you.
 5            Now, this form doesn't have information regarding
 6   whether the passenger was secondary or not, does it?
 7   A.    No.  It's just its crossings.
 8   Q.    Okay.  Here is the next exhibit, which is Exhibit 51.  Can
 9   you please explain to us what this is?
10   A.    Yes.  This would be a secondary inspection as stated above.
11   Q.    And what is -- what information is contained here?
12   A.    Name of the passenger, date of birth of the passenger, date
13   ranges that you're requesting for the secondaries, and again if
14   it's an inbound or outbound flight and baggage examination and
15   results.
16   Q.    Can you tell from this form whether or not there is any
17   record of this passenger being secondary?
18   A.    There is no record.
19   Q.    Is that for any particular flight or is it just in the
20   entire system?
21   A.    It's based on the date range that you conducted for the
22   passenger from 2002 through 2009.
23   Q.    Thank you.  Can you please clear the screen.  Thank you.
24            The next exhibit is Exhibit 52 which I have now placed
25   on the overhead projector.  Could you please tell us what this
```

*UNITED STATES DISTRICT COURT*

1    is.  This is the first page, 2726.

2    A.    Yes.  This would be a request for a passenger's travel

3    based on passenger's first and last name, their date of birth

4    and the time frame you're making the request.

5    Q.    Thank you.

6    A.    This is --

7    Q.    I'm sorry.  Were you not finished?

8    A.    I was just going to say the traveler's name, Mhaskar

9    Supriya.

10   Q.    Okay.

11          Now flip the page, and we are looking at the next page

12   in the exhibit which is Bates stamped 2727.  Could you please

13   interpret for us, if you can, this entry that I'm referring to

14   which is the fourth from the bottom row?

15   A.    This entry here would be for the passenger.  The time frame

16   that they traveled, 03/31/07.  Location code would be JFK.  The

17   "I" would be an inbound flight into JFK from FCO.

18   Q.    Do you know what FCO is?

19   A.    I'm unfamiliar with FCO.

20   Q.    But by definition this would have to be in an airport

21   located in another country; is that right?

22   A.    Correct.

23   Q.    Let's take a look at the last row on this page where I have

24   placed my pen.  Would you please interpret that one for us?

25   A.    Sure.  Again, passenger's name.  Date of travel, 03/07/08.

*UNITED STATES DISTRICT COURT*

1   A-273 is LAX, Bradley Terminal.  It's an inbound flight, inbound

2   into LAX from LHR, which is London Heathrow.

3   Q.   Thank you.

4        I would now like to ask you a few questions about

5   Exhibit 53, which I'm placing on the overhead projector now.

6        Could you clear the screen and explain for us what we

7   are looking at here.

8   A.   This is a secondary inspection screen.  Date of inspection

9   would be 10/14/2008.  Passenger's name would be Mhaskar Supriya.

10  Date of birth for the passenger.  Passport, document number of

11  the passport, the issuing country so it was a U.S. citizen.

12  Passenger came on BA, which is British Airlines Flight No. 279.

13  It was an inbound flight.  Passenger departed London Heathrow,

14  embarked in Bombay and arrived into LAX.

15  Q.   Now, the date of this secondary inspection was October 14,

16  2008; is that right?

17  A.   Correct.

18  Q.   Thank you.

19       I'd now like you to look at Exhibits 54 through 56.

20  Excuse me.  Exhibits 54 through 57.  Once you have had a chance

21  to look those over, could you please look up to signal that you

22  are ready to continue.  Thank you.

23       First of all, I would like to refer you to Exhibit 54

24  which has already been entered into evidence in this case, and I

25  am going to place it on the overhead projector.  Do you

```
 1   recognize that document, Ms. Armijo?

 2   A.   Yes.

 3   Q.   What is it?

 4   A.   It's a Customs form.

 5   Q.   Is this one of the Customs forms that you collected or

 6   someone on your behalf collected in connection with this case?

 7   A.   Yes.

 8   Q.   Do you know why there is only a copy of this document?

 9   A.   I believe the original was requested earlier through the

10   year, and it probably wasn't placed back into the -- into the

11   original box, and only the copy was left when it was pulled.

