O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | Case No. ED CR 08-00172 VAP |
| Plaintiff, | ) ) | **[Motion filed on May 29, 2009]** |
| v. | ) ) | **ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL** |
| VINOD CHANDRASHEKM PATWARDHAN, | ) ) ) | |
| Defendant. | ) ) | |
| _____ | ) | |

Defendant's Motion for Judgment of Acquittal and/or New Trial came before the Court for hearing on June 29, 2009.  After reviewing and considering all papers filed in support of, and in opposition to, the Motion, as well as the arguments advanced by counsel at the hearing, the Court DENIES the Motion.

## I. BACKGROUND

Defendant Vinod Patwardhan was tried before a jury on the first six counts in the Second Superseding Indictment in this Court from April 28, 2009 through May 7, 2009; the jury returned a guilty verdict on all six counts on May 8, 2009.[1]

After the Government rested its case, Defendant brought a Motion for Acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  The Court denied the Motion on May 8, 2009, before the jury returned its verdict.

---

[1] Count One charged Defendant with Conspiracy to Introduce into Interstate Commerce Drugs That Are Misbranded, in Violation of Title 21 U.S.C.  §§ 331(a), 333(a)(2), 352(c) & 352 (f)(1) (Violation of 18 U.S.C. § 371); Count Two charged him with Introducing and Delivering Misbranding Drugs into Interstate Commerce, Specifically 23 Vials of Farmorubicina, 50 MG (Violation of 21 U.S.C. §§ 331(a), 333(a)(2), 352(c) & 352(f)(1)); Count Three Charged him with Introducing and Delivering Misbranded Drugs into Interstate Commerce, Specifically 100 Vials Of Docetax, 80 MG (Violation of 21 U.S.C. §§ 331(a), 333(a)(2), 352(c) & 352(f)(1)); Counts Four, Five and Six charged Fraudulently and Knowingly Importing or Causing the Importation of Drugs from India into the United States (violation of 18 U.S.C. § 545); and Counts Seven and Eight sought forfeiture of Defendant's assets.

1  On May 29, 2009, Defendant filed a "Motion for
2  Judgment of Acquittal and/or New Trial."[2]  The Government
3  filed Opposition on June 15, 2009.  Defendant filed a
4  Reply on June 22, 2009.

5

6                    **II. MOTION FOR NEW TRIAL**

7  Defendant brings his Motion for New Trial on the
8  following grounds: (1) the Court's mid-trial decision
9  regarding the admissibility of Patrick Egan's testimony
10 resulted in undue prejudice to Defendant; and (2) Agent
11 Leitner's improper comment violated Defendant's Fifth
12 Amendment right.  (<u>See</u> Mot. at 8-17, 26-28.)

13

14 **A.  Legal Standard**

15 Rule 33(a) of the Federal Rules of Criminal Procedure
16 ("Rule 33(a)") provides that "[u]pon the defendant's
17 motion, the court may vacate any judgment and grant a new
18 trial if the interest of justice so requires."  A motion
19 for a new trial is granted at the discretion of the trial
20 court and only in "exceptional cases in which the
21 evidence preponderates heavily against the verdict."
22 <u>United States v. Pimentel</u>, 654 F.2d 538, 545 (9th Cir.
23 1981).

24

25 _____

26      [2] The Motion was timely filed because the Court
   granted Defendant an extension of time, beyond the seven
27 day deadlines set forth in Federal Rules of Criminal
   Procedure 29(c)(1) (motion for acquittal) and
28 33(b)(2)(motion for new trial).

1    A trial court may sustain a verdict if "'viewing the

2 evidence in the light most favorable to the prosecution,

3 *any* rational trier of fact could have found the essential

4 elements of the crime beyond a reasonable doubt.'"

5 United States v. Lyons, 454 F.3d 968, 971 (9th Cir. 2006)

6 (emphasis in original) (quoting Jackson v. Virginia, 443

7 U.S. 307, 319 (1979).

8

9 **B.   Discussion**

10    **1.   Admissibility of Patrick Egan's Testimony**

11    At a pretrial hearing, the Court denied the

12 Government's Motion in Limine to exclude defense expert

13 Patrick Egan from testifying.  (See April 22, 2009

14 Order.)  The defense sought to have Mr. Egan testify to

15 the following: (1) various cities and states imported

16 foreign-labeled drugs; (2) the Attorney General can

17 create exemptions for travelers carrying drugs with them

18 when entering the country; (3) the Food and Drug

19 Administration ("FDA") and Drug and Enforcement Agency

20 ("DEA") have issued public statements regarding the

21 prescription drugs that travelers can bring into the

22 country; (4) confusion among the general public regarding

23 the importation of prescription drugs for personal use

24 and the FDA and DEA have called for greater clarity on

25 the issue; and (5) the FDA's creation of policies for its

26 inspectors to follow with respect to the importation by

27

28

4

1  travelers of small amounts of prescription drugs.  (<u>Id.</u>
2  at 3.)

