1          UNITED STATES DISTRICT COURT
          CENTRAL DISTRICT OF CALIFORNIA
2           EASTERN DIVISION-RIVERSIDE

3

      HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING
4

5    UNITED STATES OF AMERICA,        )
                                      )
6              Plaintiff,             )
                                      )
7    V.                               )DOCKET NO. EDCR 08-172(B)VAP
                                      )
8    VINOD CHANDRASHEKM PATWARDHAN,   )
                                      )
9              Defendant.             )
     _____)

10

11      REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                Riverside, California
12            Wednesday, April 29, 2009

13

              PHYLLIS A. PRESTON, CSR
14              License No. 8701
          Federal Official Court Reporter
15        United States District Court
              3470 Twelfth Street
16        Riverside, California 92501

17

18

19

20

21

22

23

24

25

1                                   **APPEARANCES**

2

    For the Plaintiff:        OFFICE OF THE UNITED STATES ATTORNEY
3                             By:   JOSEPH WIDMAN
                                    JERRY BEHNKE
4                             Assistant United States Attorneys
                              3880 Lemon Street, Suite 210
5                             Riverside, California 92501

6

    For the Defendant:        BIRD MARELLA
7                             By:   BENJAMIN GLUCK & JEAN RHEE
                              1875 Century Park East, 23rd Floor
8                             Los Angeles, California 90067

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2
    WITNESS
 3

 4  FOR PLAINTIFF:                                 PAGE

 5

    NORMA FRANCO
 6  DIRECT EXAMINATION BY MR. WIDMAN . . . . . . . . . . 46

 7

 8

 9
```

```
10          EXHIBITS                          ADMITTED
            1 A-W                             48
11          112 A-D                           59
            113 A-D                           61
12          114 A-B                           67
            115 A                             71
13          127 A-B                           78
```

```
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              WEDNESDAY, APRIL 29, 2009, RIVERSIDE, CALIFORNIA

 2                             ---o0o---

 3              THE COURT:  Mr. Widman, or is it Mr. Behnke?

 4              MR. BEHNKE:  Yes, Your Honor.

 5              THE COURT:  You may proceed.

 6              MR. BEHNKE:  Ladies and gentlemen, the Government

 7    expects that over the next week and a half to two weeks or so

 8    the evidence is going to show that this is a case about

 9    greed.  It's a case about money.

10              The Government expects that the evidence is going

11    to show the defendant smuggled the drugs from these foreign

12    countries into the United States and gave the drugs to his

13    patients because the drugs were cheaper.  The unapproved

14    drugs in India, Honduras, Panama, and the Philippines were

15    much cheaper than approved drugs in the United States.

16              After smuggling the drugs into the United States

17    the defendant administered the drugs to his patients.  He

18    didn't tell his patients exactly what they were getting, and

19    he billed the patients, their insurance companies, and

20    Medicare as though they were receiving the approved United

21    States drugs, the FDA-approved drugs.  By doing so, he

22    realized a substantial profit.