12   Q.   Thank you.

13            I would like you to take a look again, I guess, at

14   Exhibits 55, 56 and 57.  What are those?

15   A.   They're all Customs declarations for various passengers.

16   Q.   Are they declarations that you collected in connection with

17   this case?

18   A.   Yes.

19   Q.   Okay.

20            Your Honor, the United States moves to have Exhibits

21   55, 56 and 57 entered into evidence and for permission to

22   publish them.

23            THE COURT:  Any objection?

24            MR. GLUCK:  None, Your Honor.

25            THE COURT:  55, 56 and 57 are ordered admitted.  You
```

```
 1   may publish.
 2           (Government's Exhibits 55, 56 and 57 was received.)
 3   BY MR. WIDMAN:
 4   Q.    Let's take a look at this form which is Exhibit 55.  Let's
 5   first take a look at the right half of the form.  Now, allow me
 6   to ask you this, Chief Armijo.  This black -- black marker or
 7   whatever, these black images here, did you place those on here?
 8   A.    No.
 9   Q.    When you collected this form, were those images on there?
10   A.    No.
11   Q.    And do you know what this up here means?  This -- this dark
12   handwritten something that appears to have an "M" on the end?
13   A.    Yes.  It's -- actually it's a "T" with a slash and an "M"
14   and that would be written by a primary officer and that's
15   considered TECS match.
16   Q.    What does that mean?
17   A.    It -- a TECS match would be that you have a record on you.
18   Once your passport is swiped, there is a record on you in the
19   system, and basically you warrant a referral to a secondary area
20   based on prior information.
21   Q.    Okay.  And do you know what this language at the bottom
22   refers to?
23   A.    Yes.  The Dao is actually a current officer.  That's his
24   name, Dao, and then the slash, and that's his badge number.
25   Q.    Okay.  Thank you.
```

UNITED STATES DISTRICT COURT