3

4       In its Motion in Limine ruling, the Court found Mr.
5  Egan's proffered testimony would be relevant to the
6  following issues: (1) whether the Defendant lacked intent
7  to defraud; and (2) the purported reasonableness of
8  Defendant's belief that he acted lawfully.  (<u>Id.</u>)

9

10      On May 3, 2009, the Government brought a "Motion for
11 Reconsideration of the Court's Prior Order Permitting
12 Testimony of Defendant's Expert Witness Patrick Egan,"
13 which the Defendant opposed.  Outside the presence of the
14 jury, the Court heard argument on the Motion and ruled
15 that Mr. Egan could not testify until the defense laid
16 sufficient foundation, i.e., through the Defendant's own
17 testimony or otherwise, that he was confused about the
18 FDA's prescription drug importation policy and about the
19 wrongfulness of his actions.  The defense objected that
20 this constituted a change in the Court's earlier ruling,
21 and that circumstantial evidence regarding the manner of
22 Defendant's importation of the drugs sufficed as
23 foundation for the expert's testimony.

24

25      As it stated on the record during the hearing, the
26 Court's ruling during trial on the admissibility of
27 Egan's testimony was not a change from its prior ruling.

28

1   Rather, it simply reiterated the rule that any evidence

2   must be supported with sufficient foundation before it

3   may be admitted and published to the jury, whether

4   testimonial or documentary.  See Fed. R. Evid. 402;

5   LuMetta v. U.S. Robotics, Inc., 824, F.2d 768, 771 (9th

6   Cir. 1987).  The Court found the evidence cited by

7   defense counsel did not provide sufficient foundation for

8   Egan's testimony; there was no connection between the

9   proffered testimony regarding general confusion of the

10  public as to the FDA's importation policy of prescription

11  drugs for personal use and the Defendant's acts of

12  importing, or directing others to import, prescription

13  drugs to distribute to his patients and not for personal

14  use.  Accordingly, the Court ruled, lacking the requisite

15  foundation (in the form of Defendant's testimony, for

16  example), that the Defendant held the belief he was

17  acting lawfully, consistent with the general public's

18  confusion regarding the legality of importing

19  prescription drugs for personal use, Egan's testimony was

20  inadmissible.

21

22      In the Motion for a New Trial, Defendant argues the

23  Court's ruling entitles him to a new trial for two

24  reasons: (1) the Court was incorrect in ruling the

25  Defendant must testify before Mr. Egan's expert testimony

26  could be introduced; and (2) Defendant was prejudiced

27  unduly because defense counsel, relying on the Court's

28

Motion in Limine ruling, previewed Mr. Egan's testimony
to the jury during his opening statement but was unable
to deliver on his promise that Egan would testify.  (See
Mot. at 8-9.)

    As to his first reason, Defendant argues United
States v. Frantz, 2004 WL 5642909 (C.D. Cal. April 23,
2004), authored by the Honorable Margaret M. Morrow of
this Court, shows the impropriety of the Court's
requirement that the Defendant testify before Mr. Egan
could testify.  The Court notes Defendant opposed the
Government's Motion for Reconsideration by arguing the
applicability of this case; the Court previously
distinguished this case at the hearing on the Motion for
Reconsideration.  Frantz is a tax fraud case with little
factual similarity to this case.  Although the Frantz
Court did not require the defendant to testify to lay
sufficient foundation for his expert's testimony, it held
the defense could lay sufficient foundation through other
circumstantial evidence.

    Here, the defense proffered the circumstantial
evidence of Defendant's belief as to the legality of his
actions, i.e., Defendant's own testimony about his
beliefs, to satisfy Federal Rule of Evidence 402's
foundation requirements for Mr. Egan's testimony.  The
Court abides by its ruling on this issue for the reasons

stated above and on the record during the hearing on the
Motion to Reconsider.

Defendant's second basis, that he suffered unfair
prejudice because his lawyer described Egan's testimony
during his opening statements but the Court barred him
from presenting the witness's testimony, lacks merit as
well.  At the hearing on this issue during trial, the
defense framed this argument as an objection under
Federal Rule of Evidence 403, contending Defendant would
be unfairly prejudiced if not allowed to present Egan's
testimony.