23              You will learn that the defendant has been a

24    practicing physician in this state for over 25 years.  Among

25    other things, he administers chemotherapy and cancer
```

 1    treatments to cancer patients at an office in Upland,

 2    California.

 3              During the trial you will see some photographs of

 4    the office.  This is the exterior of the office.  You see the

 5    defendant's name above the door.  Here's a shot of the inside

 6    of the office, waiting area.  And you see here a photograph

 7    of a refrigerator where some of the cancer drugs were stored

 8    in this room.  The employees that work for the defendant will

 9    refer to this as the lab area.

10              And you see in this photograph a photograph of the

11    chemotherapy room.  In this room patients would come, they

12    would sit in these chairs, sometimes for several hours, and

13    by IV treatment they would receive chemotherapy drugs.  You

14    will learn that that happened on Tuesdays and Thursdays in

15    the defendant's office.

16              Now, normally, the cabinets and other doors that

17    you see in this photograph are not open.  You'll learn that

18    this photograph was taken during a search that was conducted

19    by federal agents which is why all the doors and cabinets are

20    open in the picture.

21              The photos depict what might be considered an

22    ordinary neighborhood medical office.  However, as you will

23    learn, when patients went into this office to receive

24    treatment, to receive help for their cancer and other

25    ailments, unbeknownst to them, many of the patients that went

1   in were receiving unapproved medications from outside the

2   United States that had been smuggled into the country.

3          During the course of the trial you're going to hear

4   from several employees that worked in this medical office

5   with the defendant.  Some of the names you're going to hear

6   during the course of the trial include Norma Franco, Mayra

7   Jaurequi, Jessica Perez, Mindy Funk, and possibly even a few

8   others.

9          In addition to the medical office in Upland,

10  defendant also had a medical office in Chino.  You'll learn

11  that the patients that the defendant saw, in terms of

12  billing, fell into three categories.  Some of the patients

13  that he saw were considered cash patients.  Those were

14  patients that paid cash for services.  Other patients had

15  private insurance.  Those patients would see the defendant,

16  receive treatments, the insurance company would be billed,

17  and oftentimes the patients had to pay a co-pay to the

18  defendant.  And also some of the patients that the defendant

19  saw received Medicare benefits.  And for those patients their

20  treatments we're billed to the federal government through

21  Medicare.

22         For many years defendant obtained much of the drugs

23  that he used at his practice from outside the United States.

24  The drugs that he obtained outside the United States came

25  largely from India and Honduras, but you will also hear about

 1    some drugs coming from Panama and some drugs coming from the

 2    Philippines.

 3            Over the course of several years defendant and

 4    several of his -- excuse me -- several co-conspirators would

 5    go outside the United States.  They traveled to India.  They

 6    traveled to Honduras.  They would physically pick up the

 7    drugs, conceal the drugs in their luggage, and bring them

 8    into the United States.  They would bring them to the office

 9    and then use the drugs in their practice.

10            Most of the drugs that were used in the practice

11    were obtained in that fashion.  However, you will also learn

12    that some of the drugs that the defendant used in his

13    practice were, in fact, FDA-approved drugs.  The employees

14    and the defendant would keep track of the drug supplies in

15    the office, and when the drugs were running low, if the

16    defendant or one of the other individuals did not have a

17    foreign trip coming up, the defendant would tell his

18    employees to purchase FDA-approved drugs usually from a

19    company named OTN.

20            When the drugs would arrive from OTN, you'll learn

21    that they were shipped to the defendant's office by Federal

22    Express in a container along with dry ice.  When the drugs

23    arrived in the defendant's office from the foreign countries,

24    they were personally transported by either the defendant or

25    one of his employees.

1          A couple of the names that you're going to hear and

2     actually witnesses that you will hear from during this trial

3     are Jessica Young and Velma Yep.  And there is another

4     individual that the evidence will show brought drugs back

5     into the United States for the defendant, a dentist by the

6     name of Dr. Mhaskar.

7          Even though most of the drugs that were used in the

8     defendant's practice were the unapproved foreign drugs, you

9     will learn that the defendant and his staff when dealing with

10    the drugs, when dealing with patients, and even when dealing

11    with other physicians, always referred to FDA-approved

12    drugs.

13         I'll give you an example.  One of the drugs that

14    you're going to hear referred to a lot in this case that came

15    from India is a drug by the name of Docetax.  Docetax is a

16    chemotherapy drug that has an active ingredient, Docetaxel.

17    In the United States the FDA has approved another drug

18    product by the name of Taxotere that uses the same active

19    ingredient.  The defendant would go to India, purchase the

20    Docetax, bring it into the country, administer the Docetax to

21    his patients but referred to it as Taxotere.  In fact, you

22    will see other photographs of the inside of that refrigerator

23    that you saw earlier.  There's a bin in there that has a

24    label on it that says Taxotere.  Inside that bin they stored

25    Docetax.

1    When patients would receive chemotherapy they would
2  write on the IV drip bag the name of the drug that the
3  patient was receiving.  If the patient was receiving Docetax,
4  the name on the bag would be Taxotere.  The insurance
5  companies and Medicare would be billed for Taxotere.  The
6  patients, Medicare, were not told what was actually being
7  administered was Docetax.
8    One of the patients that was treated by the
9  defendant during this period was a woman by the name of
10 Veronica Lin.  Veronica Lin was treated by defendant from
11 late 2005 until 2007.  Her daughter, Kathy Walton, oversaw
12 Ms. Lin's care and paid the bills for Ms. Lin.  You're going
13 to hear from Ms. Walton during the course of this trial.  You
14 will hear that her mother, Ms. Lin, went to the defendant's
15 office many times to receive chemotherapy treatment.  In
16 addition to that, the defendant gave Ms. Walton injections or
17 shots to take home to administer to her mother at home.
18    Ms. Lin had private insurance.  Ms. Walton on
19 behalf of her mother paid co-pays to the defendant for her
20 care.  Included in the co-pays were substantial co-pays for
21 these take-home injections.  She was told and, in fact,
22 you'll see receipts that she received from the defendant's
23 office, that the take home injections were an FDA-approved
24 drug.  However, what she was actually receiving was
25 unapproved drugs that the defendant had smuggled into the

1   country from India.

2           During the course of this conspiracy the defendant

3   and his co-conspirators smuggled more than a million dollars

4   worth of drugs into the United States.  The drugs that they

5   brought into the United States were illegally smuggled into

6   the country.  The drugs were misbranded and they were not

7   approved by the FDA for distribution in the United States;

8   therefore, importation of those drugs is prohibited.  And you

9   will learn from Dr. Charles Lee, who works for the FDA, that

10  these drugs are, in fact, unapproved.  He will also explain

11  to you that the labeling on these drugs was inadequate.

12          And you'll also learn what it means for a drug to

13  become approved.  The FDA has in place a rigorous procedure

14  where drug companies, when they want to seek approval to

15  distribute a drug in the United States, they have to submit

16  an application to the FDA, and the FDA then inspects the drug

17  itself, the ingredients that are in the drug, the way the

18  drug interacts with the human body.  They even inspect the

19  plant and the facilities where the drug is produced before

20  they approve the product.  None of the drugs that the

21  defendant was smuggling into the country went through this

22  process.  As a result, they can't lawfully be distributed.

23          So the way that the defendant got the drugs into

24  the country so that he could administer them to his patients

25  was by smuggling them, by deceiving Customs.  The drugs would

1    come into the country in small gym bags, typically, but you

2    will also learn that sometimes the drugs were contained

3    inside department store gift boxes.  The drugs would be

4    concealed inside luggage, the checked luggage.  And when the

5    defendant, Jessica Young, Velma Yep, would enter the country

6    and pass through Customs, they wouldn't declare the

7    merchandise that they were importing, specifically the drugs.

8    Once the drugs were admitted into the country, he would

9    administer them to his patients.

10           And, again, why go to this trouble?  Why go to the

11   trouble of going overseas, going to Honduras and physically

12   bringing these drugs back?  Again, the evidence will show

13   because of the money.

14           Jessica Young is going to testify for you that not

15   only did she make many trips to Honduras and bring back many

16   drugs for the defendant, but that she kept detailed records

17   of all of these transactions.  Jessica Young during this time

18   was the defendant's office manager, worked in the defendant's

19   medical practice, and she kept detailed records of her trips,

20   of the defendant's trips, and of the trips made by Velma Yep

21   and Dr. Mhaskar.

22           One of the things that she kept track of was cost

23   comparisons.  And the records that she kept show that

24   purchasing the drugs outside the country, these unapproved

25   drugs, resulted in substantial savings.  Some of her records

 1   show that they were saving 60 percent or more by buying the

 2   drugs outside the country.

 3           When you extrapolate that to over a million dollars

 4   worth of drugs purchased outside the country, that results in

 5   substantial savings which translates to direct profits for

 6   the defendant, because, again, all of these drugs were billed

 7   as though they were the approved United States drugs.

 8           You will hear testimony also from Customs and FDA

 9   employees about the procedures that travelers go through when

10   they enter the country.  You will learn that travelers

11   arriving in this country on international flights are given a

12   declaration form that they have to fill out before they pass

13   through Customs.  This is the front page of such a Customs

14   declaration.

15           THE COURT:  You're going to need to focus in on

16   it.

17           MR. BEHNKE:  I'll zoom in.

18           One of the questions on the form -- we can't read

19   the entire thing on the screen, but one of the questions on

20   the form says, "Residents:  The total value of all goods

21   including merchandise I or we have purchased or acquired

22   abroad and are bringing into the U.S. is."  And then there's

23   a blank that the traveler is supposed to fill in.

24           And then the back side of the form, again, you

25   can't read the entire thing on the screen, so I'll read it

1    for you.  "U.S. residents:  Declare all articles that you

2    have acquired abroad and are bringing into the United

3    States."  And then a little farther down the form are blanks

4    where you describe the article and list the value.

5              After filling this form out, the traveler meets

6    with the Customs agent and the Customs agent checks the

7    passport, checks the Customs declaration form.  And then,

8    after passing that point, the traveler goes to collect their

9    checked baggage.

10             If a traveler declares on this form that they have

11   commercial merchandise or merchandise valued at over $2,000,

12   Customs will require what they call a formal entry.  A formal

13   entry has several requirements that go with it, including

14   posting of a bond, but for this purpose what's important

15   about the formal entry is when formal entries are made of

16   commercial merchandise, for instance, merchandise that's

17   going to be sold in the United States, there's a permanent

18   record made of that entry.  If the traveler makes a formal

19   entry, that gets entered into a database and there's

20   permanent record of it.

21             You'll learn that defendant made approximately

22   12 to 13 trips to India, brought drugs back on those trips,

23   thousands of dollars worth of drugs.  Some of the trips that

24   the defendant made to India he transported back in his

25   luggage 49, $50,000 or more worth of drugs.  You'll learn

1    that that amount of drugs usually translated into about a

2    three-month supply for his medical practice.  Again, the

3    drugs were administered to his patients back in his office.

4    There's no record of any formal entries by the defendant.

5           Now, you will also learn that after the travelers

6    passed through Customs some passengers are selected for

7    secondary inspection.  When passengers are selected for

8    secondary inspection, they collect their checked luggage and

9    then go to the secondary inspector.  You will learn during

10    the course of this conspiracy, I believe you will learn that

11    it was in 2005, the defendant, on one of his trips when he

12    had drugs in his luggage, was selected for secondary

13    inspection.  When a passenger is selected for secondary

14    inspection, there is a permanent record made of that fact.

15    You will see a copy of that record.

16           During the course of the trial you will hear

17    testimony from the Customs inspector that did that secondary

18    inspection in 2005.  What you will learn from him is, first,

19    that that inspector doesn't specifically remember this

20    traveler from several years ago.  But what you will learn is

21    that if the inspector during the secondary inspection

22    encountered thousands of dollars worth of drugs that were

23    going to be sold to patients here in the United States, he

24    would have required a formal entry and there would be a

25    permanent record of that.  There's no such record following

1    that secondary inspection.  The only notation in the

2    secondary inspection record is something to the effect of

3    passenger is a doctor visiting family for one month in

4    India.

5            And you will also learn that when a passenger goes

6    through secondary inspection, it's at the discretion of the

7    Customs agent doing the inspection to determine how thorough

8    that inspection is.  Sometimes some of the bags are searched.

9    Sometimes all of the bags are searched.  It's up to the

10   individual inspector.

11           As I indicated earlier, another witness that you're

12   going to hear from is Jessica Young.  You're going to learn

13   that Jessica Young has pleaded guilty to introducing

14   misbranded drugs into interstate commerce.  And pursuant to

15   that plea she has agreed to testify against her former boss

16   in this proceeding.  She is going to explain to you how the

17   practice worked.  She is going to explain to you how she

18   personally smuggled hundreds of thousands of dollars worth of

19   drugs from Honduras to defendant's medical practice.  Some of

20   the transactions that Jessica Young was involved with

21   involved $100,000 or more worth of drugs on each trip.

22           She will tell you that when she brought these drugs

23   in on the defendant's behalf, she kept the drugs concealed in

24   her luggage.  When she was presented with the Customs

25   declaration form each time she came in, she left it blank.

1    She didn't declare the drugs.  She will explain to you that

2    she did that, she kept the drugs concealed, she didn't

3    declare the drugs, because she did not want Customs to find

4    the drugs.

5            She will even explain to you that to better ensure

6    that Customs would not find the drugs, on some of the trips

7    she would hide the drugs inside Nordstrom gift boxes.  And

8    then on the box she would put a label that said donuts or

9    something to that effect.  She will tell you that she did so

10   so that Customs wouldn't look inside, wouldn't find the

11   drugs.

12           You will also hear testimony from another one of

13   the defendant's former employees named Velma Yep.  Velma Yep

14   also worked for the defendant for many years, and she, too,

15   has pleaded guilty to introducing misbranded drugs into

16   interstate commerce.  She, too, has agreed to come in and

17   testify for you against her former boss.

18           She is going to explain to you that several years

19   ago she was on vacation in Canada and the defendant called

20   her up while she was in Canada and asked her to bring drugs

21   back into the United States from Canada.  She will tell you

22   that she agreed and got off the phone, but that she actually

23   didn't go get the drugs and bring them in because she didn't

24   feel right about it.  So she came back, went to work and told

25   the defendant, "I looked for the drugs.  Couldn't find

1    them."

2         Then in 2008 she was going on a trip to the

3    Philippines.  Defendant contacted her, I believe she will

4    tell you by e-mail, and asked her when she goes to the

5    Philippines to bring some drugs back.  She will explain to

6    you that she wanted to do something for him, so she did.  He

7    requested several different drugs.  She will explain to you

8    that one of those drugs, I believe the name you will hear is

9    Zofran, she purchased in the Philippines, concealed in her

10   luggage and brought back to the defendant's practice.

11        She, too, will tell you that when she passed

12   through Customs she didn't declare the drugs that she had in

13   her possession, even though it was valued at thousands of

14   dollars, and that she brought them to the medical practice to

15   be used at the medical practice.  Again, she will explain to

16   you that she didn't declare them on the Customs form because

17   she didn't want Customs to find them.

18        Now, in March of 2008, defendant's employees in his

19   medical practice became uncomfortable with the foreign

20   medications that were there.  You will learn that a shipment

21   of drugs from India arrived at that time in a gym bag.  An

22   employee, Norma Franco, was sent to inventory the drugs in

23   the gym bag.  And you will learn that over the years Norma

24   and Mayra Jaurequi -- excuse me, I can't pronounce it

25   correctly -- Jaurequi, were typically tasked with

1    inventorying the drugs that came in in the gym bags.  In

2    March of 2008, again, Norma was sent to count the drugs in

3    the gym bag, count the drugs to make sure the defendant was

4    getting what he paid the Indian distributor for.

5           Norma Franco told another employee, a nurse

6    practitioner by the name of Mindy Funk, who you will also

7    hear from, about the drugs in the gym bag.  Mindy Funk looked

8    at the drugs in the gym bag and immediately recognized that