```
 1            Turning now to the next exhibit, which has already
 2   been entered into evidence as Exhibit 56 which I'm placing on
 3   the overhead projector.
 4            Now, is this one of the declarations that you
 5   collected in connection with your involvement in this case?
 6   A.    Yes.
 7   Q.    Thank you.
 8            Turning now to Exhibit 57, which I'm placing on the
 9   overhead projector, is this one of the declarations you
10   collected in connection with this case?
11   A.    Yes.
12   Q.    And I would like to draw your attention to this language at
13   the bottom of the form -- date, day, month, year.  Could you
14   explain what that means?
15   A.    Yes.  The -- the date of arrival that you signed that
16   declaration.
17   Q.    Do you have any idea why the month isn't before the day as
18   opposed to vice versa?
19   A.    Outside of the U.S., sometimes they will reverse -- we put
20   month, day, year but foreign travelers are used to the opposite.
21   Q.    Thank you.
22            And is there a Bates stamp on here that you can see?
23   A.    Yes.  If you look at this area here, that's the stamp that
24   each primary officer is assigned to and that's the date of
25   admission, July 3rd, 2008.
```

1    Q.    Thank you.

2          THE COURT:  Is now a good breaking point?

3          MR. WIDMAN:  I am awfully close to the very end,

4    Your Honor.

5          THE COURT:  Then keep going.

6    BY MR. WIDMAN:

7    Q.    With respect to Dr. Patwardhan's inquiries, did you conduct

8    an ACS search?

9    A.    Yes.

10   Q.    What is ACS?

11   A.    Automated Commercial Systems.

12   Q.    What was the results of that search?

13   A.    It was negative.

14   Q.    Did you conduct a TECS search for searches, arrests or

15   seizures?

16   A.    Yes.

17   Q.    What was the result of that?

18   A.    It was negative.

19   Q.    What about the SQAD search?  Was there any results for

20   Dr. Patwardhan?

21   A.    No.  Negative.

22   Q.    Let's turn now to Jessica Young.  Did you conduct an

23   Automated Commercial System search for her?

24   A.    Yes.

25   Q.    What were the results?

1    A.    Negative.

2    Q.    When you say "negative," you mean you didn't find anything?

3    A.    Right.  It didn't link to any type of seizures or arrests

4    or even prior entries filed by the person.

5    Q.    And what about the TECS search?

6    A.    TECS search showed border crossings and one secondary

7    inspection.

8    Q.    Thank you.  I know we have covered that at some length.

9    What I meant to say what the TECS search for searches, arrests

10   or seizures?

11   A.    No.  Negative.

12   Q.    What about the SQAD search for Ms. Young?

13   A.    Negative.

14   Q.    Without objection, I am going to combine the following

15   questions for passengers Velma Yip and Supriya Mhaskar.  Did you

16   conduct ACS searches on both of them?

17   A.    Yes.

18   Q.    What were the results of those searches?

19   A.    Negative as well.

20   Q.    For both?

21   A.    Yes.

22   Q.    What about the TECS searches, arrests or seizure inquiries?

23   A.    Negative for searches or arrests.

24   Q.    For both?

25   A.    Yes.

UNITED STATES DISTRICT COURT

1  Q.   What about the SQAD searches for those two passengers?

2  A.   Negative on their addresses as well.

3  Q.   And what was the time periods that you used for conducting

4  those searches?

5  A.   It wasn't a time period.  You can just -- once you have a

6  passenger's name and date of birth, you can see any travel that

7  they've made or any type of secondary exams or border crossings.

8  So we conducted what we consider a thorough search.  We did any

9  type of travel history.

10 Q.   So all the records -- consistent with your testimony about

11 how long the records are kept, all the records that would be

12 there -- well, let me put it this way.

13        For those that you testified are kept permanently, you

14 searched all the records?

15 A.   Yes.

16        MR. WIDMAN:  Your Honor, I believe this is an

17 excellent breaking point.

18        THE COURT:  All right.

19        Thank you, ladies and gentlemen, for your work this

20 week.  We'll be in recess, as far as you're concerned, until

21 Tuesday.  I think I told you that you're only here Tuesday

22 through Friday because there are other cases on Mondays.  So we

23 will see you back Tuesday morning at 9:00.

24        Remember, don't discuss the case, don't communicate

25 about the case at all in any fashion over the next -- well, ever

*UNITED STATES DISTRICT COURT*

1    until you are discharged, but particularly over the next few

2    days until I have a chance to remind you again.  That means

3    don't discuss it with anyone, your family members, your

4    co-workers, if you're going to work on Monday or over the

5    weekend, friends, neighbors, acquaintances, anyone.  That means

6    the testimony, the witnesses, anything you saw or heard in the

7    courtroom or anything related to the case.

8          If there are any media reports about the case, don't

9    listen, watch, read them, look at them on the Internet.  Don't

10   do any research on the Internet, don't post anything on the

11   Internet, don't email, don't participate in any chat rooms,

12   either in this case or even about the subject matter about this

13   case or anything that you have seen, learned or heard during the

14   course of this trial related to the case in the broadest

15   possible sense.  And don't make up your minds about the case or

16   any issue in the case.

17         Thank you so much, ladies and gentlemen.  You're

18   excused.

19                      (Jury Out)

20         THE COURT:  You may step down, and you may be seated.

21         The documents that were handed to me for an in camera

22   review earlier today I want to return.

23         MR. WIDMAN:  Your Honor, that raises a good point.  We

24   would like to clarify the record regarding what documents we

25   provided to the Court.  That wasn't the proceeding -- I believe

*UNITED STATES DISTRICT COURT*