Rule 403, however, only allows the exclusion of
relevant evidence when the danger of, <u>inter alia</u>, unfair
prejudice outweighs its probative value.  The defense
here was not seeking to *exclude* evidence, but rather
*admit* it.  As the Court pointed out at the hearing,
balancing the interests at stake here, i.e., (1) the
purported prejudice to Defendant because he was unable to
offer the testimony of his expert witness after
describing it to the jury during opening statement,
balanced against (2) the impropriety of permitting a
witness whose testimony lacked proper foundation to
testify, did not favor the defense.

1      Defendant next argues his counsel's promise in
2   opening statement of Egan's testimony, and subsequent
3   inability to deliver it, constitutes grounds for a new
4   trial.  (See Mot. at 13 ("Courts have repeatedly held
5   that a defense attorney's failure to present the promised
6   testimony of an important witness constitutes conduct
7   that is so profoundly prejudicial to the criminal
8   defendant that it warrants reversal or vacation of a
9   conviction.").)  In support of his argument, Defendant
10  relies on several cases, to no avail.  (See Mot. at 13-17
11  (citing Ouber v. Guarino, 293 F.3d 19 (1st Cir. 2002);
12  States v. Washington, 219 F.3d 620 (7th Cir. 2000);
13  Harris v. Reed, 894 F.2d 871 (7th Cir. 1990); Anderson v.
14  Butler, 858 F.2d 16 (1st Cir. 1998); United States v.
15  Gonzalez-Maldonado, 115 F.3d 9 (1st Cir. 1997)).)
16
17      First, most of Defendant's cited cases arise in the
18  context of habeas corpus petitions granted because of
19  ineffective assistance of trial counsel, a completely
20  different legal question than that posed here.  See,
21  e.g., Ouber, 293 F.3d at 33-34; Washington, 219 F.3d at
22  634; Harris, 894 F.2d at 879; Anderson, 858 F.2d at 17.
23  Furthermore, most of Defendant's cases are
24  distinguishable factually; there, the defense counsel
25  failed, either out of incompetence or negligence, to call
26  "key" witnesses they described during opening statements
27  to the jury.  Id.  Defense counsel here did not fail to
28

1  call Dr. Egan; he attempted to do so but was not allowed,
2  as the evidentiary requirements for the witness's
3  testimony had not been satisfied.

4

5      Defendant relies in particular on the First Circuit's
6  decision in Gonzalez-Maldonado.  That case, too, is
7  distinguishable from ours.  There, the district court
8  stated it would allow an expert to testify about the
9  mental illness of the defendant's co-conspirator, Julio
10  Robles-Torres ("Robles"), who the court had found
11  incompetent to testify at trial.  115 F.3d at 14.  In
12  lieu of Robles's testimony, the Government planned to
13  introduce taped conversations between the defendant and
14  Robles in its case-in-chief as evidence of the
15  conspiracy.  Id. at 13-14.  The Robles tapes constituted
16  key evidence of the defendants' guilt in the government's
17  case.  Id. at 16.

18

19      During opening statements, defense counsel and
20  counsel for the government mentioned anticipated
21  testimony regarding Robles's mental state.  Id. at 14.
22  Specifically, defense counsel told the jury:
23      "The expert selected by this Court, Dr. Fumero,
24      selected by this Court, will come here, will sit
25      there and will testify that during this conspiracy
26      ... Mr. Julio Robles-Torres was mentally insane.
27      Therefore, you cannot trust him.  You cannot put much
28

1   attention to what he's saying because he

2   exaggerates."

3   <u>Id.</u>  After the government rested its case, the district

4   court "reconsidered its earlier decision and decided that

5   Dr. Fumero would not be allowed to testify because the

6   testimony would only go to the issue of Robles'[s]

7   competency as a witness, which is a question for the

8   court ...."  <u>Id.</u>

9

10   On appeal, the First Circuit found it reversed the

11   conviction.  It held Dr. Fumero's testimony admissible

12   and relevant to Robles's credibility, and the defendant

13   had suffered prejudice as a matter of law when the

14   district court reconsidered its ruling on the expert's

15   ability to testify after both counsel mentioned his

16   testimony in their opening statements.  <u>Id.</u> at 15-16.

17   Emphasizing the critical nature of Dr. Fumero's

18   testimony, the First Circuit explained:

19   "A defendant's opening statement prepares the jury to

20   hear his case.  <u>If the defense fails to produce</u>

21   <u>promised expert testimony that is critical to the</u>

22   <u>defense strategy</u>, a danger arises that the jury will

23   presume that the expert is unwilling to testify and

24   the defense is flawed.  That the defendant should

25   suffer this presumption because he relied on a prior

26   ruling of the trial court that the same court later

27   reversed, rather than because of poor judgment on the

28

11

1    part of his own counsel, in no way changes the fact

2    that the presumption formed in the minds of the jury

3    is prejudicial.... [W]e find that promising to admit

4    this important evidence and then failing to produce

5    it is prejudicial as a matter of law in the

6    circumstances of this case.... [W]e find that denying

7    defendants the opportunity to have Dr. Fumero

8    testify, in light of the fact that the court's

9    decision on the matter led defense counsel, in their

10   opening remarks, to promise the expert's testimony to

11   the jury, was reversible error."