9    there was a problem with those drugs, immediately recognized

10   that they should not be there.  And she told other employees

11   in the office to take pictures of the drugs and take pictures

12   of the invoice that was with the drugs.  Forgive me if this

13   doesn't come out very well, it's a bad black and white, but

14   you'll see this photograph of the drugs in the gym bag.  This

15   is a copy of the photograph that was taken in March of 2008

16   by the defendant's employees.

17          In addition to taking the photograph of the drugs,

18   the employees also began taking samples of the foreign drugs

19   from the practice and taking them home so that they could

20   turn them over to the authorities.  And eventually, one of

21   his employees, Jessica Perez, did, in fact, call the police.

22   She called the authorities.  It eventually was referred to

23   the FDA, and the FDA investigation began.

24          In July 2008, FDA agents and other federal agents

25   went to the defendant's office with a search warrant.  When

1  they went to the office with a search warrant, they found the

2  unapproved foreign drugs.  They found records pertaining to

3  the drugs and other documents that you're going to see during

4  the course of this trial.

5        When they went there to do the search in July of

6  2008, they also interviewed the defendant.  You will learn

7  that the defendant arrived at the office while the search was

8  going on.  The agents greeted him.  They went into his

9  private office in the medical office that you saw the

10  pictures of.

11        Inside defendant's private office they interviewed

12  him.  They explained to him why they were there.  They told

13  him that they were their conducting a search related to an

14  investigation of his bringing unapproved drugs into the

15  country from India.

16        They showed him a copy of the search warrant which

17  contained a factual affidavit explaining the investigation.

18  You will learn that the defendant glanced at the search

19  warrant and set it aside.  The agents asked the defendant if

20  he had, in fact, been bringing unapproved drugs into the

21  country from India, and he said that he had.  They asked him

22  how many times he had done it, and he told them he had done

23  it 12 or 13 times.

24        Then at that point the defendant put his head down

25  on the desk and said something to the effect of, "I'm less

1    than a man," and then told the agents that he felt sick and

2    wanted to go home.  The agents ended the interview and got

3    one of the defendant's employees to drive him home.

4            The evidence will show that over the course of this

5    conspiracy the defendant made a great deal of money by

6    bringing the unapproved drugs into the United States and

7    giving them to his patients and billing his patients,

8    insurance, and Medicare for those drugs.

9            You will learn that it was about the money.  It was

10   about saving money on drugs and increasing his profit,

11   increasing his own bottom line.  You will learn that Jessica

12   Young and Velma Yep hid the drugs when they brought them into

13   the country because they knew it was wrong.  You will learn

14   that his other employees reported him to the police because

15   they knew that what was going on was wrong.

16           And at the end of the case the Government will ask

17   you to determine that the defendant also knew that this was

18   wrong and return verdicts of guilty on all counts.

19           THE COURT:  Thank you.

20           MR. BEHNKE:  Thank you, Your Honor.

21           THE COURT:  Mr. Gluck, you may proceed.  I think we

22   should go ahead now and take our break after.

23           MR. GLUCK:  Either way is fine.

24           Good afternoon, ladies and gentlemen.  I've already

25   introduced myself but, once again, my name is Benjamin Gluck.

 1    With me is Jean Rhee and Mark Phillips.  We represent

 2    Dr. Patwardhan.  We are a little hidden behind here, so it's

 3    good to be able to see you.

 4              This case comes down to one thing.  It comes down

 5    to the question of whether Dr. Patwardhan knew that there was

 6    a problem with bringing these medicines into the country.  We

 7    don't disagree -- as I said earlier, we don't disagree with

 8    the vast majority of the basic facts in this case.

 9              Dr. Patwardhan does not deny that he brought

10    medicine into this country.  He didn't deny it the very first

11    time he was asked about it when Mr. Behnke was just

12    describing when the agents came to his office.  But the issue

13    is whether he acted with the intent to defraud or deceive

14    anyone.

15              Now, why does it come down to intent to defraud or

16    deceive?  Because as the Indictment has been read, the

17    charges that Dr. Patwardhan is charged with, he is charged

18    with fooling or attempting to fool, to defraud, the Customs

19    Service, the FDA.  He is charged with stealing or engaging in

20    a conspiracy to steal.  He's charged with engaging in a

21    conspiracy to defraud the United States.  And if a person

22    thinks that what he's doing is legal, if a person thinks what

23    he is doing is perfectly allowed under the law, then that

24    shows that there was no intent to fool anyone about it.  I'm

25    going to talk a lot about what the facts show in connection

1    with Dr. Patwardhan's lack of intent to defraud, but let me

2    tell you first a little bit about his background.

3              Dr. Patwardhan was born in India.  He went to high

4    school, college, and medical school in India.  He worked very

5    hard.  He was admitted to a selected medical school there and

6    he did well.  After medical school he came to the United

7    States to continue his training.  He came to this country on

8    January 1st, 1970, about 40 years ago.  At that time and

9    still today this country offers the best medical training in

10   the world and he came here to do that.

11             After medical school doctors go through several

12   years of additional training, internship, residencies, which

13   are essentially working as a doctor while under supervision

14   from other doctors, and Dr. Patwardhan did that for several

15   years when he came to this country.  He did that in Virginia;

16   in Alberta, Canada; in Rhode Island; and in New York.

17             Incidentally, there's no evidence that as part of

18   this training Dr. Patwardhan was ever trained on FDA approval

19   processes or labeling regulations.

20             Dr. Patwardhan opened his office in Upland, a

21   private practice medical office in Upland, just up the road

22   from here, in September 1976, about 33 years ago.  And since

23   that time he has specialized -- he has had a practice in

24   Upland for 33 years.  He specialized in internal medicine and

25   oncology.  Internal medicine is the treatment of serious

1   diseases not by way of surgery.  Oncology is the treatment of

2   tumors and cancer.

3          Throughout the past 33 years Dr. Patwardhan has

4   kept up with his medical education, gone to conferences,

5   seminars, read journals, and done much more training or

6   professional education than is required by the State, well

7   above and beyond the State requirements.

8          You will also hear evidence that Dr. Patwardhan was

9   extraordinarily and still is extraordinarily devoted to his

10  patients.  Many patients were effectively treated for free.

11  Insurance companies would refuse to pay for another round of

12  chemo, Dr. Patwardhan's office would provide the chemo, and

13  if the insurance company didn't pay, the office would absorb

14  the loss.

15         You will see many aspects of his practice were,

16  frankly, expensive.  He was well staffed.  His staff was well

17  paid.  He didn't cut corners on these things because he

18  wanted to provide high quality patient care.  He was devoted

19  to his patients and his patients were devoted to him.  You

20  will see some of them during the trial.  That's

21  Dr. Patwardhan's background, what he's been doing for the

22  last 40 years.

23         Let's turn to the facts of this case.  As I

24  mentioned before, this case comes down to one thing.  The way

25  this case is charged, what the Government is accusing

1    Dr. Patwardhan of is fraud.  It comes down to whether he knew

2    there was a problem with bringing in the medicine.  And the

3    first thing that you need to know about this is, the evidence

4    will show, that Dr. Patwardhan acted -- Dr. Patwardhan

5    believed that he was permitted to bring that medicine into

6    this country, and his actions throughout this entire case,

7    right up to the very day the agents came into his office, are

8    consistent with a person who believes that what he is doing

9    is allowed.

10            The evidence in this case is going to show

11   three things:  First, Dr. Patwardhan believed that he was

12   allowed to bring the medicine into the country.  He acted

13   with the belief that it was legal.

14            Second, Dr. Patwardhan's actions speak to this

15   issue.  If we look at the way he acted, the evidence will

16   show that for years he acted as a person who believes that

17   these medicines are legal.  He is allowed to have them here.

18   He is allowed to use them.

19            And the last point the evidence shows is, there is

20   no allegation that in this case the medicines were dangerous

21   or didn't work.  That's not what this case is about.  This

22   case is about, as the Government has pointed out, it's about

23   the labeling on the medicine.  It's not about the medicine

24   itself.

25            Now, another very important piece of background

1   before I get to the specific facts here.  The evidence will

2   show that an important factor in this case is a Food and Drug

3   Administration policy that permits the importation of

4   medications from other countries carried by travelers into

5   this country even when those medications are unapproved by

6   the FDA, and even when their labels don't meet the FDA

7   requirements.  Passengers arrive in this country every day

8   carrying medication that violates the law.  It doesn't meet

9   the FDA requirements.  And the FDA has a policy that says

10  that they are permitted to bring it in even though,

11  technically, it violates the law.

12          For many years the FDA has had this policy long

13  before the events at issue, but it still has it today.  It's

14  called the FDA's Personal Importation Policy.  And the FDA

15  policy says -- and you'll hear a lot about the policy.  But

16  the FDA policy says that Customs agents, the U.S. Customs

17  agents who are standing at the airport and going through your

18  baggage and making sure that people bringing things in, have

19  discretion to allow travelers to bring medication into this

20  country that does not comply with the FDA approval or

21  labeling requirements.

22          And this policy you will see has a number of

23  factors, how much is it, what it's used for, what paperwork

24  the person is carrying, do they have a prescription,

25  et cetera, et cetera.  Is it some kind of drug that is

1    illegal in the United States, for example.

2          And then the FDA says in its policy, and I quote --

3    it gives this guidance and then it says in its policy, "The

4    factors noted in the guidance and the documentation that

5    should be obtained are not mandatory requirements.  They are

6    intended to guide FDA enforcement discretion and should not

7    be represented as binding requirements."  That's what the FDA

8    says.

9          In other words, we all know there is a law.  The

10   FDA has regulations requiring approvals and requiring

11   labeling to be made in a certain way, but the FDA also says

12   that travelers are allowed to come into this country bringing

13   medicine that does not comply.

14         And it says, Customs agents, please consider the

15   following factors.  And then it says, but those are not

16   mandatory.  Those are guidance.  You should take them into

17   account.  You are allowed to exercise your discretion.

18         One more thing.  You will hear from an expert on

19   this issue, a man by the name of Patrick Egan.  Mr. Egan is a

20   lawyer and he has a lot of experience dealing with this area

21   of importations of drugs and unapproved labeling and things

22   like that.  He's testified in the United States Congress

23   about it.  And Mr. Egan will testify, he will tell you that

24   various government agencies have complained that there's a

25   lot of confusion out there in the public, among the public,

1    about whether it's permitted for a traveler to bring medicine

2    and under what circumstances is it permitted for a traveler

3    to bring medicine from a foreign country into the United

4    States.

5            So that general background out of the way, let's

6    talk for a moment as to what the evidence is going to show

7    about what Dr. Patwardhan did.  And as I said before, it's

8    all about whether he knew that these drugs represented a

9    problem.  Did he know it was contraband?  Did he try to hide

10   it from Customs, from Medicare, from anybody?

11           First, Dr. Patwardhan, as I said, comes from

12   India.  Over the years he traveled home quite frequently.

13   His elderly parents live there.  They were ill.  They have

14   since passed away within the last couple of years.  He would

15   travel home whenever he could squeeze in a trip to visit

16   them, check on their medical care, try to comfort them as a

17   son would.  While he was there he would buy medicine that he

18   would bring back to use in his practice.  There's no dispute

19   about that.

20           This is a very brief time line of some very

21   important events in this case.  And as I said before,

22   Dr. Patwardhan's conduct was consistent from the beginning of

23   this time line until the end.

24           The first -- and I'm going to go through each one

25   of these in a little more detail, but this time line goes

1    back to April 4th, 2002, which is the beginning of the -- is

2    before the events described in this Indictment.  And that's a

3    date when Dr. Patwardhan was inspected by Customs.  And we'll

4    talk about that in a moment.  And then it goes all the way up

5    to July 30th, 2008, which is the day that the FDA officers

6    and other various federal agents came into Dr. Patwardhan's

7    office in Upland.  And you will see in there it also includes

8    a March 2008 date, which is what Mr. Behnke was talking

9    about, when one of his employees or more informed the

10   authorities.

11        First, the evidence is going to show that -- first,

12   I want to talk about that first date on there, the April 4,

13   2002 secondary inspection.  The evidence is going to show

14   that on April 4th, 2002, which is just about six months,

15   maybe just a little over six months after the

16   September 11th, 2001, terrorist attacks, Dr. Patwardhan

17   enters Los Angeles International Airport on a flight from

18   India.  He is on Singapore Airlines.  He comes into LAX.  He

19   is carrying with him on April 4th, 2002, exactly 280 vials of

20   medicine that he bought in India.  And you will see the

21   evidence and the documents showing exactly what it was.

22        You will hear and you will see evidence of how

23   Dr. Patwardhan brought medicine into this country.  It was

24   really very simple.  He would carry it in a small bag.  For

25   the trip the medicine would be packed with ice or ice packs,

1    and you'll hear office employees testify that that's how they

2    received it.  And so it would be put in a small duffel bag.

3              In fact, this is the bag or one of the bags.  They

4    were all very similar.  And you will hear from the office

5    staff that this is what they would receive.  In fact,

6    Mr. Behnke has already showed you a picture of the contents

7    of this bag.  You can see right there the picture of the

8    interior of the bag, the medicine, the vials, in a bag just

9    like this.  He brings this in about six months after

10   September 11th.  He is traveling from India on Singapore

11   Airlines.  He is traveling on an expensive ticket.  It's an

12   expensive flight.  He is traveling alone.  He bought the

13   ticket in India instead of in the United States because it's

14   cheaper that way.

15             You will see later that Customs has -- the Customs

16   records designate India for inspection purposes as a, quote,

17   terrorist-affiliated country, subject to higher scrutiny and,

18   like I said, this is six months after 9/11.  He brings this

19   bag with 280 vials of medicine inside.  What does the

20   medicine look like inside?  We know because this is a picture

21   taken by the Government witness in March of 2008 when he made

22   a similar trip.  Open the zipper and there it is.  It's

23   wrapped in plastic.  It's no secret what's in it.  There's

24   ice packs in these pockets at the end to keep it cold.

25             Well, as I said, he comes through with these

1    factors, India, expensive ticket, traveling alone.  It was a

2    very short trip.  He had only been in India for a short time.

3    And Customs refers him for what they call a secondary

4    inspection.  Now, it's a little hard to see this.  I'll try

5    zooming in on some of it.  But the first thing you see here

6    is the inspection date, April 4th, 2002.  Dr. Patwardhan

7    enters the country.  And these are Customs records from the

8    United States Customs Service.  He enters the country.  He is

9    referred for a secondary inspection.  That means, as you

10   heard from Mr. Behnke, he is sent for a baggage exam.  It

11   says it right on the document.  Sent for baggage exam.  Yes.

12          So, Dr. Patwardhan gets sent for the baggage exam,

13   and the Customs officers complete the baggage exam, complete.

14   Inspection complete, inspection status complete, secondary

15   inspection complete.  They indicated in the records

16   three times that they've completed his baggage exam.  And

17   they allow him through with no violations.  He's carrying

18   this bag with 280 vials of medicine with ice packs that look

19   like this six months after 9/11, and they allow him through.

20          The Customs agents exercised the discretion that

21   was given to them by the FDA, which you will hear about, and

22   allowed a traveler to bring medicine into the country.  And

23   even if it didn't quite meet all of the factors that the FDA

24   sets out, the FDA has given them discretion to decide what to

25   allow in and what not.  That's one time it happened.

 1              That's not the only time it happened.  The next

 2     date on here is September 8th, 2002.  Dr. Patwardhan enters

 3     the country again.  This is three days before the very first

 4     anniversary of 9/11.  He comes into the country from India on

 5     Singapore Airlines, traveling alone, short trip, expensive

 6     ticket, carrying the duffel bag.  This time he's carrying

 7     exactly 400 vials of cancer medicine that was manufactured in

 8     India.

 9              Once again, he is referred for a secondary

10     inspection.  He's got this bag, ice packs, vials wrapped in

11     plastic, another ice pack.  Customs sends him over for a

12     secondary inspection.  The date on here, September 8th, 2002,

13     three days before the first anniversary of 9/11.  And they

14     are inspecting a traveler coming into the country.  What do

15     they do?  They do a baggage exam.  Yes, they do a baggage

16     exam.  And what do they determine?  Inspection complete,

17     inspection complete, inspection complete, no violations.