```
1    it was the proceeding that was off the record before so we
2    may --
3              THE COURT:  I think it was on the record.
4              MR. WIDMAN:  Wasn't that part where Phyllis --
5    Ms. Preston left?
6              THE COURT:  No.  That was --
7              MR. WIDMAN:  Remember, I annoyed everyone in the room
8    by saying there is just one more thing and then you allowed
9    Ms. Preston to leave.  I believe the "one more thing" was the
10   Customs records.
11             THE COURT:  Well, perhaps we should, just to be safe,
12   put it on the record.  Maybe you're right.  So go ahead.
13             MR. WIDMAN:  This morning after Ms. Preston, the court
14   reporter, was excused for the lunch hour, the parties and the
15   Court discussed -- continued the discussion from Tuesday
16   morning, April 28th, regarding defense's request for certain
17   records pertaining to Customs and Border Protection officials,
18   Melisa Armijo and Alfredo Cuevas in particular, regarding, as
19   the Court detailed in more specificity than I will do here --
20   regarding FDA importation policies and secondary procedures in
21   particular, reprimands or praise or anything in between on those
22   two things regarding Mr. Cuevas, as well as training records --
23   I'm going to have to -- I'm just going to have to refer to what
24   the exact categories were because I think the categories might
25   have been slightly different from Ms. Armijo from the record on
```

```
 1   Tuesday.  That discussion was continued.  The Government told
 2   the Court that we received additional materials and information
 3   from counsel's office at Customs and Border Protection
 4   concerning the contents of their personnel files and the
 5   Government also raised certain training records pertaining to
 6   these two individuals that we had received several days ago.
 7           The Government said that the Government's position was
 8   and continues do be that the training records don't contain
 9   anything within the categories set forth by the Court and that
10   with respect to the personnel records, the Government feels the
11   same way based on their inspection of the materials, that there
12   is nothing discoverable in any of those materials subject to an
13   in camera review by the Court, which I understand the Court has
14   conducted, and --
15           THE COURT:  The Court conducted the in camera review
16   of the documents that were produced as to Ms. Armijo and
17   Mr. Cuevas, and I apologize for not having their titles.  It's
18   Chief Armijo, but I think it's just Agent Cuevas.
19           MR. WIDMAN:  I think he goes by Inspector Cuevas.
20           THE COURT:  Keeping in mind that I ordered the
21   Government to turn over in terms of discovery, I don't believe
22   there are any discoverable items, and what I ordered the
23   Government to turn over was broader than just Giglio, Jencks --
24   Giglio or Henthorn material.  I reviewed everything to see if
25   there was anything else in the personnel files or the training
```

1    materials, and there isn't anything that comes within the

2    categories that I set forth on the record on Monday or Tuesday,

3    whenever that was.

4              So I want to return the documents to the counsel for

5    the Government.

6              MR. WIDMAN:  Your Honor, I actually have never gone

7    through a situation quite like this.  Would there be any way to

8    keep a permanent record in the Court's file of the materials --

9              THE COURT:  You can file them under seal.

10             MR. WIDMAN:  Okay.  Perhaps that's what we will do.

11             THE COURT:  That's what you should do.

12             MR. WIDMAN:  To create a permanent record of what we

13   gave you.

14             THE COURT:  Yes.

15             MR. WIDMAN:  Sounds great.

16             THE COURT:  Are you done with your direct, or are you

17   not sure?  You want to check your notes?

18             MR. WIDMAN:  I am about 95 percent sure I'm done.

19             THE COURT:  All right.  And then you will have cross.

20   Then who is your next witness?

21             MR. BEHNKE:  Actually that creates or brings us to an

22   issue, Your Honor, that I actually haven't had a chance to talk

23   to counsel about because it didn't even occur to me how the

24   scheduling was going until we got to this point.

25             Our next witness is going to be Charlene Craven.  She

UNITED STATES DISTRICT COURT

 1   is a representative from Palmetto who is a -- a Medicare

 2   provider.  I believe she is going to be short on testimony, just

 3   very briefly explaining the collection of submissions and

 4   payment of Medicare claims by the defendant.  The problem that

 5   it raises, though, is she is flying in from out of town, and I

 6   can't recall exactly what the situation is, but I think one of

 7   her relatives is having a medical procedure or something --

 8           MR. WIDMAN:  Your Honor, if I may.

 9           THE COURT:  You want to put her on out of order?

10           MR. BEHNKE:  Yes, Your Honor.

11           THE COURT:  First thing on Tuesday morning.

12           MR. BEHNKE:  Yes, Your Honor.  So we can put her on a

13   flight back out as soon as possible.

14           MR. GLUCK:  Put her on and then do the rest with

15   Armijo?

16           MR. BEHNKE:  Yes.

17           MR. GLUCK:  That's fine.

18           THE COURT:  We will call her first.  That was

19   Ms. Craven?

20           MR. BEHNKE:  Yes, Your Honor.

21           THE COURT:  You think maybe an hour total for her?

22           MR. BEHNKE:  I think that's fair.  I don't expect to

23   be more than 20 or 30 minutes.

24           MR. GLUCK:  May I ask a question in connection with

25   Ms. Craven?  Is she the one -- that CD I was handed the first

1    day of trial?

2              MR. BEHNKE:  Yes.

3              MR. GLUCK:  That relates to her?

4              MR. BEHNKE:  Yes.

5              MR. GLUCK:  That is an open issue as far as I'm

6    concerned.  The first day of trial we were handed a CD with

7    claims data.  That's all we were told.  I don't know what is on

8    it, and I was told there was going to be some summary of it, but

9    as far as -- that's all I know and hope --

10             THE COURT:  To have a chance to discuss that with

11   Government counsel?

12             MR. GLUCK:  I had hoped to see it first and then have

13   a chance to discuss it.  There could be many, many thousands of

14   pages of data that is purported to be summarized there.  I just

15   don't know.

16             MR. BEHNKE:  The data on the disk is very, very long,

17   and given that the allegation in this case is conspiracy and

18   even if it was a substantive violation of 641 in terms of dollar

19   value, the only thing that needs to be shown is that it exceeded

20   a thousand dollars.

21             I'll talk to counsel, but we're not planning on

22   getting into volumes and volumes of detailed data concerning

23   every code that was billed or anything like that which is what

24   is on that disk.

25             THE COURT:  Let him know which ones you intend to