12   Id. at 15 (emphasis added).

13

14   An examination of the record here reveals that by

15   contrast defense counsel only briefly mentioned Patrick

16   Egan and his anticipated testimony during opening

17   statement, as part of what he called the "general

18   background."  His description consumed but eleven lines

19   of the twenty-three transcribed pages of the defense's

20   opening statement:

21   "You will hear from an expert on this issue [of the

22   FDA's Personal Importation Policy], a man by the name

23   of Patrick Egan.  Mr. Egan is a lawyer and he has a

24   lot of experience dealing with this area of

25   importations of drugs and unapproved labeling and

26   things like that.  He's testified in the United

27   States Congress about it.  And Mr. Egan will testify,

28

1    he will tell you that various government agencies
2    have complained that there's a lot of confusion out
3    there in the public, among the public, about whether
4    it's permitted for a traveler to bring medicine and
5    under what circumstances it is permitted for a
6    traveler to bring medicine from a foreign country
7    into the United States."

8

9    Before and after this short reference to Dr. Egan,
10   Defendant's lawyer covered many other subjects in his
11   opening statement, including:
12   • Defendant's national origin, medical training,
13     and years of experience as a doctor;
14   • Some details about Defendant's medical practice
15     in Upland, California and his specialization in
16     internal medicine and oncology;
17   • Defendant's dedication to his patients and his
18     staff;
19   • Defendant's efforts to stay current in his
20     profession;
21   • Defendant's general record-keeping practice in
22     his office;
23   • Defendant's frequent travel to India to visit
24     his parents and his purchase of drugs there to
25     bring back to the U.S. to use in his practice;
26
27
28

13

- Jessica Young's expected testimony about importing drugs from Honduras at the direction of Defendant;
- Defendant's procedure for stocking the drugs in his office, administering them to his patients, and generating invoices for the drugs he imported;
- Defendant's administration of the drugs he imported to his patients;
- An overview of the charges against Defendant;
- The time line of events charged in the Indictment;
- A description of the elements of "acting with intent to defraud or mislead";
- The defense's contention that the charges were about the labeling on the drugs, not the drugs themselves;
- The appearance of the labeling on some of the drugs imported by Defendant;
- Defendant's belief that his actions were legal;
- Defendant's admission that he imported drugs into the United States;
- The manner in which Defendant imported the drugs in his luggage;
- Specific instances of Defendant's interaction with Customs agents;

1     •    Defendant's interaction with Customs agents on
2         April 4, 2002;

3     •    Defendant's interaction with Customs on April 3,
4         2005;

5     •    The expected testimony of United States Customs
6         Service Agent Cuevas, who interacted with
7         Defendant on April 3, 2005;

8     •    The FDA policy regarding importing drugs for
9         personal use;

10    •    United States Customs agents' discretion when
11        enforcing the FDA policy;

12    •    The policy of the United States Customs Service
13        on retention of declaration forms filled out by
14        travelers;

15    •    The difference between brand names for drugs and
16        their corresponding chemical names;

17    •    Medicare's reimbursement policy and practice for
18        drugs administered by doctors to their patients;
19        and

20    •    Defendant's failure to destroy documents or the
21        imported drugs before or after the FDA searched
22        his office on July 30, 2008.

23

24      In other words, viewing the reference to Dr. Egan's
25 testimony in the context of the entire opening statement,
26 it was a very brief mention amongst dozens of other
27 subjects.  In contrast to Gonzalez-Maldonado, this is not

28

1    a case where the government was able to present its
2    critical witness's testimony through taped evidence but
3    the defendant was unable to cross-examine him or call a
4    witness to question his credibility.  Instead, the
5    defense seeks admission of expert testimony unsupported
6    by foundation.  In <u>Gonzalez-Maldonado</u>, Dr. Fumero's
7    testimony weighed on the credibility of Robles's recorded
8    statements; here, Egan's testimony could not show the
9    reasonableness of Defendant's actions, as Defendant
10   argues, because there was no link between the
11   reasonableness of a mistaken belief about the FDA's
12   personal importation policy for prescription drugs and
13   Defendant's actions in this case.
14
15       Furthermore, as the Government points out in its
16   Opposition, the Court's rulings on Motions in Limine are
17   not binding on the Court throughout the trial.  (<u>See</u>
18   Opp'n at 8 (citing <u>Ohler v. United States</u>, 529 U.S. 753,
19   758 n. 3 (2000) and <u>Luce v. United States</u>, 469 U.S. 38,
20   41-42 (1984)).  As the Supreme Court noted in <u>Luce</u>,
21   where, as here, the defendant chose not to testify at
22   trial:
23       "Any possible harm flowing from a district court's *in*
24       *limine* ruling permitting impeachment by a prior
25       conviction is wholly speculative.  The ruling is
26       subject to change when the case unfolds, particularly
27       if the actual testimony differs from what was
28