18     Dr. Patwardhan is allowed through.  They don't confiscate

19     anything.  They don't cite him.  They don't fine him.  They

20     don't take away anything.  They allow him through with this

21     bag with 400 vials of foreign purchased medicine.

22              Now, Mr. Behnke has talked about this inspection on

23     April 3rd, 2005.  On April 3rd, 2005, Dr. Patwardhan came

24     into the country.  Same story.  He's referred for a secondary

25     inspection.  This time the reason for the referral is given

1    as, he is traveling from a terrorist-affiliated country.   He

2    is subject to a bag exam.   The inspection is completed.

3    There are no violations.

4            The Customs records show that Dr. Patwardhan was

5    inspected at least three times, that each time he was

6    inspected he was permitted through.   And the records also

7    show what he was carrying each time.   The first time 280

8    vials of medicine, and you'll see the records showing what he

9    was carrying.   The second time 400 vials of medicine, and

10   you'll see the records showing what he was carrying.   And the

11   third time, again, 400 vials of medicine, and you'll see the

12   records of what he was carrying at that time.

13           Now, Mr. Behnke has said that Agent Cuevas will

14   testify that he doesn't remember what happened in 2005.   This

15   is the Customs agent whose name is on that record somewhere.

16   It indicates who the agent was.   He is the agent for 2005,

17   and he says he doesn't remember anything.   But Mr. Behnke

18   says that he will testify that under his practice or his

19   standards he would have stopped this.

20           The evidence will also show, ladies and gentlemen,

21   that Agent Cuevas was never asked about this inspection in

22   2005 until long after Dr. Patwardhan was charged with this

23   crime.   The evidence will show that some people came to Agent

24   Cuevas and said, we've charged someone with having illegal

25   drugs in this country and, apparently, they got through on

1    your watch.  And the evidence will show that Agent Cuevas

2    said, "Well, if I would have seen them, I would have stopped

3    them."

4            Now, Dr. Patwardhan brought the medicine into the

5    country -- oh, I'm sorry, one more thing.

6            Mr. Behnke mentioned the declarations.  The truth

7    is, the evidence will show that the right way to refer to

8    that is the lack of declarations, not because something

9    wasn't declared, but because the Customs Service has thrown

10   away all of the declarations from all of the trips in which

11   Dr. Patwardhan is alleged to have carried medicine from

12   India.  They don't keep them very long.  They are papers and

13   they throw them away.  And they've thrown them all away in

14   this case, so we don't have them.

15           The only declaration that the Customs Service has

16   with respect to Dr. Patwardhan is a trip that he took to

17   London in the spring of 2008.  Now, there's no allegation

18   that he bought medicine in London or was carrying medicine

19   when he came back from London.  But what's interesting about

20   that declaration is that you'll see that in that declaration

21   Dr. Patwardhan declared a $20 silver souvenir cup that he had

22   brought back from London.  So the only declaration that we

23   have shows that he certainly did declare.

24           Second, when the Customs officer is inspecting

25   Dr. Patwardhan, when he's doing that secondary inspection

1    that we've seen all those records of, he's got the

2    declaration.  So if he looks in the bag and sees 280 vials,

3    400 vials, he knows what the person is carrying.  Whatever

4    was on that declaration satisfied the Customs officer.  That

5    much we do know, because there's no indication that he was

6    cited for a failure to declare.  So, as far as the

7    declarations go, all we know is they're missing because

8    Customs threw them away, but the one we have shows he did

9    declare.  And the ones that are missing, he certainly wasn't

10   cited for failing to declare, even though his baggage was

11   inspected.

12         Now, that's the way the medicine came into the

13   country.  It happened many, many times.  We don't have

14   Customs records showing that he was inspected every time, but

15   you will see Customs records, like I've shown you, showing

16   that he was inspected at least several times.  And, I'm

17   sorry, when I say "inspected," there's a secondary baggage

18   exam.

19         But Dr. Patwardhan's actions long after he left the

20   airport also show that he acted consistent with a person who

21   has just been allowed, through the exercise of the Customs

22   officer's discretion, to bring the medicine into this

23   country.

24         What happened when he came into the country?  What

25   does he do with the medicine?  Now, this is what the medicine

1    looks like.  And this is a picture of one of -- or some of

2    the vials of medicine.  And it says right here, "Manufactured

3    in India by Dr. Reddy's Laboratories Biotech Division."  This

4    one says in Spanish that it's -- it's in Spanish.  It's made

5    in Italy and it is by some Italian company.  Anybody looking

6    at this medicine can see right away where it comes from.

7    It's no secret.

8            So, does he bring it back to his office and put it

9    in his safe?  The evidence is going to show that he didn't do

10   that.  He didn't put it in a safe.  He didn't put it in a

11   closet.  He didn't put it in a secret hiding place.  No, he

12   gave it to his employees, the employees in his office whose

13   job it was to handle the medicine, meaning they would order

14   medicine from the other companies, they would receive it,

15   they would unpack it, they would inspect it, they would put

16   it on the shelf.  He took this medicine in this bag.  He

17   didn't bother to unpack it.  He didn't bother to pretty it

18   up.  The evidence -- I showed the picture before of what it

19   looks like, and he handed that to the employees and said,

20   "Here, please process this."  And they did.

21           Part of their job was to check the medicine against

22   the inventory.  I believe Mr. Behnke mentioned that.  The

23   inventory -- I'm sorry, check the medicine against the

24   invoice.  The invoice, which you will see many of them, the

25   invoice says, right on the invoice, that it was bought in

1    India.  The invoices Jessica Young would provide say right on

2    there that they were bought in Honduras.  It was not a secret

3    from anyone and there was no effort to keep it a secret from

4    anyone.  The office staff checked off the invoice and signed

5    it just like they would do as part of their job with any

6    other medicine.  And then they would send -- and you'll see

7    the staff signatures on the invoices.  And they would send

8    those invoices over to the business side of the office.

9            Where did they put the medicine?  The medicine was

10   stored in an open and accessible area.  Like I said before,

11   not in a safe, not in a locked closet, not in a locked

12   drawer.  It was kept on a shelf or in the refrigerator, some

13   of it needs to be refrigerated, some of it doesn't, along

14   with all the other medicine in a space in the office which --

15   this is just to orient things.  This is a picture of the

16   patient treatment room.  Mr. Behnke showed a picture of this

17   room before, but that one was facing the other direction,

18   facing into the corner.  Facing out of this room you can see

19   that counter which is the border of -- there's a hallway that

20   goes down that way past that TV which is the center hallway

21   of the office.  Anybody wants to go anywhere in that office

22   needs to walk down that hallway.

23           If you look right over that counter, you can see

24   and get a peek.  It's more than a peek.  It's a brown

25   cabinet.  That's the room that the medicine was kept in.

1    Now, not only was this medicine not kept behind locked doors,

2    it was in this cabinet.  It is in the refrigerator.  Not only

3    was it not kept behind locked doors, there isn't even a door

4    on this room.  Not only is there no lock, there isn't even a

5    door on this room.  Those cabinets are kept unlocked.  The

6    staff is in and out of that room all the time.  And it's

7    stored right there on the shelf.

8            Now, what happens when -- what happens when -- they

9    unpack the medicine.  You've seen what it looked like.  They

10   put it on the shelf.

11           Remember the invoice?  Somebody signs off on the

12   invoice.  What happens to the invoice?  Well, it goes over to

13   the business side of the office and it gets paid, just like

14   other business expenses.  Once it gets paid, what happens to

15   the record of it?  Remember, these are records showing that

16   someone is buying medicine in India, buying medicine in

17   Honduras.  They are evidence of a crime.  What happens to

18   them?  They are not shredded.  They are not thrown away.

19   They are not burned or hidden or anything like that.  They

20   are put on a shelf in a file that in big black letters says

21   "Invoices."  They are put in a box that says "Wires."  And

22   those are maintained just like all the other office records

23   showing the purchase of medicine, showing the payments of

24   bills.

25           In fact, when the company prepares -- or the

1    practice prepares its taxes every year, they would provide

2    copies of these invoices to their accountant, if necessary,

3    to show their expenses.  In fact, Jessica Young sent copies

4    of the checks to Honduras -- in other words, a check going to

5    pay for Honduran medicine, she sent those to the accountant

6    so that he could provide them to the Internal Revenue Service

7    when it audited the practice's taxes.  There was no

8    evidence -- there is no evidence that anybody tried to hide

9    these invoices from anyone.

10           In fact, when time went on, and generally, as

11   office records grow and grow and grow, eventually you run out

12   of room.  And so a medical practice over many years, there's

13   lots of records, not just these invoices, but just all office

14   records, records get sent to storage.  And these invoices and

15   these wires, this proof of the crime, is sent to storage, and

16   Dr. Patwardhan paid to keep it.  There's no requirement to

17   keep it for a day, but he never asked anyone to throw it away

18   or shred it or hide it or anything.  He paid to maintain it.

19   He kept it on the shelf.  It was so clearly labeled that when

20   the FDA came in, they found it right away.  There was no

21   effort to hide anything from anyone.

22           Going back to the medicine, okay?  The medicine was

23   put up on the shelf.  We talked about the invoice and how it

24   was paid and where it was maintained.  The medicine is on the

25   shelf.  The manner in which the medicine was used is also

1    consistent with -- and, frankly, only consistent with -- a

2    person who thinks this is legal, with a person who thinks

3    that, yes, I brought this into the country because the United

4    States Customs Service, exercising their discretion, allowed

5    me to.

6              First --

7              THE COURT:  Refrain from argument.  Thank you.

8              MR. GLUCK:  Sorry, Your Honor.

9              Most of these medicines are administered in the

10   office.  The evidence will show that most of the medicine is

11   administered in the office, but you will also hear from a

12   patient Mr. Behnke mentioned who received medicine that had a

13   label on it, a label on it showing that it was not FDA

14   approved.  No effort to hide that from this patient.  She was

15   given that to take home.

16             Now, you will also hear from other office staff

17   that the way the medicine was used, they would --

18   Dr. Patwardhan -- a lot of this medicine was administered

19   through intravenous drips.  It had to be mixed with saline

20   solution and administered through an IV.  So he had to

21   reconstitute it, make it liquid.

22             They would take out the medicine, put it on the

23   counter.  It would sit on the counter, made in India.  It

24   would sit on the counter until he would reconstitute it.

25   Then the evidence will show he didn't take those vials and

 1    throw them away.  He didn't hide them.  He didn't destroy

 2    them.  No, he left them on the counter.  It was the office

 3    staff's job to clean them up.  He left them on the counter.

 4    And we've seen, ladies and gentlemen, that space where they

 5    were left is right next to where everyone walks through the

 6    office.  The patients sit in those easy chairs that I

 7    displayed before, and they are sitting steps away from where

 8    this medicine is kept or is placed.

 9               In fact, one of the office staff will testify that

10    one of her jobs was to take this medicine off the shelf and

11    put it on a little table that is literally at the patient's

12    elbow, literally at the patient's elbow.  And she would put

13    it there and it would be used during the chemotherapy

14    process.

15               Now, the Government has talked a lot about the

16    names that were used in the files and that the names referred

17    to -- he used the example of Taxotere.  Taxotere is a U.S.

18    brand name.  Docetax is an Indian brand name.  Docetaxel is a

19    chemical name.  You will hear from an expert witness, an

20    oncologist, who will testify that there are many medicines

21    that are marketed and sold legally under many different

22    names.  And the practice among doctors is to use the most

23    common name for the medicine, even if -- or, to use his

24    example, it's kind of like Kleenex, that I could refer to

25    Kleenex even though really I mean any type of facial tissue.

1    So the use of the generally known name by which all doctors

2    always refer to that medicine is consistent with a person who

3    is not trying to fool anyone.

4              As far as billing is concerned, part of this case

5    is about billing.  And the Government says that

6    Dr. Patwardhan tried to fool Medicare into paying for

7    medicines that came from India.  But the important thing to

8    know about the billing, there's two things to know about the

9    billing.  First, Medicare reimburses for all of these types

10   of cancer medications based on a flat rate.  It doesn't

11   matter how much the doctor paid for it.  It's not --

12             THE COURT:  Mr. Gluck, first of all, you have about

13   five minutes left, and refrain from arguing.

14             MR. GLUCK:  I'm sorry.

15             THE COURT:  Thank you.

16             MR. GLUCK:  The evidence will show that Medicare

17   pays for these medicines on a flat rate.  The payment is

18   keyed to the medicine or the type of medicine given, not how

19   much the doctor paid for the medicine.

20             The evidence will also show that the way a medical

21   office reports these expenses to Medicare is by use of a

22   series of codes.  Every one of these medicines has a code.

23   These codes happen to start with the letter J.  They are

24   known as J codes.  You will hear, ladies and gentlemen, that

25   the J codes that Medicare gives to medicines are not based on

1    brand names.  It does not say Taxotere.  It says Docetaxel,

2    the chemical name.  And the evidence will show that the

3    chemical names under which these medicines were billed were

4    accurate.  You will also hear evidence, ladies and gentlemen,

5    that Medicare didn't pay more to reimburse these medicines

6    then it would have paid otherwise.

7              Now, let me briefly touch on the March 2008 picture

8    taking incident that Mr. Behnke mentioned.  The thing that's

9    important to keep in mind is that the evidence shows that

10   after March of 2008 -- actually, let me go straight to this

11   one.  After March of 2008, the FDA didn't come into

12   Dr. Patwardhan's office until July 30th, 2008, about

13   four months later.

14             In the interim, Dr. Patwardhan did not destroy

15   anything.  He didn't hide the medicine.  The evidence will

16   show that he didn't shred the records.  The evidence will

17   show that when the agents came into his office on July 30th

18   of 2008 and told him they were looking for drugs from India,

19   they found the drugs where they had always been.

20             When they asked him, "Are you bringing drugs from

21   India?"

22             He said, "Yes."

23             When they said, "How many times have you done

24   this?"

25             He said, "Many times."

1              He didn't change -- the evidence will show that he

2      didn't change his conduct one bit during those four months

3      when he knew that someone had told the authorities.

4              I've got one more point about the evidence and I'll

5      stop.  You've heard the Government talk about Jessica Young.

6      And Jessica Young brought medicine from Honduras and she will

7      testify to that.  And she is a Government witness.  She is

8      testifying on behalf of the Government.  Ms. Young has met

9      with the Government many times and has testified under oath

10     in the Grand Jury and promised to tell the truth.  And

11     Ms. Young has testified under oath and has told the

12     Government in interviews that every time she brought medicine

13     from Honduras -- and the evidence will show that she brought

14     more medicine than Dr. Patwardhan did -- every time she did

15     it, she did it with the belief that it was legal.

16             And, as far as the declarations are concerned, she

17     will testify, and she has already, that Dr. Patwardhan told

18     her that she needs to pay duty on the medicine.

19             Ladies and gentlemen, this case is about whether

20     Dr. Patwardhan acted with intent to defraud, whether he acted

21     like someone who thinks that what he's doing is allowed or he

22     acted like someone who is trying to hide something from

23     someone.  From the beginning of that time line all the way to

24     the end, from the times he was inspected at the airport

25     carrying this bag, all the way to the day the authorities sat

1    down with him and said, are you bringing drugs from India,

2    Dr. Patwardhan has acted consistent with a person who

3    believes that he is allowed to have this medicine here

4    because the Customs agents allowed him to bring this medicine

5    here, consistent with the FDA's discretionary policy.

6              When the case is over, we will ask that you find

7    Dr. Patwardhan not guilty on all counts.

8              THE COURT:  Thank you.

9              All right.  Ladies and gentlemen, we'll take our

10   afternoon recess.  We will be in recess for 15 minutes which

11   would make it about 3:40 by the courtroom clock.  Remember

12   what I've admonished you before or instructed you.  Do not

13   discuss the case with anyone, amongst yourselves, or with

14   anyone else, anything related to the case in the broadest

15   possible sense, anything you've heard in the courtroom, seen

16   in the courtroom, any of the participants, attorneys

17   witnesses.  We haven't heard from witnesses yet.  You haven't

18   heard any evidence yet, only the statements of the lawyers

19   which is not evidence.  Don't do any investigation about the

20   case.  Don't do any research about the case in any fashion.

21   Don't make up your minds about the case or anything having to

22   do with the case.

23              Thank you, ladies and gentlemen.  We are in recess.

24                        (Recess)

25              THE COURT:  Let the record reflect the presence of