```
 1   inquire of her about so he doesn't have to prepare a cross that
 2   goes through every one of them to have you ask about 10 or 15.
 3            MR. BEHNKE:  Yes, Your Honor.  I don't even think it's
 4   going to be that many.
 5            THE COURT:  So let Mr. --
 6            MR. GLUCK:  Appreciate that.
 7            THE COURT:  -- Gluck know --
 8            MR. BEHNKE:  Yes, Your Honor.
 9            THE COURT:  -- by the end of the day tomorrow.
10            MR. BEHNKE:  Oh, yes, Your Honor.
11            THE COURT:  If not this afternoon.
12            MR. BEHNKE:  Yes, Your Honor.
13            THE COURT:  Fine.  Then who is your next witness?
14            MR. BEHNKE:  And then -- yeah.  Then we would have
15   Inspector Cuevas and -- Inspector Cuevas and Jessica Young.
16            THE COURT:  All right.  How long for Inspector Cuevas?
17            MR. BEHNKE:  About 30 minutes on direct, Your Honor.
18            THE COURT:  And Ms. Young?
19            MR. WIDMAN:  Ms. Young is going to take considerably
20   longer, depending on -- considerably longer.  I would say
21   probably in the neighborhood of two to three hours.
22            THE COURT:  Did Kathy Walton testify?
23            MR. WIDMAN:  Yes, Your Honor, she did.
24            MR. GLUCK:  She was the one who took the medicine
25   home?
```

```
 1                 MR. BEHNKE:  She testified at the end of the day

 2   yesterday.

 3                 THE COURT:  Oh, that was Ms. Walton.  I'm sorry.

 4                 MR. WIDMAN:  Must have made an impression on the

 5   Court?

 6                 THE COURT:  I didn't remember her name.  I'm sorry.

 7                 MR. GLUCK:  The picture thing is a good idea.

 8   Brilliant.

 9                 THE COURT:  Thank you.  Actually, I think it is a

10   really helpful thing.

11                 MR. GLUCK:  I could use --

12                 THE COURT:  Well, actually I'm glad you said that

13   because I must not have told counsel this, but for your

14   closings, we will give a set to counsel to use during your

15   closings that you have to share, but both sides have a set to

16   use, and I encourage you to use them.