16

1    contained in the defendant's proffer.  Indeed even if
2    nothing unexpected happens at trial, the district
3    judge is free, in the exercise of sound judicial
4    discretion, to alter a previous *in limine* ruling."
5    <u>Id.</u>

7    Finally, the purported prejudice to Defendant by
8    being unable to deliver his expert witness was cured by
9    the following: (1) the Court gave the Ninth Circuit Model
10   Criminal Jury Instruction No. 3.7 to the jury, explaining
11   that statements by counsel are not evidence; and (2) the
12   Court barred the Government from arguing defense counsel
13   "broke its promise" by failing to introduce Egan's
14   testimony and, in fact, no witness or lawyer mentioned
15   Egan in front of the jury after defense counsel made the
16   aforementioned reference during his opening statement.

18   Accordingly, the Court's decision to bar Dr. Egan
19   from testifying does not constitute sufficient grounds
20   for the Court to grant Defendant's Motion for New Trial.

22   **2.  Agent Leitner's Testimony**
23   Agent Leitner, a Special Agent with the FDA Office of
24   Criminal Investigations, testified during the
25   Government's case about an interview he conducted of Dr.
26   Patwardhan.  On direct examination, the agent testified
27   that when interviewed during the search of his office

28

17

premises, Defendant said "words to the effect that . . .
I am less than a man or I'm not a man."  When asked on
redirect examination why he remembered that statement by
Defendant, Agent Leitner testified as follows:

>Answer:         It was, I mean, the defendant is sitting
>                right there.  He knows full well that he
>                made that comment and it was stated.  We
>                did talk about that.

The defense objected immediately; the Court sustained
the objection and instructed the jury to disregard the
agent's answer.  At the end of the trial when the Court
instructed the jury on the applicable law, the Court gave
the Ninth Circuit Model Criminal Jury Instruction No. 3.3
about Defendant's decision not to testify: "A defendant
in a criminal case has a constitutional right not to
testify.  No presumption of guilt may be raised, and no
inference of any kind may be drawn, from the fact that
the defendant did not testify."

Defendant now argues Agent Leitner's statement
violated his Fifth Amendment right not to testify at
trial, i.e., that the "Fifth Amendment prohibits the
prosecution from commenting on a defendant's decision not
to testify."  (See Mot. at 26 (citing Lincoln v. Sunn,
807 F.2d 805, 809 (9th Cir. 1987)).)  Defendant argues
Agent Leitner's comment was so prejudicial that it could

1   not be cured by the Court's immediate instruction to the

2   jury to disregard the comment or the jury instruction

3   about Defendant's Fifth Amendment right not to testify.

4   (Id.)

5

6       The Due Process Clause of the Fifth Amendment

7   prohibits a prosecutor from commenting on the defendant's

8   decision not to testify.  See Griffin v. California, 380

9   U.S. 609, 615 (1965).  A direct comment about the

10  defendant's failure to testify always violates Griffin; a

11  prosecutor's indirect comment violates Griffin "'if it is

12  manifestly intended to call attention to the defendant's

13  failure to testify or is of such a character that the

14  jury would naturally and necessarily take it to be a

15  comment on the failure to testify.'"  Hovey v. Ayers, 458

16  F.3d 892, 912 (9th Cir. 2006) (quoting Lincoln v. Sunn,

17  808 F.2d at 809).

18

19      In Hovey, the Ninth Circuit found a prosecutor's

20  indirect comment that the defendant never explained his

21  actions to the jury or contradicted testimony of other

22  witnesses violated Griffin.  458 F.3d at 912.  The Ninth

23  Circuit found the error harmless, however because it was

24  an isolated comment, the government did not stress to the

25  jury an inference of guilt from the defendant's silence,

26  and there was sufficient evidence to support the

27  defendant's conviction.  Id.

28

Here, Agent Leitner mentioned Defendant's ability to explain what he said during Defendant's interview with Agent Leitner; thus, the statement constituted, at most, an indirect reference to Defendant's choice not to testify at trial, i.e., Defendant chose not to explain his "I'm not a man" statement to the jury.  Even if this violated <u>Griffin</u>, under <u>Hovey</u>, any error was harmless: (1) this was a single comment with an immediate, sustained objection, and a curative instruction to the jury with no further mention of or reference to the statement; (2) the Government did not stress any inference of guilt from Defendant's decision not to testify; and (3) there was sufficient evidence to support the conviction, as discussed in detail below.