```
 1    all members of the jury, all counsel, and the defendant also

 2    present.

 3              The Government may call its first witness.

 4              MR. WIDMAN:  Thank you, Your Honor.  The United

 5    States calls Norma Franco.

 6              THE COURT:  Thank you.

 7         PLAINTIFF'S WITNESS, NORMA FRANCO, WAS SWORN

 8              THE CLERK:  Please be seated.  Please state your

 9    full name and spell it for the record.

10              THE WITNESS:   Norma Franco, N-O-R-M-A,

11    F-R-A-N-C-O.

12              THE COURT:  Ms. Franco, very carefully adjust that

13    microphone.  It's a little fragile, that's why I say

14    carefully.  There you go.

15              There's a pitcher of water and some cups right

16    there behind that monitor.  Help yourself if you want some

17    water.

18              THE WITNESS:  Thank you.

19              THE COURT:  Keep your voice up.  I'll let you know

20    if you need to speak louder.  Wait until the attorney has

21    finished his question before you begin your answer, all

22    right?  Thank you.

23              You may inquire.

24              MR. WIDMAN:  Thank you, Your Honor.

25    ///
```

1                            DIRECT EXAMINATION

2     BY MR. WIDMAN:

3     Q.   Good afternoon, Ms. Franco.

4     A.   Good afternoon.

5     Q.   What do you do for a living?

6     A.   I am unemployed right now.

7     Q.   What was your last job?

8     A.   Medical assistant.

9     Q.   Do you have any medical training?

10    A.   Yes.  I'm a medical assistant.

11    Q.   What kind of training do you have as part of being a

12    medical assistant?

13    A.   I went to ROP vocational school.

14    Q.   What is ROP?

15    A.   It's a program.  You go for a year and they give you

16    your medical assistant certificate.

17    Q.   What is the highest level of education that you've

18    achieved?

19    A.   Some college.

20    Q.   Do you live in the Southern California area?

21    A.   Yes, I do.

22    Q.   How long have you lived in this area?

23    A.   All my life.

24    Q.   Have you ever worked for Dr. Patwardhan?

25    A.   Yes, I have.

1    Q.   What was your role?

2    A.   I was a medical assistant and I worked there for

3    eight years.  I would check in patients, take vital signs,

4    blood draw.  I would order medications, stock the rooms,

5    clean up the chemo area.

6    Q.   What month and year, approximately, did you begin

7    working in Dr. Patwardhan's office?

8    A.   August of 2000.

9    Q.   And when did you end your employment?

10   A.   July 23rd of 2008.

11   Q.   Okay.  At this point I would like you to pull out the

12   first of those three binders that are to your right and just

13   behind you.  And I would like you to look at the pictures

14   that are behind the tabs 1 through 1W and just look them over

15   to yourself.

16   A.   Okay.

17   Q.   Do those pictures fairly and accurately depict

18   Dr. Patwardhan's medical offices at 918 West Foothill

19   Boulevard in Upland, California?

20   A.   Yes.

21        MR. WIDMAN:  Your Honor, the Government moves to

22   have Exhibits 1 through 1W entered into evidence and

23   published for the jury.

24        MR. GLUCK:  No objection.

25        THE COURT:  Thank you.  Exhibit 1 is ordered

 1    admitted and you may publish.

 2              MR. WIDMAN:  Your Honor, the way that we organized

 3    the exhibit books is that there's 1, 1A, 1B, and all of the

 4    exhibits that have the same number sort of have the same

 5    similarity.  In this case they're all from the same office.

 6    So the Government is requesting that 1 through 1W, each of

 7    those be entered into evidence.

 8              THE COURT:  Well, isn't -- I'm sorry, maybe I

 9    misunderstood.  There is no other subparts of Exhibit 1, is

10    there, than 1 through W?

11              MR. WIDMAN:  That's correct.

12              THE COURT:  A through W, I should say.

13              MR. WIDMAN:  That's correct.

14              THE COURT:  So all of it is ordered admitted.

15              MR. WIDMAN:  Very well, Your Honor.

16              THE COURT:  And you may publish whatever parts of

17    it you wish.

18              MR. WIDMAN:  Thank you, Your Honor.

19              THE COURT:  You're welcome.

20    BY MR. WIDMAN:

21    Q.   Ms. Franco, could you please turn to Exhibit 1.  And

22    just for clarity sake, it starts with 1, the next is 1A and

23    so forth.  What is this is that you see in Exhibit 1?

24    A.   This is the front office, the front door.

25    Q.   Okay.  This is Dr. Patwardhan's office; is that right?

1    A.    Yes.

2    Q.    Please take a look now at Exhibit 1A.  What is this,

3    Ms. Franco?

4    A.    This is the front door.

5    Q.    Thank you.  Exhibit 1B, please, could you tell us what

6    this is?

7    A.    This is the waiting area for the patients.

8    Q.    Exhibit 1H, please.  And this?

9    A.    That's the reception area.

10   Q.    So what would happen at this area?

11   A.    This is where the receptionists sit.

12   Q.    Would patients ever come to this area?

13   A.    No.

14   Q.    1K, please.  Please take a look at Exhibit 1K.  Do you

15   recognize -- I guess you told us you recognize it.

16         Can you tell us what this is, Ms. Franco?

17   A.    This is Room 4.  It is the examination room where we do

18   all the treadmills.

19   Q.    When you say you do the treadmill, what do you mean by

20   that?

21   A.    We do stress tests for patients, internal medicine

22   patients.

23   Q.    Please take a look at Exhibit 1L.  Could you tell us

24   what this is?

25   A.    This is the lab.

```
 1              THE COURT:  Ms. Franco, you need to keep your voice
 2    up a little bit.
 3              THE WITNESS:  Okay.
 4              THE COURT:  Thank you.
 5    BY MR. WIDMAN:
 6    Q.   What happened here?
 7    A.   This is where Dr. Patwardhan mixes chemotherapy.  This
 8    is where we have the chemo vials, all injectables,
 9    medications.
10    Q.   And is this where you would set up the chemo materials?
11    A.   Yes.
12    Q.   Exhibit 1U, please.  Can you tell us what goes on here?
13    A.   This is where we administer the chemotherapy.
14    Q.   So where would the patient sit in this picture?
15    A.   They would sit in the recliners.
16    Q.   And were the cabinet doors ordinarily open like that?
17    A.   Yes.
18    Q.   Okay.  Now that we've seen a few of the pictures, we
19    talked -- I think you mentioned before that one of your
20    responsibilities was setting up chemo?
21    A.   Yes.
22    Q.   What did you mean by that?
23    A.   The day before chemo I would set up the lab with the IV
24    saline bags with the patient's names on the bags and the
25    milligrams of the medication that the patient was going to be
```

1    getting with the vials next to those bags, syringes, gloves,

2    the mask, things that the doctor was going to use to mix the

3    chemotherapy.

4    Q.   And how did you know which drugs to put out for?

5    A.   'Cause we would have the patient's chart and we would

6    write down the name of the medication, and we would write

7    that name of the medication on the IV bags.

8    Q.   Would you write anything else on the IV bag?

9    A.   The last name of the patient, the milligrams, and the

10   name of the medication.

11   Q.   Which room within the medical office did you set up the

12   chemo?

13   A.   In the lab.

14   Q.   I would like you to take a look now at Exhibit 1L.  You

15   can actually just look at the screen.  Ms. Franco, is your

16   monitor on?

17   A.   No.

18   Q.   There probably is a little button where you can turn it

19   on.

20   A.   It's on, just no picture.

21   Q.   There's no image there?  Okay.  I'm going to set this on

22   here.  You mentioned the lab.  Is this what you were

23   referring to?

24   A.   Yes.

25   Q.   Can you show us by indicating with your finger on the

1    screen where you would set up the chemotherapy?

2    A.    This right here is where the doctor would mix the chemo.

3    And right over here, this area, this is where we would put

4    the IV bags and the medications and syringes and gloves and

5    the mask.

6    Q.    Where were the materials that would be used to set up

7    the chemo located?

8    A.    In these cabinets up here.   The medications would be

9    right here.

10   Q.    And were there any medications in the refrigerator?

11   A.    Yes.

12   Q.    And I believe you can tap the lower right-hand corner of

13   the screen to clear it or the lower left-hand.

14            THE COURT:   Right-hand.

15            MR. WIDMAN:   Is it the right-hand corner?

16   BY MR. WIDMAN:

17   Q.    See if that works.

18            I now would like you to take a look at Exhibit 1Q.

19   Could you tell us what is located in these cabinets, if

20   anything?

21   A.    In these cabinets here there is just prescription

22   medication.   On this one here is where the chemo medication

23   vials are stocked.

24            MR. WIDMAN:   Okay.   And for the record, Ms. Franco

25   is referring to the cabinet to the furthest left part of the

```
 1    image.
 2    BY MR. WIDMAN:
 3    Q.   Is that right, Ms. Franco?
 4    A.   Yes, this one right here.
 5    Q.   In the foreground, if you will.  Turning now to
 6    Exhibit 1R, please, in relation to the cabinets that we were
 7    just looking at, where are these cabinets?  You might want to
 8    clear the screen, please.
 9              My question was, where are these cabinets in
10    relation to the ones we were just looking at?
11    A.   Those are located on the right-hand side of the lab.
12    Q.   And what are contained in these cabinets?
13    A.   Medications, samples of just regular medication, drugs.
14    Q.   Let's take a look at Exhibit 1M.
15              Actually, you know, I just want to ask one other
16    question regarding 1R.  Towards the bottom part of the screen
17    there appears to be something that says "Chemo meds" where my
18    finger is pointing.  Do you recognize that?
19    A.   Yes.
20    Q.   What is that?
21    A.   That's a log where we write down the medications that we
22    order from the distributor.
23    Q.   And what are located in the cabinets right to the left
24    of that?
25    A.   There we have like needles to draw blood.
```

1   Q.   Thank you.  Now, turning to Exhibit 1M, what is depicted

2   in this picture?

3   A.   These are refrigerated medications that are used for

4   chemotherapy.

5   Q.   And what do you see on the middle shelf, if you will,

6   right above where it says -- it has that neon sign that says

7   "Prime Care Patients Individual Meds."  What do you see

8   there?

9   A.   Taxotere.

10  Q.   Okay.  So there's a bin there that has handwritten on it

11  "Taxotere"?

12  A.   Yes.

13  Q.   And what is below that?

14  A.   Procrit.

15  Q.   And again, is that a prewritten label or is it

16  handwritten?

17  A.   It's handwritten.

18  Q.   And these are drugs that are used in the treatment of

19  cancer?

20  A.   Yes.

21  Q.   I now would like to show you Exhibit 1N.  Could you tell

22  us what's in this picture?

23  A.   This is on the door of the refrigerator.  There's also

24  some medications that are used for chemo and there's insulin

25  also.

 1    Q.    And now 1P.  And what is in this picture, Ms. Franco?

 2    A.    Neumega.  That's also used for chemotherapy.

 3    Q.    And is that in the inside of the refrigerator or outside?

 4    A.    It's inside the refrigerator on the door.

 5    Q.    Let's take a look now at Exhibit 1S.  What do you see

 6    here, Ms. Franco?

 7    A.    This is the cabinet where all the chemotherapy vials are

 8    kept in.

 9    Q.    Okay.  Is there any indication on the shelves themselves

10    what drugs are there?

11    A.    Yes.

12          MR. WIDMAN:  For the record, I'm going to zoom in.

13    BY MR. WIDMAN:

14    Q.    Could you please point out where in the picture there is

15    such indications?

16    A.    (The witness complies).

17    Q.    Thank you.  And finally, 1T.  What is in this picture,

18    Ms. Franco?

19    A.    This is our lower cabinets.  This is where we keep the

20    IV saline bags and also saline water that is used to mix the

21    chemotherapy and also chemotherapy vials.

22    Q.    Can you point out for the jury where the IV bags are?

23    You may want to clear the screen.  Thank you.

24    A.    (The witness complies).

25          MR. WIDMAN:  And for the record, Ms. Franco has

1    indicated the upper right quadrant of the shelves.

2    BY MR. WIDMAN:

3    Q.    Who had the final say on which drugs were administered

4    to particular patients?

5    A.    Dr. Patwardhan.

6    Q.    And I think we may have mentioned this before, but how

7    did you know which drugs to put out for the doctor?

8    A.    We would look in the patient's file and we would see the

9    medications that were given the week or two weeks before,

10   depending on how their chemo is given.

11   Q.    And then after you set up the chemotherapy treatments,

12   what would happen next to the treatments?

13   A.    Can you repeat that?

14   Q.    Sure.  After you set up the treatments, what happened

15   next to the treatments?  Did anyone mix them at any time?

16   A.    After I would set up the chemo, Dr. Patwardhan, the

17   following morning at 7:00, he would come in and mix the

18   chemo.

19   Q.    What do you mean by mix the chemo?

20   A.    He would mix the chemotherapy vials with saline water

21   and mix the milligrams that the patient is supposed to be

22   getting and mix it into the IV bag.

23   Q.    Did you ever personally see him mixing the chemotherapy

24   treatments?

25   A.    Yes.

1    Q.    And did you play any part in -- well, let me ask you

2    this:  After he was done mixing the chemotherapy treatments,

3    what happened next on the counter?

4    A.    We would get all the bags together for that particular

5    patient, put them all together.  And once the patient came

6    in, we would do the vital signs and then put all the bags

7    where that patient was going to be seated and then the IV

8    would be started.

9    Q.    After Dr. Patwardhan finished mixing the chemo, was

10   there anything left over on the counter?

11   A.    Yes.

12   Q.    What was left over on the counter?

13   A.    The vials that were used to mix the chemo.

14   Q.    And did you play any part in clearing that off?

15   A.    Yes.  We would clean the counters after all the patients

16   were gone and dispose of them.

17   Q.    I believe you mentioned before, did you play any role in

18   billing?

19   A.    We would do the charge slips for the patients that

20   received the chemotherapy, and we would give them to the

21   billing department.

22   Q.    What is a charge slip?

23   A.    A charge slip is where the names of all the drugs are on

24   there with milligrams and there's like billing codes on them.

25   And we would check off the medication that was given to the

1    patient.

2    Q.    Was there any other forms that were used that you

3    prepared in connection with billing of the patients?

4    A.    There was a progress note.  That's where we would write

5    down the patient's name, their vital signs and the chemo

6    medications that the patient was going to be getting with the

7    times the medications were administered.  And then we would

8    make a copy of that and attach it to the charge slip, and

9    then it would go to the billing department.

10   Q.    When would you fill out the progress note and the charge

11   slip?

12   A.    We would do it the day before chemotherapy.

13   Q.    I would like to show you -- how about this:  Could you

14   please look in the binder at Exhibits 112 through 112D.  And

15   just look them over for yourself.  Oh, yes, Ms. Franco, it's

16   in binder No. 3.  There's three binders.  Exhibit 112 through

17   112D, please.

18   A.    You said binder No. 3?

19   Q.    Yeah.  It should start with -- Exhibit 112 should be in

20   there.  That's how you know you have the right binder.  So

21   please look over 112 through 112D.  Could you tell us what

22   you see there?

23   A.    It's the charge slip.  This is where we would write the

24   patient's name, the diagnosis of the patient, the co-payment

25   that the patient had to pay, and we would check off all the

1    medications that were administered that day.

2    Q.    And do these exhibits -- are they the same forms that

3    you used when you worked in Dr. Patwardhan's office?

4    A.    Yes.

5              MR. WIDMAN:  Your Honor, the Government moves to

6    have Exhibit 112 through 112D or Exhibit 112 --

7              THE COURT:  A through D, is that it?

8              MR. WIDMAN:  Exactly, 112A, B, C and D moved into

9    evidence and permission to publish.

10             THE COURT:  Any objection?

11             MR. GLUCK:  No objection, Your Honor.

12             THE COURT:  Thank you.  112A through D is ordered

13   admitted and you may publish.

14             MR. WIDMAN:  Thank you, Your Honor.

15   BY MR. WIDMAN:

16   Q.    I am now putting on the overhead projector, and you may

17   want to clear the screen, Exhibit 112.  Let's take a look at

18   this.  Could you please explain to the jury, sort of walk

19   through what this all means in this exhibit.

20   A.    This is the date.  And this is where we write the

21   diagnosis.  This is the co-payment that the patient has to

22   pay if they have a co-payment.  And these check marks are the

23   medications that we check off.  And this is the milligrams

24   that the patient received.

25   Q.    Okay.  Right here where it says "Name," what would

1   ordinarily be written there?

2   A.   The patient's name.

3   Q.   Now, could you please clear the screen, Ms. Franco?

4   A.   Yes.

5   Q.   Thank you.

6        So if you were to administer a particular drug,

7   let's say, for example, you were to administer Taxotere, how

8   would you indicate that on this form?

9   A.   We would check mark this one here and write the

10  milligrams here.

11  Q.   And what if the drug you were administering wasn't on

12  the form?

13  A.   We would write it in this area, wherever there is an

14  empty space.

15       MR. WIDMAN:   And for the record, Ms. Franco is

16  pointing to sort of the center column which is blank on the

17  page.

18  BY MR. WIDMAN:

19  Q.   Now, I'd like you to take a look at Exhibit 113 to 113D.

20  And just review them for yourself and then I'm going to ask

21  you some questions about them.   What are those exhibits?

22  A.   This is the charge slip.   This is where we write down

23  the patient's weight, the CBC that is done that morning, the

24  name of the medications that the patient is getting, and the

25  diagnosis.