17                 All right.  All right.  Now, what I was going to tell

18   you both about the exhibits is that what we do at the end of the

19   trial is once -- as to everything that has been admitted but

20   maybe in retrospect you haven't really used it, you -- you have

21   to meet and confer and go over everything with Ms. Dillard, and

22   it's better if you do it right -- maybe like the night before we

23   send everything to the jury or send the case to the jury so

24   they're not in the jury room waiting for the exhibits to make

25   sure that you're in agreement about what got admitted and what
```

```
1   didn't.  So what we are sending back to the jury room in terms
2   of exhibits everybody is in agreement on and nothing gets sent
3   back that wasn't admitted and everything does get sent back that
4   was.  And in the course of doing that, you may agree that some
5   things that you either stipulated to or that were admitted you
6   never inquired about.  So that usually takes care of the problem
7   of when either an exhibit of many pages or many photographs were
8   admitted but nobody ever then asked any questions about it, you
9   may stipulate at the end of the case to withdraw some pages or
10  some parts of a document.  So I understand -- and I agree with
11  the concern about something may be authenticated and the witness
12  may say, "Yes, I either took all the photographs" or "That's my
13  signature on the end of a document," but at the end of the case,
14  it may be that they never have really been explained.  And you
15  can either -- if you can't stipulate to withdraw it after you
16  have talked to one another, you can bring it back up with me.
17  Because if there -- even though somebody -- even though it was
18  admitted and there was a foundation for it, if it really hasn't
19  been explained or described to the jury, I'll entertain a motion
20  to strike it because I don't want them back there speculating
21  about something.
22          MR. BEHNKE:  Right.  No.  Understood, Your Honor.
23          THE COURT:  So, you know, to shorten things up, unless
24  it's, you know, something that is really scandalous or
25  potentially prejudicial, I will usually let it in if there is a
```

UNITED STATES DISTRICT COURT

1    foundation despite that because some other witness may be

2    explaining it if it's a photograph or something.  But if it's

3    not used, we probably won't send it back.

4            MR. GLUCK:  Your Honor, with that understanding, I

5    will stop worrying about that issue now.

6            THE COURT:  That's fine.  You can always raise it at

7    the end.  Usually what happens at the end when people sit down

8    with Ms. Dillard, like I said, she says they want to put a

9    stipulation on the record that they want to withdraw, 39, 86 and

10   1022, or whatever it is, which is fine.  So just that in mind.

11           Anything else?

12           MR. GLUCK:  Do you want to -- unfortunately -- do you

13   want to talk about the --

14           MR. BEHNKE:  Yes, Your Honor.  I'm sorry.  The --

15   there has been ongoing, I guess negotiations, if you will, and

16   work between the AUSA in Los Angeles who has been reviewing the

17   Jessica Young notebooks and I believe Ms. Rhee and Mr. Gluck,

18   and I believe it's to the point where today, my understanding

19   is, Ms. Feldman, who is doing the review for our office, did an

20   in camera submission and attached what I believe is only a

21   handful of pages of the notebook for the Court's review to

22   determine the issue of privilege.

23           THE COURT:  All right.

24           MR. BEHNKE:  I don't -- beyond that, I don't know

25   anything about the filing.

1          MR. GLUCK:  I just want to put one thing out there.

2    This was filed by Ms. Feldman.  We haven't seen it.  She has

3    been working with Ms. Rhee around the clock trying to get this

4    thing finished.  They have both been working on it very hard.

5          From our side, I have never been in this situation

6    before where we have kind of an entity privilege, an individual

7    who has her own privilege, and especially what really makes it

8    difficult for us is it's an individual who frankly we can't

9    speak to right now and who is a cooperating witness, etc., etc.

10         I think if this were a normal situation, we would sit

11   down with Jessica Young and we would say what did you write

12   there, why did you write that, and we would know whether

13   something is or isn't privileged.

14         A lot of what is at issue, in my understanding, in

15   these pages comes from our lack of knowledge.  And our

16   meaning -- we can't ask Jessica Young and get an answer from her

17   and --

18         THE COURT:  So if I understand this -- pardon me for

19   interrupting you.  If I understand this right, you looked at

20   this, you said it was privileged?

21         MR. GLUCK:  Ms. Rhee, can you explain exactly what is

22   left because --

23         THE COURT:  Right.  In other words, you did a

24   privilege log?

25         MS. RHEE:  What happened, Your Honor, is that the

*UNITED STATES DISTRICT COURT*