Furthermore, Defendant's argument is not persuasive for an additional reason.  In the case law described above and relied upon by Defendant, the improper comment or argument was made by the prosecutor; here, the comment was made by a government witness, a federal law enforcement officer, but not the attorney for the Government.

Accordingly, the Court finds Agent Leitner's comment not a sufficient basis upon which to grant the Motion for New Trial.

Defendant argues an additional basis for his Motion for New Trial, that the Government failed to present any evidence to support the essential elements of the misbranding offense which necessitates a new trial on the smuggling counts.  The Court discusses this basis below, in Section III(B)(3).

### III. MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Dr. Patwardhan cites the following grounds for his Motion for Acquittal: (1) "the government introduced no evidence of a nexus between the introduction into interstate commerce of foreign medicines and the alleged misbranding violations"; and (2) "the government never introduced evidence establishing the requisite nexus between the alleged fraud and the alleged misbranding violations" or "evidence of materiality."  (See Mot. at 18-25.)

### A.   Legal Standard

Rule 29(c) of the Federal Rules of Criminal Procedure ("Rule 29(c)") permits a defendant to move for a judgment of acquittal after a guilty verdict if the evidence adduced at trial was insufficient to sustain a conviction.  "'There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense[]

charged beyond a reasonable doubt.'  In conducting this
review, '[the Court is] powerless to question a jury's
assessment of witnesses' credibility,' and 'must presume
... that the trier of fact resolved any ... conflict[ing
inferences] in favor of the prosecution.'" United States
v. Johnson, 229 F.3d 891, 893 (9th Cir. 2000) (citing
United States v. Hinton, 222 F.3d 664, 669 (9th Cir.
2000); see also United States v. Croft, 124 F.3d 1109,
1125 (9th Cir. 1997).

**B.   Discussion**

    **1.   United States v. Evers**

    Defendant argues the Government failed to prove all
elements of the misbranding charges.  In support of this
basis for the Motion for Judgment of Acquittal, Defendant
relies entirely on a Fifth Circuit case, United States v.
Evers, 643 F.2d 1043 (5th Cir. 1981).

    In Evers, the Fifth Circuit held the doctor-defendant
did not misbrand the medicines he administered to his
patients for a non-FDA-approved use because he did not
distribute the drugs to other doctors.  (See Mot. at 18-
19.)  According to Defendant, Evers stands for the
principle that the Government could not prove his guilt
of the misbranding Counts because he did not distribute
the prescription drugs he imported to other physicians.
(See Mot. at 18-20.)

1    The Court declines to apply the holding of <u>Evers</u> here
2 for several reasons.

3

4    First, in <u>Evers</u>, the defendant was not charged under
5 the same sections of the Food, Drug and Cosmetic Act
6 ("FD&C Act") as the sections under which Defendant
7 Patwardhan was charged.  In seeking to enjoin Dr. Evers'
8 practice of misbranding prescription drugs, the
9 government argued Dr. Evers had violated Title 21 of the
10 United States Code, Sections 331(k)[3] ("Section 331(k)")
11 and 352(f)(1)[4] ("Section 352(f)(1)").  <u>Id.</u> at 1046.
12 Here, the grand jury charged Dr. Patwardhan with
13 violating Title 21 of the United States Code, Sections
14 331(a)[5] ("Section 331(a)"), 333(a)(2)[6] ("Section
15 333(a)(2)"), 352(c)[7] ("Section 352(c)"), and 352(f)(1).

16 _____

17    [3] This section states the following act is prohibited
under the FD&C Act: "(k) The alteration, mutilation,
18 destruction, obliteration, or removal of the whole or any
part of the labeling of, or the doing of any other act
19 with respect to, a food, drug, device, or cosmetic, if
such act is done while such article is held for sale
20 (whether or not the first sale) after shipment in
interstate commerce and results in such article being
21 adulterated or misbranded."

22    [4] This section requires a label or labeling to
include "(1) adequate directions for use."

23
   [5] This section of the FD&C Act prohibits: "The
24 introduction or delivery for introduction into interstate
commerce of any food, drug, device, or cosmetic that is
25 adulterated or misbranded."

26    [6] This section of the FD&C Act provides the penalties
for violations of the Act.

27
   [7] This section of the FD&C Act states a drug or
28                                            (continued...)

23

1  (See Second Superseding Indictment.)   The only common

2  alleged violation by Dr. Evers and Defendant Patwardhan

3  was Section 352(f)(1).