```
 1   Q.   Do you see your handwriting anywhere on Exhibit 113?

 2   A.   Yes.

 3   Q.   Is yours the only handwriting on the page?

 4   A.   No.  The top portion is Mayra Jaurequi.

 5   Q.   Are these forms the same kind of forms you used during

 6   your time as a medical assistant in Dr. Patwardhan's office?

 7   A.   Yes.

 8             MR. WIDMAN:  Your Honor, the Government moves to

 9   have Exhibits 113, 113A through D moved into evidence and

10   permission to publish.

11             THE COURT:  Any objection?

12             MR. GLUCK:  No objection.

13             THE COURT:  Thank you.  113 and 113A through D are

14   ordered admitted and you may publish.

15             MR. WIDMAN:  Thank you, Your Honor.

16   BY MR. WIDMAN:

17   Q.   I'm putting Exhibit 113 on the overhead projector.  And

18   just like you did with the other document we were looking at,

19   can you please walk us through what you see here.

20   A.   This is where we would write the patient's name.  This

21   top corner right here is the initials of the nurse, the

22   medical assistant that brought in the patient that morning.

23   Q.   And whose initials are these, if you can tell?

24   A.   These are my initials.

25   Q.   Thank you.  Please continue.
```

1   A.   The date.   And this is the CBC that was done in the

2   morning.

3   Q.   What does CBC mean?

4   A.   CBC is to check your white blood count, your red blood

5   cells and your platelets just to make sure that -- if your

6   white blood cells are too low, the doctor normally doesn't

7   give chemotherapy, so he will postpone it for the following

8   week.

9   Q.   And would someone sign off on this form once it was

10  completed to authorize it?

11  A.   Yes.

12  Q.   Can you please indicate for the jury where they would

13  sign?

14  A.   Right here at the lower part of the form.

15  Q.   And, typically, who in the office would sign?

16  A.   Dr. Patwardhan or the nurse practitioner.

17  Q.   And who is the nurse practitioner?

18  A.   Velma Yep.

19  Q.   Thank you.   Are you familiar with the expression "no

20  charge"?

21  A.   Yes.

22  Q.   What does it mean?

23  A.   Where there's no charge when the patient is seen, they

24  don't pay anything.

25  Q.   And who would decide whether a patient should be no

1    charged?

2    A.    Dr. Patwardhan.

3    Q.    How often would Dr. Patwardhan no charge for

4    chemotherapy medications?

5    A.    Never.

6              MR. GLUCK:  Objection, Your Honor, speculation.

7              THE COURT:  Overruled.

8    BY MR. WIDMAN:

9    Q.    Let me ask you this:  Were there ever times where you

10   witnessed Dr. Patwardhan no charge for any kind of patient?

11   A.    Yes.

12   Q.    Did you ever see him do that for chemotherapy patients?

13   A.    No.

14   Q.    Changing subjects now, did you learn at some point that

15   Dr. Patwardhan was bringing drugs into the United States from

16   India?

17   A.    Yes.

18   Q.    When did you first notice that?

19   A.    When I first started working in the Upland office.

20   Q.    And what year was that?

21   A.    I believe it was in 2003.

22   Q.    How many trips -- how often would he make the trips?

23   A.    He would go about three, four times a year.

24   Q.    And how would he bring the drugs back?

25   A.    In a gym bag, a Reebok gym bag.

1    Q.   And could you describe what the drugs -- well, first of

2    all, did you ever have an opportunity to look inside of those

3    bags?

4    A.   Yes.

5    Q.   Could you describe what you saw when you looked inside?

6    A.   There was chemotherapy drugs inside of the gym bag and

7    on the side of the duffel bag.

8    Q.   Was there any packaging?

9    A.   Yes.  They were packaged in clear tape.  They were all

10   like -- they weren't bubble wrap.  Some of them were bubble

11   wrap and some of them were wrapped in like Scotch tape.

12   Q.   Was there any written or printed materials in there like

13   instructions or anything along those lines?

14   A.   No.

15   Q.   Would the drugs be refrigerated?

16   A.   Some of the bags did come with ice packs on the side of

17   the gym bag.

18   Q.   And when you saw the bags, what temperature were the ice

19   packs at?

20   A.   At room temperature.

21   Q.   And the drugs themselves, what temperature would they

22   be?

23   A.   Room temperature.

24   Q.   Were these drugs that were ordinarily refrigerated?

25   A.   Yes, some of them.

1   Q.   Did Dr. Patwardhan ever use dry ice to keep the vials

2   cold?

3   A.   No.

4   Q.   I'm sorry?

5   A.   No.

6   Q.   And how many vials would be in the bag?

7   A.   Maybe about 200.

8   Q.   And for how long would that supply the medical practice,

9   typically?

10   A.   Last about three months.

11   Q.   Did you ever see him mixing drugs that he had brought in

12   from India into the bags -- excuse me.  Strike that, please.

13            We talked before about witnessing him mix

14   chemotherapy medications.  Do you remember that?

15   A.   Yes.

16   Q.   Did you ever see him mixing drugs brought into the

17   office from India in that way?

18   A.   Yes.

19   Q.   Okay.  Let's step back.  Once the drugs were brought

20   into the office, how would you first encounter them?

21   A.   He would leave them on the lab counter or he would -- if

22   I was doing something, he would call my name or call another

23   medical assistant to count the vials.

24   Q.   And when you say "count the vials," what do you mean?

25   A.   We would have to count the vials to make sure that the

1    right amount was in there for what he paid for it.

2    Q.    And what would you do when you were done doing that?

3    What would you do with the drugs?

4    A.    We would put them away in the cabinets.

5    Q.    Did you keep any kind of record reflecting what you were

6    doing?

7    A.    Yes.

8    Q.    What would you call that?  What would you call that?

9    A.    We would write it normally on lined paper and write the

10   names of the drugs and how many were counted for, and we

11   would write our initials and date it.

12   Q.    Who would ask you to count out the drugs?

13   A.    Dr. Patwardhan and Jessica Young.

14   Q.    Who is Jessica Young?

15   A.    She is the office administrator.

16   Q.    Thank you.  I'd like you to look in your exhibit binder

17   there at Exhibit 114 through 114B.  Could you tell us what

18   you see there?

19   A.    This is the paper where we would write the name of the

20   medication and the number of vials that we counted for with

21   our initials.  And they were given to the administrator.

22   Q.    And each of these three exhibits, are they in your

23   handwriting?

24   A.    Yes.

25   Q.    And are your initials on each of them?

```
 1   A.   Yes.
 2            MR. WIDMAN:  Your Honor, the Government moves to
 3   have Exhibits 114, 114A and 114B moved into evidence and
 4   permission to publish.
 5            THE COURT:  Any objection?
 6            MR. GLUCK:  No objection, Your Honor.
 7            THE COURT:  Thank you.  Exhibits 114, 114A and B
 8   are ordered admitted.  You may publish.
 9            MR. WIDMAN:  Thank you, Your Honor.
10   BY MR. WIDMAN:
11   Q.   I'm now putting on the overhead projector Exhibit 114.
12   Could you please walk the jury through what they see here?
13   A.   This is the date.  This is my initials.  And these are
14   the names of the chemo medication drugs.  And here are the
15   number of drugs counted for.
16   Q.   And here, next to your initials, what is that writing to
17   the right there?
18   A.   MA.
19   Q.   What does that mean?
20   A.   Medical assistant.
21   Q.   Thank you.  Could you please clear the screen?
22   A.   (The witness complies).
23   Q.   Were there ever times when you were counting the drugs
24   when you weren't sure what kind of drug it was?
25   A.   Yes.
```

```
1    Q.   How would you figure it out?

2    A.   I would ask Dr. Patwardhan what the drug was and where

3    to store it.

4    Q.   With respect to the drug Docetax, how would you refer to

5    that drug?

6    A.   Taxotere.

7    Q.   Now, turning back to the charge slip that has already

8    been entered into evidence, Exhibit 112, could you please

9    show the jury where you would indicate that this drug had

10   been administered?

11   A.   (The witness complies).

12        MR. WIDMAN:   Please let the record reflect that she

13   checked off next to the words, Taxotere, 20 milligrams,

14   parentheses, Docetaxel.

15   BY MR. WIDMAN:

16   Q.   Ms. Franco, did you learn at some point that Jessica

17   Young was bringing drugs into the office from Honduras?

18   A.   Yes.

19   Q.   And how often would she make trips?

20   A.   She would go about three times a year.

21   Q.   Could you describe how she brought them back?

22   A.   She would bring them back in gift boxes, like Nordstrom

23   gift boxes, or Macy's bags.

24   Q.   Was there any packaging accompanying the drugs?

25   A.   No.
```

1    Q.    And you said gift boxes.  Can you describe what the

2    boxes look like?

3    A.    It looked like a present with a ribbon on it.

4    Q.    Would there be any tissue paper or other packaging of

5    that sort?

6    A.    Yes, tissue paper.

7    Q.    Thank you.  Did you ever see Dr. Patwardhan mixing drugs

8    that were brought into the office from Honduras?

9    A.    Yes.

10   Q.    Was there ever a time when you would clear off the

11   counter drugs from Honduras?

12   A.    Yes.

13   Q.    How much supply of drugs from Honduras would be brought

14   in typically?

15   A.    Maybe about twenty, twenty or thirty.

16   Q.    Twenty or thirty --

17   A.    Vials of chemotherapy.

18   Q.    And how long would that last?  Let me rephrase the

19   question.

20          How long would that quantity supply the medical

21   office?

22   A.    About two months.

23   Q.    Was any effort made to keep the drugs cold?

24   A.    No.

25   Q.    Was there any room in the boxes for ice packs or some

1    way to keep the drugs cold?

2    A.    No.

3    Q.    Were these drugs that ordinarily were refrigerated?

4    A.    Yes.

5    Q.    I would like now to show you exhibits 115 and 115A.

6    Actually, before I do that, let me ask you, did you inventory

7    drugs that were brought in from Honduras like you explained

8    for the drugs that came in from India?

9    A.    Yes.

10   Q.    Thank you.  Now, I'd like you to look at Exhibits 115

11   and 115A.  What do these appear to be?

12   A.    The name of the medication.

13   Q.    More generally, what kind of document is it?

14   A.    Like an invoice that we would do ourselves with the

15   medication that was brought in and the number of vials.

16   Q.    And are these documents both in your handwriting?

17   A.    Yes.

18   Q.    Do your initials appear on both of these documents?

19   A.    Yes.

20         MR. WIDMAN:  Your Honor, the Government seeks to

21   have these exhibits moved into evidence and published, 115

22   and 115A.

23         THE COURT:  Any objection?

24         MR. GLUCK:  None, Your Honor.

25         THE COURT:  Thank you.  115 and 115A are ordered