```
1   notebooks are actually all initially turned over to the taint
2   attorney, and the taint attorney reviewed all of the pages which
3   is I guess almost 700 pages of handwritten notes and produced a
4   privilege log to us, along with the pages that she thought were
5   either our privilege alone or not privileged at all.  And then
6   we reviewed those and then we met -- and then we designated
7   additional pages, only a handful that we thought were
8   potentially privileged as well.
9            And she and I have met and conferred many, many times,
10  including last night really late before she, you know, dropped
11  off the ex parte, and we whittled it down to I think it's only 7
12  pages that are at issue, and most of them we have never seen
13  because they actually -- those pages are dated after July 30,
14  2008, and so we're already in a time period after the search,
15  and I think at least two or three of them involve Jessica Young
16  and Ken Miller and his wife, Karen Miller, who are both her
17  attorneys.  And so we -- those have actually been kept from us
18  as well.  But they are all indicated in the privilege log.
19           So some of the documents are documents over which we
20  are claiming privilege and then some of the documents are
21  documents over which she is claiming privilege.
22           THE COURT:  I guess my confusion is that your
23  assertion of the privilege is based on what you have seen from
24  Ms. Feldman?
25           MS. RHEE:  That's correct.
```

UNITED STATES DISTRICT COURT

1        THE COURT:  That's my confusion.  So --

2        MS. RHEE:  But she is doing the logging.  She has

3   agreed on certain of the ones that we have designated and so she

4   has logged those.  It's only the couple --

5        THE COURT:  Seven pages, that's fine.  Really I

6   appreciate very much your effort and Ms. Feldman's effort and

7   please convey that to Ms. Feldman as well.

8        MR. BEHNKE:  We will, Your Honor.

9        THE COURT:  I really do.  Seven pages.  I have seen

10  those logs that come in, so I know that there is a lot of

11  documents that you have -- I know there is a lot of work to have

12  gotten it down to seven pages, but just so I understand what

13  the -- it's not that I am going to ask you to do any more.  I am

14  very persuaded you have done everything you could do.  But your

15  assertion of the privilege on behalf of your client -- I guess

16  my question is this.

17       As I understand it, you are doing two things.  You're

18  asserting a privilege as to some of these documents on behalf of

19  your client and you're also challenging that some of the

20  documents are privileged.

21       MS. RHEE:  Actually that's not correct.  We are not

22  challenging her designations on any of the ones that she has

23  done on Jessica Young's behalf because we don't even know to

24  challenge it.  So she is just -- I think she is in the awkward

25  position of -- she wants to give as many pages as she can to --

*UNITED STATES DISTRICT COURT*