4

5      Assuming, arguendo, Evers applies to Section

6  352(f)(1), mandating the Government prove the doctor-

7  defendant distributed prescription drugs to other doctors

8  to be found guilty, Evers does not require acquittal

9  here.  As the Government argues in Opposition, the Second

10 Superseding Indictment gave two alternative bases for Dr.

11 Patwardhan's misbranding conviction: (1) violation of

12 352(f)(1) because the labeling on the drugs he imported

13 lacked adequate directions for use; and (2) violation of

14 352(c) because the "label or labeling was not in such

15 terms as to render them likely to be read and understood

16 by the ordinary individual under customary conditions of

17 purchase and use."[8]  (Second Superseding Indictment at

18 14; Opp'n at 11-12, n.5)  Although the Government did not

19 prove Dr. Patwardhan distributed the drugs to other

20

21 _____

      [7](...continued)
22 device is misbranded if: "(c) Prominence of information
   on label.  If any word, statement, or other information
23 required by or under authority of this chapter to appear
   on the label or labeling is not prominently placed
24 thereon with such conspicuousness (as compared with other
   words, statements, designs, or devices, in the labeling)
25 and in such terms as to render it likely to be read and
   understood by the ordinary individual under customary
26 conditions of purchase and use."

27     [8] The Verdict Form for Counts Two and Three did not
   require the jury to select which basis it chose to
28 establish Defendant's guilt.

                          24

doctors, the jury's conviction of Dr. Patwardhan on these

Counts remains supported; pursuant to Section 352(c), the

jury could have found Dr. Patwardhan guilty because the

jurors found the label or labeling on the drugs Dr.

Patwardhan imported and administered to his patients was

not "in such terms as to render it likely to be read and

understood by the ordinary individual under customary

conditions of purchase and use."  21 U.S.C. § 352(c).

    Defendant argues Evers should be applied to Section

352(c) because "by law only physicians (or those acting

under their supervision) can use prescription drugs, and

thus any statutory duty imposed by Section 352(c) to have

labeling that is comprehensible under 'customary

conditions of purchase and use' is owed to physicians

alone and can only be violated by distribution or

intended distribution to physicians."  (Reply at 13.)

    Such an interpretation ignores the plain language of

the statute, which uses the term "ordinary individual,"

not "ordinary physician."  See Boise Cascade Corp. v.

U.S. E.P.A., 942 F.2d 1427, 1432 (9th Cir. 1991) ("Under

accepted canons of statutory interpretation, we must

interpret statutes as a whole, giving effect to each word

and making every effort not to interpret a provision in a

manner that renders other provisions of the same statute

inconsistent, meaningless, or superfluous.").  Section

1  352(c) establishes a requirement that label or labeling

2  on prescription drugs must be comprehensible by ordinary

3  persons, including but not limited to doctors, when they

4  purchase and use the products.  See Avendano-Ramirez v.

5  Ashcroft, 365 F.3d 813, 816 (9th Cir. 2004) ("Canons of

6  statutory construction dictate that if the language of a

7  statute is clear, we look no further than that language

8  in determining the statute's meaning.")

9

10     Lastly, the factual distinctions between Evers and

11 this case are many.  The government charged Evers with

12 advertising treatment for a certain medical condition

13 with FDA-approved drugs but a non-FDA approved use; the

14 Fifth Circuit held the government had not proven its case

15 because it had not shown Dr. Evers distributed the drugs

16 to other doctors, but only distributed and administered

17 the drugs to his patients.  Evers, 643 F.2d at 1053.

18

19     Here, of course, the Government charged Defendant

20 with distributing non-FDA approved drugs; the evidence at

21 trial established he distributed such medicines to his

22 patients, and then charged them and their insurance

23 carriers for the FDA-approved version.

24

25     Also, Evers obtained the FDA-approved drugs through

26 ordinary distribution chains from pharmaceutical

27 manufacturers, whereas Dr. Patwardhan introduced the non-

28

1  FDA-approved drugs into interstate commerce by importing
2  them into the country himself or through his staff.  Id.
3  at 1049-50.  Lastly, unlike Dr. Evers, Dr. Patwardhan was
4  not advocating to other doctors a new treatment about
5  non-approved uses for FDA-approved drugs; rather, Dr.
6  Patwardhan administered non-FDA-approved drugs to his
7  patients without their knowledge and profited from the
8  venture.  Id. at 1053, n. 16.

9

10      **2.   Dr. Patwardhan's Intent to Defraud or Mislead**
11      Next, Defendant argues there was insufficient
12  evidence of his purported intent to defraud or mislead to
13  sustain his conviction for misbranding.  (Mot. at 20-24.)
14  Specifically, he argues the Government failed to prove a
15  nexus between the particular misbranding violations and
16  Defendant's purported intent to defraud or show that his
17  misrepresentations were material.  (Id. (citing United
18  States v. Geborde, 278 F.3d 926, 930 (9th Cir. 2002);
19  United States v. Arlen, 947 F.2d 139, 143 (5th Cir.
20  1991); United States v. Mitcheltree, 940 F.2d 1329, 1349-
21  50 (10th Cir. 1991).)