```
 1    admitted and you may publish.
 2              MR. WIDMAN:  Thank you, Your Honor.
 3    BY MR. WIDMAN:
 4    Q.   I am now placing on the overhead projector Exhibit 115.
 5    Could you please explain the contents of this document to the
 6    jury?
 7    A.   We have the date here.  And this is for Jessica, the
 8    office administrator.  Here are the names of the chemotherapy
 9    medications and the quantities that were counted for.
10    Q.   And can you please point out your initials?
11    A.   (The witness complies).
12    Q.   And there's another set of initials here.  Do you see
13    that?
14    A.   Yes.
15    Q.   Do you know whose initials those may be?
16    A.   Jessica Young.
17    Q.   Thank you.  Were there ever times when you were
18    preparing this kind of inventory that you didn't know what
19    kind of drug it was?
20    A.   Yes.
21    Q.   And how would you figure it out?
22    A.   I would ask Dr. Patwardhan.
23    Q.   Let's say, for example -- well, let me ask you this:  Do
24    you remember a drug called Farmorubicina?
25    A.   Yes.
```

1    Q.    How would you list that on the inventory?

2    A.    Farmorubicina.

3    Q.    Okay.  I'm now going to go back to what has already been

4    entered into evidence as Exhibit 112 and place that on the

5    overhead projector.  Do you see that on this form?  I realize

6    it's actually quite difficult to see.

7    A.    Right there.

8    Q.    So if you were to administer the medication

9    Farmorubicina, you would mark indicated where it says -- I

10   already lost it.  Oh, there it is, okay.  Doxorubicin.  I'm

11   sorry.  Can you please underline it again.  Epirubicin.  It's

12   a couple below Ellence, Epirubicin, for the record.

13   A.    Yes.

14   Q.    Changing gears a little here, were you ever present when

15   Dr. Patwardhan would communicate with his patients about the

16   course of treatment they were receiving?

17   A.    Yes.

18   Q.    Did Dr. Patwardhan ever tell them that he was

19   administering them drugs that had been brought into the

20   country from India?

21   A.    No.

22   Q.    Did Dr. Patwardhan ever tell them that he was

23   administering them drugs that he brought into the country --

24   excuse me, strike that.

25            Did Dr. Patwardhan ever tell them that he was

1   administering them drugs that had been brought into the

2   country from Honduras?

3   A.   No.

4   Q.   Did Dr. Patwardhan ever tell them that he was

5   administering them drugs that were not approved by the FDA?

6   A.   No.

7   Q.   Did Dr. Patwardhan ever refer to the drugs by their

8   Indian trade names?

9   A.   No.

10   Q.   Was there ever a time when a patient would ask

11   Dr. Patwardhan or his staff to write down the names of the

12   drugs, chemotherapy drugs, they were receiving?

13   A.   Yes.

14   Q.   And approximately how often would that happen?

15   A.   Not that often, but it did happen.

16   Q.   Were you ever involved in providing such a list?

17   A.   Yes.

18   Q.   Did you ever write down Indian trade names?

19   A.   No.

20   Q.   Now, I believe you mentioned at the outset that one of

21   your responsibilities was ordering drugs.  Do you remember

22   that or have you testified to that?

23   A.   Yes.

24   Q.   How would you go about carrying out that responsibility?

25   A.   We would -- there was a white board in the hallway and

1    normally we would write the names of the medications that we

2    are running low on.  And we would call OTN and --

3    Q.    Let me stop you there.  What is OTN?

4    A.    OTN is a distributor.  It is a company that distributes

5    chemo medications.

6    Q.    Was there any other company that you ever purchased

7    medications from?

8    A.    NSS.

9    Q.    Did you ever speak with Dr. Patwardhan regarding the

10   current supply of chemotherapy medications?

11   A.    Yes.

12   Q.    Did he ever mention purchases of drugs from India?

13   A.    Yes.

14   Q.    What would he say?

15   A.    When he was going to go on a trip he would say, "Don't

16   order this because I'm going to bring it home from India."

17   Q.    When you say, "Don't order this," what do you mean?

18   A.    Like, for example, Taxotere, Camptosar.

19   Q.    Did you understand "Don't order this" to mean from a

20   particular place?

21   A.    Not to order it from OTN and NSS.

22   Q.    Did Dr. Patwardhan ever indicate why he was purchasing

23   drugs in India instead of in the United States?

24   A.    Yes.

25   Q.    What was that reason?

1    A.    He told me that it was cheaper to buy them over there.

2    Q.    Would you ever speak with -- excuse me, strike that.

3              Approximately what percentage of the medications

4    that were used in the office, chemotherapy medications, were

5    brought into the office from Honduras or India?

6    A.    About 90 percent.

7    Q.    Now, you mentioned OTN and NSS.  When you ordered

8    medications from OTN or NSS, how were they sent to the

9    office?

10   A.    In cardboard boxes with "Fragile" on it and they were in

11   ice.

12   Q.    How were they transported?

13   A.    By UPS or FedEx.

14   Q.    For those drugs that are supposed to be refrigerated,

15   were they refrigerated?

16   A.    Yes.

17   Q.    How were they refrigerated?

18   A.    With ice packs and it came in a Styrofoam container.

19   Q.    And once they reached the office, was there any

20   confusion about what kind of drugs they were?

21   A.    No.

22   Q.    When you ordered drugs from OTN or NSS, did anyone ever

23   physically go to OTN or NSS, pick up the drugs and bring them

24   back into the office?

25   A.    No.

1    Q.    During the time that you worked with Dr. Patwardhan did

2    you ever get the impression that he was cost conscious?

3    A.    Yes.

4    Q.    What led you to that?  What was your impression?

5    A.    By him saying that the drugs over in India were cheaper.

6    And sometimes he would mention that there was no money coming

7    in, that the Chino office was in the red.

8    Q.    What do you mean by, "The Chino office was in the red"?

9    A.    In the red was it's not making any money, so the Upland

10   office has to put money to the Chino office to cover the

11   expenses.

12   Q.    Was there any discussion regarding the number of

13   patients he was seeing on any particular day?

14   A.    Can you repeat that?

15   Q.    Was there any discussions regarding the number of

16   patients he was seeing in any particular day?

17            MR. GLUCK:  Objection, the questions are leading.

18            THE COURT:  Overruled.

19            THE WITNESS:  Yes.

20   BY MR. WIDMAN:

21   Q.    What kind of discussion?

22   A.    He would tell the receptionist or the medical assistants

23   to call patients to come in.  He wanted to see about

24   40 patients a day at least.

25   Q.    And if he wasn't seeing that number of patients a day,

1  what would happen or what would he say?

2  A.   He would tell us to call patients to come in, or if the

3  patient didn't show up, to call them to come in.

4  Q.   Switching gears, do you recall being involved in the

5  treatment of a patient called Veronica Lin?

6  A.   Yes.

7  Q.   Was any family member of Ms. Lin involved in the medical

8  treatments?

9  A.   Yes.

10  Q.   Do you recall her name or his name?

11  A.   I believe it was Katherine.

12  Q.   Thank you.  What kind of medication was given to

13  Ms. Lin?

14  A.   She took Neulasta.  It's an injectable.

15  Q.   I would like to show you Exhibits 127, 127A, and 127B.

16  Please just take a look at them for yourself.  Could you tell

17  us what's in these pictures?

18  A.   It's Neulasta.  It's the injection.

19  Q.   Was that the same kind of medication that was given to

20  Ms. Lin?

21  A.   Yes.

22          MR. WIDMAN:  Your Honor, the Government seeks to

23  have Exhibits 127, 127A and B entered into evidence and

24  published.

25          THE COURT:  Any objection?

1              MR. GLUCK:  None, Your Honor.

2              THE COURT:  127A and B are ordered admitted and you

3     may publish.

4              MR. WIDMAN:  Thank you.

5     BY MR. WIDMAN:

6     Q.   I'm placing on the overhead projector Exhibit 127A.

7     Could you please tell us what we see here?

8     A.   This is, I believe, in Indian writing or Hindu, I'm not

9     sure, but this is Neulasta in USA, I guess USA brand.

10    Q.   Would this be -- let me ask you this:  I'm going to take

11    this off the overhead projector.  The Indian injectable that

12    we just looked at, was that given to Ms. Lin to take home for

13    her treatment?

14    A.   Yes.

15    Q.   Were there any concerns ever raised from the patient or

16    the patient's family about that?

17    A.   Yes.

18    Q.   Can you please tell us about that?

19    A.   The patient's daughter, her name is Katherine, she

20    called the office one time when she got this injection and

21    she was concerned about the injection because it wasn't the

22    same injection that was given to her previous.  So we told

23    Dr. Patwardhan that she was concerned about the injection,

24    and Dr. Patwardhan told me to tell her to bring back the

25    injection and we would give her another injection.

1    Q.    Let me ask you this, Ms. Franco:  Did you receive any

2    guidance from Dr. Patwardhan about this incident in terms of

3    future conduct?

4    A.    Yes.

5    Q.    What was that guidance?

6    A.    He told all the medical assistants not to give those

7    injections to the patient's for home use, to use those for

8    the office use.

9    Q.    Switching gears now.

10             THE COURT:  Is now a good breaking point?

11             MR. WIDMAN:  Yes, Your Honor.

12             THE COURT:  All right.  Ladies and gentlemen, we

13   will adjourn, as far as you're concerned, this afternoon and

14   we will resume tomorrow morning at 9:00 with you.  You can

15   gather in the jury room any time after 8:30.  Fresh coffee is

16   served at 8:30.  My assistant, I don't know if you've met her

17   yet, she's unforgettable, so you'll know when you've met her,

18   and she makes a mean cup of coffee.  She will have coffee

19   ready for you at 8:30.  And we will start promptly at 9:00

20   tomorrow morning.

21             Thank you so much for your work here today.

22   Remember, don't discuss the case with anyone, apart from

23   telling family members or whomever you may see this evening

24   that you've been seated as a juror on a case in the U.S.

25   District Court.  That's all you should really say.  And don't

```
 1    do any research in any fashion.  Don't read any newspaper
 2    articles, listen or watch any media reports about the case,
 3    if there are any.  Don't communicate in any fashion, e-mail,
 4    blogging, all the other things I mentioned, Twittering,
 5    anything of that nature or of any nature of any sort.  Don't
 6    communicate in any fashion.  Do not make up your minds about
 7    the case or any issue involved in this case, because you
 8    haven't heard all of the evidence, of course.
 9              Thank you, ladies and gentlemen.  We'll see you
10    tomorrow morning at 9:00.
11              And you may step down.
12               (The jury has now exited the courtroom)
13              THE COURT:  We are on the record outside the
14    presence of all members of the jury.
15              You may be seated.  A couple of housekeeping
16    matters to take up quickly.
17              You will continue with Ms. Franco in the morning?
18              MR. WIDMAN:  Yes, Your Honor.
19              THE COURT:  How much longer do you think your
20    direct will be?
21              MR. WIDMAN:  One moment, please, so I can just
22    check over my notes.  I estimate about 45 minutes.
23              THE COURT:  How long do you estimate for
24    cross-examination, Mr. Gluck?
25              MR. GLUCK:  I would guess about an hour.
```

```
 1              THE COURT:  The next witness?

 2              MR. WIDMAN:  The next witness we expect is going to

 3   be Mindy Funk.

 4              THE COURT:  How long do you think her direct will

 5   be?

 6              MR. BEHNKE:  Her direct will be no longer than an

 7   hour.  I expect shorter than that, maybe more in the

 8   neighborhood of 40, 45 minutes.

 9              THE COURT:  All right.  And then after that?

10              MR. WIDMAN:  Jessica Perez, Your Honor.

11              THE COURT:  And then?

12              MR. WIDMAN:  Kathy Walton, Your Honor.

13              THE COURT:  It's not the lineup that is causing me

14   to tear up, I'm sorry, it's just my allergies.

15              If we need another witness, who would the next one

16   be?

17              MR. WIDMAN:  If there is a fourth witness in

18   addition to Ms. Franco, we expect that it would be Dr. Lee.

19   And also, to make clear, the order of the first two, we're

20   not sure which is going to go first or second.