```
 1   over to Mr. Widman, and she's just -- but she can't give him
 2   pages that are also privileged as to Jessica Young either so
 3   that's why she is turning those pages over to you.  We are not
 4   challenging those because we actually don't -- we don't know
 5   anything other than the fact that Ken Miller --
 6            THE COURT:  But those would be pages that would only
 7   we given to counsel for the Government?
 8            MS. RHEE:  Yes.
 9            THE COURT:  You won't be getting those?
10            MS. RHEE:  We will not be getting those.  If
11   Your Honor -- I mean, I don't --
12            THE COURT:  Assuming --
13            MS. RHEE:  Yes.  But we are not challenging those.
14            THE COURT:  What you're challenging is anything
15   that -- you're challenging a few pages that you say are
16   privileged as to -- that your client holds a privilege as to?
17            MS. RHEE:  That is correct.
18            THE COURT:  All right.  But there are two types of
19   privilege that are at issue:  The privilege that Ms. Young
20   asserts and the privilege that your client is asserting.
21            MS. RHEE:  With respect to the pages over which we are
22   claiming a privilege, I don't think that Ms. Young is claiming a
23   private at that point.  I think we can kind of neatly divide
24   them by a timeline.  So the pages over which we are claiming the
25   privilege actually fall squarely before the search at which time
```

1    Ms. Young did not have an attorney.

2         THE COURT:  Right.  But as to the few pages that I am

3    being asked to look at, they at least potentially fall -- the

4    could be one of two kinds, right?  They could be pages as to

5    which there is potential -- pages that could be turned over to

6    the Government but not to the defense, and then there are the

7    pages as to which Dr. Patwardhan -- you're asserting a privilege

8    as to -- on Dr. Patwardhan's behalf.

9         MS. RHEE:  That's correct.

10        THE COURT:  That's what I needed to know.

11        MR. GLUCK:  And we're doing so, unfortunately without

12   the insight that we would normally gain from talking to Jessica

13   Young.

14        THE COURT:  All right.  I will endeavor to review

15   those and get something to you on Monday or have Ms. Dillard

16   call you both on Monday and let you know what my that I have

17   reviewed them and what my -- what's going to be disclosed.

18        Anything else?

19        MR. BEHNKE:  Just -- we still need to talk to defense

20   counsel about those.  Just want to let the Court know we are

21   working on the limiting instruction that we discussed yesterday.

22   We have a proposal that we can share with defense counsel, get

23   their thoughts and hopefully come up with something by the time

24   we resume.

25        THE COURT:  All right.  Thank you.  In the meantime, I

```
 1    am going to return these documents that were given to me today

 2    for the in camera review.

 3              MR. WIDMAN:  May I approach, Your Honor, and collect

 4    them?

 5              THE COURT:  Yes.  Thank you.  And if that's not -- I

 6    think that is everything, but I'll keep looking if it's not.  It

 7    could be that they got buried up here.

 8              MR. WIDMAN:  I think there is another --

 9              THE COURT:  There should be one more, I think.

10              MR. WIDMAN:  A set of stapled sheets.

11              THE COURT:  Eventually we will get them.

12              MR. WIDMAN:  I know exactly what they are --

13              THE COURT:  It might be Monday before they get

14    unearthed.  We will get them back to you.

15              MR. WIDMAN:  Okay.  Thank you, Your Honor.

16              THE COURT:  All right.  We are in recess.  Thanks.

17                     (Proceedings adjourned at 4:50 p.m.)
```

*UNITED STATES DISTRICT COURT*

1                          <u>CERTIFICATE</u>

2

3       I hereby certify that pursuant to Section 753, Title 18,
United States Code, the foregoing is a true and correct
4  transcript of the stenographically reported proceedings held in
the above-entitled matter and that the transcript page format is
5  in conformance with the regulations of the Judicial Conference
of the United States.

6

7

    _____              _____
8  Pamela A. Seijas, CSR No. 3593              Date
Official Reporter
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*UNITED STATES DISTRICT COURT*

```
 1                          Day 4
                      Friday, May 1, 2009
 2                        I N D E X

 3   WITNESSES FOR THE
     GOVERNMENT:          DIRECT      CROSS     REDIRECT     RECROSS
 4
 5     Velma Yip                        4

       Sylvia Thomas        23         30
 6
       Melisa Armijo        40
 7

 8

 9

10   WITNESSES FOR THE
     DEFENSE:            DIRECT      CROSS     REDIRECT     RECROSS
11

12

13

14

15
     GOVERMENT EXHIBITS:            MARKED           RECEIVED
16
       100                                            5
17     60                                            47
       61-A through 61-T                             56
18     46                                            82
       47                                            87
19     48 through 53 (conditionally)                 91
       55, 56, 57                                    99
20

21

22   DEFENSE EXHIBITS:              MARKED           RECEIVED

23

24

25
```

*UNITED STATES DISTRICT COURT*