22

23      Assuming, arguendo, the Government was required to
24  prove Defendant specifically intended to defraud or
25  mislead his patients as to adequacy of directions for use
26  of the drugs or as to the comprehensibility of the labels
27  or labeling on the drugs, the Government met its burden
28

1  of proof.  See Mitcheltree, 940 F.2d at 1349-50.  During

2  trial, Kathy Walton testified that she contacted

3  Defendant's office to inquire as to the name of one of

4  the drugs she obtained for her mother's treatment because

5  she did not recognize it.  Defendant's employees

6  testified that, following Ms. Walton's inquiry, Defendant

7  was upset and restricted his employees from sending

8  prescription drugs home with his patients, for fear they

9  would ask more questions.  This was evidence of

10 Defendant's intent to mislead his patients as to the

11 comprehensibility of the label or labeling of the drugs

12 he administered to them, plus proof that his intent to

13 defraud or mislead was connected directly to the

14 comprehensibility of the label or labeling on the drugs.

15 In addition, Ms. Walton's testimony showed her reliance

16 on the comprehensibility of the labeling on her mother's

17 prescription drugs that she obtained from Defendant.[9]

18 See United States v. Nguyen, 565 F.3d 668 (9th Cir. 2009)

19 (materiality is an undisputed element of felony

20 misbranding); United States v. Watkins, 278 F.3d 961, 969

21 (9th Cir. 2002) (same).

22

23     Furthermore, as the Government argues, there was

24 evidence at trial that Defendant and "his co-conspirators

25 _____

26     [9] Defense counsel pointed out at the hearing that
Defendant was not charged with misbranding the drug given
27 to Kathy Walton's mother.  Defense counsel was correct;
this evidence, however, remains relevant to the issue of
28 Defendant's intent to defraud or mislead.

made extensive efforts to avoid detection, including
hiding drugs from auditors, misleading patients about
where the drugs came from, [after the Kathy Walton
incident] refusing to send the drugs home with patients
for fear that the patients would start asking question,
and lying to Medicare about the drugs."  (Opp'n at 16.)
Taken together, that evidence showed Defendant's specific
intent to defraud or mislead his patients as to the
comprehensibility of the label or labeling on the drugs
and as to adequacy of the directions for use on the
drugs.

     Additional evidence of Defendant's intent to defraud
and mislead was as follows: (1) Defendant never declared
the drugs on his Customs forms; (2) Defendant lied to a
Customs inspector about how long he had been traveling in
India; (3) Defendant directed Velma Yep, a co-
conspirator, to give drugs she purchased abroad at his
direction to Jessica Young, another co-conspirator, and
"no one else;" (4) Defendant asked Jessica Young to ask a
doctor friend to buy drugs in India and not to mention
that Defendant asked her to do so; (5) Defendant picked
up the drugs personally instead of using an international
courier; (6) the drugs were no longer cold when
Defendant's staff inventoried them at the office; and (7)
Defendant is an educated medical doctor who is familiar

with the FDA, its regulation of drugs, and its regulatory standards.  (See Opp'n at 21-22.)

Contrary to Defendant's arguments, the Government presented sufficient evidence to support the conviction on the misbranding Counts.  Viewing the evidence in the light most favorable to the Government, the Court finds a rational trier of fact would have convicted Defendant Dr. Patwardhan of the misbranding Counts; the Court DENIES the Motion for Judgment of Acquittal on the misbranding Counts.

**3.   Motion for New Trial on Smuggling Counts**

According to Defendant, because the Government could not prove his guilt of the misbranding Counts, the Court should also grant him a new trial on the smuggling Counts because the jury may have found him guilty of the smuggling Counts improperly, based on the misbranding Counts.  (Mot. at 26.)  As the Court has found sufficient evidence supports Defendant's conviction on the misbranding Counts, the Court finds the conviction on the smuggling Counts has not been undermined.  (Cf. Mot. at 18-20.)  Thus, this argument is also insufficient to support Defendant's Motion for New Trial.

IV. CONCLUSION

1      Defendant fails to satisfy the burden imposed on the

2  party seeking a new trial or acquittal, i.e., to show

3  that the evidence preponderates heavily against the

4  verdict.  For the foregoing reasons, the Court DENIES

5  Defendant's Motion for Judgment of Acquittal and/or New

6  Trial.

7

8

9

10  Dated: July 18, 2009          _____

11                                VIRGINIA A. PHILLIPS
                                  United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28