21              THE COURT:  You mean as to Funk or Perez?

22              MR. WIDMAN:  Yes, Your Honor.

23              THE COURT:  All right.  A couple of other issues to

24   take up first.  One of the things we were talking about late

25   yesterday, and that is the Grand Jury testimony of
```

 1    Ms. Young.  You know, Ms. Young testified on -- do you all

 2    have copies?  Is this the only copy you have?

 3            MR. WIDMAN:  It's the only copy I have with me.

 4    Obviously, I'm very familiar with it and I believe defense

 5    counsel has a different copy.

 6            THE COURT:  Do you have a copy, Mr. Gluck?

 7            MR. GLUCK:  I can as soon as I get this thing to

 8    wake up.

 9            THE COURT:  We were talking late yesterday about

10    the differing perspectives that counsel have regarding her

11    Grand Jury testimony.  I think there were at least two

12    places -- maybe there were more, but there were two places

13    where she testified with regard to her understanding of

14    whether bringing the drugs into the country from Honduras was

15    unlawful.  One was on page 11 of the testimony.  I think this

16    might have been what you read yesterday into the record.

17            Are you still waiting for it to warm up?

18            MR. GLUCK:  No, I've got it.  Actually, Your Honor

19    is correct.  It is on page 11.  It was a question by

20    Mr. Widman.  The one I read yesterday was a question by the

21    Grand Juror which was on the same -- I mean, it's the same

22    thing, but this is not the one I read.

23            THE COURT:  All right.  On page 11 she said -- the

24    question was:  When you brought drugs into the country, you

25    didn't know it was illegal; is that right?

1                   Answer:  That's correct.

2                   That's near the bottom of the page on page 11.

3                   On page 13 -- and this is, again, in answer to a

4    question by Mr. Widman -- the question is asking:  At the

5    time of the initial conversation with Dr. Patwardhan, like

6    you told us, the initial conversation, you knew at that point

7    that it wasn't right to bring in drugs from overseas; is that

8    right?

9                   Answer:  Correct.

10                   Question:  And that's why you were unwilling to

11   help him in that regard; is that right?

12                   Answer:  Correct.

13                   Then on page 21:  And at that time that you brought

14   the drugs in, you didn't know there was anything illegal

15   about doing so; is that right?

16                   Answer:  That is correct.

17                   So there are differing answers to this question.

18                   MR. WIDMAN:  Your Honor --

19                   THE COURT:  Depending on -- she's talking about

20   different time periods.

21                   MR. GLUCK:  She is also talking about different

22   things, Your Honor.  If you look at page 13, the

23   discussion, the colloquy, begins actually on page 12.

24                   THE COURT:  Right.

25                   MR. GLUCK:  Where he says -- I'm sorry, where she

1   discusses that she doesn't want to -- well, it actually

2   starts with, did you learn that Dr. Mhaskar did, in fact, buy

3   drugs in India?  I'm sorry.  I'm backing up here.

4           On page 11 the chain of questions begins.

5           THE COURT:  About Dr. Mhaskar?

6           MR. GLUCK:  Exactly.  And what she's saying is she

7   refused to help Dr. Patwardhan.  She will testify that at

8   some point, after this attorney/client conversation,

9   Dr. Patwardhan asked her to ask Dr. Mhaskar to bring medicine

10  from India and to tell Dr. Mhaskar that she was the one that

11  wanted Dr. Mhaskar to do that.  And she refused to do that.

12  She never did that.  She did pay for the trip and whatever,

13  but that's something else, but she never did that.

14          And so the question of, the reason you did that is

15  because -- I'm sorry, the reason you didn't do that, the

16  reason you refused, because at that point you knew it was

17  wrong, was her explaining why after March 2008 she refused to

18  tell Dr. Mhaskar that she was the one asking Dr. Mhaskar to

19  bring the drugs into the country.  But she is consistent that

20  for all the times she actually made trips, meaning Jessica

21  Young made trips, because her trips ended in February 2008,

22  all the times she made trips, she's consistent throughout,

23  both answering Mr. Widman as well as answering the Grand

24  Juror, that when she did it, she thought it was legal.

25          The only thing she's saying she refused to do,

1    because at that point she knew that it was wrong, is talk to

2    Dr. Mhaskar about Dr. Mhaskar bringing it in.  This goes back

3    to our point yesterday, which is, why does she know it's

4    wrong.  According to her, because by that point she'd talked

5    to a lawyer.

6              THE COURT:  On page 11, right after the discussion

7    about Dr. Mhaskar, the question is, to backtrack when you

8    brought drugs back into the country, so your point is --

9              MR. GLUCK:  It is backtracking chronologically.

10   She did it between 2004 and February 2008.  Then they talk

11   about why she did what she did after March of 2008.

12             THE COURT:  All right.  Do you have anything to add

13   on that point?

14             MR. WIDMAN:  Yes, Your Honor, we do have one thing

15   to add.  If you'd just give me one moment, Your Honor.

16             Yes, Your Honor.  Essentially, the point that we

17   want to make is, as we said yesterday, I'm going to restate

18   something I said yesterday and then give the new point after

19   just for context.  What I said yesterday essentially was,

20   once you remove the original reference to attorney, there's

21   no inference later that, oh, someone must have talked to an

22   attorney and so forth and so on.  And then defense counsel

23   said, well, that would put him in the awkward position of

24   having to not be able to ask, you know, why did you think

25   that.  And the Government submits that --

1            THE COURT:  Or not being able to cross-examine.

2            MR. WIDMAN:  And the Government submits that he is

3    able to cross-examine if he wants to, if he wants to waive

4    the privilege, but it's not a situation where he's not

5    permitted to, where he's not allowed to or you would tell

6    him, "Please stop, counsel."

7            THE COURT:  Well, no, she consulted her private

8    attorney, didn't she?

9            MR. GLUCK:  No, Your Honor.  She never had a

10   private attorney until after the search, which was in July.

11           MR. WIDMAN:  Your Honor, if I may clarify the time

12   frame, I'm confident defense counsel would agree with this.

13           THE COURT:  I think I understand the time frame.

14   At that point she consulted Mr. --

15           MR. GLUCK:  Fergie.  Exactly.  Her position is that

16   she, through Dr. Patwardhan, obtained the advice of

17   Mr. Fergie.

18           THE COURT:  No, that's your position.

19           MR. GLUCK:  No, that's Ms. Young's position.

20           MR. WIDMAN:  She said to Dr. Patwardhan, you need

21   to talk to a lawyer.  Dr. Patwardhan learned from the lawyer

22   that it was illegal, told Ms. Young that, and here we are.

23           THE COURT:  Well, it's your position that it's a

24   corporate privilege.

25           MR. GLUCK:  Correct.  The only lawyer that

1    Ms. Young has individually is Mr. Miller who is retained like

2    from the 31st of July.  I know this goes without saying, but

3    we, of course, dispute her characterization of what happened

4    here, but because it's privileged we don't need to go there.

5              The point is, this evidence -- and I was really

6    thinking about this last night, because other than knowing

7    something is wrong here, in terms of the framework in the

8    rules, the problem is there are only two possible options in

9    terms of this evidence having any or drawing any inference

10   from this evidence.  Either it's inadmissible under 501 as

11   attorney/client privilege, or it's inadmissible under 403 as

12   being entirely misleading, because we know that the only true

13   inference that could be drawn from here goes right through

14   the privilege.  If we cut that out, then all we're doing is

15   throwing something to the jury that causes them to speculate

16   about, well, gee, if Ms. Young, who is not a doctor, was able

17   to educate herself on this point in March of 2008, it's a lot

18   less likely that Dr. Patwardhan didn't know about it then.

19             THE COURT:  Now, the jury -- counsel can argue -- I

20   am still not inclined to let the Government ask her why, but

21   the Government is free to argue at the end of the case that

22   her actions in the way that she brought the drugs in, the

23   medications in, to use their language, hiding them and

24   putting them in a department store gift box and so forth,

25   shows that she didn't want to see -- some consciousness that

1   bringing them in was not aboveboard or was wrong and that she

2   was trying to conceal them.  And they can argue that.  That's

3   free to be argued.  That's circumstantial evidence.  And they

4   can argue all the circumstantial.  They can ask her about

5   that.  They can ask her why she did all those things at that

6   time.

7           MR. GLUCK:  Absolutely.

8           THE COURT:  Like I said, I don't want to tell -- I

9   don't need to do that.  Certainly neither side needs me to

10  say.  But the question as to why she stopped, my ruling

11  stands on that.

12          MR. WIDMAN:  Thank you, Your Honor.  I just want to

13  make one other point that I think really underlies this whole

14  thing, which is if the defense's position is that the advice

15  was never given, then why have we been litigating whether

16  this communication is privileged or not.

17          THE COURT:  I don't think that's their position.

18  That wasn't my understanding.

19          MR. GLUCK:  First of all, it's simply not the rule,

20  that I need to waive privilege unless you know exactly what

21  the attorney said.

22          THE COURT:  I don't need to hear any more

23  argument.  In the interest of time, I understand the issue

24  and I've heard both sides.

25          Let's see.  The other issue as to the -- I have the

1    case law and so forth right here.  The issue about who has

2    the burden of proof about the statutory exception -- now, let

3    me just say while I'm waiting for that, as a piece of trial

4    advocacy advice I will give to both sides, but 75 percent to

5    the defense, it does not cure the argumentative nature of an

6    opening statement to insert the words, "The evidence will

7    show that" before you make an argumentative -- before you

8    argue in opening statement.

9             MR. GLUCK:  Thank you, Your Honor.

10            THE COURT:  Thank you.  There was a bit of argument

11   that both sides did, you know, but it was more than a bit on

12   your side.

13            MR. GLUCK:  I appreciate any trial advocacy advice

14   the Court is willing to give.

15            THE COURT:  Next time you try a case in front of

16   me, on opening I'll be a little bit more on guard.

17            MR. GLUCK:  I'm fairly warned.

18            THE COURT:  All right.  The instruction that's at

19   issue here -- I think I went to that same class and heard

20   that same piece of advice about starting off with, "The

21   evidence will show that."  And, of course, one's perspective

22   changes.

23            All right.  It's Government's proposed instruction

24   No. 4 which is on page 9 of what was called the joint

25   proposed jury instructions, but it's behind tab A, page 9,

1   because it is one of the not so joint ones.  All right.

2            So the issue is, as I understand the parties'

3   positions here, who has the burden of proof of showing the

4   statutory exception applies.  There's no Ninth Circuit case

5   that we've been able to find or, apparently, that the parties

6   have been able to find.  And although, as I understand it,

7   the defendant's position is that, in general, that the burden

8   of proof is on the Government to prove the elements, this

9   issue does not really --

10           MR. BEHNKE:  I'm sorry, Your Honor.  In

11  anticipation of arguing about this earlier today, I did some

12  additional research and have a case to cite to the Court and

13  to defense.  I apologize.  I was in a hurry.  I didn't bring

14  multiple copies to hand out.  But there's another case.  It

15  is certainly not an FDA case, but it has to do with

16  exemptions concerning crimes that occur on Native American

17  land.  And the Ninth Circuit also said in that case that, you

18  know, statutory exemptions, in that context defense has the

19  burden of producing evidence if the exception applies, and

20  then the Government at that point would bear the burden of

21  proving beyond a reasonable doubt the nonexistence.

22           THE COURT:  In other words, it's a defense.

23           MR. BEHNKE:  Yes, Your Honor.

24           THE COURT:  It's a defense which the defendant has

25  the burden of establishing?

1            MR. BEHNKE:  Yes, Your Honor.

2            THE COURT:  What's the citation to the case?

3            MR. BEHNKE:  It's <u>United States v. Bruce</u>,

4    394 F.3d 1215.

5            THE COURT:  All right.  I'm inclined, after reading

6    the cases that were cited, I think it's an Eleventh Circuit

7    case, which is <u>United States v. Hill</u>, which is very helpful,

8    it's not a Ninth Circuit case, but to find that the

9    instruction that the Government has proposed appropriately

10   assigns the burden; that is, that the defense has the burden

11   of showing that it falls within the statutory exception.  And

12   if it has done so, then the burden shifts to show that the

13   exception does not apply, but not until it has met -- the

14   defense has the initial burden, as it would be a defense.

15           So I'm inclined to give the instruction that the

16   Government has proposed.

17           MR. GLUCK:  Your Honor, may we just take a look at

18   the case and raise it again if we are --

19           THE COURT:  Certainly.

20           MR. BEHNKE:  Just to clarify, Your Honor, the

21   Government apologizes for the way that this was all crafted,

22   but at the end of the case if there has been no evidence of

23   any exemptions --

24           THE COURT:  Then you would object to having that

25   defense?

1          MR. BEHNKE:  We would withdraw that objection at

2     that point, the definition -- the instruction defining the

3     exemptions.

4          THE COURT:  You would withdraw this instruction?

5          MR. BEHNKE:  That proposed instruction.

6          THE COURT:  Exactly.  Not your objection, but the

7     instruction.

8          MR. BEHNKE:  Yes, Your Honor.

9          THE COURT:  I'm so easily confused.  Don't make it

10    any worse.  Thank you.  I understand.

11          I think that my intended ruling should help you

12    about the witness that you're going to put on.

13          MR. BEHNKE:  Yes, Your Honor.

14          THE COURT:  Thank you.  I'll see you tomorrow

15    morning.

16          MR. GLUCK:  May I ask one question?

17          THE COURT:  Certainly.

18          MR. GLUCK:  Just as a practical matter with respect

19    to Dr. Lee, Dr. Lee is -- I know subject or consistent with

20    the Court's ruling about what he can testify about, he is

21    going to be talking somewhat about the FDA regulatory scheme,

22    I would like to, although, I don't know yet what, but would

23    like to possibly use in cross-examination FDA material that's

24    available on the FDA's Web site and things like that.  In

25    terms of requesting judicial notice to allow those things in,

1    I don't know how the Court wants to handle that.

2              THE COURT:  Is it on the FDA's Web site?

3              MR. GLUCK:  Yes.  Printed from FDA dot gov slash

4    whatever.

5              THE COURT:  Before you give your cross-examination,

6    you have to give the Government copies and me a copy of

7    anything you wish the Court to take judicial notice of.

8              MR. GLUCK:  That's fine.  Thank you.

9                  (Proceedings adjourned)

10                    ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

### DOCKET NO. EDCR 08-172(B)-VAP

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and accurate transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

_____

PHYLLIS A. PRESTON, CSR            DATED:  January 19, 2010
Federal Official Court Reporter
License No. 8701