1               UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2                EASTERN DIVISION-RIVERSIDE

3

        HONORABLE VIRGINIA A. PHILLIPS, JUDGE PRESIDING

4

5   UNITED STATES OF AMERICA,          )
                                       )
6                     Plaintiff,       )
                                       )
7   V.                                 )DOCKET NO. EDCR 08-172(B)VAP
                                       )
8   VINOD CHANDRASHEKM PATWARDHAN,     )
                                       )
9                     Defendant.       )
    _____)
10

11        REPORTER'S TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                     Riverside, California
12                 Thursday, April 30, 2009

13
                   PHYLLIS A. PRESTON, CSR
14                   License No. 8701
               Federal Official Court Reporter
15             United States District Court
                   3470 Twelfth Street
16             Riverside, California 92501

17

18

19

20

21

22

23

24

25

1                              <u>APPEARANCES</u>

2

3   For the Plaintiff:      OFFICE OF THE UNITED STATES ATTORNEY
                            By:  <u>JOSEPH WIDMAN</u>
                                 <u>JERRY BEHNKE</u>
4                           Assistant United States Attorneys
                            3880 Lemon Street, Suite 210
5                           Riverside, California 92501

6

7   For the Defendant:      BIRD MARELLA
                            By:  <u>BENJAMIN GLUCK</u> & <u>JEAN RHEE</u>
8                           1875 Century Park East, 23rd Floor
                            Los Angeles, California 90067
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
1                    I N D E X

2    WITNESSES                                    PAGE

3    NORMA FRANCO
     DIRECT EXAMINATION BY MR. WIDMAN (RESUMED) . . . . . . 9
4    CROSS-EXAMINATION BY MR. GLUCK . . . . . . . . . . . 31
     REDIRECT EXAMINATION BY MR. WIDMAN . . . . . . . . . 93
5
     MELINDA FUNK
6    DIRECT EXAMINATION BY MR. BEHNKE . . . . . . . . . 101
     CROSS-EXAMINATION BY MS. RHEE. . . . . . . . . . . 119
7    REDIRECT EXAMINATION BY MR. BEHNKE . . . . . . . . 130

8    JESSICA PEREZ
     DIRECT EXAMINATION BY MR. WIDMAN . . . . . . . . . 134
9    CROSS-EXAMINATION BY MR. GLUCK . . . . . . . . . . 156
     REDIRECT EXAMINATION BY MR. WIDMAN . . . . . . . . 216
10
     KATHERINE WALTON
11   DIRECT EXAMINATION BY MR. BEHNKE . . . . . . . . . 219
     CROSS-EXAMINATION BY MR. GLUCK . . . . . . . . . . 237
12   REDIRECT EXAMINATION BY MR. BEHNKE . . . . . . . . 239

13   EXHIBITS                                    ADMITTED

14    3 - 8                                         16
      122 - 126C                                    23
15    129 - 135B                                    28
      200                                           73
16    201                                           75
      202 - 203                                     78
17    204                                           81
      205                                          129
18    102                                          145
      102A - 102D                                  145
19    224                                          186
      221                                          189
20    223                                          193
      226                                          194
21    225                                          204
      120                                          231
22    134A                                         234
      134B                                         234
23    136                                          236
      135                                          236
24

25
```

```
 1            THURSDAY, APRIL 30, 2009, RIVERSIDE, CALIFORNIA

 2                           ---o0o---

 3            THE CLERK:  EDCR 08-172 VAP, United States of

 4    America versus Vinod Patwardhan.

 5            Counsel, please state your appearance.

 6            MR. BEHNKE:  Good morning, Your Honor.  Jerry

 7    Behnke for the United States.  Joe Widman and Agent Crawford

 8    are also present.  They just stepped out momentarily.

 9            THE COURT:  All right.

10            MR. GLUCK:  Good morning, Your Honor.  Benjamin

11    Gluck for Dr. Patwardhan who is present.  My colleague, Jean

12    Rhee, had some pretty serious computer trouble last night.

13    We've been sitting putting stickers on things all morning.

14    So she is actually in our conference room working on that

15    right now.

16            While I'm on the subject, I would ask the Court's

17    indulgence.  I have the exhibits.  I'm putting stickers on

18    them right now, but I would ask for a short break before the

19    cross.  They're not punched yet and they need to be stapled.

20    There may be a break anyway.

21            THE COURT:  How much longer -- I think the estimate

22    was only about 45 minutes.

23            MR. WIDMAN:  Yes, Your Honor, that was and is the

24    estimate.

25            MR. GLUCK:  And I may very well be able to talk
```

1    about other things, use Government exhibits, but at some

2    point I'm going to have to finish this.

3            THE COURT:  Why don't we -- we'll begin your cross

4    and when you need to --

5            MR. GLUCK:  I'll need the exhibits.

6            THE COURT:  When you need to recess, if it's not a

7    natural break, just let me know and we will recess.

8            MR. GLUCK:  Thank you.

9            THE COURT:  Mr. Behnke.

10           MR. BEHNKE:  Yes, Your Honor.  We just had an issue

11   to bring to the Court's attention.  It probably isn't going

12   to be something that the Court would actually have to rule on

13   until if and when the time actually comes in testimony, but

14   in light of the opening statement yesterday, the Government

15   anticipates that on cross-examination of witnesses like Norma

16   Franco, you know, there may be attempt by the defense to

17   elicit the defendant's self-serving, exculpatory statements

18   to the witnesses through cross-examination.  And the

19   Government does object and will object if and when that time

20   comes.

21           THE COURT:  Mr. Gluck.

22           MR. GLUCK:  We are aware of the hearsay rule and

23   the only -- I discussed this earlier with Mr. Behnke and

24   Mr. Widman.  The only -- I guess the only thing we would say

25   in not knowing exactly what she is going to say from the

 1   stand, is that to the extent that she testifies that, for

 2   example, her instructions were to do X, Y, and Z, we can test

 3   that by asking whether those indeed were her instructions and

 4   weren't you instructed to do the opposite or something like

 5   that.  But we do not intend to simply inquire, didn't

 6   Dr. Patwardhan ever tell you, you know, that this was legal

 7   or something like.  I should say for Ms. Franco.  I think the

 8   analysis may be different for Ms. Young because, for example,

 9   her state of mind may be an issue later, but I'm just saying

10   as far as Ms. Franco is concerned.

11            THE COURT:  All right.  Thank you.  Anything else

12   before we bring the jury in?

13            MR. WIDMAN:  Your Honor, there is one other point

14   we wanted to mention, not particularly disputed.  I believe

15   there are some members of the gallery here today who have not

16   been here on previous occasions.

17            THE COURT:  Do you want me to just repeat the

18   admonitions?

19            MR. WIDMAN:  I think that may be a good idea.

20            THE COURT:  I think I see a few new faces, so good

21   morning to everyone who hasn't been here before.  If you are

22   not already aware of this, let me just tell you that

23   everything that takes place in a courtroom in this country,

24   with very few exceptions, is open and all members of the

25   public are welcome in the courtroom virtually always because

1    it's one of the fundamental principles of our country that

2    everything that happens in a courtroom, unless it's a

3    juvenile court or something, should be open to the public.

4    So you're always welcome in a courtroom, in this courtroom,

5    as in any other during the course of this trial.  There

6    should be almost -- it would be very rare for the courtroom

7    to be closed and not open to the public.  That's a rare

8    exception, so you're all welcome here.

9           Whenever there's a trial, it's because there's a

10   dispute, there's a disagreement, and this trial is no

11   different than any other, so, of course, people who are here

12   to watch are here also usually because they disagree with one

13   side or the other's views of the facts.  You're welcome to

14   leave the courtroom if you're listening to something that you

15   disagree with and you find it difficult to maintain your

16   composure, but please leave quietly and in a dignified

17   fashion if you decide that it's too difficult for you to

18   listen to testimony or statements by the attorneys that you

19   disagree with.  You're not required to stay in here once you

20   come in.  You're always free to leave.  But please maintain a

21   neutral and impassive demeanor in front of the jury, because

22   both sides deserve that, to have the case decided without

23   distraction.

24          Make sure you always have your cell phone turned

25   off so that the proceedings go on and nobody gets distracted

```
 1   and everything takes place in a dignified manner.
 2            And, of course, make sure that you avoid any
 3   contact with the jury no matter how casual.  You can't talk
 4   to them on any subject about the weather, anything.  They
 5   will be very -- they've been told that.  They know they can't
 6   have contact with anyone during the course of the trial, so
 7   don't put them in the awkward position of having to walk away
 8   from you or report it to the Court if you try to talk to
 9   them.
10            Thank you.
11                (In the presence of the jury:)
12            THE CLERK:  EDCR 08-172-VAP, United States of
13   America versus Vinod Patwardhan.
14            Counsel, please state your appearance.
15            MR. WIDMAN:  Good morning, Your Honor.  On behalf
16   of the United States Assistant United States Attorneys Joseph
17   Widman and Jerry Behnke.  And with us at counsel table -- he
18   actually stepped away for a moment -- is Special Agent
19   William Crawford from the Food and Drug Administration's
20   Office of Criminal Investigations.
21            THE COURT:  Thank you.  Good morning.
22            MR. GLUCK:  Good morning, Your Honor.  Benjamin
23   Gluck and Dr. Patwardhan.  And as I mentioned, my colleague
24   Jean Rhee is just working on some things right next door.
25            THE COURT:  Thank you.  Good morning.
```

1          good morning, ladies and gentlemen.  Let the record

2  reflect the presence of all members of the jury.

3          Ms. Franco, you may resume the witness stand.  You

4  do not need to be resworn as a witness as you were sworn to

5  give your testimony under penalty of perjury yesterday and

6  your testimony again today is given under penalty of perjury.

7          You understand that?

8          THE WITNESS:  Yes.

9      <u>PLAINTIFF'S WITNESS, NORMA FRANCO, PREVIOUSLY SWORN</u>

10         THE COURT:  Thank you.  You may be seated.

11         And you may resume your examination.

12         MR. WIDMAN:  Thank you, Your Honor.

13             <u>DIRECT EXAMINATION</u> (Resumed)

14  BY MR. WIDMAN:

15  Q.   Good morning, Ms. Franco.

16  A.   Good morning.

17  Q.   Yesterday right at the very end you testified about

18  Veronica Lin being given take-home injections.  Do you recall

19  that?

20  A.   Yes.

21  Q.   And you testified that she was given an injection that

22  Dr. Patwardhan had brought into the country from India.  Do

23  you recall that?

24  A.   Yes.

25  Q.   And that someone called the office named Katherine and

1   asked about the Indian injectable and that you received

2   guidance from Dr. Patwardhan regarding your conduct going

3   forward.  Do you remember that?

4   A.   Yes.

5   Q.   Could you explain what that guidance was?

6   A.   He told us to just give the patients to take home the

7   medication that was brought -- that we buy here from OTN.

8   Q.   Did he provide any guidance regarding the Indian drug?

9   A.   Yes.  He told us not to give the patients the foreign

10  drug to take home with them.

11  Q.   There's one matter that I wanted to clarify yesterday

12  that I think my question could have used some improvements,

13  and it concerns Exhibit 1U, which is already entered into

14  evidence.  And I'm going to place it on the overhead

15  projector.

16          Do you remember discussing this picture yesterday,

17  Ms. Franco?

18  A.   Yes.

19  Q.   Now, my question is, these cabinets, were they

20  ordinarily opened in that -- were they ordinarily open like

21  that?

22  A.   Yes.

23  Q.   So from a day-to-day basis these cabinets were open?

24  A.   No.

25  Q.   Can you explain?

1    A.    No, they were closed.  If we needed something from the

2    cabinet, we would open it and take it out.

3    Q.    When I said "open" before you understood me to mean

4    locked or unlocked?

5    A.    Yes.

6    Q.    So just so there's no confusion, the cabinets were

7    unlocked but typically closed?

8    A.    Yes.

9    Q.    Thank you.  Removing Exhibit 1U from the overhead

10   projector.

11             I wanted to clarify one other matter from

12   yesterday.  You testified yesterday concerning drugs from

13   India brought back by Dr. Patwardhan.  Do you recall that?

14   A.    Yes.

15   Q.    And drugs brought back from Honduras by Jessica Young,

16   do you recall that?

17   A.    Yes.

18   Q.    And I believe you said -- and correct me if I'm wrong --

19   that typically Dr. Patwardhan would bring back in the

20   neighborhood of 200 vials per trip, approximately; is that

21   what you recall?

22   A.    Yes.

23   Q.    And that Ms. Young would bring back approximately 20; is

24   that right?

25   A.    Yes.

1    Q.   And I think you also testified that both supplies would

2    last the practice approximately the same length of time; is

3    that correct?

4    A.   Yes.

5    Q.   Why would they last the same amount of time even though

6    there's such a different number of vials?

7    A.   Because some patients were taking different medications.

8    Q.   Could you explain that?

9    A.   Some patients were on a different chemotherapy treatment

10   and some weren't.  There was a lot more patients on different

11   medications that were used more than the others.

12   Q.   And with respect to the drugs from Honduras and India,

13   can you explain that?  Do you understand my question?

14   A.   No.

15   Q.   Were the drugs from Honduras not used on as many

16   patients as the drugs from India or the other way around?

17   A.   They were both used for the patients.

18   Q.   My question is, in terms of how often they were used,

19   how commonly they were given out, was there any difference?

20   A.   No.

21   Q.   Were the Indian drugs used more often?

22        MR. GLUCK:  Your Honor, it's asked and answered.

23        THE COURT:  Sustained.

24   BY MR. WIDMAN:

25   Q.   I'm going to change subjects now, Ms. Franco.

1          Did someone approach you at some point concerning

2    the purchasing of drugs from India and Honduras?

3    A.    Yes.

4    Q.    Who?

5    A.    Dr. Patwardhan and Jessica Young.

6    Q.    With respect to -- did anyone ever approach you with

7    concerns about drugs coming in from India and Honduras?

8    A.    Can you repeat the question?

9    Q.    Sure.  Did anyone ever approach you at any time about

10   concerns about Dr. Patwardhan bringing in drugs from

11   overseas?

12   A.    No.

13   Q.    Was there a time when Jessica Perez raised concerns with

14   you about that topic?

15   A.    Yes.

16              MR. GLUCK:  Objection, leading.

17              THE COURT:  Overruled.

18   BY MR. WIDMAN:

19   Q.    I'm sorry.  My question was, was there a time when

20   Jessica Perez approached you regarding concerns on that

21   topic?

22   A.    Yes.

23   Q.    Can you please tell us about that?

24   A.    She came to me and asked me what's contained in the gym

25   bag, and I told her that those were drugs that Dr. Patwardhan

```
 1    had brought from India when he went on his trip.  And she

 2    asked -- well, she actually told me that it was wrong and

 3    that it was illegal to bring those medications.  I told her I

 4    didn't know.  And she was very concerned about that, and

 5    that's how I knew that Dr. Patwardhan was doing something

 6    wrong.

 7    Q.    Was there any discussion about how long Dr. Patwardhan

 8    had been bringing drugs into the country from overseas?

 9    A.    Yes.

10    Q.    What was that discussion?

11    A.    We had a discussion with Dr. Patwardhan and Jessica

12    Young and another medical assistant employee.

13    Q.    Allow me to ask you this, Ms. Franco:  Were efforts made

14    to document what was going on?  To document -- do you

15    understand what I mean by document?

16    A.    No.

17    Q.    Was there any effort to get some concrete evidence of

18    what was going on?

19    A.    Yes.

20    Q.    Can you explain that?

21    A.    We needed to take pictures of the medications that were

22    brought in in order to make sure that they were FDA-approved

23    or not.

24    Q.    And were any pictures ever taken?

25    A.    What was that again?
```

1    Q.   Were any pictures ever taken?

2    A.   Yes, they were.

3    Q.   By whom?

4    A.   By me and another medical assistant.

5    Q.   Could you please explain how that came about?

6         THE COURT:  Ms. Franco, let me remind you, you need

7    to keep your voice up.  Thank you.

8         THE WITNESS:  We just decided that we had to take

9    pictures to have evidence -- have evidence of the names of

10   the vials.  So I took pictures with my camera phone, and the

11   other medical assistant also took pictures with her phone,

12   and we gave it to Jessica Perez.

13   BY MR. WIDMAN:

14   Q.   Why did you give it to Jessica Perez?

15   A.   Jessica Perez needed those pictures to send in to the

16   authorities.

17   Q.   I would like you to look in your exhibit binder at

18   Exhibits 3 through 8.

19   A.   Binder 3?

20   Q.   No.  I think it should be binder 1, actually, Exhibits 3

21   through 8.  And just look at them for yourself and then I'm

22   going to ask you some questions about them.

23         Have you had an opportunity to look at them?

24   A.   You said Exhibit 3?

25   Q.   Exhibits 3, 4, 5, 6, 7 and 8, 3 through 8.

1    A.    Yes.

2    Q.    What do those appear to be?

3    A.    These are the pictures we took.

4    Q.    Where were you when you took those pictures?

5    A.    In the office at 918.

6          MR. WIDMAN:  Your Honor, the Government moves to

7    have Exhibits 3 through 8 entered into evidence and for

8    permission to publish them to the jury.

9          THE COURT:  Any objection?

10         MR. GLUCK:  None, Your Honor.

11         THE COURT:  Thank you.  Exhibits 3 through 8 are

12   ordered admitted and you may publish.

13         MR. WIDMAN:  Thank you, Your Honor.

14   BY MR. WIDMAN:

15   Q.    I'm now placing Exhibit 3 on the overhead projector and

16   I would ask you, Ms. Franco, to look at the screen version.

17   Could you please explain to the jury what we're looking at

18   here?

19   A.    This is an invoice that came out of the gym bag.

20   Q.    Let me ask you first, when did you take these pictures?

21   A.    I believe it was in February.

22   Q.    Okay.  And you mentioned a gym bag.  Could you explain

23   what you mean by that?

24   A.    It's a gym bag that you take to the gym.  It was a

25   Reebok gym bag.

```
 1    Q.   And the gym bag, was there any -- the drugs were located

 2    in the gym bag or not?

 3    A.   Yes.

 4    Q.   Okay.  Thank you.

 5              I'm now placing on the overhead projector

 6    Exhibit 4.  Can you tell us what this is?

 7    A.   This is Gemzar.

 8    Q.   But it says Amgem right in the middle there.  Can you

 9    please explain the difference?

10    A.   Amgem is the foreign named drug.  We normally call it

11    Gemzar.

12    Q.   Who told you to call it Gemzar?

13    A.   Dr. Patwardhan.

14    Q.   Thank you.  I'm going to now place Exhibit 5 on the

15    overhead projector.  Could you please tell us what we are

16    looking at here?

17    A.   This is Farmorubicina.  It's also a chemo medication.

18    Q.   And could you please explain the discrepancy between the

19    word "Farmorubicina" and "Epirubicin"?

20    A.   That's the foreign name also.

21    Q.   And why do you refer to this as Epirubicin?

22    A.   Because Dr. Patwardhan told me it's Epirubicin.

23              THE COURT:  You need to make sure -- don't move

24    that, move your seat.  That's very fragile.

25              THE WITNESS:  Okay.
```

```
 1              MR. WIDMAN:  And it may also make it easier to

 2   adjust where the binders are.  So you can put the microphone

 3   more directly in front of you if you find that easier.

 4              THE WITNESS:  Okay.

 5   BY MR. WIDMAN:

 6   Q.   Thank you.  I'm now placing on the overhead projector

 7   Exhibit 6.  Could you please explain what we're looking at

 8   here?

 9   A.   I believe this is Alimta.

10   Q.   Now, these pictures were taken on a cellular telephone?

11   A.   Yes.

12   Q.   Thank you.  Now, turning back to what we were just

13   looking at, Exhibit 6, was this -- is this a picture of one

14   of the drugs from the bags or not?

15   A.   Yes.

16   Q.   How do you mean?

17   A.   Because I took them out of the bag.

18   Q.   You took this drug out of the bag?

19   A.   Yes.

20   Q.   Thank you.  Turning now to Exhibit No. 7, could you

21   please explain what we're looking at here?

22   A.   This is Docetax normally called Taxotere.  It is inside

23   the gym bag.

24   Q.   And is there any packaging materials that you can see

25   here?
```

1    A.   No.

2    Q.   Does there appear to be anything to make sure that they

3    don't get damaged in transit?

4         MR. GLUCK:  Objection, asking the witness to

5    interpret a photograph, I'm not sure --

6         MR. WIDMAN:  Your Honor, I'd be happy to rephrase.

7         THE COURT:  All right.  Thank you.

8    BY MR. WIDMAN:

9    Q.   Based on what you remember about seeing what's in this

10   bag, was there any bubble wrap or wrapping paper or anything

11   of that nature?

12   A.   No.

13   Q.   Now, this was February 2008 you testified; is that right?

14   A.   Yes.

15   Q.   Was this the first time you had ever seen these kinds of

16   drugs in the office?

17   A.   No.

18   Q.   When was -- how long at that point had you seen drugs

19   like that in the office?

20   A.   Since I started working in the Upland office, I believe

21   in 2003.

22   Q.   And what was your understanding of where those drugs

23   came from?

24   A.   From India and Honduras.

25   Q.   Ms. Franco, why did you take the pictures?

1   A.    I took the pictures because I wanted to make sure these

2   medications were safe for the patients.

3   Q.    Was there any instructions for use or other guidance in

4   the bag?

5   A.    No.

6   Q.    Did there come a point where you discussed what you were

7   doing with your colleagues?

8   A.    Yes.

9   Q.    Can you tell us about that?

10  A.    We went to -- after work we went to -- it was St.

11  Patrick's Day and we went to celebrate St. Patrick's Day and

12  we were just talking about the medications and about the

13  patients.  We wanted to make sure these medications were

14  safe.

15  Q.    Who was there?

16  A.    Jessica Perez, Mindy Funk, Mayra Jaurequi and Jeannette

17  -- I don't recall her last name.

18  Q.    And what kind of meeting place -- where did this meeting

19  take place?

20  A.    It's called Tequila Hoppers.  It's a restaurant.

21  Q.    Was there any discussion about what was going to be done

22  with the pictures?

23  A.    Yes.

24  Q.    Can you please tell us about that?

25  A.    We talked about Jessica Perez, that she was going to

```
 1   send it to the medical board and to the FDA.
 2   Q.   Now, at some point did you attend a meeting regarding
 3   the pictures with Dr. Patwardhan and Jessica Young?
 4   A.   Yes.
 5   Q.   And from this point on did you ever learn of
 6   Dr. Patwardhan taking a trip to India to purchase drugs?
 7   A.   No.
 8   Q.   And from this point on did you ever learn of Jessica
 9   Young taking a trip to Honduras to purchase drugs?
10   A.   No.
11   Q.   From this point on did you see any drugs from India come
12   into the office at any time?
13   A.   No.
14   Q.   At some point were you interviewed by Agent Crawford
15   from the Food and Drug Administration?
16   A.   Yes.
17   Q.   And when was that approximately?
18   A.   I believe it was in May.
19   Q.   Of which year?
20   A.   2008.
21   Q.   Now, at that time were there drugs from India in the
22   office?
23   A.   Yes.
24   Q.   And when do you believe they arrived in the office?
25   A.   In February.
```

1    Q.    What did you discuss with Agent Crawford?

2    A.    We discussed the medications, the pictures that we had

3    taken, and the names of the medications.  I took samples of

4    the medications and I showed it to him.

5    Q.    Why did you do that?

6    A.    Because the pictures -- some of the pictures weren't

7    clear and I wanted for him to see and read the names on the

8    vials to make sure.  He's an agent, so I would think he would

9    know if these are illegal or not.

10   Q.    Now, Agent Crawford is with us here in court; is that

11   right?

12   A.    Yes.

13   Q.    Can you please point him out for the jury?

14   A.    Right there (indicating).

15            MR. WIDMAN:  For the record, Ms. Franco is pointing

16   at the case agent, William Crawford, from the FDA's Office of

17   Criminal Investigations.

18            THE COURT:  So noted for the record.

19            MR. WIDMAN:  Thank you.

20   BY MR. WIDMAN:

21   Q.    I would like to show you some pictures, Ms. Franco, and

22   ask you some questions about it.  Could you please look at

23   Exhibits 122 through 126C?

24   A.    Which binder?

25   Q.    Those might be in 3 of 3, I believe.  I'm not really

1    sure.  I think on the binding of each binder you may see the

2    range of exhibits that are included in that binder.

3              The range is, for the record, 122 to 126C.

4              What I would ask you to do, Ms. Franco, is to look

5    at each picture briefly, or as long as it takes for you to

6    get familiar with them, and then look up.

7              Now, what are these pictures of?

8    A.   These are pictures of chemotherapy drugs that came from

9    India and Honduras.

10   Q.   Are these drugs that Dr. Patwardhan administered in his

11   practice?

12   A.   Yes.

13   Q.   Are these drugs that you gave to Agent Crawford?

14   A.   Yes.

15             MR. WIDMAN:  Your Honor, the United States moves to

16   enter Exhibits 122 through 126C into evidence and for

17   permission to publish them to the jury.

18             THE COURT:  Any objections to these exhibits?

19             MR. GLUCK:  No, Your Honor.

20             THE COURT:  Thank you.  Exhibits 122 through 126C

21   are ordered admitted.  You may publish.

22             MR. WIDMAN:  Thank you, Your Honor.

23   BY MR. WIDMAN:

24   Q.   I'm going to place Exhibit 122 onto the overhead

25   projector.  Could you please explain to the jury what we're

1    looking at here?

2    A.   This is Pemnat.  It's -- we call it Alimta.

3    Q.   Why do you call it Alimta?

4    A.   Because Dr. Patwardhan told me that's what it was.

5    Q.   Thank you.  I'm now going to place Exhibit 123 on the

6    overhead projector.  Can you please explain what this is,

7    Ms. Franco?

8    A.   This is Amgem.  It's normally called Gemzar here.

9    Q.   And was this one of the pictures that you had taken --

10   excuse me.  Was this one of the drugs that you had taken a

11   cell phone picture of?

12   A.   Yes.

13   Q.   And why did you call it Gemzar?

14   A.   Because Dr. Patwardhan told me that's what it was.

15   Q.   Thank you.  Turning now to Exhibit 124, can you please

16   tell us what this is, Ms. Franco?

17   A.   This is Docetax and it's normally called Taxotere.

18   Q.   And is this one of the drugs that Dr. Patwardhan would

19   bring into the country from India?

20   A.   Yes.

21   Q.   And why did you call it Taxotere?

22   A.   Because Dr. Patwardhan told me that's what it was.

23   Q.   Thank you.  Turning now to Exhibit 124A, can you please

24   tell us what this is?

25   A.   This is the back of the vial, the instructions of the

1    Taxotere vial.

2    Q.   So this is the back of what we were just looking at?

3    A.   Yes.

4    Q.   I would like to direct your attention to this language

5    under the word "Storage" where it says to store under

6    refrigeration between 2 and 8 degrees Celsius, 36 to

7    46 degrees Fahrenheit.  Was this one of the drugs that was

8    required to be refrigerated?

9    A.   Yes.

10   Q.   And when you would count this out in the gym bag that

11   you described yesterday, what was its temperature?  Was it

12   room temperature or not?

13   A.   Room temperature.

14   Q.   Thank you.  I would like to direct your attention now to

15   Exhibit 125 which I'm placing on the overhead projector.

16   Could you please tell the jury what this is?

17   A.   This is Epirubicin.

18   Q.   And is this one of the drugs that you took pictures on

19   your cell phone of?

20   A.   Yes.

21   Q.   Where did this kind of drug come from in your office?

22   A.   This one, Jessica Young brought it from Honduras.

23   Q.   Thank you.  Allow me to ask you, you said "Epirubicin"

24   but this says "Farmorubicina"?

25   A.   Yes.  That's the foreign med.

```
 1    Q.    Thank you.  Turning now to Exhibit 125A, can you please
 2    tell us what this is?
 3    A.    This is located behind the box, the back of the box.
 4    Q.    The box of what?
 5    A.    Where the vial is contained.
 6    Q.    Which vial?
 7    A.    The Epirubicin.
 8    Q.    Which is what we were just talking about a moment ago;
 9    is that right?
10    A.    Yes.
11    Q.    The last picture?
12    A.    Yes.
13    Q.    Thank you.  I would like to look now at Exhibit 125G.
14    Could you please tell us what we are looking at now,
15    Ms. Franco?
16    A.    This is located in the back of the vial of the
17    Epirubicin.
18    Q.    Thank you.  Now, I would like to look at 126,
19    Exhibit 126.  Could you please tell us what we're looking at
20    here?
21    A.    This is Grafeel.  We normally call it Neupogen.
22    Q.    When you say "we," who are you referring to?
23    A.    The whole office.
24    Q.    And why would you call it Neupogen?
25    A.    Because Dr. Patwardhan told us that's what it was.
```

1   Q.   And, finally, I would like to show you Exhibit 126B,

2   which I'm placing on the overhead projector.  I would like to

3   direct your attention to this language here:  Store between 2

4   and 8 degrees Celsius.

5        Do you see that?

6   A.   Yes.

7   Q.   Was this one of the medications that was supposed to be

8   refrigerated?

9   A.   Yes.

10  Q.   When you would inventory this kind of medication as you

11  discussed yesterday, would it be?

12  A.   No.

13  Q.   Thank you.  I'd like to show you some pictures of some

14  other items, Ms. Franco, at this time.  Could you please look

15  through your binder at Exhibits 129 through 135B.  Could you

16  please tell us what those are pictures of?

17  A.   These are chemotherapy medications.  They need to be

18  refrigerated also.

19  Q.   And could you -- were these kinds of drugs that

20  Dr. Patwardhan would use in his medical practice?

21  A.   Yes.

22        MR. WIDMAN:  The United States moves to enter

23  Exhibits 129 to 135B into evidence and for permission to

24  publish them to the jury.

25        THE COURT:  Any objection to Exhibits 129 to 135B?

1          MR. GLUCK:  More of a comment, Your Honor.  We

2    don't have an objection to the pictures, but there are a lot

3    of pictures going in that nobody is identifying anything

4    about them.  In other words, there's a stack of pictures, the

5    witness talks about two or three, and there's no context as

6    to what the other pictures are.  So we don't have an

7    objection to any of these pictures, but we would rather that

8    if pictures are going to go into evidence, someone ought to

9    say what they are.

10          THE COURT:  Mr. Widman.

11          MR. WIDMAN:  If the Court would prefer, we would be

12   happy to show her each and every picture.  Let me

13   represent --

14          THE COURT:  We'll take this up outside the presence

15   of the jury just to save some time, but for now, 129, is it,

16   through 135B are ordered admitted.

17          MR. WIDMAN:  Thank you, Your Honor.  Do I have

18   permission to publish?

19          THE COURT:  Yes.

20          MR. WIDMAN:  Thank you.

21   BY MR. WIDMAN:

22   Q.   I'd like to show you Exhibit 129, Ms. Franco, which I'm

23   placing on the overhead projector.  Would you please tell the

24   jury what we're looking at here?

25   A.   It's Oxaliplatin.

1    Q.    What is that?  What is Oxaliplatin?

2    A.    I'm not sure what the real name is.

3    Q.    And if you weren't sure in your practice what the real

4    name is, how would you find out?

5    A.    We would ask Dr. Patwardhan.

6    Q.    Thank you.  I'd like to now turn to Exhibit 133, which

7    I'm placing on the overhead projector.  Could you please tell

8    us what this picture depicts?

9    A.    This is an injectable.  It is Neulastim.  It's called

10   Neulasta.

11   Q.    Who is it called Neulasta by?

12   A.    By Dr. Patwardhan.

13   Q.    And is this one of the drugs that was brought into the

14   country from India by Dr. Patwardhan?

15   A.    Yes.

16   Q.    I would like to refer you now to Exhibit 133A.  Could

17   you please identify for the jury what this is?

18   A.    This is the instructions on the Neulasta injection.

19   Q.    And when you say "Neulasta," are you referring to the

20   drug that we were just looking at in Exhibit 133?

21   A.    Yes.

22   Q.    I'm going to zoom in a little bit and ask you a question

23   regarding this language:  Store between 2 and 8 degrees

24   Celsius in a refrigerator.

25              Was this one of the drugs that was required to be

1   refrigerated?

2   A.   Yes.

3   Q.   And when you would inventory this, as you discussed

4   yesterday, was it -- could you please describe its

5   temperature?

6   A.   Room temperature.

7   Q.   Thank you.  I would like to change the topic a little

8   bit, move away from pictures of drugs.

9            When did you stop working for Dr. Patwardhan?

10  A.   July 23rd, 2008.

11  Q.   Why did you quit -- or let me ask you this:  What were

12  the circumstances surrounding your departure?

13  A.   I was uncomfortable working for him anymore.  We had,

14  you know -- I had discussed my feelings towards working with

15  him anymore and the stuff I had seen, and I told him I wasn't

16  comfortable working for him.

17  Q.   Before you quit, did you ever discuss with

18  Dr. Patwardhan the possibility of staying?

19  A.   Yes.

20  Q.   Could you please tell us about that?

21  A.   When I talked to Dr. Patwardhan about me wanting to

22  leave, he was very insistent.  He wanted to take me out to

23  lunch, to dinner.  I refused a couple of times and then I did

24  tell him -- I agreed one time and we went to lunch.  We went

25  to Denny's.  And at Denny's we discussed -- he asked me why

```
 1    did I want to leave, and I told him because I was
 2    uncomfortable working for him anymore.  And he said because
 3    of the medications, because of my morals, and I told him,
 4    yes.  And he said, "I don't want you to leave.  I'll give you
 5    a month off.  Take a vacation for you to relax and be with
 6    your kids."  And he offered me a vacation trip to Cabo San
 7    Lucas for me just to relax, and after I came back if I still
 8    wanted to work for him, my job was there.
 9    Q.    Thank you, Ms. Franco.
10              MR. WIDMAN:  The United States has no further
11    questions.
12              THE COURT:  Cross-examination.
13                         CROSS-EXAMINATION
14    BY MR. GLUCK:
15    Q.    Good morning, Ms. Franco.
16    A.    Good morning.
17    Q.    Are you comfortable continuing?
18    A.    Yes.
19    Q.    Ms. Franco, I think Mr. Widman asked you about a meeting
20    that you had with Mr. Crawford.  Do you recall that?
21    A.    Yes.
22    Q.    In fact, you've had several meetings with Mr. Crawford
23    as well as other Government representatives; isn't that
24    right?
25    A.    Yes.
```

```
 1   Q.   You met with them both before -- well, we'll start at

 2   the beginning.

 3             You met with them before you resigned from

 4   Dr. Patwardhan's office?

 5   A.   Only one agent which is Michael.

 6   Q.   Well, how many times did you talk to Mr. Crawford before

 7   you quit?

 8   A.   I believe two times, about two times.

 9   Q.   Would that include -- okay.  I'll ask -- I'm sorry.

10   I'll stop.  I'm confusing myself.  I apologize.

11             The first time you met Mr. Crawford would have been

12   in May of 2008; is that right?

13   A.   Yes.

14   Q.   And the second time you met Mr. Crawford would have been

15   in June of 2008?

16   A.   We talked on the phone.

17   Q.   Do you recall if you talked on the phone between those

18   two dates?

19   A.   Yes.

20   Q.   So you met him first in May?

21   A.   Yes.

22   Q.   And where was that meeting?

23   A.   It was at an El Torito restaurant.

24   Q.   I'm sorry, did you say El Torito?

25   A.   Yes.
```

```
 1   Q.   And how long did it last?

 2   A.   Probably about an hour.

 3   Q.   I didn't hear that.

 4   A.   About one hour.

 5   Q.   You met with him again in June of 2008?

 6   A.   No.

 7   Q.   When did you -- you were previously shown some pictures

 8   of medicine just a few minutes ago?

 9   A.   Yes.

10   Q.   And those were pictures -- if I understood correctly,

11   those are pictures of medicine that you gave to Mr. Crawford?

12   A.   Yes.

13   Q.   When did you give those medicines to Mr. Crawford?

14   A.   In May.

15   Q.   At the first meeting?

16   A.   Yes.

17   Q.   When did you take those medicines from Dr. Patwardhan's

18   office?

19   A.   In May.

20   Q.   Before you met with Mr. Crawford?

21   A.   Yes.

22   Q.   You had a meeting with Mr. Crawford in June -- in

23   mid-June of 2008.  Do you recall that?

24   A.   No.

25   Q.   Now, you mentioned that there was a telephone call.  Was
```

1    it one telephone call or a series of telephone calls?

2    A.    A couple of telephone calls.

3    Q.    Do you recall talking to Mr. Crawford on the telephone

4    after you -- well, let me try to get some dates here.

5              You said your last date at Dr. Patwardhan's office

6    was when?

7    A.    July 23rd, 2008.

8    Q.    And are you aware of the date that the agents -- that

9    Mr. Crawford came to Dr. Patwardhan's office?

10   A.    I believe it was after -- after July 23rd.

11   Q.    Do you know if it was July 30th, 2008?

12   A.    Yes.

13   Q.    And you had a telephone call with Mr. Crawford after you

14   had quit but before Mr. Crawford came to Dr. Patwardhan's

15   office on July 30th; is that right?

16   A.    Can you repeat that again?

17   Q.    Sometime between when you quit on July 23rd and when

18   Mr. Crawford came to Dr. Patwardhan's office on July 30th,

19   sometime between those two dates, you had a telephone call

20   with Mr. Crawford; is that right?

21   A.    Yes.

22   Q.    And you met with other -- well, on September 10th, 2008,

23   you testified in the Grand Jury.  Do you remember that?

24   A.    Yes.

25   Q.    And you testified under oath?

1    A.    Yes.

2    Q.    Did you meet with Mr. Crawford before going in to give

3    that testimony?

4    A.    No.

5    Q.    Did you meet with any other Government representatives

6    before going in to give that testimony?

7    A.    No.

8    Q.    How did you find out that you needed to go talk to the

9    Grand Jury on that date?

10   A.    Because I got a call.

11   Q.    From whom did you get a call?

12   A.    From Mr. Crawford.

13   Q.    Did he explain to you what was going to happen?

14   A.    Yes.

15   Q.    Did you talk about any of the subject matter that you

16   might be asked about in the Grand Jury?

17   A.    Yes.

18   Q.    But before you went in you didn't sit down and go over

19   it with anyone?

20   A.    No.

21   Q.    You met Mr. Crawford and Mr. Widman on February 5th,

22   2009; is that right?

23   A.    February 5th, 2009?

24   Q.    Yes.

25   A.    Yes.

1    Q.   And you met Mr. Crawford, Mr. Widman, and Mr. Behnke on

2    April 9th, 2009?

3    A.   Yes.

4    Q.   Have you met with them since April 9th, before today?

5    A.   No.

6    Q.   Have you discussed your testimony that you have given

7    here today with any of the Government representatives between

8    April 9th and today, which is April 30th, 2009?

9    A.   Yes.

10   Q.   With whom did you discuss it?

11   A.   With Joe Widman and Mr. Crawford.

12   Q.   Are you saying that wasn't in a face-to-face meeting?

13   A.   Yes.

14   Q.   That was a bad question.  I apologize.

15        Was it or was it not in a face-to-face meeting?

16   A.   Yes, it was.

17   Q.   It was a face-to-face meeting?

18   A.   Yes.

19   Q.   And where was that meeting?

20   A.   Here in this building.

21   Q.   In this building.  When did that meeting take place?

22   A.   Yesterday.

23   Q.   So you discussed your testimony with them yesterday?

24   A.   Yes.

25   Q.   Where in this building did you meet with them?

1    A.    In their office.

2    Q.    Now, taking all of these meetings with the various

3    Government representatives, whether it's May 30th or your

4    telephone call in July, in that period towards the end of

5    July, the Grand Jury, every time you've spoken to the

6    Government --

7              MR. WIDMAN:   Objection, Your Honor.   That misstates

8    her testimony regarding the timing of the meetings.

9              THE COURT:   He said whether, so it does not

10   misstate it.   The objection is overruled.

11   BY MR. GLUCK:

12   Q.    Let me start again.   Every time you have spoken with any

13   Government representative no matter when it was, have you

14   told the truth?

15   A.    Yes.

16   Q.    Have you withheld anything from them intentionally?

17   A.    No.

18   Q.    Have you tried to tell the complete truth?

19   A.    Yes.

20   Q.    Now, is it correct -- well, let me ask:   During these

21   meetings, were people taking notes of what you said?

22   A.    Yes.

23   Q.    And in the Grand Jury, in fact, you saw there was a

24   court reporter there?

25   A.    Yes.

1    Q.   Okay.  In fact, when you met with the Government agents

2    in April, they came -- they brought you into the courtroom to

3    show you what the courtroom would look like so you would be

4    comfortable here?

5    A.   No.

6    Q.   You said earlier that you worked for Dr. Patwardhan for

7    about eight years?

8    A.   Yes.

9    Q.   But you also said that you started in Upland, I think

10   you said in 2003; is that right?

11   A.   Yes.

12   Q.   And before that you worked in the Chino office?

13   A.   Yes.

14   Q.   Do patients in the Chino office -- do patients receive

15   chemotherapy in the Chino office?

16   A.   No.

17   Q.   So your experience with the chemotherapy and the

18   chemotherapy drugs started in 2003 in the Upland office?

19   A.   Yes.

20   Q.   Now, you were on the medical -- would it be fair to say

21   that you were involved in the medical side of the office

22   rather than the business side of the office?

23   A.   Yes.

24   Q.   You gave care to patients?

25   A.   Yes.

1    Q.    What were some of the tasks that you did?

2    A.    I would draw blood, do EKGs, stress test monitors, set

3    up the chemo, take vital signs, check in patients, stock the

4    rooms, clean the lab, send out blood work to the lab.

5    Q.    It was also part of your responsibilities to order

6    medicine?

7    A.    Yes.

8    Q.    And to keep track of inventory?

9    A.    Yes.

10   Q.    And sometimes you would be asked, what medicine are we

11   running low on?

12   A.    Yes.

13   Q.    What medicines do we need to buy more of?

14   A.    Yes.

15   Q.    You testified that from when you started in the Upland

16   office you -- when you got there you saw these bags, these

17   gym bags, coming in?

18   A.    Whenever he would go on a trip.

19   Q.    Let me ask you about that.  How would you know if

20   Dr. Patwardhan was going on a trip?

21   A.    He would say it.  He would tell the office, I'm going to

22   India on this day.

23   Q.    So he would say "I'm going to India" and then he would

24   be gone for a few days?

25   A.    Yes.

1   Q.   And when he would come back, he would have a gym bag?

2   A.   Yes.

3   Q.   And you testified that inside the gym bag were vials of

4   medicines, right?

5   A.   Yes.

6   Q.   Now, you said -- let's see if we can do this without

7   having to go back and look at all the pictures.

8        But earlier you talked about some of the labels

9   that indicated on them that the medicine should be

10  refrigerated.  Do you remember that?

11  A.   Yes.

12  Q.   And you also mentioned that there were ice packs in the

13  gym bags?

14  A.   Yes.

15  Q.   Between 2003 and the day you left in July 2008, did you

16  ever ask Dr. Patwardhan or say anything to Dr. Patwardhan

17  about the fact that the medicine in the gym bag was at, I

18  believe you said room temperature?

19  A.   Yes.

20  Q.   You spoke with him about that?

21  A.   No.

22  Q.   Between 2003 and 2008 you never said to Dr. Patwardhan,

23  "Look, it says it should be refrigerated and here it's room

24  temperature," you never said anything like that?

25  A.   No.

1    Q.   You did not?

2    A.   No, I did not.

3    Q.   In fact, you never -- well, let me take a step back.

4            There were many other people in the office that

5    knew about the gym bags, right?

6    A.   Yes.

7    Q.   Who were some of the people who knew?

8    A.   Everyone.

9    Q.   Can you tell me names, please?

10   A.   Martha Rodas, Elizabeth Regis, Melissa Franco, Sophia

11   Radar, Maria Acosta.  Do you want me to go back as far as --

12   Q.   Please, everyone that you can tell us.

13   A.   Esther Casillas.  I believe that's her last name.

14   Doreen Whitmore, Christina Escobar, Betty, Fatima --

15   Q.   I don't mean to interrupt, but do you remember Betty's

16   last name?

17   A.   Betty Courier.  Jessica Young, Jessica Perez, Velma Yep,

18   Mindy Funk, Heidi Larson.  I believe that's all.

19   Q.   No others that you can think of?

20   A.   (No audible response).

21   Q.   Okay.  Earlier I think you said it was pretty much

22   everyone in the office that knew.

23   A.   Yes.

24   Q.   Did Dr. Patwardhan ever tell you not to tell anyone

25   about the gym bags?

1   A.   No.

2   Q.   And you never -- now you've given us this long list,

3   which I can't repeat off the top of my head, but did you ever

4   say to any one of those people, "I'm really concerned these

5   drugs are room temperature"?

6   A.   No.

7   Q.   Did any of them ever say to you, "I'm really concerned

8   these drugs are room temperature"?

9   A.   Yes.

10  Q.   Who told you that?

11  A.   Jessica Perez.

12  Q.   When did she tell you that?

13  A.   I believe it was in February of 2008.

14  Q.   Was that in connection with the incident or the

15  picture-taking episode that you were describing earlier?

16  A.   No.  This was when she found the gym bag, when Jessica

17  Perez found the gym bag, and she asked me about the contents

18  in the gym bag.

19  Q.   So this was before the picture-taking episode?

20  A.   Yes.

21  Q.   But nobody else ever expressed concern to you about that?

22  A.   Yes.

23  Q.   Okay.  Again, that's my fault.  That wasn't a good

24  question.

25          Did anyone else ever express concern to you about

1     the temperature?

2     A.    Yes.

3     Q.    Who did?

4     A.    Maria Acosta.

5     Q.    You didn't go to Dr. Patwardhan about that issue, did

6     you?

7     A.    No.

8     Q.    You didn't go to Dr. Patwardhan about Jessica Perez'

9     concern either, did you?

10    A.    No.

11    Q.    Let's talk about part of your duties that you discussed

12    yesterday.  Going back to the gym bag, so a gym bag comes

13    into the office after Dr. Patwardhan takes a trip to India.

14    By the way, was he open about why he was going to India or

15    that he was going to India?

16    A.    Yes.

17    Q.    He would bring in a bag.  I think you described it as a

18    Reebok bag?

19    A.    Yes.

20    Q.    Did it ever have any other symbol on it that you could

21    remember?

22    A.    No.

23    Q.    Is it possible some of them were Nike bags?

24    A.    Yes.

25    Q.    It would have a Nike -- I think it's called a Swoosh?

1    A.    Yes.

2    Q.    Any other sports bags?

3    A.    No.

4    Q.    Adidas?   Puma?

5    A.    No.

6    Q.    And once that bag is in the office -- well, first of

7    all, you weren't the only person that unpacked these gym

8    bags; is that right?

9    A.    Yes.

10   Q.    Assuming a time when you are the person who unpacks it,

11   what exactly is your responsibility?   What are you supposed

12   to do?

13   A.    I am supposed to count the medications and write it on a

14   paper how many were accounted for and give it to Jessica

15   Young.

16   Q.    We saw yesterday some papers -- a piece of paper with a

17   bunch of medicine on it.   That's an example of what we're

18   talking about?

19   A.    Yes.

20   Q.    Sometimes you would review an invoice like the one --

21   well, let me try to find that.   Let me try to make it faster.

22   It was just up a few minutes ago.

23           One of the pictures that you sent to or that was

24   sent to the Government was a picture of an invoice.   Do you

25   remember that?

1    A.   Yes.

2    Q.   Do you remember at the top left it said "Arihant

3    Chemist"?

4    A.   Yes.

5    Q.   And under it it had a city and country, do you remember

6    that?

7    A.   Yes.

8    Q.   Do you remember what country was on there?

9    A.   No.

10   Q.   Was it India?

11   A.   Yes.

12   Q.   You would initial those invoices sometimes?

13   A.   No.

14   Q.   Your initials are N.F., right, Norma Franco?

15   A.   Yes.

16   Q.   You would never initial invoices from Arihant Chemist?

17   A.   No.

18   Q.   I apologize.  I keep doing it.

19        Would you or would you not initial invoices from

20   Arihant Chemist?

21   A.   No.

22   Q.   You would not?

23   A.   No.

24   Q.   Okay.  You take the medicine -- or, I'm sorry, you've

25   got the bag.  You've got this piece of paper that you've

```
 1    written down what's on it or what's in it.  I'm sorry.  Back
 2    up one minute.
 3              When you open that bag, what do you see inside?
 4    A.   Vials of medications.
 5    Q.   And they were wrapped -- I believe this morning you said
 6    sometimes they were wrapped in bubble wrap and sometimes they
 7    weren't?
 8    A.   Yes.
 9    Q.   But it was some kind of plastic wrap?
10    A.   Yes.
11    Q.   So when you unzipped it, you saw right there what it
12    was?
13    A.   Yes.
14    Q.   I mean, we've seen the picture.  It's clearly vials of
15    medicine?
16    A.   Yes.
17    Q.   There was -- Mr. Widman asked you if there was paper or
18    other things in the bag, and I believe you said there wasn't?
19    A.   Yes.
20    Q.   So your job is to take out the medicine and do what with
21    it?
22    A.   My job was to count the medication, separate it and
23    stock it in, and put it away.
24    Q.   Put it away, where would you put it?
25    A.   Some would go in the refrigerator, some would go in the
```

1  cabinet.

2  Q.  And what else was in that refrigerator?

3  A.  Other medications.

4  Q.  What else was in the cabinet?

5  A.  Other medications.

6  Q.  With the other similar medications?

7  A.  Yes.

8  Q.  Actually, going back to something we talked about this

9  morning, we went through a series of pictures this morning of

10  various medicines.  Do you remember?

11  A.  Yes.

12  Q.  And Mr. Widman asked you -- well, I will give you an

13  example.  Mr. Widman showed you a picture of medicine and

14  said, "What is this," and you said -- well, a specific

15  example.  He showed you a picture, Exhibit 125.  He showed it

16  to you and he said, "What is this," and you said, "It's

17  Epirubicin."  Do you remember that?

18  A.  Yes.

19  Q.  And he said to you or something to the effect of, "Well,

20  it doesn't say Epirubicin, right?"

21  A.  Yes.

22  Q.  And it actually said Farmorubicina?

23  A.  Yes.

24  Q.  And Mr. Widman asked you, "Why are you calling it

25  Epirubicin?"

```
 1   A.   Yes.

 2   Q.   And you said that Dr. Pat told you that it was

 3   Epirubicin, right?

 4   A.   Yes.

 5   Q.   Now, over the years, from 2003 all the way until you

 6   left, right, in 2008, you've testified that this medicine --

 7   I'm just using Epirubicin as an example, but these foreign

 8   medications were used in the office, correct?

 9   A.   Yes.

10   Q.   And they were administered to patients?

11   A.   Yes.

12   Q.   And you were involved in administering them to patients,

13   right?

14            MR. WIDMAN:  Objection, Your Honor, vagueness.

15            THE COURT:  As to administering to patients?

16            MR. WIDMAN:  As in involving.

17            THE COURT:  Sustained.

18            You can reword the question.

19   BY MR. GLUCK:

20   Q.   Did you assist in preparing that medicine to give to

21   patients?

22   A.   No, not preparing it.  I would lay it out for

23   Dr. Patwardhan.

24   Q.   You assisted in the process that led to the

25   administration of that medicine to patients, correct?
```

```
 1    A.    Yes.
 2    Q.    And you did this over the course of about five years,
 3    right?
 4    A.    Yes.
 5    Q.    And you did this with the belief that this was an
 6    equivalent or, for example, that Farmorubicina is, in fact,
 7    the equivalent of Epirubicin, correct?
 8    A.    Yes.
 9              MR. WIDMAN:   Objection, Your Honor, vagueness.
10              THE COURT:   Overruled.
11    BY MR. GLUCK:
12    Q.    And, in fact, Exhibit 124, which is in evidence, if you
13    can put that or find that one while I try to find it.  This
14    was one of the bottles, I believe you testified, tell me if
15    I'm wrong, but I believe you testified that this is one of
16    the medicines that you gave to Mr. Crawford?
17    A.    Yes.
18    Q.    And that down there in the white on blue portion right
19    above the number 80 says "Docetax," right?
20    A.    Yes.
21    Q.    And I believe you testified before that Dr. Pat told you
22    that this is Taxotere, right?
23    A.    Yes.
24    Q.    You didn't believe that it said "Taxotere" on it, did
25    you?
```

1   A.   No.

2   Q.   I mean, you've read this, right?

3   A.   Yes.

4   Q.   Do you see the top left corner of the gray portion of

5   the label is the letters Rx?  Do you see that?

6   A.   Yes.

7   Q.   Maybe I can zoom in on it a little bit.  And what is the

8   word underneath the letters Rx?

9   A.   Docetaxel.

10  Q.   What is Docetaxel?

11  A.   Taxotere.

12  Q.   Well, let me be specific.  If you know, is Docetaxel a

13  chemical name?

14           MR. WIDMAN:  Objection, Your Honor, lack of

15  expertise to answer a medical question.

16           THE COURT:  The objection is sustained.

17  BY MR. GLUCK:

18  Q.   Well, do you know, Ms. Franco, if Taxotere is also

19  Docetaxel?

20           MR. WIDMAN:  Objection, Your Honor.

21           MR. GLUCK:  If you know.

22           THE COURT:  Excuse me.  The objection is overruled.

23           THE WITNESS:  Yes.

24  BY MR. GLUCK:

25  Q.   It is?

```
1    A.    Yes.

2    Q.    You mentioned that many -- or you gave us a list of

3    people in the office who knew about bringing the medicine,

4    remember?

5    A.    Yes.

6    Q.    Who else in the office -- just to make sure we're clear,

7    you earlier discussed writing down what was in the bags,

8    correct?

9    A.    Yes.

10   Q.    I'm going to refer to that as doing an inventory, okay?

11   A.    Okay.

12   Q.    Who else in the office did inventories of what was in

13   the bags?

14   A.    Mayra Jaurequi.

15   Q.    Okay.

16   A.    Betty Courier, Maria Acosta.  I think that's all.

17   Q.    Were these medical assistants?

18   A.    Yes.

19   Q.    Was there any medical assistant who was not allowed to

20   do inventories?

21   A.    No.

22   Q.    It was part of the duties of the medical assistants?

23   A.    Yes.

24   Q.    The space where the medicine -- Mr. Widman asked you a

25   question about the doors in the patient treatment room.  Do
```

1    you remember that?

2    A.   Yes.

3    Q.   And there was a little bit of confusion about locked or

4    unlocked.  Do you remember that?

5    A.   Yes.

6    Q.   And I think we came to the conclusion -- you came to the

7    conclusion that the doors were generally closed but unlocked;

8    is that right?

9    A.   Yes.

10   Q.   The doors in the -- the refrigerator where the medicine

11   was kept, the medicine you took out of the gym bags, I assume

12   it was kept generally closed?

13   A.   The refrigerator was closed.

14   Q.   Did it have a lock on it?

15   A.   No.

16   Q.   That space where the refrigerator was, was that an area

17   of the office where all of the medical staff could go?

18   A.   Yes.

19   Q.   Was there any rule that anyone in particular was not

20   permitted to go there?

21   A.   No.

22   Q.   Did anyone ever get in trouble for going there?

23   A.   No.

24   Q.   You talked earlier about your duties as a medical

25   assistant and gave a list of things that you did with

1    patients.  So you spoke directly with patients in the office?

2    A.   Yes.

3    Q.   Did you ever refuse to tell a patient -- well, let me be

4    very specific.

5          Did it ever happen that a patient said to you,

6    "What medicine am I getting" and you refused to give any

7    answer?

8    A.   No.

9    Q.   Did you ever tell a patient that you were giving him or

10   her a special blend of medicine?

11   A.   No.

12   Q.   If a patient had asked you -- well, let me -- let me

13   stick with your duties for a moment before you get to the

14   patient.

15          Part of your job you said is to prepare, or was, to

16   prepare the medication that was needed to be used for chemo,

17   correct?

18   A.   Yes.

19   Q.   How would you know what needed to be prepared?

20   A.   It would be in the patient's chart.

21   Q.   So let's just take an example patient.  You would get

22   the patient's chart?

23   A.   Yes.

24   Q.   Where would you get it from?

25   A.   From the file cabinet.

1   Q.   How would you know that that patient is coming in for a

2   visit that day?

3   A.   It would be in the appointment list.

4   Q.   So the first thing that you look at is the appointment

5   list?

6   A.   Yes.

7   Q.   And then you go pull the charts?

8   A.   Yes.

9   Q.   By the way, many of Dr. Patwardhan's patients are HMO

10  patients or were HMO patients at the time you were there,

11  right?

12  A.   Yes.

13  Q.   And if patients missed their appointments, the office

14  would send them what they called -- I think they called an

15  oops note?

16  A.   Yes.

17  Q.   What is an oops note?

18  A.   It's a reminder that they missed their appointment and

19  to call the office to schedule another appointment.

20  Q.   And for chemo, if you know, for chemotherapy patients,

21  missing an appointment is rather -- or it can be a bad thing?

22  A.   Yes.

23  Q.   Incidentally, sticking with this for just a moment, HMO

24  patients, are you familiar with what is called capitation?

25  A.   Yes.

1    Q.    What is capitation?

2    A.    Capitation is when Dr. Patwardhan gets capitated with a

3    volume of patients.  Depending on the insurance, he only gets

4    a certain amount of money each month.

5    Q.    So he gets -- if we can just take one patient.  We'll

6    just try to stick, our example, with one.  But he gets a

7    certain amount of money per month for that patient, to care

8    for that patient; is that what capitation is?

9    A.    Yes.

10   Q.    And it doesn't matter -- I'm sorry, it's a flat number,

11   not based on if the patient came in one time or five times or

12   twelve times that month, correct?

13   A.    Yes.

14   Q.    And yet about 80 percent of his patients in his office

15   were capitated patients, right?

16   A.    I would say about 60 percent.

17   Q.    But a large part?

18   A.    Yes.

19   Q.    You weren't on the billing side of the office, right?

20   A.    Yes.

21   Q.    Would you be aware if a patient was coming in -- as part

22   of what you were doing, would you be aware if this was a

23   capitated patient or not?

24   A.    Yes.

25   Q.    How would you know that?

1    A.    It would be on the chart.

2    Q.    You'd recognize it from the insurance information?

3    A.    No, it would be written in front of the chart.

4    Q.    What would be written there?  Did it say "capitated

5    patient"?

6    A.    Capitated.

7    Q.    I interrupted myself, but going back to our example, you

8    pulled the appointment book, you pulled the chart, right?

9    A.    Yes.

10   Q.    And then what would you do next?

11   A.    We would get the chart slip and the SOAP note ready.

12   And we would look in the chart to see what the patient got

13   the previous week, or depending on what the chemo protocol

14   is, and we would write what they got -- copy what they got

15   the weeks before and write it on the chart.

16   Q.    You used the words "SOAP note," what is a SOAP note?

17   A.    It's like a nurse's note where we write down the vital

18   signs of the patient, the names of the medications, their

19   diagnosis, and then the doctor signs off at the bottom of the

20   note.

21   Q.    Is it correct -- you're going to have to help me on this

22   because I can't remember all of them, but it stands for

23   subjective, objective, I'm not sure what the "A" stands for?

24   A.    I'm not sure.

25   Q.    Okay.  But it's nurse's notes, is that what it is?

1    A.    Yes.

2    Q.    And so you would see the treatments that were reflected

3    in the chart already?

4    A.    Yes.

5    Q.    And you would know what medicine this patient was going

6    to receive this day?

7    A.    Yes.

8    Q.    And you would then take out of the shelf or the

9    refrigerator whatever it was?

10   A.    The refrigerated ones we would take them out that same

11   morning that the doctor was going to mix the chemo.

12   Q.    In the chart it would say -- well, to use an example,

13   while we've got this on the screen, would the chart say

14   "Docetax"?

15   A.    No.

16   Q.    What would it say?

17   A.    Taxotere.

18   Q.    But you might go to the shelf and take out Docetax and

19   prepare that?

20   A.    Yes.

21   Q.    You did that for five years?

22   A.    Yes.

23   Q.    For many different medications?

24   A.    Yes.

25   Q.    Did you think you were putting patients in danger by

1    doing that?

2    A.    No.

3    Q.    After -- okay.  The materials out there on the shelf on

4    the area where it's going to be -- I'm sorry.  Let's use this

5    as an example:  You've taken some medicine off the shelf

6    because you looked in the chart and you looked in the SOAP

7    notes and you put it where?

8    A.    In the lab on the counter.

9    Q.    On the counter.  And now you mentioned that the

10   refrigerated medicine would stay in the refrigerator until

11   shortly before it was prepared?

12   A.    Yes.

13   Q.    How long would the other medicine be sitting on the

14   counter?

15   A.    The day before.

16   Q.    So you'd take it out at the end of the day before?

17   A.    Yes.

18   Q.    And it would stay there overnight?

19   A.    Yes.

20   Q.    And then what would happen to that medicine?

21   A.    Then the doctor would come in that morning, the next

22   day, and mix the chemo.

23   Q.    And what would happen when he would -- well, what do

24   you mean mix the chemo?

25   A.    He would mix the vials into the milligrams that the

1    patient is going to be taking.

2    Q.    Well, let me back up for a second.

3          How is this medicine administered?  Is it done by

4    an IV?

5    A.    Yes.

6    Q.    So he would mix it with fluid, with liquid?

7    A.    Yes.

8    Q.    And that was -- I believe you testified about this

9    yesterday -- the bags, the saline?

10   A.    Saline bags.

11   Q.    Right.  And that's also kept in the lab?

12   A.    Yes.

13   Q.    So mixing chemo means taking the medicine, mixing it

14   into the drip bag so that it's ready to be administered?

15   A.    Yes.

16   Q.    Once that was done, once he was done mixing, what would

17   happen next?  Did he leave everything there?

18   A.    Yes.

19   Q.    When I say "everything," so there's a saline bag that's

20   now been mixed?

21   A.    Yes.

22   Q.    And there's a bunch of vials or whatever the medicine

23   came in also there?

24   A.    Yes.

25   Q.    And part of your job was --- or what was the next step

1    in your job after Dr. Patwardhan did that?

2    A.    Whenever the patient came in, we would get all their

3    bags together and set them up where the patient was going to

4    be seated.

5    Q.    But part of your job at some point was to write on the

6    saline bag, right?

7    A.    Yes.

8    Q.    What would you write on the saline bag?

9    A.    That was written the day before.  We would write the

10   last name of the patient, the name of the medication, and the

11   milligrams.

12              THE COURT:  I'm sorry, I didn't hear the last word.

13              THE WITNESS:  And the milligrams.

14              THE COURT:  Thank you.

15   BY MR. GLUCK:

16   Q.    Now, during -- we talked before about all of the

17   different meetings you've had with the Government.  You never

18   said that Dr. Patwardhan told you to write false things on

19   the bags, did you?

20   A.    No.

21   Q.    You worked for Dr. Patwardhan for about -- well, let's

22   just talk about in the Upland office, for about five years?

23   A.    Yes.

24   Q.    About how many patients did you assist with who received

25   chemotherapy treatments, if you had to guess -- I mean, not

```
 1    guess, but your best estimate over five years?
 2    A.    A lot.
 3    Q.    Hundreds?
 4    A.    Yes.
 5    Q.    Did you ever hand a patient the packaging that the
 6    chemotherapy drug came in?
 7    A.    No.
 8    Q.    Did you ever -- and I'm not just talking about drugs
 9    from India.  You testified that you also ordered drugs from,
10    I think it was OTN was one of the companies?
11    A.    Yes.
12    Q.    And what was the other one?
13    A.    NSS.
14    Q.    NSS?
15    A.    Yes.
16    Q.    And those arrived in boxes?
17    A.    Yes.
18    Q.    And they had all kinds of packaging, I assume?
19    A.    Yes.
20    Q.    Instructions for use and things like that?
21    A.    Yes.
22    Q.    Did you ever hand those instructions to use to a
23    patient?
24    A.    No.
25    Q.    In fact, all of these chemotherapy medicines were
```

1    administered in the office; is that right?

2    A.   Yes.

3    Q.   A patient never got chemotherapy medicine to take home?

4    A.   Yes, they did.

5    Q.   Well, let me try to clarify.  Are you familiar with the

6    distinction between chemotherapy medicine and

7    chemo-supportive medicine?

8    A.   Yes.

9    Q.   Is it correct that chemo-supportive medicine is medicine

10   that is used to deal with the side effects of the chemo

11   medicine?

12   A.   Yes.

13   Q.   So, for example, chemo-supportive medicine might help

14   the patient be less nauseous?

15   A.   Yes.

16   Q.   But the chemotherapy medicine itself is the medicine

17   that kills the cancer?

18   A.   Yes.

19   Q.   Hopefully.  The chemotherapy medicine is poison, right?

20           MR. WIDMAN:  Objection, Your Honor.  This goes

21   beyond her training.

22           THE COURT:  Sustained.

23   BY MR. GLUCK:

24   Q.   Ms. Franco, the chemotherapy medicine, you talked about

25   these saline and the drip bags, right?

1    A.    Yes.

2    Q.    Is it correct that chemotherapy medicine is administered

3    by IV?

4    A.    Yes.

5    Q.    And the IVs were always done in the office?

6    A.    Yes.

7    Q.    Patients weren't given IVs to take home?

8    A.    No.

9    Q.    And you never gave one of those patients in the office

10   who is getting an IV the packaging of the medicine that they

11   were receiving?

12   A.    No.

13   Q.    You said you first met with Mr. Crawford in May of 2008,

14   right?

15   A.    Yes.

16   Q.    And you said you brought the medicine with you to the

17   first meeting?

18   A.    Yes.

19   Q.    Are you sure about that?

20   A.    Yes.

21   Q.    Did Mr. Crawford -- well, from May until -- May 30th,

22   2008, until July 23rd, 2008, you worked at Dr. Patwardhan's

23   office, right?

24   A.    Yes.

25   Q.    And foreign medicine was still administered there then?

```
 1   A.    Yes.
 2   Q.    Did Mr. Crawford tell you that you should immediately
 3   stop using the medicine?
 4   A.    No.
 5   Q.    In fact, you testified earlier that you were -- or the
 6   discussion, I guess you could call it, with Jessica Perez
 7   about her concerns about the medicine, do you recall that?
 8   A.    Yes.
 9   Q.    When was that?
10   A.    I believe it was in February of 2008.
11   Q.    But you never talked to Mr. Crawford until the end of
12   May, right?
13   A.    Yes.
14   Q.    In fact, you said this morning that after the picture
15   taking incident Dr. Patwardhan didn't bring any more medicine
16   from India?
17   A.    Yes.
18   Q.    You never inventoried more medicine from India after
19   that incident?
20   A.    No.
21   Q.    You did not?
22   A.    No.
23   Q.    Are you aware that in December of 2007 Dr. Patwardhan's
24   father in India passed away?
25   A.    Yes.
```

1    Q.    And how were you aware of that?

2    A.    Because he told the office.

3    Q.    Were you aware if -- did you ever learn that

4    Dr. Patwardhan's mother had passed away?

5    A.    Yes.

6    Q.    And when did she pass away?

7    A.    I believe it was in November.  I don't remember the

8    year.

9    Q.    But she had passed away by the beginning of 2008?

10   A.    I don't remember the year.  I know it was around

11   Thanksgiving.

12   Q.    Well, just to be clear, it happened sometime while you

13   were at the office?

14   A.    Yes.

15   Q.    And if it was in November, the last time it could have

16   been would have been November 2007, right?

17   A.    Yes.

18   Q.    You weren't working at Dr. Patwardhan's office in

19   November of 2008?

20   A.    No.

21   Q.    You discussed earlier that Dr. Patwardhan would mention

22   that he was traveling to India.  Was it your understanding

23   that part of the reason for his travel was to visit his

24   parents?

25   A.    Yes.

1   Q.   You were aware that he dealt with their medical care

2   there?

3   A.   No.

4   Q.   You were not aware of that?

5   A.   No.

6   Q.   Are you friends with -- well, that's not a good

7   question.

8           When is the last time you spoke to Mayra -- I'm

9   going to -- I'm sorry, how do you pronounce it?

10  A.   Jaurequi.

11  Q.   I'm sorry?

12  A.   Jaurequi.

13  Q.   Jaurequi.  When is the last time you spoke with Mayra

14  Jaurequi?

15          MR. WIDMAN:  Objection, Your Honor, relevance.

16          THE COURT:  Why don't we take our morning recess

17  now.  We'll be in recess until 10:45, ladies and gentlemen,

18  just a little over 15 minutes.

19          Remember the admonitions I have given you earlier.

20  Don't discuss the case with anyone, your fellow jurors,

21  anyone else.  And when I say don't discuss the case, don't

22  communicate in any fashion with anyone about the case or

23  anything having to do with the case, any of the participants

24  in the trial, witnesses' testimony, anything related to the

25  case.  And communicating means talking, e-mailing, blogging,

1    anything, anything, communication in any fashion.  Don't make

2    up your minds about the case or any issue related to the case

3    or any of the participants.  Keep an open mind.

4              Thank you, ladies and gentlemen, you're excused.

5              You may step down and go outside.

6                  (Out of the presence of the jury:)

7              THE COURT:  You may be seated.

8              Where are you going in this next area, Mr. Gluck?

9              MR. GLUCK:  I'm trying to remember.

10             THE COURT:  Friendship or conversations with

11   Ms. Jaurequi.

12             MR. GLUCK:  Yes.  Your Honor, may I approach or can

13   we have an agreement the Government won't discuss it with her?

14             THE COURT:  Of course, the Government knows that it

15   can't discuss the --

16             MR. GLUCK:  There is something that Ms. Franco

17   testified to that she never mentioned in any of her

18   previous --

19             THE COURT:  And no one in the courtroom is, of

20   course, to discuss this with the witness.

21             MR. GLUCK:  There's something Ms. Franco testified

22   to that she never mentioned in any of her previous meetings

23   with the Government, and it was never mentioned by

24   Ms. Jaurequi in any of her meetings with the Government until

25   about a week ago.

 1              THE COURT:  This is impeachment?

 2              MR. GLUCK:  Yes.

 3              THE COURT:  That's fine.  The objection is

 4    overruled.  All right.  We're in recess.

 5                        (Recess)

 6              (In the presence of the jury:)

 7              THE COURT:  Let the record reflect the presence of

 8    all members of the jury, all counsel, and the defendant

 9    present.

10              You may continue, Mr. Gluck.

11              MR. GLUCK:  Thank you.

12    BY MR. GLUCK:

13    Q.   Hello, again, Ms. Franco.

14              Yesterday Mr. Widman showed you Exhibit 112.  I

15    just want to put that up one more time.  This is already in

16    evidence.  And this is -- I believe you described this as a

17    charge slip?

18    A.   Yes.

19    Q.   Now, just to be clear, this document, the way you

20    indicated things on this document, is by making a check or

21    drawing a line over, so for example, the column on the right

22    says at the top, I think it says "Rituxan."  Do you see that?

23    A.   Yes.

24    Q.   And the one under that or I can't see it because it's

25    got marker over it, but would that indicate to whomever would

1   receive these that whatever was written there was

2   administered to this patient?

3   A.   Yes.

4   Q.   So it is kind of like a checklist?

5   A.   Yes.

6   Q.   Thank you.  You said that on St. Patrick's Day 2008 you

7   went to -- the restaurant was called Tequila?

8   A.   Tequila Hoppers.

9   Q.   Tequila Hoppers with several co-workers?

10  A.   Yes.

11  Q.   And, once again, those were whom?

12  A.   Mindy Funk, Jessica Perez, Mayra Jaurequi and Jeannette,

13  I don't remember her last name.

14  Q.   Do you remember what date it was?  I know you said it

15  was St. Patrick's Day, when is that?

16  A.   I don't know.

17           THE COURT:  March 17th.

18           MR. GLUCK:  Thank you, Your Honor.

19  BY MR. GLUCK:

20  Q.   It was March 17th, Ms. Franco?

21  A.   Yes.

22  Q.   Thank you.  And the issue of the foreign medicine came

23  up?

24  A.   Yes.

25  Q.   Was there any expression among the people at this dinner

1     that discussing this might be against the policy of the

2     practice?

3     A.    No.

4     Q.    It was a free and open discussion among you?

5     A.    Yes.

6     Q.    Did anyone at the dinner -- I know you said that some

7     people or someone at least expressed concern about the

8     medication, correct?

9     A.    Yes.

10    Q.    Did anyone at the dinner say that it must immediately be

11    stopped and someone should dial 911 or something like that?

12    A.    No.

13    Q.    Let me show you -- actually, I had asked a question

14    right before the break.  When is the last time you spoke with

15    Mayra Jaurequi?

16    A.    About three or four weeks ago.

17    Q.    Are you friendly with her?

18    A.    Yes.

19    Q.    And when you worked in the office together, were you

20    friendly then?

21    A.    Yes.

22    Q.    At some point though was there a dispute between you and

23    Ms. Jaurequi concerning who took the pictures?

24    A.    Yes.

25    Q.    And that discussion involved or that involved a

1  discussion with Dr. Patwardhan, Jessica Young, you and Mayra?

2  A.   Yes.

3  Q.   And initially Mayra denied being involved in the picture

4  taking incident?

5  A.   Yes.

6  Q.   And she blamed it on you?

7  A.   Yes.

8  Q.   And you told Dr. Patwardhan and Jessica Young that Mayra

9  was involved?

10 A.   No.

11 Q.   Okay.  Was Mayra involved?

12 A.   Yes.

13 Q.   But there was some discussion with Jessica Young and

14 Dr. Patwardhan about who was involved in the picture taking

15 incident?

16 A.   Yes.

17 Q.   Do you recall about when those discussions were?

18 A.   I think it was in April.

19 Q.   Could it have been in late March?

20 A.   Yes.

21 Q.   But it was several months before you left?

22 A.   Yes.

23 Q.   I would like to -- we spoke earlier today about what I

24 was referring to as the inventories, do you remember that?

25 A.   Yes.

1    Q.   And we spoke about those, a sheet of paper that you

2    would write the names of medicine that was in the bag,

3    correct?

4    A.   Yes.

5              MR. GLUCK:  I would like to ask to have placed in

6    front of the witness -- Your Honor, shall I walk up and place

7    it?

8              THE COURT:  If you can hand it to the clerk.  Is

9    this a document to be newly marked?

10             MR. GLUCK:  It is marked, Your Honor, as

11   Defendant's 1.

12             THE COURT:  Okay.  You already have a copy of it?

13             MR. GLUCK:  No, no, I'm saying it is newly marked.

14             THE COURT:  It's marked.  It is newly offered?

15             MR. GLUCK:  Yes.

16             THE COURT:  Thank you.  What's the last exhibit in

17   the Government's exhibits?

18             MR. WIDMAN:  141.

19             THE COURT:  All right.  So this will be marked as

20   Defendant's No. 200.

21             MR. GLUCK:  Okay.

22             THE COURT:  The clerk will place it before the

23   witness.  Thank you.

24   BY MR. GLUCK:

25   Q.   Ms. Franco, have you had a moment to look at that

1   document that I have put in front of you?

2   A.   Yes.

3   Q.   Is that your handwriting?

4   A.   Yes.

5          MR. GLUCK:   The defense moves Defense Exhibit 200

6   into evidence and requests to publish to the jury.

7          THE COURT:   Any objection?

8          MR. WIDMAN:   No objection, Your Honor.

9          THE COURT:   Thank you.   Exhibit 200 is ordered

10   admitted.   You may publish.

11          MR. GLUCK:   Thank you.

12   BY MR. GLUCK:

13   Q.   Now, just to go through this document quickly.   At the

14   top -- and again, this is your handwriting?

15   A.   Yes.

16   Q.   At the top here is 3-19-07, and that's the date,

17   correct?

18   A.   Yes.

19   Q.   And what does that say there?

20   A.   "Meds."

21   Q.   And what is in the circle there underneath?

22   A.   My initials.

23   Q.   That's NF?

24   A.   Yes.

25   Q.   And what is underneath it?

1   A.    MA.

2   Q.    So that's -- you talked about this yesterday, that's

3   Norma Franco, Medical Assistant?

4   A.    Yes.

5   Q.    And then down the left side of the page is the list of

6   different medications, correct?

7   A.    Yes.

8   Q.    And the size, what specific it is, what it specifically

9   is?

10  A.    The milligrams.

11  Q.    The milligrams and then the No. 25 would be?

12  A.    The quantity.

13  Q.    The quantity.  So it is 25 vials of 100 milligrams each

14  of, what is the first medicine there?

15  A.    Eloxatin.

16  Q.    Eloxatin.  Okay.

17            MR. GLUCK:  I would ask to place in front of the

18  witness what will be Defendant's 201.

19  BY MR. GLUCK:

20  Q.    If you turn to the second page of that document, is that

21  your handwriting?

22  A.    Yes.

23  Q.    And then on the first page of that document, do you see

24  fairly close to the middle of the page is a circle with some

25  initials in it?

```
 1    A.    Yes.

 2    Q.    Is that your initials?

 3    A.    Yes.

 4              MR. GLUCK:   Defense moves this into evidence.

 5              THE COURT:   Any objection to 201?

 6              MR. WIDMAN:   No, Your Honor.

 7              THE COURT:   Thank you.   Exhibit 201 is ordered

 8    admitted.   You may publish.

 9    BY MR. GLUCK:

10    Q.    I'm going to put up first the second page of this

11    document.   And again, that's your handwriting, Ms. Franco?

12    A.    Yes.

13    Q.    And down at the bottom is, it looks like $6,830.   Do you

14    see that?

15    A.    Yes.

16    Q.    Again, that's your handwriting?

17    A.    No.

18    Q.    Whose handwriting is that?

19    A.    That I think is Jessica Young's.

20    Q.    So you -- but the portion above that is your

21    handwriting?

22    A.    Yes.

23    Q.    Turn to the first page of this document, please.   Now,

24    what does it say in the top left corner there.   Can you read

25    just the bold words?
```

1   A.   Arihant Chemist.

2   Q.   And zooming in a little bit more, do you see an address

3   there underneath it?

4   A.   Yes.

5   Q.   Do you know where that address is?

6   A.   I suppose India.

7   Q.   And then down in the middle of the page underneath the

8   column or at the bottom -- the base of the column that has

9   PKG on top of it is your initials, right?

10   A.   PKG?

11   Q.   I'm sorry.  I'm just directing you if look at the column

12   that has PKG.

13         THE COURT:  If you put your finger on it.

14         MR. GLUCK:  Thank you.

15   BY MR. GLUCK:

16   Q.   Right there those are your initials, right?

17   A.   Yes.

18   Q.   And it says -- next to it it says -- what does that say?

19   A.   RCVD.

20   Q.   And what does that mean?

21   A.   Received.

22   Q.   Is there a date there?

23   A.   Yes.

24   Q.   And you wrote that?

25   A.   Yes.

1   Q.   And what does it say?

2   A.   January 6th, 2004.

3   Q.   So this time you are -- well, how would you come to

4   write your initials on an invoice that has all the

5   information preprinted on it with the name of the pharmacy?

6   A.   'Cause it was in the gym bag.

7   Q.   So is it correct then, Ms. Franco, that if -- well, at

8   least some of the gym bags had this invoice in them?

9   A.   Rarely.

10  Q.   Did you ever see an invoice like this in the office?

11  A.   Yes.

12  Q.   When they did come in the gym bag, you would use this to

13  take the inventory; is that right?

14  A.   No, I would still have to count the medication.

15  Q.   But would you use this -- well, then why would you --

16  well, what was the purpose of you writing received 1-6-04 NF,

17  what was the purpose of that?

18  A.   It's the date we received the medication.

19  Q.   And who were you directing that to?

20  A.   To Jessica Young.

21  Q.   And that was part of your job?

22  A.   Yes.

23  Q.   Would you look at this invoice and then look at the

24  material in the bag to make sure that it matched?

25  A.   No.

1    Q.   But you said you would still do the inventory?

2    A.   Yes.

3    Q.   Thank you.

4              MR. GLUCK:   It will be 202 and 203.

5              THE CLERK:   Three sets.

6              MR. GLUCK:   They're actually very similar but they

7    are two different pages and two different exhibits.   The top

8    right corners the numbers are different.

9    BY MR. GLUCK:

10   Q.   Ms. Franco, do you have the paper that has the 202 at

11   the bottom of it handwritten on the sticker?

12   A.   Yes.

13   Q.   Do you see your initials on that paper?

14   A.   Yes.

15   Q.   And turn please to 203.   The one that has 203 on the

16   sticker, do you see your initials on that?

17   A.   Yes.

18             MR. GLUCK:   The defense moves 202 and 203 into

19   evidence.

20             THE COURT:   Any objection?

21             MR. WIDMAN:   No, Your Honor.

22             THE COURT:   Thank you.   202 and 203 are admitted.

23   You may publish.

24             MR. GLUCK:   Thank you, Your Honor.

25   BY MR. GLUCK:

1    Q.   Let's start with where on this paper are your initials,

2    Ms. Franco.

3              MR. WIDMAN:   Objection, Your Honor.   For the

4    record, could we indicate which one we are looking at?

5    BY MR. GLUCK:

6    Q.   I apologize.   I am placing 202 on the projector, and

7    where on this paper -- oh, you did it already, so it is in

8    the box at the bottom left corner?

9    A.   Yes.

10   Q.   And what did you -- well, how much of what's written in

11   that box -- in this box is your handwriting?

12   A.   All of it.

13   Q.   And what does it say?

14   A.   6 Zoladex NF 11-21-2003.

15   Q.   And at the top of this page there is a name of a

16   company, do you see that?

17   A.   Yes.

18   Q.   What does that say?

19   A.   Corporacion Mandofer.

20   Q.   Is there any indication to you as to where that company

21   is located?

22   A.   Mexico.

23   Q.   Well, do you think it's outside the United States?

24   A.   Yes.

25   Q.   I'm going to put 203 on the projector.   And where are

1    your initials on this page?

2    A.    (Witness complies).

3    Q.    In that box, the lower left corner, is that all your

4    handwriting?

5    A.    Yes.

6    Q.    And what does it say?

7    A.    Ten Zometa 11-21-2003.

8    Q.    And this has the same company information at the top,

9    correct?

10   A.    Yes.

11   Q.    So there were times when you signed your initials at

12   least and indicated the date on receipts from -- well, we saw

13   before from Arihant Chemist?

14   A.    Yes.

15   Q.    And there were times when you signed on this other

16   company Mandofer?

17   A.    Yes.

18   Q.    Let me show you one more, and this will be 204.  Do you

19   see this?  Do you have 204 in front of you?

20   A.    Yes.

21   Q.    Would you turn to the last page of that, please.  Is

22   that your handwriting?

23   A.    No.

24   Q.    The last page, just to make sure we are --

25   A.    Oh, yes.

1    Q.    That is your handwriting?

2    A.    Yes.

3    Q.    So we know we're all talking about the same thing, it

4    says "solvent" on the top?

5    A.    Yes.

6    Q.    Is your handwriting on -- turn back to the first page --

7    is that your handwriting, the date that's written there?

8    A.    No.

9    Q.    Do you know whose handwriting that is?

10   A.    I think it's Jessica Young's.

11   Q.    Now, on the last page --

12            MR. GLUCK:  We would move Exhibit 204 into

13   evidence.

14            THE COURT:  Any objection?

15            MR. WIDMAN:  No, Your Honor.

16            THE COURT:  Thank you.  Exhibit 204 is ordered

17   admitted.  You may publish.

18            MR. GLUCK:  Thank you, Your Honor.

19   BY MR. GLUCK:

20   Q.    Turning to the last page -- well, just to orient us, it

21   says at the top "solvent 50" and again it is a list of

22   medication, correct?

23   A.    Yes.

24   Q.    Again, one of these inventories we have talked about?

25   A.    Yes.

1   Q.   Do you know whose handwriting it is on the right side of

2   that page or at an angle on the right side of the page?

3   A.   I think it's Jessica Young's.

4   Q.   Can you read that?  Do you know what that says?

5   A.   "Checked by Marlene, Norma and Lorena."

6   Q.   Who is Marlene?

7   A.   She was an ex-employee working there.

8   Q.   Do you remember her last name?

9   A.   Mendoza.

10  Q.   Marlene Mendoza and Norma?

11  A.   Franco.

12  Q.   That's you?

13  A.   Yes.

14  Q.   And the last one is Laura?

15  A.   Lorena.

16  Q.   Lorena.  And what was Lorena's last name?

17  A.   Jimenez.

18  Q.   Now, at the beginning, the first page of this we have

19  seen similar invoices, this is from Arihant Chemist again.

20  Do you see a date on there?

21  A.   7-9-2002.

22  Q.   Okay.  Do you know -- well, let's just say this, in

23  2002, Marlene and Lorena were employed at Dr. Patwardhan's

24  office?

25  A.   Yes.

1    Q.    I thought you came to Upland in 2003.

2    A.    I think so.  I was a year in the Chino office.  When I

3    first started there I was there one year.

4    Q.    Okay.  Well, do you recall testifying in the Grand Jury

5    that you started in 2000?

6    A.    Yes.

7    Q.    So you came to Upland in 2001 then?

8    A.    I started working for Dr. Patwardhan August 20th of

9    2000.

10   Q.    Okay.  So by August -- well, in August of 2001, is that

11   when you moved to Upland?

12   A.    I think so.  I don't remember.

13   Q.    So this morning when I asked you questions about things

14   that happened between 2003 and 2008, in fact, it appears that

15   you started in Upland in 2001, correct?

16   A.    Correct.

17   Q.    Let me move on to something else for just a minute.

18                You met with -- we talked about this already.  You

19   met many times with Government representatives before today?

20   A.    Yes.

21   Q.    And they took notes when they met with you?

22   A.    Yes.

23   Q.    And when you were in front of the Grand Jury, you were

24   under oath, right?

25   A.    Yes.

1    Q.    There was someone there taking down everything you said?

2    A.    Yes.

3    Q.    You never told the Government -- well, let me back up.

4    Yesterday and this morning you testified that Dr. Patwardhan

5    told you not to give patients Indian drugs to take home.  Do

6    you recall that?

7    A.    Yes.

8    Q.    Why didn't you ever mention that to the Government any

9    time before yesterday?

10   A.    I did.

11   Q.    When did you tell them?

12   A.    I don't remember exactly the month.

13   Q.    Okay.  Do you remember if it was this year or last year?

14   A.    I think it was this year.

15   Q.    In 2009?

16   A.    2008.

17   Q.    Last year was 2008.

18   A.    2008.

19   Q.    So you think you told them sometime in 2008?

20   A.    Yes.

21   Q.    You met with the Government on May 30th, 2008.  I'm

22   sorry.  We will be more specific.  You met with Mr. Crawford

23   on May 30th, 2008 --

24   A.    Yes.

25   Q.    -- at a restaurant?

1    A.    Yes.

2    Q.    Well, how did you know he was going to be there then?

3    Did you speak to him by phone before then?

4    A.    Yes.

5    Q.    How long was the conversation by phone beforehand?

6    A.    Ten minutes.

7    Q.    Was it during that conversation that he told you which

8    drugs to bring from the office?

9    A.    Yes.

10   Q.    What did he say?

11   A.    He told me if I wanted to meet with him, that Jessica

12   Perez had given him my name, and I told him yes.

13   Q.    I'm asking about which drugs.  Did he say specifically

14   which drugs to bring to the meeting?

15   A.    No.

16   Q.    But he knew you were bringing drugs to the meeting,

17   right?

18   A.    Yes.

19   Q.    Did he tell you just bring any Indian drugs?

20   A.    No.

21   Q.    So you met with him on May 30th at the restaurant.  You

22   also had a telephone conversation with him at some point

23   after you resigned.  Do you recall that?

24   A.    Yes.

25   Q.    Was it during that telephone conversation that you told

1    him about Dr. Patwardhan telling the medical assistants not

2    to give out Indian drugs for patients to take home?

3    A.    No.

4    Q.    Was it during the restaurant meeting?

5    A.    No.

6    Q.    You never met with them again in 2008 other than the

7    Grand Jury testimony; isn't that right?

8    A.    Yes.

9    Q.    So when in 2008 did you tell Mr. Crawford the story

10   about Dr. Patwardhan saying that you should not give out

11   Indian medicine for patients to take home?

12   A.    It wasn't 2008.

13   Q.    It was not 2008?

14   A.    Yes.

15   Q.    It was 2009?

16   A.    Yes.

17   Q.    When in 2009 was it?

18   A.    I think like about two months ago.

19   Q.    Two months ago.  Would that make it February?

20   A.    Yes.

21   Q.    You met with the Government or Government

22   representatives on February 5th, 2009, right?

23   A.    Yes.

24   Q.    You didn't tell them during that meeting, did you?

25   A.    I don't remember.

1    Q.   You met with them again on February 9th, 2009, right?

2    A.   Yes.

3    Q.   You didn't tell them during that meeting, did you?

4    A.   I don't remember exactly the date.

5    Q.   But you were pretty sure that you told them during

6    February 2009?

7    A.   No, I'm not sure.

8    Q.   I'm sorry.  Just a moment, please.  But other than

9    February 5th and February 9th, you haven't met with them

10   again until you said just a day or two ago; isn't that right?

11   A.   No.  I think we met, I think in March.

12   Q.   You met in March.  Where did you meet?

13   A.   Here in the office here in this building.

14   Q.   Was it during that March meeting that you told them this?

15   A.   I think so.

16   Q.   When did this occur.  Let me clarify that.  This story

17   you've told about Dr. Patwardhan telling the medical

18   assistants not to give patients the medicine to take home,

19   when did that occur?

20   A.   I think it occurred in 2007.

21   Q.   2007.  Okay.  We talked earlier about oops cards?

22   A.   Yes.

23   Q.   Oops notes, I think they're called.  Ms. Franco, you

24   mentioned yesterday that Dr. Patwardhan would not be happy if

25   the office or if patients weren't coming in.  Do you remember

1    that testimony?

2    A.   Yes.

3    Q.   Isn't it true that certainly for HMO patients the office

4    doesn't actually make more money if they come in?

5    A.   Yes.

6    Q.   Because they are capitated?

7    A.   Yes.

8    Q.   In fact, the office loses money if they come in?

9    A.   Yes.

10   Q.   Each visit costs the office money?

11   A.   Yes.

12   Q.   And you are also aware that many of the HMOs as well as

13   the other insurance companies require the office to remind

14   patients if they miss their visits, correct?

15   A.   Yes.

16              MR. WIDMAN:   Objection, Your Honor, lack of

17   foundation.

18              THE COURT:   The objection is overruled.

19   BY MR. GLUCK:

20   Q.   And, in fact, it goes to the point where if a patient

21   misses, I'm not sure of the number, but are you aware that if

22   a patient misses a certain number of visits, the office sends

23   a registered letter saying you really need to come in?

24   A.   No.

25   Q.   You're not aware of that?

1    A.    No.

2    Q.    You testified earlier that -- I apologize -- you

3    testified earlier that your duties in general were with

4    respect to medical care instead of the business side,

5    remember?

6    A.    Yes.

7    Q.    You didn't do billing, did you?

8    A.    No.

9    Q.    You didn't deal with insurance companies, did you?

10   A.    No.

11   Q.    You didn't -- so you would have no way of knowing what

12   the insurance company actually paid or didn't pay for a

13   particular patient, correct?

14   A.    Yes.

15   Q.    You would have no way of knowing?

16   A.    Yes.

17             MR. GLUCK:  Your Honor, I have -- I would like to

18   refer to a specific patient and I don't want to --

19             THE COURT:  Use their first name and the last

20   initial.

21             MR. GLUCK:  Okay.  I can try.

22   BY MR. GLUCK:

23   Q.    Do you remember a patient with the first name Mary and

24   the last name -- first initial of the last name is O, and I

25   will give you a hint, this is shortly before you left.  I

 1    will give you another hint, apparently she had anemia and

 2    lymphoma.  Do you recall such a patient?

 3    A.   (No audible response).

 4    Q.   I'm sorry.

 5              THE COURT:  Do you want to approach the witness?

 6    Do you have a document with the witness's name?

 7              MR. GLUCK:  I can write it down.

 8              THE COURT:  That's fine.  Why don't you try that.

 9    And show it to opposing counsel.

10              MR. GLUCK:  May I approach?

11              THE COURT:  You may approach.

12    BY MR. GLUCK:

13    Q.   So, Ms. Franco, I have just shown you a name written

14    down of a patient whose name is -- first name is Mary and the

15    last name starts with an O, and I wrote down and showed you

16    the full name?

17    A.   Yes.

18    Q.   Do you recall such a patient in the summer of 2008?

19    A.   Yes.

20    Q.   And do you recall that two weeks before you left

21    Dr. Patwardhan asked you to call Mary O and tell her that

22    even though her insurance company was not going to pay for

23    her chemo, she shouldn't worry about it, she should come in

24    and do it anyway?  Do you recall that?

25    A.   That patient was actually put into this free program

 1    where Dr. Patwardhan gets reimbursed for the medication, yes.

 2    Q.    But you called her and told her that she shouldn't worry

 3    about --

 4    A.    Yes.

 5    Q.    -- the fact that the insurance company won't pay?

 6    A.    Yes.

 7    Q.    And also, as you testified, before that -- well, let's

 8    clarify your testimony.  You said that patients were never

 9    "no charged" if they were chemo patients, right?

10    A.    Yes.

11    Q.    You have no way of knowing if patients were -- well,

12    when you say "no charged," that means that you would fill out

13    a charge slip for chemo patients, right?

14    A.    Yes.

15    Q.    And you would send that charge slip over to the business

16    side?

17    A.    Yes.

18    Q.    You don't know if they actually were billed for it, do

19    you?

20    A.    It would be in the computer if they were billed.

21    Q.    Would you know for a particular patient if the patient

22    was billed or not billed?

23    A.    Yes.

24    Q.    Would you know if the bill was collected or not?

25    A.    No.

```
 1   Q.   So you have no way of knowing whether, for example, an
 2   insurance company refused to pay for a particular round of
 3   chemo treatment?
 4   A.   No.
 5              THE COURT:  I'm going to remind you again to keep
 6   your voice up, Ms. Franco.
 7              THE WITNESS:  Okay.
 8              MR. GLUCK:  Your Honor, if I might have just a
 9   moment.  I think I'm just about finished.
10              THE COURT:  Okay.
11   BY MR. GLUCK:
12   Q.   Yesterday you testified that Dr. Patwardhan would
13   discuss with -- you know what, I'm going to withdraw that.
14              MR. GLUCK:  Let me briefly speak with Ms. Rhee and
15   make sure I didn't miss anything.
16                   (Counsel confer off the record)
17   BY MR. GLUCK:
18   Q.   I did forget one thing.  Similar to the patient I
19   mentioned earlier, Mary O, do you remember a patient named
20   Esther, whose last name begins with an M, and I can write it
21   down again if that might help.  Do you want me to --
22   A.   Can you tell me what kind of cancer?
23              THE COURT:  You may approach.
24              MR. GLUCK:  I will approach.
25   BY MR. GLUCK:
```

```
 1   Q.   Ms. Franco, I have just shown you a written name of a
 2   person whose first name is Esther and last name begins with
 3   M, do you recall -- but I showed you the full name -- do you
 4   recall this patient?
 5   A.   No.
 6   Q.   You don't recall anything about her receiving chemo for
 7   free?
 8   A.   No.
 9   Q.   You don't recall her at all?
10   A.   No.
11        MR. GLUCK:   Your Honor, I have no further
12   questions.
13        THE COURT:   Thank you.   Redirect examination.
14        MR. WIDMAN:   Thank you, Your Honor.
15                     REDIRECT EXAMINATION
16   BY MR. WIDMAN:
17   Q.   Hello again, Ms. Franco.
18   A.   Hello.
19   Q.   You were asked on cross-examination about meetings with
20   Agent Crawford or members of the United States Attorney's
21   Office.  Do you remember that?
22   A.   Yes.
23   Q.   Was there ever a time when you were asked a question and
24   you did not respond truthfully?
25   A.   No.
```

1   Q.   With respect to the topic of Dr. Patwardhan directing

2   that Indian injectables should not be sent home with patients

3   and only U.S. drugs should be sent home with patients, did

4   anyone from the Government ever ask about that in 2008 to

5   your recollection?

6   A.   No.

7   Q.   Did anyone from the Government ever ask about Indian

8   injectables and whether they were allowed to be sent home?

9   A.   Yes.

10  Q.   Let me rephrase.   In 2008 and before, or in 2008, did

11  anyone from the Government ever ask you about whether Indian

12  injectables could be sent home with patients?

13  A.   No.

14  Q.   Did anyone ever ask you about the treatment of Veronica

15  Lin?

16  A.   No.

17  Q.   And just to clarify, my question was, and I think you

18  understood, concerned 2008?

19  A.   Yes.

20  Q.   Thank you.   Now, you were also asked on

21  cross-examination about particular meetings you had with

22  Agent Crawford.   Do you remember that?

23  A.   Yes.

24  Q.   And I believe one of the meetings was on St. Patrick's

25  Day -- excuse me -- St. Patrick's Day -- strike that please.

```
 1              I believe you testified that you had a conversation
 2    with him in May of 2008?
 3    A.   Yes.
 4    Q.   And I believe you may have testified that you had
 5    another conversation with him before you left the office; is
 6    that right?
 7    A.   Yes.
 8    Q.   How come you didn't approach Dr. Patwardhan about your
 9    concerns before you left the office?
10    A.   I did.
11    Q.   How come you continued to work in the office as long as
12    you did?
13    A.   Well, I talked to him about my concerns before I left.
14    Q.   Thank you.  I would like to ask you now about your
15    educational background.  We covered this briefly but I would
16    like to clarify for the jury.  Are you a high school
17    graduate?
18    A.   Yes.
19    Q.   Do you have a degree past high school?
20    A.   No.
21    Q.   Do you have any formal medical training of any kind?
22    A.   Yes.
23    Q.   What is that?
24    A.   Medical assistant certification.
25    Q.   And what did you learn?  What were the topics covered in
```

```
 1    medical assistant certification?
 2    A.   To take vital signs, how to draw blood, some diseases,
 3    about the body.
 4              THE COURT:  I'm sorry.  I couldn't hear you.
 5              THE WITNESS:  About the body.
 6              THE COURT:  You need to keep your voice up.
 7    BY MR. WIDMAN:
 8    Q.   Was there anyone in the office who you relied on for
 9    medical judgments and medical decisions?
10    A.   Dr. Patwardhan.
11    Q.   One of the things that was mentioned on
12    cross-examination was the saline bags and what you would
13    write on the saline bags.  Do you remember that?
14    A.   Yes.
15    Q.   And I believe you testified that you would write the
16    patient's name and the drug and the amount of the drug; is
17    that right?
18    A.   Yes.
19    Q.   When the patient -- was there ever a time when the
20    patient would actually see what was written on the bag?
21    A.   Yes.
22    Q.   When was that?
23    A.   All the time.
24    Q.   Would you ever write the Indian trade names on the
25    saline bags?
```

```
 1   A.    No.

 2   Q.    What would you write?

 3   A.    The brand name.

 4   Q.    So you would write the name of the U.S. drug; is that

 5   right?

 6   A.    Yes.

 7   Q.    Now, another thing that was mentioned on direct

 8   examination was the patient Mary O, who I believe defense

 9   counsel showed you the full name written out?

10   A.    Yes.

11   Q.    And you started to explain that, something concerning a

12   reimbursement program?

13   A.    Yes.

14   Q.    Could you explain a little bit more for the jury what

15   you meant by that?

16   A.    There are programs depending on the medication that the

17   patient is going to be receiving.  If the insurance doesn't

18   cover that medication and the doctor wants to give it to that

19   patient or if they don't have insurance, there is a program

20   that we put the patient on and they reimburse the doctor the

21   medication.

22   Q.    So for drugs under that program, Dr. Patwardhan was

23   still paid; is that right?

24   A.    Yes.

25   Q.    Turning now to what has been entered into evidence as
```

1    Government's Exhibit 1L, which I will place on the overhead

2    projector, can you remind us which room in the office this

3    is?

4    A.   That's the lab.

5    Q.   And I believe I asked you on direct examination about

6    this reddish, pinkish looking binder, which is in the lower

7    right hand portion of the exhibit.  Do you remember that?

8    A.   Yes.

9    Q.   And what is that?

10   A.   It's a chemo inventory where we -- when we order

11   medications, we write them in that book.

12   Q.   So you would write things in that book?

13   A.   Yes.

14          MR. WIDMAN:  Your Honor, may I have permission to

15   approach the witness with an exhibit for identification?

16          THE COURT:  Yes, you may.

17          MR. GLUCK:  Your Honor, this is beyond the scope.

18   There was no questions on this subject.

19          THE COURT:  Well, I think it is -- I don't think

20   it's outside the scope.

21          MR. WIDMAN:  Shall I approach the court clerk or

22   Ms. Franco?

23          THE COURT:  Are you just asking -- well, first show

24   your opponent what it is that you're inquiring about -- and

25   you're not marking this for identification -- I mean, you are

 1    not introducing it?

 2              MR. WIDMAN:  After we ask a few questions, we may

 3    seek to introduce it -- enter into evidence.

 4              THE COURT:  You can approach the witness with it at

 5    this point.

 6    BY MR. WIDMAN:

 7    Q.   You recognize that?

 8    A.   Yes.

 9    Q.   Can you tell us what it is?

10    A.   It is the chemo log of the medications where we log all

11    the medications we order.

12    Q.   And you would log information in there?

13    A.   Yes.

14    Q.   What kind of information would you log?

15    A.   If I was to order Taxotere, I would log it in the book.

16    Q.   Who would you order Taxotere from?

17    A.   From OTN and NSS.

18    Q.   Now, if Dr. Patwardhan brought drugs into the office in

19    a gym bag from India, would you note that in the binder?

20    A.   No.

21    Q.   If Jessica Young brought drugs from Honduras into the

22    office, would you note that in the binder?

23    A.   No.

24              MR. WIDMAN:  Your Honor, the Government would like

25    to have Exhibit 73 entered into evidence and made available

1    to the jury at their request.

2              MR. GLUCK:  Your Honor, we would object.  It's a

3    binder, nobody has looked through it, I haven't paged through

4    it.

5              THE COURT:  I will take the request for admission

6    under submission and we will discuss this outside the

7    presence of the jury at the next break.

8              MR. WIDMAN:  Thank you, Your Honor.

9              THE COURT:  You're welcome.

10   BY MR. WIDMAN:

11   Q.   Turning now to what was entered into evidence as

12   Defendant's Exhibit 201, which I'm placing on the overhead

13   projector.  I'm going to direct you to handwriting.  Do you

14   recognize that handwriting right there?

15   A.   I believe it's Jessica Young's.

16   Q.   Are you sure it's not your handwriting?

17   A.   No.

18   Q.   So are you sure or not sure?

19   A.   I'm sure.

20   Q.   Thank you.

21             MR. WIDMAN:  If I can have just one moment, Your

22   Honor.

23             THE COURT:  Okay.

24             MR. WIDMAN:  The United States has no further

25   questions, Your Honor.

1          THE COURT:  Thank you.  You may step down.

2          And your next witness.

3          MR. BEHNKE:  Thank you, Your Honor.  The Government

4   calls Mindy Funk.

5          THE CLERK:  Step by the court reporter, please.

6   Please raise your right hand.

7          PLAINTIFF'S WITNESS, MELINDA FUNK, WAS SWORN

8          THE CLERK:  Please be seated.  Please state your

9   full name and spell it for the record.

10          THE WITNESS:  Melinda Louise Funk, M-E-L-I-N-D-A,

11   Louise, L-O-U-I-S-E, Funk, F-U-N-K.

12          THE COURT:  Thank you.  You may inquire.

13                    DIRECT EXAMINATION

14   BY MR. BEHNKE:

15   Q.   Your full name is Melinda, but do you go by Mindy?

16   A.   Yes.

17   Q.   Where do you work?

18   A.   At City of Hope National Medical Center.

19   Q.   What do you do for City of Hope?

20   A.   I am a nurse practitioner in the thoracic surgery

21   department.

22   Q.   How long have you worked as a nurse practitioner for

23   City of Hope?

24   A.   Since April 4th.

25   Q.   Of this year?

```
 1    A.    Of 2008.
 2    Q.    And for how long have you worked as a nurse
 3    practitioner?
 4    A.    Since 2001.
 5    Q.    Prior to beginning your work as a nurse practitioner,
 6    did you receive any special education and training?
 7    A.    Yeah, at Azusa Pacific University for my nurse
 8    practioner for my master's degree in nursing.
 9    Q.    So you have a master's in nursing?
10    A.    Yes.
11    Q.    Do you have any other education or training related to
12    nursing other than your master's degree?
13    A.    In oncology in the past at City of Hope Medical Center,
14    that was one of my first position -- jobs as an RN,
15    registered nurse.
16    Q.    So you worked at City of Hope on a prior occasion?
17    A.    Mm-hmm.
18    Q.    When was that?
19    A.    From 1990 to 2000 -- 2002.
20    Q.    While you worked at City of Hope, did you also receive
21    training to become a nurse practitioner?
22    A.    Not at City of Hope, but yes, during that time period, I
23    was going to school to be a nurse practitioner.
24    Q.    What does a nurse practitioner do?
25    A.    Usually a nurse practitioner is advanced practice nurse,
```

1    has a master's degree in nursing, meaning more than just

2    nursing, it's also extending the practice of pre med in

3    regards to assessing the patient in the office, hospital

4    setting, diagnosis, treatment and plan.

5    Q.   So is it fair to say that a nurse practitioner has

6    advanced training beyond what a normal registered nurse has?

7    A.   Correct, yes.

8    Q.   As part of your training to become a nurse practitioner,

9    did you receive any education and training regarding

10   administration of drugs to patients?

11   A.   As a nurse practitioner as far as the medications, as an

12   RN we receive as far as administration of medications.

13   Q.   So your education and training concerning drugs was the

14   same training that all registered nurses would receive?

15   A.   It was more advanced as far as the medications as far as

16   prescribing and more detail in regards to narcotics,

17   schedule II through IV drugs.

18   Q.   As a nurse practitioner are you able to prescribe

19   medications?

20   A.   Yes.

21   Q.   During your education and training to work as a nurse

22   practitioner, did you receive any education and training

23   regarding the FDA and their role in approving drugs?

24   A.   Correct, yes.

25   Q.   What did you learn in that regard?

1    A.   Mainly in the advanced pharmacology course that we had

2    we went over as far as medications mainly the scheduled drugs

3    and those as far as FDA-approved that all drugs had to be

4    FDA-approved as far as for prescribing from the local

5    pharmacies, from the hospital.

6    Q.   So when you say that drugs had to be FDA-approved, were

7    you told that drugs that you prescribed to patients had to be

8    FDA-approved?

9    A.   Yes.

10   Q.   At some point during your career as a nurse practitioner

11   did you work for the defendant Dr. Patwardhan?

12   A.   Yes.

13   Q.   When did you work for him?

14   A.   I believe I started in late August and I worked for him

15   until late March, late August of 2007 until late March 2008.

16   Q.   What were your duties in Dr. Patwardhan's office?

17   A.   I was the nurse practitioner for the internal medicine

18   plans, as far as seeing internal medicine patients, and then

19   also I worked in the setting where he had -- where we started

20   the chemotherapy on the oncology patients.

21   Q.   Now, the chemotherapy for the oncology patients, was

22   that administered at the 918 office?

23   A.   Yes, on Foothill Boulevard, yes.

24   Q.   918 is the street address number of the office, correct?

25   A.   Yes.

1    Q.   When you worked in the internal medicine portion of the

2    practice, did you also do that at 918 or was that at one of

3    the defendant's other offices?

4    A.   That was at 918.  I believe there was only one time that

5    I did go to the Chino office, only one day.

6    Q.   So the Upland office is where you worked most of the

7    time?

8    A.   Correct.

9    Q.   Were there certain days that internal medicine was

10   practiced at the Upland office?

11   A.   Mainly it was every day, Monday through Friday, except

12   for on Tuesdays and Thursdays in the morning.

13   Q.   What happened on Tuesdays and Thursdays in the morning?

14   A.   Chemo would be administered.

15   Q.   I believe you already said you assisted with the

16   administration of chemotherapy?

17   A.   Mm-hmm, yes.

18   Q.   Focusing on the administration of chemotherapy, what

19   were your responsibilities regarding the chemotherapy?

20   A.   As far as the chemotherapy was already set up, the

21   patients, we've checked them in, checked their lab values

22   right then and there, verify they can still receive it, look

23   at the order, and it would already be prepared, and then hang

24   it.  As far as administer, depending on if they had a

25   portacath, we had to start an IV to start administration.

1    Q.    When you say "the chemotherapy had been prepared," what
2    do you mean by that?
3    A.    It was already prepared.    Either in the one area where
4    the chemotherapy was actually mixed or prepared, it was
5    already ready in the IV bags, the bags themselves, even the
6    pre meds were already ready and it was labeled with the
7    patient's and the medication and the dose.
8    Q.    And what do you mean when you say "the chemotherapy was
9    mixed"?
10    A.    A lot of them have to be mixed right there under the
11    chemo doctor as far as a lot of them come in different vials
12    and they have to be mixed with saline or their powder form
13    and have to be mixed
14    Q.    When the chemotherapy arrived in the office, would it
15    essentially be contained in vials and then it would later
16    have to be mixed into saline drip bags?
17    A.    Yes, I didn't see that half of it.    Yes.
18    Q.    While you worked for Dr. Patwardhan, did you ever see
19    him mixing the chemotherapy?
20    A.    Yes, I would see him mixing it, but I would not be
21    watching.    It was just in that room.
22    Q.    So while you saw him doing it, did you ever have
23    occasion to see what exactly he was putting into the saline
24    drip bags?
25    A.    No, I wasn't that close.    But as far as seeing, yes, as

1     far as whatever was in the vials, part of the chemo vials.

2     Q.   Were you able to read the chemo vials?

3     A.   I didn't really see them that often, the chemo vials,

4     but mainly they were in the sink or in the chemo bag right

5     after mixing.

6     Q.   Did you ever have any responsibility for cleaning up the

7     lab after the chemotherapy had been mixed?

8     A.   No.

9     Q.   So when you actually handled the chemotherapy, was it

10    already mixed into the saline drip bags?

11    A.   Correct.

12    Q.   Were the saline drip bags identified in any way?

13    A.   Yes, identified as far as just written with a marker pen

14    as far as the name of the patient and the chemotherapy itself

15    and the dosage.

16    Q.   Was one of the chemotherapy drugs that was frequently

17    used in the practice a drug named Taxotere?

18    A.   Yes.

19    Q.   So the name of a patient and the chemotherapy drug, such

20    as Taxotere, would be written on the drip bag?

21    A.   Yes.

22    Q.   Did you ever see the name Docetax written on a drip bag?

23    A.   I don't recall that.

24    Q.   Now, when you would take the saline drip bags with the

25    chemotherapy inside, what would you do with it?

1    A.    Once they are prepared, they are right there taking

2    those with the pre meds, then I would already be gowned up

3    and looking at the order as far as what was needed for the

4    patient, identify with the patient the medication, the

5    patient themselves, and as far as finding their line or vein

6    as far as starting the medication, starting the pre med

7    first.

8    Q.    So you referred to an order, what do you mean by that?

9    A.    So an order as far as first identifying as far as having

10   the chemotherapy, start the bag and the pre meds there and

11   then on the sheet of paper, which the order, the actual order

12   for that day as far as the pre medications and the

13   medication, the chemotherapy that was to be provided with the

14   dosage, checking over that, verifying that on the bag and

15   then going to where the patient is at, identifying the

16   patient and then hanging from there and administering,

17   starting the chemotherapy and the pre meds.

18   Q.    So there would be written instructions that explained

19   what medications each patient was supposed to receive that

20   day?

21   A.    Yes, it was in writing as far as which patient.

22   Q.    Do you know who prepared those forms?

23   A.    Usually the medical assistants would have them or even

24   we would look at the orders.  I would look at them and as far

25   as writing down as far as for that day, but it was already

1    prepared, but writing down what chemotherapy was ordered for

2    that day.

3    Q.    Would you look at the written order and compare that to

4    the saline drip bag to make sure that you had the correct

5    medication for the correct patient?

6    A.    Yes.

7    Q.    And then you would actually go out and administer the IV

8    to the patient?

9    A.    Yes.

10   Q.    How would you go about doing that?

11   A.    First of all, just seeing the patient when they are in

12   the chair, so just identifying them.  Of course we didn't

13   have any name tags or anything, but identifying them, going

14   over the medication and then hang it and then starting as far

15   as their line, starting with the saline and pre meds first

16   and waiting a little while, but also identifying as far as

17   the medication that was to be administered that day and the

18   dosage.

19   Q.    Was that the same routine that you followed most

20   Tuesdays and Thursdays regarding chemotherapy?

21   A.    Yes.

22   Q.    Now, at some point did Dr. Patwardhan raise an issue

23   with you regarding the treadmill that was contained in the

24   office?

25   A.    Yes.

1    Q.    What did he tell you about that?

2    A.    That it had to be ordered more often, as far as used

3    more often, especially of the diabetic patients.

4    Q.    I'm going to show you what's been previously admitted as

5    Exhibit 1K.  Do you recognize this?

6    A.    Yes, I do.

7    Q.    Is this the treadmill in Dr. Patwardhan's office?

8    A.    Yes.

9    Q.    Now, you said that Dr. Patwardhan told you that you

10   needed to order the treadmill more for patients?

11   A.    Mm-hmm.

12   Q.    What do you mean by that?

13   A.    As far as to have the test done more often in our office

14   instead of outside facilities, outside places as far as

15   ordering it, especially just more for the patients that were

16   diabetic patients or cardiology patients.

17   Q.    Before he spoke to you about it, what had you been doing

18   with patients that needed to be monitored on a treadmill?

19   A.    I would refer them out to cardiology for that or an

20   outside facility for that.

21   Q.    When you were referring patients out for the treadmill

22   test, if you could describe as simply as you can for the

23   jury, what that entails?

24   A.    For some of them it's a stress test.  For some of them

25   it's that simple.  Some of them also needing a medication

1    that's going to effect the heart rate a little bit to see if

2    they could tolerate that, see if it effects their heart while

3    they're on the treadmill.  Usually it is monitored with an

4    EKG on at the same time they are on the treadmill, so that's

5    monitoring what's going on as far as with the heart while

6    they are on the treadmill doing either walking or any kind of

7    jogging.

8    Q.   Did Dr. Patwardhan tell you why he wanted you to use the

9    treadmill in his office as opposed to referring patients out?

10   A.   Because it was bought and it needed to be utilized.

11   Q.   Did he tell you how much money the office would charge

12   each time a patient was put on the treadmill?

13   A.   I don't recall as far as how much they would be charged.

14   Q.   And what was your understanding as to why the test

15   needed to be done in his office as opposed to some place

16   else.

17          MR. GLUCK:  Objection, speculation and asked and

18   answered.

19          THE COURT:  Sustained.

20   BY MR. BEHNKE:

21   Q.   Now, at some point you left Dr. Patwardhan's practice,

22   correct?

23   A.   Yes.

24   Q.   Why did you leave Dr. Patwardhan's practice?

25   A.   Because of noting there was -- we were receiving

1   chemotherapy from other places, other countries.

2   Q.   You learned that he was receiving chemotherapy

3   medications from other countries?

4   A.   Mm-hmm.

5          THE COURT:  You need to -- I'm sorry.  You need to

6   say "yes" or "no."

7          THE WITNESS:  Yes, I'm sorry.

8          THE COURT:  Thank you.  And keep your voice up,

9   please.

10  BY MR. BEHNKE:

11  Q.   When did you learn that chemotherapy drugs from other

12  countries were being used in the office?

13  A.   When I did see the one gym bag.

14  Q.   Do you recall approximately when that happened?

15  A.   I believe that was in February, I believe.  I'm not able

16  to recall as far as date.

17  Q.   Approximately?

18  A.   Late February.

19  Q.   February of 2008?

20  A.   2008, yes.

21  Q.   How did you come to see this gym bag with drugs in it in

22  February of 2008?

23  A.   We completed chemotherapy a little bit early in the

24  office and the patients had already left, and at that time I

25  believe it was Norma that brought the gym bag.  It was a

 1   dirty, medium sized gym bag that she brought.  She said, "I
 2   want you to see this."  I can't remember her exact words, but
 3   she brought it into the room that Dr. Patwardhan would
 4   prepare the chemotherapy and she opened it and that's when I
 5   saw the vials.
 6   Q.   Now, when you say "Norma," are you referring to Norma
 7   Franco?
 8   A.   Yes.
 9   Q.   So she showed you the gym bag.  You looked inside?
10   A.   Yes.  We put it on the table in that room and looked
11   inside.
12   Q.   What did you see inside of the gym bag?
13   A.   I did see the Taxotere, the name there as far as the
14   Docetaxel, the Docetaxol, however you say it.  I'm so used to
15   saying the other name as far as the Taxotere, but it was
16   that.
17   Q.   How could you tell -- when you looked at the drugs
18   inside the bag, what caused you to think that they were from
19   some place else?
20   A.   Well, it was odd they weren't in any kind of FedEx bag,
21   no drug from the company itself.  No, they were vials.  There
22   is no bubbles, no nothing to protect it in this old, dirty
23   gym bag.  And then there was a receipt with it, and the
24   receipt that was in it was a receipt with Dr. Patwardhan's
25   name on it and a lot of it -- most of it was in, as far as

```
 1    that, as far as the Indian as far as the writing and the
 2    amount, the price, but also just it not being, again, wrapped
 3    up in bubbles, and as far as looking at even some of the
 4    vials not even having any lot number or expiration date on
 5    it.
 6    Q.   I'm going to show you what's been previously admitted
 7    Exhibit No. 7.  Do you recognize that?
 8    A.   Yes.
 9    Q.   What is that?
10    A.   It's kind of hard to see on here, but as far as the gym
11    bag and as far as a lot of those vials.
12    Q.   Is this the gym bag that Norma Franco showed you?
13    A.   I believe so.  It's really hard to see as far as the
14    color here, but yeah, it looks like the gym bag.
15    Q.   When you looked inside the gym bag, is this essentially
16    what you saw?
17    A.   Actually, there was more in there.
18    Q.   There were more drugs than as depicted in this
19    photograph?
20    A.   Yes.  I mean, it was packed.  It was full.
21    Q.   Now, showing you Exhibit No. 3, does this look like the
22    receipt that was inside the gym bag?
23    A.   Yes, it does.
24    Q.   Now, you said that you immediately noticed the way that
25    the drugs were packaged.  Is there anything else that struck
```

1   you as unusual about these drugs?

2   A.   Unusual as far as there was no, again, I believe the

3   dosage.  I just remember just seeing the bag but there was

4   no -- the way it was packed, again, there was nothing to

5   protect.  I mean, assuming from that it wasn't protected as

6   far as the medication, but again, as far as looking at one of

7   the vials, there was no expiration date, there is no lot

8   number that usually is with approved drugs, any drugs.

9   Q.   Was there information that you would normally expect to

10  see on approved product that you didn't see on these drugs?

11  A.   Yes, as far as like I said, the lot number and the

12  expiration date and actual vials, but also as far as on the

13  receipt, you know, from a drug company facility.  I mean, I

14  have never really seen that many receipts, but not showing as

15  far as the specific company, one of the drug companies that

16  we -- that is utilized in the states, the actual company that

17  makes that here.

18  Q.   Was there anything unusual about the temperature of the

19  drugs?

20  A.   It was room temperature.  With that medication, too,

21  usually it does have to be refrigerated.  The max temperature

22  it can tolerate is 77 -- like 77 to I think 78, and it's

23  usually refrigerated and is given and mixed while at room

24  temperature.  Just thinking about how long that has been in

25  the bag as far as what temperatures it's been exposed to.

1    Many times, too, those medications, especially that one,

2    should be refrigerated or even in ice, ice packed.

3    Q.   Now, showing you what's been previously admitted,

4    Exhibit 124, is this a photograph of one of the vials that

5    was contained inside the gym bag?

6    A.   Yes.

7    Q.   Now, when you saw the drugs in the gym bag, did you say

8    anything to Norma Franco?

9    A.   I said I couldn't really believe it as far as that.  I

10   think I was just really surprised that these were all in a

11   gym bag as far as all these medications and where they did

12   come from.

13   Q.   Is there any discussion about what you or Norma or

14   anybody else on the staff should do with the drugs?

15   A.   Take pictures of them.

16   Q.   What was the purpose for taking pictures?

17   A.   Taking pictures of them just because as far as at that

18   point, as far as reporting it, and from that point on also

19   having any, if need be, as far as any kind of, you know,

20   physical evidence if those were going to be used.

21   Q.   Approximately how long after you saw the drugs in the

22   gym bag did you leave the practice?

23   A.   It was in late March.  It was probably the third week of

24   March.

25   Q.   Did you tell Dr. Patwardhan why you were leaving?

1  A.   Mainly I gave him a notice, a written notice that said I

2  was leaving since I found a new job, a new position somewhere

3  else.

4  Q.   At any point did you ever confront him about these drugs?

5  A.   No.

6  Q.   Why not?

7  A.   I felt at that time even confronting there might be, of

8  course, a lot of defense about that.  And as far as possibly

9  stopping that in general at that time, who knows how long

10  this has been going on.  So at that time I just felt that we

11  had -- it had to be reported, and from there just having

12  whatever -- I mean, just be caught in the act as far as

13  whatever evidence.  Of course, looking at the safety of the

14  patients, I mean, that was the main thing, too, but --

15  Q.   So did you believe that it would have had any effect to

16  confront Dr. Patwardhan about it?

17  A.   No.

18            THE COURT:  Is now a good breaking point?

19            MR. BEHNKE:  Yes, Your Honor.  I actually have no

20  further questions.

21            THE COURT:  Let's recess.  Ladies and gentlemen, we

22  will recess until 1:15 today.  Remember the admonitions,

23  don't discuss the case with anyone, amongst yourselves or

24  with anyone else.  When I say "the case," I mean that in the

25  broadest possible sense, the testimony, the evidence,

```
 1    anything you have seen or heard in the courtroom, any of the
 2    participants in the trial.  Don't make up your minds about
 3    the case or any issues and, of course, don't communicate,
 4    blog, post anything on the Internet, do any research in any
 5    fashion.
 6              Thank you very much, ladies and gentlemen.  You're
 7    excused.
 8              Thank you.  You may step down.
 9                 (Out of the presence of the jury:)
10              THE COURT:  We have to take up that issue about
11    the one exhibit.  Let's see.  If I recall correctly -- you
12    may be seated.  I'm sorry.
13              The issue was the Government had moved it into
14    evidence.  The defense objected because -- well, the
15    Government moved it into evidence for the purpose, I think,
16    of illustrating the witness' testimony as to the presence or
17    absence of certain information in the entire notebook, which
18    is a voluminous exhibit.  I would suggest that the parties
19    attempt to reach a stipulation as to what is or isn't in the
20    proffered exhibit.
21              MR. GLUCK:  That's fine.
22              THE COURT:  Is that acceptable?
23              MR. GLUCK:  That's acceptable, Your Honor.
24              THE COURT:  Why don't we try to do that.
25              MR. GLUCK:  Your Honor, I have one very minor mea
```

```
 1    culpa.  Ms. Rhee I hope will be cross-examining Ms. Funk.  I
 2    stood up and made one objection.
 3                 THE COURT:  That's fine.
 4                 MR. GLUCK:  Thank you.
 5                 THE COURT:  You're welcome.
 6                        (Lunch Recess)
 7               (In the presence of the jury:)
 8                 THE COURT:  Good afternoon.  Let the record
 9    reflect the presence of all members of the jury, all counsel
10    and the defendant present, the witness on the witness stand.
11                 You may cross-examine, Ms. Rhee.
12                 MS. RHEE:  Thank you, Your Honor.
13                        CROSS-EXAMINATION
14    BY MS. RHEE:
15    Q.   Good afternoon, Ms. Funk.  My name is Jean Rhee and I am
16    one of the defense attorneys in this case.
17                 You earlier testified that you worked as a nurse
18    practitioner in Dr. Patwardhan's office from late August 2007
19    to around late March 2008; is that correct?
20    A.   Yes.
21    Q.   And you testified that during that approximately seven
22    months that you worked there you had various duties,
23    including administering chemotherapy?
24    A.   Yes.
25    Q.   I believe you said it was twice a week on Tuesdays and
```

1    Thursdays in the morning?

2    A.   Yes.

3    Q.   And you said that Dr. Patwardhan would mix the

4    chemotherapy into saline bags in advance, right?

5    A.   Yes.

6    Q.   So that it would be ready for you to administer to the

7    patients?

8    A.   Yes.

9    Q.   And you would sometimes see him mixing the chemotherapy?

10   A.   Yes, when we were hanging bags sometimes he would be

11   mixing a few that would be left or something that just came

12   in.

13   Q.   And you also testified that you would sometimes see the

14   vials after he was done.  They were just left in the sink?

15   A.   Yes, some were in the sink, some were in the chemo bag.

16   Q.   So you were able to read the vials?

17   A.   No, because I never attempted to really look at them.

18   Q.   But you could have read them if you wanted to, right?

19   A.   Yes.  We were too busy.  I mean, we saw them at the time

20   that we were completed, so -- and when the gals cleaned up.

21   Q.   They were right there.  It was not as though anyone hid

22   them from you.  They were just left in the sink or around?

23   A.   Yes, they were in the sink or in the chemo container.

24   Q.   Not all chemotherapy drugs have to be refrigerated; is

25   that correct?

```
1    A.   That all depends.

2    Q.   It depends on the drug?

3    A.   Yes.

4    Q.   And you testified earlier that Taxotere can be kept at

5    78 degrees, I believe you said?

6    A.   Yes, I think that's the highest.

7    Q.   And that is room temperature, correct?

8    A.   Mm-hmm.

9             THE COURT:  You need to say "yes" or "no."

10            THE WITNESS:  Yes.  I'm sorry.

11            THE COURT:  And keep your voice up, please.

12            And, Ms. Rhee, you need to slow down a little.

13            MS. RHEE:  Yes, Your Honor.

14   BY MS. RHEE:

15   Q.   Ms. Funk, are you familiar with what a chemotherapy hood

16   is?

17   A.   Chemotherapy code?

18   Q.   Hood.

19   A.   Yes.

20   Q.   And what is that?

21   A.   It's a hood as far as that you turn on the -- a lot of

22   the pharmacists while -- if I was in the hospital itself and

23   also Dr. Patwardhan's office where they turn it on and as far

24   as any aspiration, anything that they are actually aspirating

25   out of a vial or into a bag, anything, air would actually go
```

1    up into the hood as far as protection from going anywhere

2    else, as far as airborne or aspirating.

3    Q.    In your case, chemotherapy is always administered by a

4    licensed doctor or nurse; is that correct?

5    A.    Yes.

6    Q.    And in your experience do chemotherapy medications

7    typically come with printed materials, such as directions or

8    instructions, on how one should be administering them?

9    A.    Yes.

10   Q.    And you don't make it a point to save those printed

11   directions or instructions for your patients, right?

12   A.    There are already preprinted ones, and as far as going

13   over some medications, especially the chemo therapies that

14   were already started, just going over the main actual

15   chemotherapy, what is like the main side effects.

16   Q.    That's for your own reference in administering the

17   chemotherapy?

18   A.    It's for the patient as far as patient teaching that

19   they are receiving.

20   Q.    But with respect to the actual -- the small fine print

21   materials, did you save that and give it to the patients?

22   A.    No.

23   Q.    Because your patients wouldn't be doing the

24   administration themselves; is that correct?

25   A.    Correct, and I didn't see many of those.  Anyway, most

```
 1    of them, like I said, were already prepared in the bags, the

 2    majority.

 3    Q.    And that's for any kind of chemotherapy that you would

 4    be administering?

 5    A.    There at his office.

 6    Q.    And, to your knowledge, those printed directions or

 7    instructions were never sent to insurers; is that correct?

 8    A.    That I have no idea.

 9    Q.    Because you weren't involved in billing?

10    A.    Correct.

11    Q.    So, to your knowledge, you don't know one way or the

12    other if it was ever sent?

13    A.    Correct.

14    Q.    And what about Medicare, do you know if such printed

15    materials were ever sent to Medicare?

16    A.    I have no idea.

17    Q.    You testified this morning that in February 2008 you

18    became aware that some of the chemotherapy medications used

19    in the practice came from India, right?

20    A.    Correct.

21    Q.    And you described in your testimony how you found out,

22    do you recall that?

23    A.    Yes.

24    Q.    You said that Norma Franco walked up to you with a gym

25    bag filled with chemotherapy bottles?
```

1    A.    Yes.

2    Q.    And this was in the office?

3    A.    Yes, it was.

4    Q.    And when you looked in the bag, the way the medicines

5    looked, you noticed right away that they were from India?

6    A.    Just only it was from India was just from the receipt.

7    Q.    And it's because when you looked at the receipt or

8    invoice it showed that it was from an Indian pharmacy and it

9    had Indian price, that's what you said?

10   A.    Correct.

11   Q.    Did you ever go -- withdraw that.

12             Did you go to dinner with co-workers at Tequila

13   Hoppers on St. Patrick's Day in 2008?

14   A.    Yes.

15   Q.    And did you discuss your concerns with the foreign

16   medicines with your co-workers at this dinner?

17   A.    Yes.

18   Q.    So everyone at that dinner knew about Dr. Patwardhan

19   bringing medicines from India, correct?

20   A.    At that time we discussed it.

21   Q.    And everyone at that dinner, because you discussed it,

22   was aware of your concerns?

23   A.    Yes.

24   Q.    You testified this morning that when Norma Franco showed

25   you the foreign medicines being used, you thought right away

1    that there was something wrong; is that correct?

2    A.   Yes.

3    Q.   And that you knew this because you had learned about

4    foreign medicines in an advanced pharmacology course in nurse

5    practitioner school?

6    A.   We didn't learn about foreign medications, but as far as

7    transporting a suspicious in itself in advanced pharmacology.

8    Q.   And where did you say you went to nurse practioner

9    school again?

10   A.   Azusa Pacific University, Azusa, California.

11   Q.   So that's around here?

12   A.   Yes.

13   Q.   I would like to ask you to take a look at Exhibit No. 7,

14   which has previously been admitted and which Mr. Behnke

15   showed you this morning.  You testified this morning that

16   this was the gym bag that you saw when Norma Franco came into

17   the office; is that correct?

18   A.   Yes.  It's really hard to see here.  It's not colored as

19   far as the color but, yes, it looks the same.

20   Q.   And you said that when you looked inside you saw that it

21   was full of Taxotere, just like in this picture?

22   A.   Yes.

23   Q.   And you said that some of the things you noticed that

24   were missing were the lot number and expiration date; is that

25   correct?

1    A.    Yes.  I looked really briefly as far as the vials.

2    Q.    Could I ask you to please turn to Exhibit No. 124, this

3    is also a photograph that Mr. Behnke showed you this

4    morning.  This is the photograph that Mr. Behnke showed you

5    this morning; is that correct?

6    A.    Correct.

7    Q.    And this is the photograph of the Taxotere that was in

8    the gym bag photograph we just looked at earlier?

9    A.    I believe so, yes.

10   Q.    I would like to ask you to turn to Exhibit 124B, which I

11   believe has also already been admitted.  This is a picture of

12   Taxotere, right?

13         MR. BEHNKE:  Objection, Your Honor, facts not in

14   evidence and misstating the name of the drug.

15         THE COURT:  The objection is sustained to the form

16   of the question.  You may reword your question.

17   BY MS. RHEE:

18   Q.    Do you know what this is?

19   A.    It has an expiration date on there.

20   Q.    But do you know -- can you tell from this photograph

21   what this is a vial of?

22   A.    I just see the last part as far as the X.

23   Q.    This is a photograph I just showed you a few minutes

24   ago?

25   A.    Yes.

1    Q.    This is a photograph of Docetax?

2    A.    Yes.

3    Q.    This is a photograph of the side of the bottle of

4    Docetax of which I just showed you the front.  Is that a

5    "yes"?

6    A.    Yes.

7    Q.    You just said that when I asked you what this photograph

8    was, you said this is a photograph of an expiration date.

9    Can you please point to the expiration date?

10   A.    It's right here.

11   Q.    And is this a lot number?

12   A.    It could be the lot number, but it says V number, yes.

13   Q.    You testified this morning that you talked to Norma

14   about taking pictures of the medicines so it could be

15   reported to the authorities; is that right?

16   A.    Yes, we were talking about taking pictures.

17   Q.    But, in fact, you yourself did not make an effort to

18   report it to the authorities; is that correct?

19   A.    Not at that time, no.

20   Q.    Did you make an effort later to report it to the

21   authorities, you yourself?

22   A.    No, because one other person already reported it.

23   Q.    But you did testify that after you learned that there

24   were foreign medicines being used in the practice, it

25   prompted you to want to leave; is that correct?

1    A.   Correct.

2    Q.   But you testified that you never told Dr. Patwardhan

3    face-to-face that you were leaving because you thought there

4    was a problem with the medicines?

5    A.   Correct.

6    Q.   You said that you submitted a written resignation

7    letter; is that correct?

8    A.   Yes.

9              MS. RHEE:  Your Honor, could I have a moment,

10   please?

11             THE COURT:  Certainly.

12             MR. GLUCK:  Your Honor, may we hand these up and

13   mark them in a moment?

14             THE COURT:  What's the defendant's next in order?

15             MS. RHEE:  205, I think.

16             THE COURT:  205.  That's fine.  This will be marked

17   for identification as Defendant's 205.  And have you shown a

18   copy to your opponent?

19             MS. RHEE:  Yes.

20   BY MS. RHEE:

21   Q.   Do you recognize this as the resignation letter that you

22   submitted?

23   A.   Yes.

24             MS. RHEE:  Your Honor, I would like to move to

25   admit and publish Defendant's 205.

```
 1              THE COURT:  Any objection?

 2              MR. BEHNKE:  No objection, Your Honor.

 3              THE COURT:  Thank you.  Exhibit 205 is ordered

 4   admitted.  You may publish.

 5              MS. RHEE:  Thank you, Your Honor.

 6              THE COURT:  If you tap the lower right-hand side of

 7   the screen, it will clear that.  So tap it on the lower

 8   right-hand corner.

 9   BY MS. RHEE:

10   Q.   What is the date on this letter, Ms. Funk?

11   A.   March 4, 2008.

12   Q.   And when do you say your effective last day is going to

13   be?

14   A.   Friday, March 28th.

15   Q.   So, when you gave notice, you gave roughly three weeks

16   notice?

17   A.   Correct, yes.

18   Q.   So, in fact, by the time you had left more than a month

19   had past since you had first become aware of the foreign

20   medications?

21   A.   I'm sorry.  Say that again.

22   Q.   So by the time that you had actually left the practice

23   more than a month had elapsed since you became aware?

24   A.   Yes.

25   Q.   And there is nothing in the letter about your concerns
```

1   with foreign medications, correct?

2   A.   Correct.

3   Q.   Actually, there is no mention of any kind of concerns

4   whatsoever?

5   A.   Correct.

6   Q.   And instead you tell Dr. Patwardhan and Jessica Young

7   that it has been a pleasure working with you?

8   A.   Correct.

9   Q.   You continued to administer chemotherapy at

10  Dr. Patwardhan's office right up until you left; is that

11  correct?

12  A.   Yes.

13  Q.   And you never refused to do it?

14  A.   No.

15  Q.   Didn't you tell Dr. Patwardhan that the reason you were

16  leaving his practice was because you had finally gotten your

17  dream job at the City of Hope?

18  A.   Correct.

19         MS. RHEE:   Could I have a moment, Your Honor?   I

20  think I'm done.   No further questions, Your Honor.

21         THE COURT:   Thank you.   Redirect examination.

22                     REDIRECT EXAMINATION

23  BY MR. BEHNKE:

24  Q.   Earlier when you were describing the instructions and

25  paperwork that you typically see that arrives with

1    chemotherapy drugs, could you describe a little bit further

2    what that paperwork is like for the jury.  What does it

3    entail?

4    A.    I really didn't see too much of it.

5    Q.    No, I'm talking about what you typically see with

6    FDA-approved chemotherapy medications?

7    A.    Yes, as far as usually there would be an invoice as far

8    as when they would deliver it to the office as far as in the

9    boxes or however they delivered it and it just was a formal

10   as far as from the company itself.

11   Q.    Did the drugs themselves include any written material

12   that included instructions for use warnings, side effects and

13   other types of information?

14   A.    Yes.

15   Q.    Can you explain for the jury how that type of material

16   typically appeared?

17   A.    Yes.  As far as each vial would be in a boxed container

18   with all of that information.  Also in the boxed container

19   each individual vial and on it that would come with that and

20   usually either like kind of like pasted a little bit would be

21   a very fine folded instruction of everything about the chemo

22   as far as uses, side effects, toxicities, precautions,

23   mixing, all that information would be on each box that the

24   vial would be inside.

25   Q.    So a long sheet of printed material with all that

1    information would be pasted to the box?

2    A.    Yes, kind of like a -- very easily removable but very

3    much folded would be on the box.

4    Q.    And then the vial of chemotherapy would typically be

5    contained inside the box?

6    A.    Yes.

7    Q.    Did you see any paperwork like that, instructions,

8    details of side effects or any information like that with the

9    drugs in the bag that you saw in February 2008?

10   A.    No, I did not.

11   Q.    You submitted your resignation notice March 4th, 2008,

12   correct?

13   A.    Correct.

14   Q.    Why did you wait three weeks to actually leave the

15   practice as opposed to leaving immediately?

16   A.    The first reason was because I finally did find a

17   position, a job, that was the first thing I had to do since I

18   have two kids and I have a house I own.  So, first of all,

19   finding a position, finding a job.  And when I did find the

20   job at the one position at the City of Hope, I was not able

21   to start until April 4th, as far as the position as far as

22   being open and the orientation.

23   Q.    So the delay between March 4th and the time you actually

24   left was time you gave yourself to find another position?

25   A.    I already had a position right at that time and day but

1    I could not start until April 4th.  And I attempted to find

2    -- to seek like a per diem nursing position in the meantime.

3    With those positions, as far as the hours, I couldn't do that

4    with baby-sitting and that kind of deal.

5    Q.    When you wrote your resignation letter to the defendant,

6    why did you write "it's been a pleasure working here" and not

7    include any information about your concerns regarding the

8    drugs?

9    A.    Because at that time I knew that we already had

10   discussed, as far as me and a couple of the gals, as far as

11   find out how we can -- how this was going to go about in

12   regards to reporting it and how much time would be -- because

13   of that, not really putting -- because I don't know how much

14   that would affect as far as any removal of any of those items

15   or stopping anything like that to where even reporting that

16   he would actually have to be caught, so far caught or the

17   evidence, that's just from reporting that.

18   Q.    And since you left the practice, have you made conscious

19   efforts to try to forget what went on there?

20   A.    I think it's difficult to forget it.  I've learned from

21   that that I should have reported it at that time as far as

22   found something earlier and left earlier.  As far as

23   reporting, as far as now understanding how to report

24   something, how to go about it in the appropriate way.

25            MR. BEHNKE:  Nothing further, Your Honor.

```
 1              THE COURT:  Thank you.  You may step down.
 2              The Government may call its next witness.
 3              MR. WIDMAN:  Thank you, Your Honor.  The United
 4    States calls Jessica Perez.
 5              THE CLERK:  Please raise your right hand.
 6         PLAINTIFF'S WITNESS, JESSICA PEREZ, WAS SWORN
 7              THE CLERK:  Please be seated.  Please state your
 8    full name and spell it for the record.
 9              THE WITNESS:  Jessica Perez, J-E-S-S-I-C-A,
10    P-E-R-E-Z.
11              THE COURT:  Ms. Perez, you need to keep your voice
12    up so everyone in the courtroom can hear you.  You can scoot
13    your chair up so the microphone picks up your voice, and
14    carefully, that's right, adjust that microphone.  I have been
15    told it cost more than any of us make in a year.  Don't yank
16    it out of there but make sure that you're close enough to the
17    microphone so that it's picking up your voice.  All right.
18    Thank you.
19              You may examine.
20              MR. WIDMAN:  Thank you, Your Honor.
21                      DIRECT EXAMINATION
22    BY MR. WIDMAN:
23    Q.   Good afternoon, Ms. Perez.  What do you do for a living?
24    A.   I am a provider representative for a medical group.
25              THE COURT:  You need to speak about three times as
```

```
 1    loud.  Try it again.
 2             THE WITNESS:  I am a representative.  I work for a
 3    medical group.
 4    BY MR. WIDMAN:
 5    Q.   Which medical group?
 6    A.   Vantage Medical Group.
 7    Q.   And what do you mean by representative?  Can you just
 8    explain a little bit of what your work is.
 9    A.   Sure.  What I do is, we are a medical group that carry
10    all doctors, specialty doctors, primary doctors, and they are
11    with our group.  And any issues, I take care of all of the
12    issues that doctors may have.  They can vary.
13    Q.   Do you have any medical training?
14    A.   In health care but not clinically.
15    Q.   Can you please explain what you mean by that?
16    A.   Health care experience.  I worked for a health plan for
17    10 years and then from there data entry for payment to
18    providers.
19    Q.   Do you have any training in terms of actually providing
20    medical services to people?
21    A.   No.
22    Q.   And what is the highest level of education you have
23    achieved?
24    A.   Bachelor's, and I'm still working on my bachelor's.
25    Q.   Do you have a major?
```

1    A.    Business management.

2    Q.    Thank you.  Turning now to another subject.  Have you

3    ever worked for the defendant, Dr. Patwardhan?

4    A.    Yes.

5    Q.    When did you begin working for him?

6    A.    In May of 2007.

7    Q.    And what was your position?

8    A.    I was hired for administrator.

9    Q.    Who was your supervisor?

10   A.    Jessica Young.

11   Q.    What was her role?

12   A.    She was above me.  And my responsibilities were to run

13   the offices, to ensure that patient's charts, that we

14   verified eligibility for the patients a day prior and made

15   sure everything was running.  That, you know, all the staff

16   was there, ensure that the applications that the doctor had

17   that they were filled out properly and sent to the health

18   plans or the medical groups.

19   Q.    When you said the applications that the doctor sent,

20   what do you mean by that?

21   A.    Well, every year a physician or a doctor has to fill out

22   a form and make sure that the license is current and the

23   malpractice is current, that's a procedure that is done every

24   year, so that was one of my responsibilities.

25   Q.    Do you currently work for Dr. Patwardhan?

1    A.    No.

2    Q.    When did your employment with him end?

3    A.    I'm sorry?

4    Q.    When did you stop working for Dr. Patwardhan?

5    A.    I resigned in March.

6    Q.    Of what year?

7    A.    2008.

8    Q.    Now, turning back to what you were just explaining to

9    the jury about keeping applications current, did there come a

10   time when you were involved in updating Dr. Patwardhan's

11   credentials for Pomona hospital?

12   A.    Yes, it was for a hospital that was requiring more

13   information.  Generally, it's just a license, that they need

14   to provide a California license, but this time they were --

15   they needed a second license.  So I was never trained to fill

16   out these forms, so I went back to the previous forms of the

17   previous manager before me.  So I went in there and I noticed

18   that there was a second ID, which was a passport.  So I went

19   ahead and submitted that in as a second ID that they were

20   requiring.

21   Q.    Okay.  What happened next?

22   A.    So he had an issue.  I'm not really sure exactly the

23   whole story.

24   Q.    Who are you referring to when you say he?

25   A.    Dr. Patwardhan.  So he wanted to know.  He wanted to

1    review the packet, and he called me in the office with

2    Jessica Young and told me, why did I give his passport ID.

3    And I said because they wanted a second identification, so I

4    used what was before, which was your passport, so I submitted

5    that.  So he told me that, why did I do that without him and

6    that don't I know how many times -- they can find out how

7    many times he went to India, and I didn't understand why I

8    was being reprimanded for that.  So Jessica just put her hand

9    on her mouth to him and told me to leave.

10             MR. WIDMAN:  Your Honor, I would like the record to

11    reflect that Ms. Perez raised her index finger towards her

12    mouth and sort of perpendicular to her lips.

13             THE COURT:  All right.  That's an accurate

14    description for the record.

15    BY MR. WIDMAN:

16    Q.   Did anything else happen?

17    A.   I just didn't understand why I was being reprimanded or

18    why I was called in for that and then Jessica told me to

19    leave.  So I just started to think, why was he so angry with

20    me.

21    Q.   What happened next?

22    A.   So then after that Elizabeth from, she works in our

23    billing, came to me to the 913 office where we see patients

24    at.  There is billing and then there is where I'm at.  And

25    she had a bag, a gym bag, and asked me, "What should I do

1    with them," where should she put them.  And I looked at

2    Elizabeth and I said, "I don't know what you're talking

3    about."  And she said, "You don't?"  And I looked at the bag

4    and I said, "No, I have never seen this before."

5           So I told her, "Why don't you walk with me to

6    Dr. Patwardhan so that we can see what he wants to do."  And

7    at the time we had chemo patients that day and he was mixing,

8    so I asked him, I said, "Dr. Patwardhan," I said, "What do

9    you want me to do with this bag?"  And he looked at the bag

10   and he got upset and said that I had nothing to do with it,

11   for me not to touch the bag, not to do anything.  And he just

12   was very upset with me in front of everybody, and I just -- I

13   left.  He was scolding at me, and I left and I had Elizabeth

14   handle it.  So she went back --

15   Q.   Let me stop you there.  What made you think he was

16   upset?

17   A.   Because he looked at me and he saw the bag that

18   Elizabeth had and he changed.  He just completely was upset,

19   changed his attitude, and he said for me not to do anything,

20   not to touch it, and he just was very upset.  I don't know

21   why.

22   Q.   Can you describe his tone of voice?

23   A.   He was yelling at me.

24   Q.   So what happened after the conversation?

25   A.   She put the bag in a chair inside an office that we have

1    and she sat it there and she called Jessica, but since the

2    bag was there, it was open and I could see that there were

3    these vials or medications in the bag.  And my nurse

4    practitioner, Mindy, was there in the office with me, and I

5    told Mindy to take a look in that bag, and she did.  And then

6    she, Elizabeth, came back, took the bag and took it back to

7    the other office.

8    Q.    Thank you.  Now, before that day, had you ever seen a

9    bag containing drugs?

10   A.    No, that was the first time that I ever even saw that.

11   Q.    Thank you.  Approximately what month and year did that

12   take place, if you can recall?

13   A.    It was February, around that period.

14   Q.    Of what year?

15   A.    Of 2008.

16   Q.    Thank you.  I'm going to ask you a few other questions

17   on a different topic now concerning the billing or concerning

18   co-payments in Dr. Patwardhan's office.

19         Can you explain what your role was in ensuring that

20   patients pay their co-payments?

21   A.    Now, we have patients that are Medi-Cal.

22   Q.    What is Medi-Cal?

23   A.    They are paid by the state or government, depending if

24   they are seniors or family or children.  So if you're a

25   Medi-Cal patient, then you don't need to pay a share of cost

1    because that's paid by the state or federal, but if you fall

2    into a commercial, which means you pay out of pocket, then

3    you have a share of costs to pay for.  Your prescription,

4    like going to a pharmacy, you know, I work so I'm going to

5    pay a co-pay to get my prescription.

6    Q.    I'm sorry.  Did I cut you off?  Excuse me.

7    A.    Go ahead.

8    Q.    So you mentioned Medi-Cal patients and patients who had

9    insurance.  Did any patients pay, essentially, in cash for

10   the medications?

11   A.    Yes.

12   Q.    What percentage would you say approximately?

13   A.    I just remember our seniors were the ones that were

14   paying.

15   Q.    Seniors?

16   A.    Yes.

17   Q.    With respect to seniors, you mentioned Medi-Cal.  Was

18   there any other public health insurance programs that you had

19   interaction with when you were working for Dr. Patwardhan?

20   A.    No.

21   Q.    Have you ever heard of Medicare?

22   A.    You know what, yes, Medicare.  So there is other lines.

23   There is Medi-Cal and then there is Medicare.

24   Q.    Can you explain, if you understand the difference, how

25   they are different?

1    A.   If you have Medicare and you're a patient and you're a

2    senior, then you have a co-pay, you know, you have to pay a

3    share of cost.  So with Medi-Cal you don't have to pay a

4    share of cost because that's, of course, paid for.  So they

5    are responsible because they have a senior commercial plan.

6    They have to pay out of pocket.  So, due to that, Jessica

7    told me that I had to --

8    Q.   When you say "Jessica," who are you referring to?

9    A.   My boss, Jessica, is the person who I report to.

10   Q.   Jessica Young; is that right?

11   A.   Yes.

12        MR. GLUCK:  Objection, nonresponsive.

13        THE COURT:  The objection is sustained.

14   BY MR. WIDMAN:

15   Q.   You mentioned Jessica, your boss, is that a reference to

16   Jessica Young?

17   A.   Yes.

18   Q.   Thank you.  So you were explaining Medicare patients and

19   insurance patients and Medi-Cal patients, is it correct that

20   the only patients that didn't have to pay out of pocket were

21   Medi-Cal patients?

22   A.   Right.

23   Q.   Thank you.  Now, what was your role, your

24   responsibilities in co-payments?

25   A.   In co-payments -- well, what would happen is if it was a

1    new patient, then I would get a form from the billing

2    department, which was Jessica would somehow generate this and

3    inform me that the patient had to fill out this form.  And

4    this form had a list of medications on there and what they

5    were responsible to pay for.  And I had to speak to the new

6    patient before they're seen and inform them about this form

7    and what they have to pay out of pocket for every time they

8    came in.  And I had to have the patient sign it and me sign

9    it so that way she knew that I did inform the patient of

10   their cost.

11   Q.    Did you typically actually have the patient sign the

12   form?

13   A.    No.

14   Q.    Why not?

15   A.    Because when you're talking to a patient and you see the

16   amount of what it is and they couldn't even pay that amount,

17   I could not have them sign it, even though I would be

18   reprimanded for it, because I just couldn't do that.  I would

19   just talk to the patient about the cost, and if they couldn't

20   meet that amount, then I had to tell Jessica or

21   Dr. Patwardhan about it to see if somehow he would still see

22   the patient.

23   Q.    I would like you to take a look at one of the binders

24   that are over there to your right.  I think it should be

25   binder No. 3 of 3.  It's a black binder.  Maybe it's there in

1    front of you.

2    A.    Okay.

3    Q.    I would like you to take a look at Exhibit 102, 102A,

4    102B, 102C and 102D.

5    A.    Yes.

6    Q.    Have you had a chance to look at all five of those

7    pieces of paper?

8    A.    102C.

9    Q.    Let me ask you a question, Ms. Perez.

10   A.    Okay.

11   Q.    Once you've had a chance to review all of them, let me

12   know.

13   A.    Yes, sir.

14   Q.    What are they?

15   A.    These are the forms that I was given for the patient

16   that would come in to review.

17   Q.    Okay.  So each of them is the same exact kind of form

18   that you would use?

19   A.    Yes, that is to a new patient.

20           MR. WIDMAN:  Thank you.  Your Honor, the United

21   States moves to have these exhibits entered into evidence and

22   published to the jury.

23           THE COURT:  Any objections?

24           MR. GLUCK:  Just a moment, Your Honor.

25           MR. WIDMAN:  For the record, I am referring to

```
 1    Exhibits 102, 102A through D.
 2              THE COURT:  Through D?
 3              MR. WIDMAN:   Through D like David.
 4              MR. GLUCK:  No objection.
 5              THE COURT:  102A through D is ordered admitted.
 6    You may publish.
 7              MR. WIDMAN:  Thank you, Your Honor.  Just for the
 8    record, that includes 102 plain.
 9              THE COURT:  Okay.  Exactly.
10    BY MR. WIDMAN:
11    Q.   I'm going to place Exhibit 102 onto the overhead
12    projector.  Could you please tap the right -- lower right
13    corner of the screen to clear that dot off of it, the lower
14    right-hand corner of your monitor.
15              Now, could you please walk us through what's on
16    this form, what this means.
17    A.   Okay.  Where the medications are, that is what he's
18    going to give to the patient.
19    Q.   And allow me to also add that you can touch the screen
20    and indicate things if you think it would make it clearer
21    what you're saying.
22    A.   Like these are all the medications that a patient would
23    receive during their chemo, all of them.  And those are the
24    doses that he would give and then this would be the amount of
25    what the patient had to pay.  I don't know why it's not
```

1    there.  So then I would have to tell them that they are

2    responsible to pay this cost.

3    Q.   Now, I see four digits right here.  Which digit

4    represents how much the patient had to pay, if any?

5    A.   Sorry.  This is what -- the 632.54, the 8 and the

6    co-pay, that's added into this amount.  All of that is what

7    the patient has to pay.

8    Q.   Now, is that per visit or how often does the patient

9    have to pay that?

10   A.   Well, the initial consultation or the first time that I

11   talk to the patient they have to agree that every time they

12   come in, this is what the plan is.  It could change.  This

13   can change.  This can vary.  This is what it is now.  So when

14   he's coming in today, that is what he's going to -- the

15   patient is responsible to pay that.

16          MR. GLUCK:  Objection, nonresponsive.

17          THE COURT:  Sustained.

18          MR. WIDMAN:  Thank you, Your Honor.

19   BY MR. WIDMAN:

20   Q.   Okay.  There is some language here at the bottom right

21   below where it says, "total payment per chemotherapy

22   treatment."  And after you've had a chance to read it to

23   yourself, could you explain to the jury what it means?

24   A.   Well, the first sentence about it may vary week to week,

25   it's true, because he can change it.  You know, he may think,

1    you know what, I'm not going to use this medication, so it

2    can change the cost, and that would be something that he

3    would himself converse with the patient, not with us anymore.

4    It would be straight to the patient if he was going to change

5    anything from this plan.

6    Q.   Okay.  Let's take a look now at this handwriting and

7    these initials.  Do you recognize the handwriting or the

8    initials?

9    A.   Yes.  That is a signature.  Fatima is the person in the

10   billing that gave it to me, so she has to sign it and then I

11   sign it that I did receive it, because they have to ensure --

12   see that signature right here is Fatima, FA, that she gave it

13   to me at that date, period, and she gave me the form.

14   Q.   It appears to read, copy given to JP.  Do you know what

15   JP is a reference to?

16   A.   Jessica Perez, me.

17   Q.   Thank you.  I'm now placing on the overhead projector

18   Exhibit 102A.  Could you please explain what the content of

19   the information below where it says, "Medication," "Dose,"

20   Patient is Responsible for" and "Co-Insurance Total."

21         You may just want to clear the screen so there is

22   no confusion about the dots.

23   A.   Now, what this is saying is that, you know, they're

24   responsible, the patient is responsible to pay the 20 percent

25   of all these medications.  Of course, they're all going to be

1    different for every patient and, of course, the dose and then

2    the amount.  You know, these are all the things that he does

3    and this is going to be the cost.  And the 20 percent is the

4    574 that he has here.  So that's what they are responsible to

5    pay every time they come in and get their treatments.

6    Q.   Thank you.  I'm now placing onto the overhead projector

7    Exhibit 102B in evidence.  Now, this one appears to be a

8    little bit different than the other ones.  Can you explain

9    what the information at the top means in relation to the

10   information at the bottom below where it says, "Day 8"?

11   A.   You know, is there anything on the bottom of this form?

12   Nothing.  Okay.  This is -- I have never seen this one.  I

13   have seen them separated but not combined together.

14   Q.   Okay.  We can pick another one then.  Exhibit 102C I am

15   placing on the overhead projector.

16   A.   Well, this is the same form as the others.  Of course,

17   the medications that, you know, what they're going to be

18   given, and on the bottom you see shots that may become

19   necessary.  Those are additional injections that the patient

20   is going to be receiving, so all of that they're just letting

21   the patient know that they're going to be applied to them

22   once they begin their chemotherapy, so those are -- that's a

23   separate cost.

24   Q.   Can I ask you this:  I'm going to zoom in a little bit

25   on this.  What does this mean, "$968.18 On days when Avastin

```
 1   is" and it seems to break off right there.  And then over
 2   here "$278.18 On days when Avastin is NOT," the first couple
 3   letters you see are A and D.  Do you have any idea what
 4   that's referring to?
 5   A.    That would be Fatima and Jessica.  They made that
 6   adjustment.  I'm sorry.  I don't know why.
 7   Q.    And what do you understand Avastin to be?
 8   A.    I just know that it's something that's given to our
 9   patients.  I don't know the medical clinical.
10   Q.    Okay.
11   A.    I just know what they're given.  Sorry.
12   Q.    No need to apologize.  I'm going to place Exhibit 102D
13   on the overhead projector.  Can you explain this one?
14   A.    And, of course, that's the same thing.  That's just in
15   another form of what the patient is going to be receiving,
16   the medications and the cost of what they're going to be
17   paying for, and I just review -- I share this with the
18   patient.  They look at it and I tell them what their cost is
19   going to be.
20   Q.    Thank you.  Now, picking up with your testimony before
21   we started talking about co-payments, when did the incident
22   that you described before take place regarding the bag, and,
23   you know, the interaction you had with Dr. Patwardhan?
24   A.    Where did it take place?
25   Q.    No, when.
```

1    A.    It was about the same period in February or so.

2    Q.    And after that incident, did you make any inquiries

3    regarding what you had seen?

4    A.    Yes.  Actually, I started to talk to my staff.  I

5    started to ask questions.  You know, just the way he

6    addressed to me how he was upset made me feel that something

7    was wrong, so I started to ask, what are these, and I started

8    to build trust with my staff.  And they started telling me

9    that these are vials that were coming from Honduras and

10   India.  And I asked other questions, you know, like why is it

11   when UPS comes he makes it, you know, initiative that they

12   have to be transferred immediately to a cool temperature and

13   to address it to my medical staff so that they can go ahead

14   and get the box and do what they need to do, things like

15   that.

16   Q.    Let me ask you this:  When you said "my staff," who are

17   you referring to?

18   A.    The medical assistants, Mindy, Norma, Mayra, all of the

19   medical assistants that worked with me.  I would tell them,

20   you know, that Jessica would come to me and say, every time

21   that UPS comes, make sure that the girls get the box and they

22   put it in the refrigerator to keep the temperature.  So then

23   I would get the girls together and I would tell them, every

24   time UPS comes and they bring a box, make sure that you put

25   it, you know, in a cold temperature.  But then my staff would

1    come to me with questions that I wasn't able to answer.

2    Q.   Did there come a time when you saw a gym bag full of

3    drugs in the chemo lab at the office?

4    A.   Yes.  One time when I started to ask questions when I

5    found out about the Honduras, I asked him, "How are those

6    coming in?"  And Norma was the one who told me they come from

7    Jessica, they come in a Nordstrom's bag.  She comes in here

8    with a Nordstrom's bag and then she puts them in a

9    Nordstrom's box.  So I told her, next time she comes, you

10    know, I want to know.

11    Q.   Thank you.

12          MR. GLUCK:  Objection, it's not responsive, Your

13    Honor.

14          THE COURT:  The objection is overruled.

15    BY MR. WIDMAN:

16    Q.   So what happened next?  Did you at some point see a bag?

17    A.   Actually Norma called me in the chemo lab and she showed

18    me a Nordstrom box and it had all filled chemo, bunch of

19    little vials, bunch of them in a box, Nordstrom.  There was

20    like three of them when I saw them in the lab, three boxes,

21    three Nordstrom.

22    Q.   Did you actually see the vials?

23    A.   Yes.  I saw them quickly and then I left.

24    Q.   Did you see any paper in there, instructions, packaging?

25    A.   No.  I just -- she just wanted to show me quickly, so I

1    just -- she opened the box, I saw them, and then -- there

2    were no instructions, no.

3    Q.   Did there appear to be any mechanism for keeping the

4    drugs cold?

5    A.   No.

6    Q.   Could you tell -- could you describe the temperature of

7    the drugs?

8    A.   Yes.  When I saw the bag, it was just at room

9    temperature.  I mean, it wasn't in a frozen or anything in a

10   box or anything.  Even with the Nordstrom's boxes that I saw,

11   they were just in room temperature.

12   Q.   Did that strike you as odd?

13   A.   Yes, it did, because I don't -- then they would ask me,

14   well, how do we know the ones that are refrigerated and the

15   ones that are in a bag are good, and we started asking all

16   these other questions.  It started to come out that --

17   Q.   Okay.  Now, when you saw drugs come into the office

18   from, I believe you said UPS, were those drugs refrigerated?

19   A.   Yes, they were.

20   Q.   How were they refrigerated?

21   A.   They were in a box and then when you opened the box it

22   had all this special equipment in there to keep it cold, and

23   then from there they would actually put them inside the

24   refrigerator.  We had a refrigerator.  Sorry.

25            THE COURT:  It's not your fault.

1              MR. WIDMAN:  It appears it was the microphone and

2      not you.

3      BY MR. WIDMAN:

4      Q.   So the last part of your answer, could you please repeat

5      it?

6      A.   When the UPS guy would come in, it was in a box, and

7      then when you open the box there were these little material

8      things that they have in it to keep it cold.  And somebody

9      had to sign for it, and then Mayra and Norma would grab

10     whatever they needed and put it in the refrigerator

11     immediately.  They wouldn't leave it out there, to keep it

12     cool temperature.

13     Q.   You mentioned seeing Nordstrom boxes containing vials.

14     Did you see any bags containing vials?

15     A.   No.

16     Q.   Did there come a time when you saw a gym bag containing

17     vials?

18              MR. GLUCK:  Objection, leading.

19              THE WITNESS:  No.

20              THE COURT:  Overruled.  I'm sorry.  I didn't hear

21     your answer.

22              THE WITNESS:  No.

23     BY MR. WIDMAN:

24     Q.   After you saw what you described in the Nordstrom gift

25     boxes in the laboratory, the chemo laboratory, what did you

1    do?

2    A.    After I saw the box, I just -- I left and I started

3    to -- I realized that this was wrong because I don't know

4    what these are and neither did my staff and I don't know if

5    they were --

6              MR. GLUCK:  Objection, nonresponsive.

7              THE COURT:  Sustained.

8    BY MR. WIDMAN:

9    Q.    What did you do next?

10   A.    What I did next is, I just gathered all the information

11   I had and I called the American Board and I informed them of

12   what was occurring, of what was going on in the office

13   that --

14   Q.    When you say the American Board, who are you referring

15   to?

16   A.    The board where you call when something is going on with

17   a patient.

18   Q.    Okay.  Now, at some point after that, did you speak with

19   Agent Crawford from the Food and Drug Administration?

20   A.    Yes.

21   Q.    What was the purpose of that conversation?

22   A.    I informed him that there were medications coming in

23   from Honduras and from India that were not FDA-approved, and

24   I provided him with pictures and what was coming into the

25   office and that patients were not aware of.

```
 1    Q.   And you mentioned a picture.  I'm going to place on the
 2    overhead projector a picture that has already been entered
 3    into evidence as Exhibit 7.  Do you recognize that?
 4    A.   Yes.
 5    Q.   Can you tell us what it is?
 6    A.   It's a gym bag full of medications.
 7    Q.   Do you recognize this as one of the pictures you sent to
 8    the Government?
 9    A.   Yes.
10    Q.   After you spoke with Agent Crawford, what happened next?
11    A.   When I talked to him, I provided him with all of the
12    information that he needed to know.
13    Q.   At some point did you end your employment with
14    Dr. Patwardhan?
15    A.    I resigned.  Actually, after I found the gym bag,
16    everything went down for me, and he actually sent me to the
17    other office, and then I told Jessica.  After I reported and
18    spoke with Matt, I went ahead and gave my resignation because
19    I had already received what I needed to to provide to Matt.
20    Q.   And when you say "Matt," you are referring to Agent
21    Crawford from the FDA?
22    A.   Yes.
23    Q.   So when you left, did you give notice to your employer
24    in advance of your departure?
25    A.   When I went to Jessica Young, I also -- before I went to
```

1    Jessica, I told my staff that I am resigning, I am giving my

2    resignation, so at the same time Mindy, my nurse

3    practitioner, also gave her resignation, and I gave it to

4    Jessica the same day.  And after work we celebrated and did a

5    little toast with Jessica of my farewell.

6    Q.   Ms. Perez, why did you give the pictures to the

7    Government?

8    A.   I did it for the patients.  I didn't do it for Dr. -- I

9    have nothing, you know, regardless between me and

10   Dr. Patwardhan or how he treated me, it has nothing to do

11   with that.  I felt that it was wrong that patients,

12   especially this one patient that I remember, that compelled

13   me to report this, because if she had stage one and if she is

14   getting medications every time that she comes in, how did it

15   advance so fast?  And it's just not me, it's my entire staff

16   that feel this way.  And they have a right to know.  If you

17   want to live, you have a right to know what you're getting.

18           MR. WIDMAN:  United States has no further

19   questions, Your Honor.

20           THE COURT:  Cross-examination.

21                      CROSS-EXAMINATION

22   BY MR. GLUCK:

23   Q.   Good afternoon, Ms. Perez?

24   A.   Good afternoon.

25   Q.   My name is Benjamin Gluck.  Ms. Perez, you just spoke to

```
 1   Mr. Widman about, I think you said that after you gave
 2   everything you needed to give to Matt, you quit?
 3   A.    Mm-hmm.
 4   Q.    And you're referring to Mr. Crawford who is sitting
 5   right here?
 6   A.    Yes.
 7   Q.    You met with Mr. Crawford and other Government agents
 8   many times; is that right?
 9   A.    Yes.
10   Q.    You met with him -- well, when was the first time you
11   spoke with him?
12   A.    I can't remember exactly what time, but before I gave my
13   resignation I was already calling.
14   Q.    You worked for Dr. Patwardhan from about August -- you
15   began in about August or September of 2008; is that right?
16   A.    Around that time.
17   Q.    And you left in March, I think you just said?
18   A.    Right around that time.
19   Q.    And you said that your job was to deal with -- well, you
20   were not involved in the actual provision of medical care,
21   correct?
22   A.    Right.
23   Q.    You were on the --
24   A.    Business.
25   Q.    -- administrative side?
```

```
 1    A.    Right.

 2    Q.    And you handled things like payroll, correct?

 3    A.    Right.

 4    Q.    Insurance eligibility, things like that?

 5    A.    I made sure that that needed to be done.

 6    Q.    Where did you sit in the office?

 7    A.    I sit in the 913 office in the administration.  We have

 8    a room where Dr. Patwardhan sits, and I sit --

 9    Q.    Let me -- you just said 913, are you sure about that

10    address?

11    A.    I'm talking about where the only office that I'm only in

12    where patients are seen.

13    Q.    Is it possible that you actually mean the 918?

14    A.    I'm sorry, it's been awhile.

15    Q.    So it would be 918?

16    A.    Yes.

17    Q.    So that's the office patients would come in to see the

18    doctor in that office?

19    A.    Yes, and that's where I'm at.

20    Q.    And like most medical offices, there is a waiting room

21    outside?

22    A.    Right.

23    Q.    And there is a window or a counter to speak with the

24    staff?

25    A.    Mm-hmm.
```

1    Q.   And are you one of the people behind that counter?

2    A.   No.

3    Q.   So where is your office, is it in a separate room in

4    that location?

5    A.   Yes.

6    Q.   When Elizabeth Regis came to you with the bag that led

7    to the incident you describe where you said that

8    Dr. Patwardhan seemed upset, when she came to you, she -- you

9    said that she said something to the effect of -- well, let me

10   back up.

11         She asked you what to do with the bag, right?

12   A.   Mm-hmm.

13   Q.   And you said to her, "What is this," right?

14   A.   Mm-hmm.

15         THE COURT:  I'm sorry.  You need to answer "yes" or

16   "no."

17         THE WITNESS:  Yes.

18   BY MR. GLUCK:

19   Q.   And she said something to you about or to the effect of

20   you don't know what this is?

21   A.   Right.

22   Q.   She believed that you knew what it was, correct?

23   A.   Correct.

24   Q.   Was it your impression that she thought that you knew

25   what it was?

1    A.    Yes.

2    Q.    After that incident did Elizabeth tell you not to speak

3    to anyone about it?

4    A.    No.

5    Q.    And you did discuss it with other people, correct?

6    A.    Yes.

7    Q.    And eventually you found a receipt -- well, I'm a little

8    confused.  Did you -- I believe Mr. Widman asked you if you

9    saw medicines in Nordstrom boxes, correct?

10   A.    Correct.

11   Q.    And you said you did?

12   A.    Yes.

13   Q.    And then he asked you if you had ever seen medicines in

14   a gym bag and you said that you had not?

15   A.    I'm sorry.  What was the question again?

16   Q.    After he asked you about the Nordstrom's boxes, he asked

17   you if you had ever seen medicines in a gym bag and you said

18   you had not seen medicine in a gym bag?

19   A.    I have seen medicine in a gym bag.

20   Q.    So the picture that he showed you that you sent to the

21   authorities, is that the gym bag you saw?

22   A.    Yes.

23   Q.    And in that gym bag there was an invoice from India; is

24   that right?

25   A.    Yes.

```
 1   Q.   Now, when you met with Mr. Crawford in May of -- May

 2   13th, 2003, you discussed that invoice with him, didn't you?

 3            MR. WIDMAN:  Objection, Your Honor, lack of --

 4   misstates the testimony, 2003.

 5            MR. GLUCK:  I apologize.

 6   BY MR. GLUCK:

 7   Q.   On May 13th, 2008 -- let me just make sure I have that

 8   date correct.  Yes, May 13th, 2008, you met with Mr.

 9   Crawford, correct?

10   A.   Yes.

11   Q.   And you discussed that invoice with him then, correct?

12   A.   Yes.

13   Q.   Do you have a binder up there that would have Exhibit 3

14   in it?  It would be in a binder.

15            THE COURT:  Binder 1, the black binders.

16            MR. GLUCK:  Actually, I believe this exhibit is in

17   evidence.

18            THE COURT:  That's fine.  Go ahead.

19            MR. GLUCK:  I'll just put it up on the screen.

20   It'll be easier.

21   BY MR. GLUCK:

22   Q.   This is a copy of an invoice.  This is a copy of the

23   invoice that was in the gym bag; is that right?

24   A.   All this information was provided by my staff.

25   Q.   Ms. Franco --
```

1          THE COURT:  You need to listen to the question and

2     answer the question that the attorney has asked you.

3     BY MR. GLUCK:

4     Q.   I apologize for getting your name wrong, Ms. Perez.

5               I'm asking if this invoice was in the gym bag?

6     A.   No.

7     Q.   You saw this invoice at some point before you met with

8     Mr. Crawford on May 13th, 2008, correct?

9     A.   Repeat the question.

10    Q.   Did you see this invoice at any time before May 13th,

11    2008?

12    A.   Yes.

13    Q.   Where did you get it from or, I'm sorry, where did you

14    see it?

15    A.   In Dr. Patwardhan's office.

16    Q.   How did that happen that you saw it in Dr. Patwardhan's

17    office?

18    A.   By Norma and Mayra.

19    Q.   Norma and Mayra together showed this to you?

20    A.   Yes.

21    Q.   When was that?

22    A.   Before I reported this to Matt, because I had to have

23    something, I had to have proof.

24    Q.   I'm just asking when.  So you're saying it was at some

25    point --

1    A.    I don't know when, I'm sorry, no.

2    Q.    On May 13th, 2008, you told Mr. Crawford that you are

3    very familiar with Dr. Patwardhan's signature, correct?

4          Well, actually let me back up.

5          Are you very familiar with Dr. Patwardhan's

6    signature?

7    A.    Yes.

8    Q.    And you told that to Mr. Crawford on May 13th, 2008?

9    A.    Yes.

10   Q.    And you also told him that Dr. Patwardhan's signature is

11   on this document.  Would you please point it out.

12   A.    That's not what I said.

13   Q.    You didn't tell him that it was on this document?

14   A.    I said that this is a receipt from one of the bags that

15   he had.

16   Q.    Let me -- did you tell Mr. Crawford on May 13th, 2008,

17   that Dr. Patwardhan's signature is on this document?

18          MR. WIDMAN:  Objection, Your Honor, hearsay.

19          THE COURT:  The objection is overruled.  You may

20   answer.

21          THE WITNESS:  I'm sorry.  What was the question?

22   BY MR. GLUCK:

23   Q.    I will say it again.  Did you tell Mr. Crawford on May

24   13th, 2008, that Dr. Patwardhan's signature appears on this

25   document?

1    A.    No.

2    Q.    You did not say that to him?

3    A.    No.

4    Q.    Did you discuss with him -- well, isn't it true, Ms.

5    Perez, that at that meeting you told Mr. Crawford that --

6    well, among other things, you told him two things, you told

7    him, first, that you are very familiar with Dr. Patwardhan's

8    signature and, second, that it appears on that document?

9            MR. WIDMAN:  Objection, Your Honor, compound

10   question, asked and answered.

11           THE COURT:  Well, it is compound and she has

12   already answered the first question.

13           MR. GLUCK:  I'm sorry, Your Honor, I'm trying to

14   remember which was the first and which was the second.

15           THE COURT:  The first one was, is she familiar with

16   the signature.

17           MR. GLUCK:  Okay.

18   BY MR. GLUCK:

19   Q.    And the second then is, did you tell Mr. Crawford on May

20   13th, 2008, that Dr. Patwardhan's signature appears on this

21   document?

22           MR. WIDMAN:  Objection, Your Honor, asked and

23   answered.

24           THE COURT:  Overruled.   You may answer.

25           THE WITNESS:  What was the question?

```
 1   BY MR. GLUCK:
 2   Q.   I will say it again.  Did you tell Mr. Crawford on May
 3   13th, 2008, that Dr. Patwardhan's signature appears on this
 4   document?
 5   A.   No.
 6   Q.   You're sure about that?
 7   A.   Yes, that's not what we discussed.
 8   Q.   You didn't discuss anything at all about Dr.
 9   Patwardhan's signature being on that document?
10   A.   I just stated this is a receipt that I have.
11   Q.   In other words, all you said was, this is a receipt,
12   right?
13   A.   Yes.
14   Q.   You did not express any opinion at all as to whether Dr.
15   Patwardhan's signature was on it; is that right?
16   A.   Right.
17   Q.   Okay.  And you have a clear recollection of that
18   meeting, right?
19   A.   Right.
20   Q.   Ms. Perez, turning back to some of the exhibits that
21   were discussed before, if you recall, Mr. Widman went through
22   a series of documents beginning with 102 that are essentially
23   acknowledgments from patients about the costs of the
24   medicines they would be receiving, do you recall discussing
25   those?
```

1    A.    Of the medications that the patients need to receive?

2    Q.    Do you recall discussing with Mr. Widman these series of

3    documents?

4    A.    Yes.

5    Q.    Isn't it true, Ms. Perez, that actually many HMOs

6    require patients to acknowledge their payments?

7              MR. WIDMAN:  Objection, Your Honor, lack of

8    foundation.

9              THE COURT:  Overruled.

10   BY MR. GLUCK:

11   Q.    I will ask it again.  Isn't it true that many HMOs and

12   insurance companies require doctor's offices to obtain

13   acknowledgment from the patients as to their share of the

14   expenses?

15   A.    Yes.

16   Q.    And, actually, I believe you testified you have worked

17   for quite sometime in the medical field?

18   A.    Yes.

19   Q.    How long is that?

20   A.    I would say about over 10 years.

21   Q.    Over 10 years.  And you're aware that other offices also

22   require some type of similar acknowledgment from patients?

23             MR. WIDMAN:  Objection, Your Honor, vague as to

24   other offices.

25             THE COURT:  Sustained.  You may reword the question.

1          MR. GLUCK:  I'll move on, Your Honor.

2     BY MR. GLUCK:

3     Q.   Let me just ask a follow-up question on No. 102.  It's

4     already in evidence, and I'll just put it up on the screen.

5          You said that part of your job was to obtain a

6     patient's signature -- actually, let me show the whole

7     thing -- obtain a patient's signature on this document?

8     A.   Yes.

9     Q.   Where would a patient sign this document?

10    A.   Anywhere.

11    Q.   So your job was just to get a signature anywhere on the

12    page?

13    A.   Yes.

14    Q.   You mentioned that you didn't press the patients to

15    actually sign it?

16    A.   Right.

17    Q.   But you did discuss with them their payment

18    responsibilities, right?

19    A.   Yes.

20    Q.   And you told them the truth about how much it would

21    cost, right?

22    A.   Well, yes, because I read -- or not read, but I show

23    them what they give me, yes.

24    Q.   So the only thing you felt uncomfortable about doing --

25    well, I'll back up.

1          You would go over this line by line with them?

2    A.   No, I was informed just to tell them what the cost --

3    Q.   The total?

4    A.   The cost and, of course, this is the plan that he was

5    going to give them, so those were the treatments and the

6    cost.

7    Q.   So using this Exhibit 102 as an example, you would tell

8    the patient, for example, when you come in for treatment,

9    it's going to be your responsibility, Mr. or Mrs. patients,

10   to pay $636.10, you would tell that to the patient?

11   A.   Yes, that was what I was informed to tell the patient.

12   Q.   And you did so, right?

13   A.   Right.

14   Q.   The only thing you felt uncomfortable about was to get

15   the patient to sign that piece of paper, right?

16   A.   Right.

17   Q.   But you knew that part of your job was to get the

18   patient or was to obtain the signature, right?

19   A.   Right.

20   Q.   And, in fact, I believe you said that Jessica Young told

21   you that was part of your job?

22   A.   Right.

23   Q.   You wouldn't do that?

24   A.   She told me.

25   Q.   I'm sorry.  Maybe I wasn't clear.  Despite the fact that

1     it was part of your job, you frequently did not obtain the

2     signatures, correct?

3     A.    Right.

4     Q.    Now, you said that -- I'm going to try to find my notes

5     on this, I'm sorry.  You said that if a patient couldn't

6     sign, couldn't pay it, I'm not sure if you said that you or

7     someone else would talk to Dr. Patwardhan to see if he would

8     still see the patient; is that right?

9     A.    Right.

10    Q.    Who would talk to Dr. Patwardhan?

11    A.    I would tell either Jessica and tell her that the

12    patient, you know, cannot pay this right now up front or

13    Dr. Patwardhan.

14    Q.    And the patient would still be seen though, right?

15    A.    Everything is under Dr. Patwardhan is what he would say.

16    Q.    And he would say the patient should still be seen,

17    correct?

18              MR. WIDMAN:  Objection, Your Honor, hearsay.

19              THE COURT:  Overruled.

20    BY MR. GLUCK:

21    Q.    Do you remember my question.  I'll ask it again.  I'm

22    sorry.  I'll rephrase it.

23              Frequently you would have a patient who would say,

24    for example, the example we used, I don't have $636 to pay,

25    and you have testified that in the end Dr. Patwardhan would

1    be the one who made the decision about whether that patient

2    would be seen or not, right?

3    A.   Right.

4    Q.   And often the decision that he made was that the patient

5    should be seen, correct?

6             MR. WIDMAN:  Objection, Your Honor, vagueness as to

7    often.

8             THE COURT:  Overruled.  That means you may answer.

9             THE WITNESS:  Yes, but they had to pay a certain

10   amount.

11   BY MR. GLUCK:

12   Q.   But even patients who couldn't pay the full amount might

13   still be seen, correct?

14   A.   Correct.

15            THE COURT:  Mr. Gluck, now might be a good time to

16   break for the afternoon recess.

17            All right.  Ladies and gentlemen, we will take a

18   recess this afternoon until 3:00.  Remember the admonitions,

19   do not discuss the case in any fashion or communicate in any

20   fashion with anyone about the case, any of the issues in the

21   case, any of the participants in the case.  Don't do any

22   research about the case, that means consulting reference

23   works, dictionaries, encyclopedias, researching the Internet.

24   Do not make up your mind about the case or any of the

25   evidence or testimony or any issue in the case.

```
 1              Thank you, ladies and gentlemen.  You're excused.
 2                   (Out of the presence of the jury:)
 3              THE COURT:  You may step down, Ms. Perez.
 4              MR. GLUCK:  Your Honor, may the witness be
 5    instructed not to discuss the case with anyone during the
 6    break?
 7              THE COURT:  Ms. Perez, don't discuss your testimony
 8    or the case with anyone until you retake the witness stand.
 9    Thank you.
10              You may be seated, counsel.
11              I've been trying to think of whether or not to
12    raise this because neither side has made an objection on this
13    ground, but because I think both sides, at least as I
14    understand, the only purpose that I can conceive as to why
15    certain questions are being asked by both sides, I'm going to
16    raise this sua sponte.
17              Maybe there is another reason why certain questions
18    are being asked, and you can enlighten me about that, but I
19    just don't -- I can't understand the reasons for certain
20    questions being asked by both sides.  In other words, I think
21    both sides are running afoul of the Rules of Evidence on a
22    couple of issues.  So, like I said, normally I wouldn't --
23    normally I wouldn't raise this.  I'd just wait for one side
24    or the other to make an objection.  Since I think both sides
25    are eliciting testimony from the witnesses that I can't see
```

 1    how it's admissible, I'm going to raise this sua sponte.

 2            And this has been an issue, from my perspective,

 3    from the opening statements onward.  So perhaps there is some

 4    other issue in the case or some other reason that the parties

 5    are doing this, and I invite you to educate me about this,

 6    but both sides have been, throughout the case thus far,

 7    referring in your openings and now through the examinations

 8    of the witnesses referring to character evidence of the

 9    defendant, and the rules are as follows, and you know, pardon

10    me if this sounds basic, but since character evidence is so,

11    you know, to put it sort of broadly, the presumption is that

12    character evidence is inadmissible.  So when I hear it being

13    referred to, I at least sort of go back to the beginning and

14    try to think upon what basis is one side or the other either

15    referring to as an opening statement or eliciting character

16    evidence.

17            So 404(1) says that in a criminal case evidence of

18    a pertinent trait of character as to the defendant offered by

19    the accused is admissible or by the prosecution to rebut the

20    same, so it only comes in by the defense, basically.

21            And then 405(a) says that to the extent that it is

22    admissible, then in the first instance that is when the

23    defense brings it in, it can only be brought in by testimony

24    as to reputation or by testimony in the form of an opinion by

25    a witness as to the defendant's reputation.  But what's not

1    admissible by the defense as to character is, and this is

2    from the comment directly on Rule 405(a) as well as repeated

3    in the cases, specific instances of conduct.

4            So on direct the defense may only elicit evidence

5    regarding Dr. Patwardhan's reputation or the witness' opinion

6    on his character, and then on cross-examination only if the

7    door is opened in that fashion.  Inquiry would be allowed

8    into relevance of specific instances of conduct and as to

9    specific charges, with a limiting instruction that the

10   evidence is being admitted not to prove that the specific

11   incidents took place but, rather, the witness is being asked

12   whether he or she has heard of the specific incidents,

13   because that goes to impeach the opinion that's been offered

14   about the reputation of the defendant.

15           But this is all very different from what's been

16   happening so far, particularly with this last witness.  And

17   yet both sides are doing it without any objection, which is

18   what I find so very puzzling.

19           I also find it puzzling that both sides, without

20   objection pretty much, are introducing evidence on the

21   subject of whether or not there was any danger to the

22   patients about the drugs that were administered.  That's not

23   an element that the Government has to prove.  It's not an

24   element of any of the charged offenses.  And the defense also

25   in its opening made a point that this is one of the things

1    this case is not about.  And so it seems to me that this is

2    not a medical malpractice case, I mean, that's not the way

3    you put it, but you did say in your opening this is not what

4    this case is about.

5            The Government doesn't have to prove that any

6    patient was harmed, and the defense has made a point of that,

7    so why are we having testimony about whether the drugs were

8    not kept at room -- at the correct temperature?  That's not

9    really relevant here.

10           MR. BEHNKE:  Your Honor, the Government does

11   believe that it's relevant because the defendant's whole

12   position in this case is that he believed that what he was

13   doing was appropriate.  He didn't believe that there was

14   anything wrong.  And the fact that the drugs were being

15   transported into the office in a completely different manner

16   than the approved drugs were transported into the office,

17   including the fact that they were not refrigerated,

18   demonstrates that his defense, his belief that what he was

19   doing was appropriate is frankly absurd in the Government's

20   position.

21           THE COURT:  So what you're trying to show by

22   introducing the evidence of the manner in which they were

23   transported or brought into the office, you're trying to show

24   it was clandestine, not because of the difference between the

25   way the FedEx deliveries were made versus being brought in in

1    a gym bag?

2         MR. BEHNKE:  Yes, Your Honor, correct.

3    Essentially, the argument would be, if he believed that it

4    was okay to get these drugs from India and Honduras, why were

5    they not shipped in -- packed in dry ice, you know, to

6    protect them the same way the drugs were brought in -- the

7    approved drugs were brought in from OTN and the other

8    company, NSS, I believe it was.

9         THE COURT:  I understand the difference.  I think I

10   understand the difference about the manner in which they are

11   brought in, but I'm not so sure that this testimony about

12   their not being properly stored at the right temperature

13   really goes to that.

14        MR. BEHNKE:  The relevance -- if the evidence has

15   gone astray from this, then that could be a problem, but the

16   relevance from the Government's perspective is that the drugs

17   were being brought in in this manner, and in being brought to

18   the office in the manner that they were being brought in, the

19   drugs were not properly refrigerated, and the Government

20   believes that that's relevant because we should be able to

21   argue that in light of that, it's simply not plausible that

22   an oncologist such as this would think that that's okay.

23        THE COURT:  Well, the problem is, it doesn't matter

24   if he --

25        MR. BEHNKE:  Their whole defense is he thought it

 1    was okay.

 2                THE COURT:  I understand that part.  I'm having a

 3    hard time understanding the connection between him

 4    thinking -- well, no, I guess I see your point.  Let me let

 5    Mr. Gluck be heard.

 6                MR. GLUCK:  I will say I think the Court is

 7    absolutely right.  Mr. Behnke makes a point that maybe there

 8    was some other problem here, but that doesn't go to the FDA

 9    approval requirements or more specifically in this case which

10    is about labeling.  Whether the ice packs were still cold

11    doesn't go to that, so, you know, perhaps there is some other

12    violation, but that doesn't go to the question of whether it

13    was permitted to be brought in.

14                I should say that some of the testimony on that

15    subject was a bit new to us.  I did not see much reflected in

16    the discovery that people were making that point.

17                THE COURT:  At the very least, I think there should

18    be a limiting instruction to the jury given that there is

19    no -- you know, as to the lack of refrigeration for the

20    chemotherapy, there is no issue in this case.

21                MR. GLUCK:  And one of the things that I have been

22    thinking about, you know, in terms of our case, I mean, we

23    heard Mindy Funk who is the only or the person so far that

24    has the most training, say that actually this medicine, the

25    Docetax or Taxotere, is fine up to 77 or 78 degrees, and you

1  know, we're having -- you know, Norma Franco who isn't

2  really -- her medical qualifications are lower, you know,

3  opine that other stuff needs to be in the refrigerator, and

4  we're going to get into a question on expert testimony of

5  when it is okay.

6          THE COURT:  At the very least, we should have a

7  limiting instruction to the jury that the evidence, the

8  evidence regarding the conditions in which the medicines in

9  the gym bag or the Nordstrom bag were brought in or the lack

10  of refrigeration is only being offered by the Government for

11  the purpose, I guess you're saying of showing knowledge of

12  wrongdoing or intent, at least for the purpose of

13  instructions at the end of the case.

14          MR. GLUCK:  I would think that that might be

15  relevant, that that chain of relevance might work.  If it

16  were a question of hiding something, I can understand the

17  relevance of Jessica Young packing it in a Nordstrom box, but

18  packing it in a gym bag doesn't make it anymore clandestine.

19  If the ice is cold or not cold, the ice packs are there.  It

20  doesn't really go to that issue in terms of whether

21  Dr. Patwardhan was trying to smuggle, because the ice packs,

22  eventually, which again this is new to us, that Miss whatever

23  said that the ice packs were at room temperature by the time

24  they got there.

25          THE COURT:  Well, I think the testimony, if I

1    recall it correctly, it was just that the vials, the

2    medicines were at room temperature.

3                MR. GLUCK:  That's correct.  That doesn't make it

4    anymore or less clandestine.  It doesn't go -- smuggling it

5    doesn't go to intent to defraud Customs about what he was

6    bringing into the country, the temperature of the contents of

7    the bag that he got through Customs one way or another.

8                THE COURT:  I think it depends on what we have

9    heard by the end of the case.  If there is testimony that any

10   of these medications had to be kept -- I think the record is

11   not clear enough at this point, so it's probably too early to

12   discuss a limiting instruction, but I'm a little

13   uncomfortable with the testimony coming in, which I think,

14   from both sides, which I think is tending to mislead or

15   confuse the jury as to the issue of, you know, what the

16   doctor here is accused of -- the defendant here is accused

17   of.  He's not accused of medical malpractice.

18               MR. WIDMAN:  Your Honor, if I may add something to

19   what my colleague AUSA Behnke has said.

20               THE COURT:  Go ahead.

21               MR. WIDMAN:  I want to point out two things.  The

22   vials themselves, many of them say this needs to be

23   refrigerated.

24               THE COURT:  You put that in.  I said the record is

25   not entirely clear yet.

1          MR. WIDMAN:  Judge, when I was attempting to ask

2     the question, I intended to ask, not do these need to be

3     refrigerated, but are they ordinarily refrigerated based on

4     you were in the office, you knew what went in the

5     refrigerator and what went in the cabinet, along those lines,

6     for whatever it's worth.

7          THE COURT:  I think there is going to have to be

8     more testimony on it.  I would let that testimony come in.  I

9     think the jury needs to know it's coming in for one purpose

10    only and not the purpose that -- not the purpose of showing

11    that patients may have been harmed.

12         MR. GLUCK:  Okay.

13         THE COURT:  And I think that's important.  And I

14    know I've gone back and forth on this in the last 30 seconds,

15    but now I'm really -- the more I think about it, I think it

16    needs to be given not at the end of the case, it needs to be

17    given now because, you know, if not -- I mean, we need to

18    take some care in drafting it.  But tonight I want the

19    parties to submit a limiting instruction so I can look at it

20    tomorrow morning and give it to the jury tomorrow.

21         MR. BEHNKE:  Yes, Your Honor.  Along those lines

22    though, while there is not going to be any evidence in the

23    case that a patient was harmed, and, you know, the Court is

24    correct that whether or not any patients actually were harmed

25    by this, you know, is not an element, it is not something --

1           THE COURT:  The Government doesn't need to prove

2      it.  I mean, it's something both sides in a sense need to

3      have the jury aware of, that you don't need to prove that

4      that happened and he doesn't need to defend against it.

5           MR. BEHNKE:  I understand that, Your Honor.  But

6      just from a common sense perspective, what we're dealing with

7      here is a doctor who was bringing drugs from far away places

8      on long trips and when the drugs arrive at his office there

9      is melted -- I believe one of the --

10          THE COURT:  You may want to argue that to the jury.

11     I understand that you're going to want to argue that in terms

12     of the state of mind, the circumstantial evidence and what

13     that means, and I'm not saying you can't do that, but the

14     concern I have is that the jury may make a different

15     inference from that and may be prejudiced or misled or

16     confused.

17          MR. BEHNKE:  I understand.

18          THE COURT:  I don't think the danger of that

19     substantially outweighs the relevance, so under 403 I think

20     it's admissible, but I think we need to instruct the jury

21     about it.

22          Now, as to the character evidence -- we need to

23     take a recess -- but I want the parties to think about this

24     issue, because we're not in the defense case yet and yet

25     character -- there is many levels on which the character

1    evidence rules are being, I think, violated here.  So think

2    about that and we can talk about that at the end of the day.

3    Let's take a recess now.

4                         (Recess)

5                    (In the presence of the jury:)

6                 THE COURT:  Let the record reflect the presence of

7    all members of the jury, all counsel and the defendant

8    present, the witness on the witness stand again.

9                 And you may continue, Mr. Gluck.

10                MR. GLUCK:  Thank you, Your Honor.

11   BY MR. GLUCK:

12   Q.   Ms. Perez, you mentioned earlier what you said about

13   Elizabeth Regis coming to you with the gym bag and then you

14   took that to Dr. Patwardhan and he got upset with you,

15   correct?  You remember that?

16   A.   I remember Elizabeth coming to me with the bag and we

17   walked to where Dr. Patwardhan was at.

18   Q.   You remember discussing earlier today that story?

19   A.   Yes.

20   Q.   And Dr. Patwardhan got upset with you?

21   A.   Yes.

22   Q.   And isn't it true, Ms. Perez, that Dr. Patwardhan and

23   Jessica Perez -- I apologize -- Jessica Young were frequently

24   upset with you about your job performance?

25   A.   No.

1  Q.  Isn't it true that there are a number of written

2  warnings in your file at the office?

3  A.  No.

4  Q.  Do you know if there were any written warnings in your

5  file at the office?

6  A.  Not that I'm aware of.  I know that we -- no, not that

7  I'm aware of.

8  Q.  Isn't it true that Jessica Young and Dr. Patwardhan were

9  generally upset with your -- or generally dissatisfied and

10 upset with the way you did your job?

11 A.  No.

12 Q.  Weren't they also upset about the fact that you lied

13 about having a bachelor's degree?

14         MR. WIDMAN:  Objection, Your Honor, lack of

15 foundation.

16         THE COURT:  Overruled.

17 BY MR. GLUCK:

18 Q.  Do you have a bachelor's degree?

19 A.  Not yet.

20 Q.  You told -- well, did you ever tell Jessica Young that

21 you had a bachelor's degree?

22 A.  No.

23 Q.  Are you enrolled in college now?

24 A.  I'm saving money so I can pay my final classes.

25 Q.  Have you ever been enrolled at the University of Phoenix

1   in San Bernardino?

2   A.   I sure have.  All I need are three classes.

3   Q.   And in -- you began working with Dr. Patwardhan in the

4   summer of 2007; is that right?

5   A.   Around that time.

6   Q.   And you submitted an application, correct?

7   A.   Mm-hmm, yes.

8   Q.   And let me -- well, let me show you -- before I get to

9   that, let me take a step back.

10        Let me ask you to take a look at what will be

11   marked as 224.  Do you have 224 in front of you, Ms. Perez?

12   A.   Mm-hmm.

13   Q.   Just turn to the -- or look at the top right corner of

14   the page.  There are two initials separated by a slash, are

15   those your initials there, JP?

16   A.   Yes, they are.

17   Q.   So this is a document that you initialed on December

18   10th, 2007; is that right?  I'm referring to the date on the

19   top of the page.

20   A.   I'm looking at the date, but I'm looking at what's

21   written here.

22   Q.   Let me ask you, those are your initials?

23   A.   I don't sign my initial that way.

24   Q.   You didn't sign this document?

25   A.   I don't sign my initial that way.

1    Q.   Let me just ask the question again, did you sign this

2    document, Ms. Perez?

3    A.   I don't know about -- that top initial is not my

4    initial.

5    Q.   I'm not referring to --

6    A.   But the --

7    Q.   I'm sorry.  I'm not referring to the initials to the

8    left and above the slash, I'm referring only to the initials

9    to the right and below that diagonal slash where it says

10   "JP"?

11   A.   Mm-hmm.

12   Q.   That's your -- those are your initials, right?

13   A.   Yes.

14   Q.   And that's your signature, right?

15   A.   Right.

16            MR. GLUCK:  Your Honor, the defense would move this

17   document into evidence and seeks permission to publish.

18            THE COURT:  Any objection?

19            MR. WIDMAN:  Your Honor, the Government objects on

20   lack of foundation and whether she has seen the rest of this

21   document, whether that may be her handwriting.

22            THE COURT:  The objection is sustained.

23   BY MR. GLUCK:

24   Q.   Ms. Perez, I'd ask you to just take a moment and look at

25   this document and just -- excuse me -- read it quietly to

1    yourself.

2              Have you read the document?

3    A.    Yes.

4    Q.    Were you or did you receive written discipline in

5    December of 2007 regarding your job performance?

6    A.    Yes.

7    Q.    In fact, that wasn't the only time you received written

8    discipline, was it?

9    A.    As far as I know, yes.

10   Q.    So there wouldn't be any other documents out there with

11   your initials on them reflecting discipline in your personnel

12   file?

13   A.    No.

14   Q.    There should not be, is that what you're saying?

15   A.    Right.

16   Q.    Ms. Perez, in the office hierarchy, Jessica Young

17   supervised you; is that correct?

18   A.    Yes.

19   Q.    And you did receive written discipline in December of

20   2007.  Was Jessica Young involved in imposing that

21   discipline?

22   A.    Jessica is the only one that would go over these items

23   with me, but she did not state that this was a disciplinary;

24   that this is only signed because I understood that these are

25   the things that needed to be taken care of, not that it was a

1    disciplinary action.

2    Q.   I'm sorry.  I won't refer to it as discipline.

3    A.   Okay.

4    Q.   Forgetting that I ever referred to this as discipline,

5    do you recognize this document?

6    A.   Yes.

7    Q.   This is a document you went over with Jessica Young on

8    December 10th, 2007, correct?

9    A.   Mm-hmm.

10   Q.   And you signed it, right?

11   A.   Right.

12          MR. GLUCK:  The defense would move this document

13   into evidence and seek permission to publish it.

14          THE COURT:  Any objection?

15          MR. WIDMAN:   The Government objects on relevance

16   grounds.

17          THE COURT:  The objection is overruled.  I'm sorry.

18   Exhibit 224 is ordered admitted and you may publish.

19   BY MR. GLUCK:

20   Q.   Now, I have highlighted a portion of this, okay, on just

21   the version that I'm going to display.

22   A.   Okay.

23   Q.   Actually, Mr. Widman is helping out so we can all look

24   at the exact same thing.  Ms. Perez, when I was talking

25   before about your initials JP, can you point to the screen or

1    touch the screen to highlight where you see those on this?

2    A.    I see it here and here.

3    Q.    Okay.  I need to zoom out a little bit.  So at the

4    bottom is your initials as well?

5    A.    I don't know who's on top.  This is not mine.

6    Q.    So, just to be clear, what I'm pointing to right now,

7    the JP to the right of the slash is yours?

8    A.    No.

9    Q.    This is not yours?

10   A.    No.

11   Q.    So your initials are where on this?

12   A.    (The witness indicates).

13   Q.    This is yours?

14   A.    Yes.

15   Q.    At the bottom.  All right.  Just to summarize this

16   document, because you already looked through it, am I correct

17   that in certain areas in which you're being told you need to

18   improve your job performance?

19   A.    Yes.

20   Q.    Not using the word "discipline," but this wasn't the

21   only time that written documents were placed in your file

22   that discussed areas in which you needed to improve your job

23   performance?

24   A.    It's the same thing over and over, but, yes.

25   Q.    So when you say, "it's the same thing over and over,"

```
 1    there were many or at least several pieces of paper placed in
 2    your file discussing ways in which you needed to improve your
 3    job performance, correct?
 4    A.    Mm-hmm, yes.
 5              MR. GLUCK:  Ask to place in front of the witness
 6    Defendant's 221.
 7    BY MR. GLUCK:
 8    Q.    Do you recognize this, Ms. Perez?
 9    A.    Sure do, yes.
10    Q.    This is a copy of your resume', isn't it?
11    A.    Mm-hmm.
12    Q.    It is a copy of your resume' that you gave to Jessica
13    Young in connection with your job application, correct?
14    A.    Yes.
15    Q.    You see at the top it says University of Phoenix of San
16    Bernardino, California, BS in business management, you see
17    that?
18    A.    Mm-hmm.
19    Q.    And then it says June 2007, do you see that?
20    A.    Uh-huh.
21    Q.    You submitted this to Ms. Young at the beginning of
22    August 2007, correct?
23    A.    When we were interviewing around that time.
24    Q.    So it was after June 2007, right?
25    A.    Mm-hmm.
```

1    Q.   And in fact when you came in for -- I'm sorry.  I should

2    ask to move this exhibit into evidence and publish it.

3              THE COURT:   Any objection to 221?

4              MR. WIDMAN:   United States has no objection, Your

5    Honor.

6              THE COURT:   Thank you.  221 is ordered admitted.

7    You may publish.

8              MR. GLUCK:   Thank you, Your Honor.

9    BY MR. GLUCK:

10   Q.   And just to -- well, first, if you can press the bottom

11   right corner of that screen to get rid of the -- thank you.

12             All right.  This is a copy of your resume'?

13   A.   Mm-hmm.

14   Q.   Just go over it again now that it's on the screen.

15   Jessica Perez, that's you?

16   A.   Mm-hmm.

17   Q.   You met with Ms. Young sometime around August 2007,

18   correct?

19   A.   Mm-hmm.

20   Q.   And on your resume' you indicated University of Phoenix,

21   San Bernardino, California, BS in business management,

22   correct?

23   A.   Yes.

24   Q.   And the date right there says June 2007, correct?

25   A.   I am attending University of Phoenix, June 2007.

1    Q.   I'm sorry.  Where do you see the word "attending"?

2    A.   That is attending.  And in the bottom where it says

3    "contracting," and all that is still present.  That November

4    period --

5    Q.   I'm sorry.  I'm asking very specifically where on this

6    does it say the word "attending" or does it say?

7    A.   It says present, till present.

8    Q.   You submitted this to Ms. Young in August 2007 or  about

9    the beginning of August 2007?

10   A.   Around that time.

11   Q.   Does it say here that you're attending the University of

12   Phoenix in August 2007?

13   A.   This -- I know that this is the resume' that I

14   represented, but that's not what I had.  This is not making

15   sense.

16   Q.   You wrote it, Ms. Perez, didn't you?

17   A.   No, I know I did.  I need a little bit of time here.

18   Q.   Well, actually --

19   A.   I know what I submitted in and I know that I put

20   present, and it's not showing on this resume'.

21   Q.   Well, let me ask you a question.  The resume' I just

22   showed you that doesn't have the word "present" --

23   A.   Right.

24   Q.   -- is not the resume' you submitted?

25   A.   No, it had present.  This is a copied resume'.

1    Q.   Well, let's be specific.  Is this an altered document?

2    This is not -- I'm sorry.  I'll try to make my question as

3    clear as possible.

4              The document as I have showed it to you --

5    A.   Mm-hmm.

6    Q.   -- the typewritten portions on the document, I'm not

7    talking about anybody who might have written on it or

8    redacted or whatever later, the typewritten portion of the

9    document, it's your testimony here under oath that this is

10   not the same as what you submitted to Ms. Perez in August of

11   2007?

12   A.   To Mrs. Young, yes.

13   Q.   I do apologize.

14             THE COURT:  Wait.  One question.  Just one question

15   at a time.  And then wait until he finishes his question

16   before you begin your answer, all right?

17             THE WITNESS:  Okay.

18   BY MR. GLUCK:

19   Q.   And I do apologize I keep making that mistake with both

20   of your last names.

21             Is it your testimony under oath that the

22   typewritten portion of this document is not the same as what

23   you submitted to Jessica Young in August 2007, "yes" or "no"?

24   A.   No.

25   Q.   It's not your --

1    A.    It had "to present."

2    Q.    And this document is different?

3    A.    It's a copied document.

4    Q.    Okay.  You haven't graduated yet, have you?

5    A.    No.

6    Q.    You have not?

7    A.    No.

8    Q.    When do you expect to graduate, Ms. Perez?

9    A.    I'm actually enrolling because I need money to finish my

10   college degree.

11   Q.    You received an offer from Dr. Patwardhan to go work

12   there, correct?

13   A.    Mm-hmm.

14   Q.    And you received that offer on August 13th, 2007,

15   correct?

16   A.    Mm-hmm.

17             MR. GLUCK:  We would ask to have placed in front of

18   the witness Exhibit 223.

19   BY MR. GLUCK:

20   Q.    Is this document familiar to you, Ms. Perez?

21   A.    Yes.

22   Q.    You received this document sometime in August 2007?

23   A.    Yes.

24   Q.    And turn to the last page, please.  Is that your

25   signature there?

1    A.   Yes.

2              MR. GLUCK:  The defense requests or moves to admit

3    Exhibit 223 and asks to publish to the jury.

4              THE COURT:  Any objection?

5              MR. WIDMAN:  No objection, Your Honor.

6              THE COURT:  Thank you.  Exhibit 223 is ordered

7    admitted.  You may publish.

8    BY MR. GLUCK:

9    Q.   Ms. Perez, I'm going to put a version on the screen here

10   and I've highlighted a portion of that, it's not highlighted

11   on your portion, but that's the portion I want to discuss

12   with you.

13             Do you see the second paragraph --

14   A.   Yes.

15   Q.   -- that I've highlighted in pink?

16   A.   Yes.

17   Q.   Would you read the first sentence of that, please?

18   A.   "Dr. Patwardhan is relying on your experience,

19   educational background and skill to perform the above

20   responsibilities.  He also reserves his right to modify,

21   delete, add or change some of these responsibilities."

22   Q.   Thank you.  So it was pretty clear to you that

23   Dr. Patwardhan and Jessica Young thought that your

24   educational background was important, right?

25   A.   Thought, yes.

```
 1    Q.   They thought that it was important in terms of
 2    performing your job, correct?
 3    A.   Mm-hmm.
 4    Q.   Let me just show you one more exhibit, which would be
 5    Defendant's 226.  Actually, let me ask you a question while
 6    it's coming up.  You said before that you have three more
 7    classes or what was it?
 8    A.   Yes.  I have about three classes to finish my degree,
 9    but because of the money that I have to come up with I can't
10    afford to pay those.
11    Q.   Do you recognize 226?
12    A.   Yes.
13    Q.   That's your resume', isn't it?
14    A.   Mm-hmm.
15           THE COURT:  I'm sorry.  Remember to say yes.
16           THE WITNESS:  Yes.
17    BY MR. GLUCK:
18    Q.   That is a resume' prepared by you?
19    A.   Yes.
20           MR. GLUCK:  The defense moves 226 be admitted and
21    published.
22           THE COURT:  Any objection?
23           MR. WIDMAN:  No objection, Your Honor.
24           THE COURT:  Thank you.  226 is ordered admitted.
25    You may publish.
```

1          MR. GLUCK:  Thank you, Your Honor.

2   BY MR. GLUCK:

3   Q.   Is this another copy of your resume'?  Do you know when

4   this is from?

5   A.   No.

6   Q.   Ms. Perez, let me -- you discussed earlier today that

7   you had -- you made a telephone call to the American Board

8   about the medicine that you saw.  Do you remember that?

9   A.   Mm-hmm, yes.

10  Q.   That was sometime in March of 2008, March 2008; is that

11  right?

12  A.   When I called the American Board?

13  Q.   Yes.

14  A.   I'm unsure exactly when the time period was.  I just

15  knew that I started calling in February, around February and

16  on.

17  Q.   Isn't it true that at some point you spoke to an FDA

18  representative in New York?

19  A.   Yes.

20  Q.   And you spoke anonymously?

21  A.   Yes.

22  Q.   And you said you were going to send some pictures there

23  via e-mail?

24  A.   Yes.

25  Q.   And you made a mistake and sent your resume' instead of

1   the pictures?

2   A.   Yes.

3   Q.   Is this your resume' that you sent?

4   A.   Yes.

5   Q.   And here it says that you graduated the University of

6   Phoenix in April 2008, correct?

7   A.   That's not -- that's wrong.

8   Q.   You wrote that?

9   A.   Yes, I did, but that's incorrect.

10  Q.   In fact, you have never graduated, correct?

11  A.   Right.

12  Q.   But you're certain that you have attended?

13  A.   Yes.

14  Q.   How is it possible -- well, could you explain why the

15  University of Phoenix might not have any record of your

16  attendance at all?

17  A.   Do you want me to give you my IRN number?

18  Q.   Well, actually, I'm asking, did you attend under some

19  other name?

20  A.   No.  My name is Jessica Michelle Perez and I have

21  attended University of Phoenix, and when I had my daughter in

22  2004, I couldn't pay anymore because my financial -- I was

23  gone from University of Phoenix for sometime that the

24  financial wouldn't -- because I was over my time period, so

25  now I'm paying now for my financial and now I have to come up

1    with the rest of the money myself.

2    Q.   All right.  But just answer my question, you never

3    attended the University of Phoenix under any name other than

4    Jessica Michelle Perez, correct?

5    A.   Sir, I know.

6         THE COURT:  Just answer the question.

7         THE WITNESS:  Yes.

8    BY MR. GLUCK:

9    Q.   Going back to the subject I was asking you about

10   earlier, again, I don't want to use the word "discipline," so

11   I will leave that aside.  But going back to the subject that

12   I was talking about earlier -- actually, sorry, let me start

13   again.

14        There was a point when Jessica Young became

15   concerned that you had not, in fact, graduated yet from the

16   University of Phoenix, correct?

17   A.   Repeat that again, sir.

18   Q.   There was a point while you were working at Dr.

19   Patwardhan's office that Jessica Young became concerned that

20   you had not actually graduated from the University of

21   Phoenix, correct?

22   A.   She did not.

23   Q.   She never discussed with you --

24   A.   Never discussed anything with me at all.

25   Q.   About?

1    A.    About that, no.

2    Q.    But it's fair to say that there were at least written

3    documents placed in your file about areas in which you needed

4    to improve your performance?

5    A.    Right.

6    Q.    And is it fair to say that Dr. Patwardhan was sometimes

7    upset about your job performance?

8    A.    Yes.

9    Q.    And is it fair to say that Dr. Patwardhan sometimes

10   became impatient with you?

11   A.    Yes.

12   Q.    Did Dr. Patwardhan ever express that impatience with

13   you?

14   A.    I'm sorry?

15   Q.    Did Dr. Patwardhan ever express his impatience?

16   A.    Oh, yes.

17   Q.    So the time that he got upset when you came in with the

18   bag wasn't the only time he got upset with you; is that right?

19   A.    He was always upset.

20   Q.    About lots of different things?

21   A.    Everything.

22   Q.    Even things that didn't have anything to do with

23   medicine from India?

24   A.    Even if it had nothing to do with me.

25   Q.    I'm asking, was he upset with you?

1    A.    That day?

2    Q.    Was Dr. Patwardhan upset with you about things other

3    than this bag incident?

4    A.    I can't recall that.  I just knew that he was upset when

5    I brought him the bag at the time.

6    Q.    Just a moment ago I believe you told me that that wasn't

7    the only time Dr. Patwardhan was upset.  Do you recall that?

8    A.    Yes.

9    Q.    So I'm talking about the other times when he was upset,

10   do you recall any of those times?

11   A.    No.

12   Q.    Okay.  Let me break this down.  There were other times

13   Dr. Patwardhan was upset with you other than the bag

14   incident; is that correct, "yes" or "no"?

15   A.    Yes.

16   Q.    And the other times he was upset with you were not about

17   carrying a bag of medicine from India, correct?

18   A.    Right.

19          MR. GLUCK:  Your Honor, may I have just a moment?

20   BY MR. GLUCK:

21   Q.    Earlier today you testified that you never told Mr.

22   Crawford that Dr. Patwardhan's signature was on that receipt

23   that we looked at, I believe it was Exhibit 7.  I'll display

24   Exhibit 7 again, which is -- I apologize, it's not 7, it's

25   3.  I will display Exhibit 3 which is already in evidence.

1          Do you remember discussing this?

2     A.    Yes.

3     Q.    And you said that you had not -- well, you don't see Dr.

4     Patwardhan's signature on here, right?

5     A.    Right.

6     Q.    And you said that you didn't tell Mr. Crawford that his

7     signature was on there, correct?

8     A.    Correct.

9     Q.    Did you tell anyone else that Dr. Patwardhan's signature

10    was on there?

11    A.    I only talked to Matt.

12    Q.    Did you ever in any meeting with the Government tell

13    anyone that Dr. Patwardhan's signature was on there?

14    A.    No, I just gave them all of these documents.

15    Q.    There was only one invoice though, correct, that you

16    gave them?

17    A.    Yes.

18    Q.    You never discussed it with anyone -- well, let me move

19    to something else for just a moment.

20          You had several meetings with the Government.  You

21    met with the Government -- when I say "Government," I include

22    Mr. Crawford, Mr. Widman, Mr. Behnke and Mr. Fernandez and --

23    well, you actually testified in the Grand Jury, so let's go

24    through those in order.

25          On May 13th, 2008, you met with Mr. Crawford,

1    correct?

2             MR. WIDMAN:  Objection, Your Honor, relevance.

3             THE COURT:  Overruled.  You may answer.

4             THE WITNESS:  Yes.

5    BY MR. GLUCK:

6    Q.   And you met with him on May 15th, 2008, you met with Mr.

7    Fernandez, correct?

8    A.   I met with them together.

9    Q.   Okay.  Was it about that time, in the middle of May?

10   A.   I can't recall the time.  I just remember that Matt and

11   Mr. Fernandez went to my home, both of them together.

12   Q.   And then about two weeks later, on May 30th, 2008, you

13   met with Mr. Crawford?

14   A.   Around that time, yes.  We've been communicating after I

15   communicated with somebody, yes.

16   Q.   And on September 9th, 2008, you met with Mr. Crawford

17   and Mr. Widman?

18   A.   I don't know who Mr. Widman is.

19   Q.   This man here.

20   A.   Oh, yes, I'm sorry.

21   Q.   And on September 10th, 2008, you testified in the Grand

22   Jury.  Do you remember that?

23   A.   Right.

24   Q.   Do you remember taking an oath to tell the truth in the

25   Grand Jury?

1    A.    Mm-hmm.

2    Q.    Is that "yes"?

3    A.    Yes.

4    Q.    Did you tell the truth in the Grand Jury?

5    A.    Yes.

6    Q.    On each of these instances, starting from the earliest

7    one through the final one, you tried your best to tell the

8    true and complete story of what happened; is that right?

9    A.    Yes.

10   Q.    You told Mr. Fernandez on -- well, at this -- apparently

11   at this meeting on May 13th or 15th, but you told Mr.

12   Fernandez that you believed that Dr. Patwardhan knew that you

13   had reported him to law enforcement.  Do you recall that?

14            MR. WIDMAN:  Objection, Your Honor, hearsay.

15            THE COURT:  Objection sustained.

16   BY MR. GLUCK:

17   Q.    Ms. Perez, in May of 2008, did you know whether

18   Dr. Patwardhan knew that you had reported him to law

19   enforcement?

20   A.    I don't recall that.

21   Q.    You don't recall knowing that he --

22   A.    Go ahead and repeat the question.

23   Q.    I'm sorry.  Going back to May of 2008, did you have any

24   information as to whether Dr. Patwardhan knew that you had

25   reported him to law enforcement?

1    A.    I did not speak to Dr. Patwardhan in May, no.

2    Q.    Did somebody speak to you about Dr. Patwardhan and

3    whether he knew -- about whether he knew you reported him to

4    law enforcement?

5    A.    Yes.

6    Q.    Who spoke to you?

7    A.    My staff are the only people that were involved.

8    Q.    In May of 2008, you were no longer working at

9    Dr. Patwardhan's office, correct?

10   A.    Right.

11   Q.    You left Dr. Patwardhan's office before or after you

12   first talked to law enforcement?

13   A.    I was talking to -- I was already calling in February,

14   March, within that time period and April.

15   Q.    Isn't it true that you actually never spoke to the FDA

16   until after you left Dr. Patwardhan's office?

17   A.    I don't understand.

18   Q.    Isn't it true that you never spoke to anyone from any

19   office of the FDA until after you left Dr. Patwardhan's

20   office?

21           MR. WIDMAN:   Objection, Your Honor, lack of

22   foundation.

23           THE COURT:   Overruled.

24           THE WITNESS:   I spoke to the FDA around sometime

25   in, I don't know, March -- February, March or April, within

1    that period.  I'm sorry.  I can't recall the dates that

2    you're giving me.

3    BY MR. GLUCK:

4    Q.   Okay.  Your last day at Dr. Patwardhan's office was

5    when?

6    A.   March, beginning of March.

7              MR. GLUCK:  I'll ask that the witness be shown

8    Exhibit 225.

9    BY MR. GLUCK:

10   Q.   Do you recognize that document?

11   A.   Yes.

12   Q.   Is that your signature on the bottom?

13   A.   Yes.

14             MR. GLUCK:  The defense moves 225 into evidence.

15             THE COURT:  Any objection?

16             MR. GLUCK:  And seeks to publish.

17             MR. WIDMAN:  No objection, Your Honor.

18             THE COURT:  Thank you.  225 is ordered admitted and

19   you may publish.

20             MR. GLUCK:  Thank you, Your Honor.

21   BY MR. GLUCK:

22   Q.   That's your signature at the bottom there, Ms. Perez,

23   correct?

24   A.   Yes.

25   Q.   So is all that your handwriting?

1    A.    No.

2    Q.    This is your signature at the bottom, correct?

3    A.    Yes.

4    Q.    Is this your handwriting?

5    A.    I don't know why that's the way it is, but I know that I

6    resigned.

7    Q.    Does this document -- having seen this document, isn't

8    it true that you resigned on March 4th, 2008 at 2:36 p.m.?

9    A.    Yes.

10   Q.    And your resignation was "effective today, my last is

11   3-4-08."  Do you see that?

12   A.    Yes.

13   Q.    So your last day working for Dr. Patwardhan was March

14   4th, 2008, correct?

15   A.    Mm-hmm, yes.

16   Q.    Did you first speak with anyone from the FDA before or

17   after that time?

18   A.    I was speaking to them already.  I was already getting

19   ahold of people as of February and March.

20   Q.    Let me be very specific.  People from the FDA, when you

21   spoke to people from the FDA, was it before or after your

22   last day at Dr. Patwardhan's office?

23   A.    Before -- around that time.  I'm sorry.  I can't recall

24   the dates.

25   Q.    But going back to the middle of May that I was just

1    discussing before, you were no longer working at Dr.

2    Patwardhan's office in May, correct?

3    A.    Right.

4    Q.    When you met with Agent Fernandez and Agent Crawford in

5    the middle of May, you were no longer working at Dr.

6    Patwardhan's office, correct?

7    A.    Right.

8    Q.    Between March the 4th and May, or the middle of May, did

9    you have conversations with people who worked for Dr.

10   Patwardhan's office?

11   A.    Yes.

12   Q.    Did any of them tell you that Dr. Patwardhan knew that

13   you had reported him to law enforcement?

14   A.    Yes.

15   Q.    Who told you?

16   A.    Norma and Mayra.

17   Q.    Norma Franco?

18   A.    Yes.

19   Q.    And Mayra Jaurequi?

20   A.    Yes.

21   Q.    You told that to Mr. Fernandez, correct?

22   A.    Later when I found out I told them.

23   Q.    Okay.  All right.  Thank you.

24          I'm going to move on from that.

25          When you spoke with the FDA around late February

1    beginning of March, whenever that was in there I believe you

2    said it was, when you spoke with the FDA, you told the FDA

3    that Dr. Patwardhan leaves receipts around the office,

4    correct?

5    A.   That's not what I said to the FDA.  I just provided them

6    with -- I'm sorry, no.

7    Q.   Thank you.  And you told the FDA that Dr. Patwardhan

8    didn't deny using drugs from India, correct?

9              MR. WIDMAN:  Objection, Your Honor, hearsay.

10             THE COURT:  Sustained.

11   BY MR. GLUCK:

12   Q.   Let me ask it this way:  Did you tell the FDA that

13   Dr. Patwardhan denied using drugs from India?

14             MR. WIDMAN:  Objection, Your Honor, hearsay.

15             THE COURT:  Sustained.

16   BY MR. GLUCK:

17   Q.   Let me cover one area that you spoke about this

18   morning.  Do you remember discussing the Pomona hospital and

19   the passport?  Do you remember that testimony?

20   A.   Yes.

21   Q.   And I believe you said that you think it was Pomona

22   hospital, you're not sure?

23   A.   Right.

24   Q.   It might have been a different hospital?

25   A.   Right.

1    Q.   And it had something to do with credentialing?

2    A.   Right.

3    Q.   What is credentialing?

4    A.   Well, credentialing is actually filling out an

5    application making sure the malpractice and the license is

6    not expired.

7    Q.   Okay.  And credentialing has to do with health care

8    facilities; is that right?

9    A.   It could be anything.  It's just making sure that the

10   credentials are updated, meaning the malpractice and the

11   license and office, yes, all of that is part of

12   credentialing.

13   Q.   But to be specific, a doctor who is credentialed by a

14   hospital can see patients at that hospital?

15   A.   Yes.

16   Q.   You said that Dr. Patwardhan was upset with you because

17   you sent his passport to Pomona hospital because they would

18   be able to see how often he traveled to India.

19           MR. WIDMAN:  Objection, Your Honor, misstates the

20   evidence.

21           THE COURT:  Excuse me.  I have to rule on the

22   objection.  The objection is overruled.

23   BY MR. GLUCK:

24   Q.   Let me try to get that out again.  You said that

25   Dr. Patwardhan was upset that you had sent his passport to

1    Pomona hospital because Pomona hospital would be able to see

2    how often he traveled to India?

3    A.    That's not what I said.

4    Q.    Okay.  Why was Dr. Patwardhan upset?

5    A.    He was upset because where we sent this application it

6    was asking for a second ID, remember?

7    Q.    I need to ask the questions.  And you sent -- as a

8    second ID, you sent a passport?

9    A.    Yes, they were asking.

10   Q.    And it's your testimony that he was upset that you had

11   sent any second ID?

12   A.    Yes.

13   Q.    He didn't want you to send any second ID at all?

14   A.    No.

15   Q.    It wasn't that it was a passport and having something to

16   do with foreign travel?

17   A.    I'm sorry?

18   Q.    Did the fact that Dr. Patwardhan was upset have anything

19   to do with the fact that it was a passport that you sent in

20   other than just ID?

21   A.    He just wanted the ID.

22   Q.    Ms. Perez, did you understand that Pomona hospital could

23   somehow obtain Dr. Patwardhan's travel history?

24   A.    No.

25   Q.    Do you know of any way that a hospital can do that?

1    A.    No.

2    Q.    So when Jessica Young indicated to Dr. Patwardhan to not

3    speak about this issue, it was not your impression that it

4    had anything to do with travel, correct?

5              MR. WIDMAN:  Objection, Your Honor, relevance.

6              THE COURT:  Overruled.

7              THE WITNESS:  I'm sorry.  Can you repeat that one

8    more time?

9    BY MR. GLUCK:

10   Q.    When Jessica Young indicated to Dr. Patwardhan -- well,

11   let me break it down.

12             You said this morning that Jessica Young had made

13   some kind of a motion to the effect or expressing that

14   Dr. Patwardhan should be quiet?

15   A.    Right.

16   Q.    And you were in this meeting, correct?

17   A.    Yes.

18   Q.    And then when she made that motion the meeting stopped?

19   A.    Right.

20   Q.    And you left?

21   A.    She told me to leave, yes.

22   Q.    And you left?

23   A.    Yes.

24   Q.    So it's not your -- I'm not going to say it in the

25   negative.

1          The reason that it was your impression as to the

2    reason why the conversation ended and you were told to leave

3    didn't have anything to do with foreign travel; is that right?

4    A.   It did, yes, in that conversation it was -- in that

5    conversation I felt that travel was some type of an issue, I

6    guess.

7    Q.   Did Dr. Patwardhan tell you travel was an issue?

8          MR. WIDMAN:  Objection, Your Honor, hearsay.

9          THE COURT:  Overruled.

10   BY MR. GLUCK:

11   Q.   You can answer if you remember my question.

12   A.   Yes.

13   Q.   He told you that travel was an issue?

14   A.   Right then and at that moment, yes.

15   Q.   So he told you that -- so Dr. Patwardhan told you that

16   he was upset that you sent his passport to Pomona hospital

17   because travel was an issue; is that your testimony?

18   A.   Because the Government can find out how many times he

19   has traveled.

20   Q.   Is Pomona hospital the Government?

21   A.   It's in regards to the application.

22   Q.   For credentials from Pomona hospital, correct?

23   A.   He had that in his hand.

24   Q.   And wasn't it your testimony just a minute ago that you

25   don't know any way that a hospital can find out about travel

1    records?

2    A.   No.   That's why I don't understand why I was even in the

3    meeting to begin with, why would I -- why would anybody care.

4    Q.   Okay.   So, Ms. Perez, you have no -- you do not believe

5    that a hospital can find out travel records, correct?

6              MR. WIDMAN:   Objection, Your Honor, asked and

7    answered.

8              THE COURT:   Sustained.

9    BY MR. GLUCK:

10   Q.   Ms. Perez, the Government -- do you know whether the

11   United States Government generally has people's travel

12   records?

13             MR. WIDMAN:   Objection, Your Honor, relevance.

14             THE COURT:   Sustained.

15   BY MR. GLUCK:

16   Q.   I'll move on to something else.   You remember -- I'm

17   going to put it up one more time.   You remember discussing

18   Exhibit 3?

19   A.   Yes.

20   Q.   You remember that you've testified that Dr. Patwardhan's

21   signature is not on there?

22   A.   Yes.

23             MR. GLUCK:   I would ask that Exhibit 227 be placed

24   in front of the witness.

25             Your Honor, may I inquire as to prior testimony,

1     the procedure, before the witness reads the document?

2              THE COURT:  All right.  So this is testimony that

3     was given under oath in an earlier proceeding, that means,

4     ladies and gentlemen, that it was given by the witness in

5     another court proceeding under the same oath, under the same

6     penalty of perjury as she has taken in your presence in this

7     proceeding.

8              So if you wish to inquire, Mr. Gluck, then just

9     give page and line number before you ask so that we can all

10    find our place, and then you may proceed if there's no

11    objection.

12             MR. GLUCK:  I would like to inquire from page 10,

13    line 22 through page 11, line 7.

14             THE COURT:  Any objection?

15             MR. WIDMAN:  Yes, Your Honor, objection on hearsay

16    grounds.  There is no prior inconsistent statement.

17             THE COURT:  Sustained.

18             MR. GLUCK:  Thank you, Your Honor.

19             Your Honor, may I have a moment?

20             THE COURT:  Yes.

21    BY MR. GLUCK:

22    Q.   Ms. Perez, you talked a bit about -- well, we've

23    discussed the gym bag, correct?  You talked a bit with Mr.

24    Widman about the medicines from Honduras?

25    A.   Yes.

1   Q.   And how many times did you see medicine from Honduras?

2   A.   One time.

3   Q.   How did you know that they came from Honduras?

4   A.   Because my staff informed me.

5   Q.   Would Jessica Young tell people before she traveled to

6   Honduras that she was going there?

7   A.   Yes, and she would tell me that she was leaving.

8   Q.   When she came back, she brought medicine with her?

9   A.   Yes.

10  Q.   And you said that you once saw the box of medicine,

11  where did you see that?

12  A.   In the chemo lab.

13  Q.   And where is the chemo lab?

14  A.   It's inside of -- it's right by the front office.  It's

15  on the left-hand side.

16  Q.   Where in the chemo lab did you see it?

17  A.   Jessica brought in the bag and set it on top of the

18  counter and called Norma to do whatever she had to do and

19  then Norma called me.

20  Q.   This was about the same time or around the same month as

21  the gym bag?

22  A.   I don't know.

23  Q.   Let me ask you this:  From the very first time you saw

24  foreign medicine, either from India or Honduras, how much

25  time passed before you quit?

1    A.   After I gathered all of the information that I needed, I

2    resigned.

3    Q.   How long do you think that took?

4    A.   Sometime.

5    Q.   Weeks?  Months?

6    A.   I don't know.  It just -- all I know is I had to get

7    what I had to get and I had to get out of there.

8    Q.   During that period, did you talk to Dr. Patwardhan about

9    your concerns?

10   A.   No.

11   Q.   Did you talk to Velma Yep about your concerns?

12   A.   No.

13   Q.   Velma Yep is a nurse practitioner there, right?

14   A.   Mm-hmm.

15   Q.   Did you talk to Jessica Young about your concerns?

16   A.   No.

17   Q.   You talked to many other employees, though, about your

18   concerns?

19   A.   Yes, I did.

20   Q.   Were you -- well, have you ever told anyone that you

21   expect to make money off this case as a whistle blower?

22   A.   I'm expecting nothing from this case, nothing.

23   Q.   My question was whether you have ever told that to

24   anyone?

25   A.   Never, no.

1    Q.    Even though you were on the business side not the

2    medical side of it -- well, let me be more clear.

3           We talked before you were involved in billing and

4    things like that?

5    A.    I'm sorry?

6    Q.    Were you actually involved in the provision of medical

7    care to patients?

8    A.    I only know the business aspect of it.

9    Q.    And that's all you did at Dr. Patwardhan's office?

10   A.    Right.

11   Q.    Was there any part of the office that you were

12   prohibited from entering?

13   A.    No.

14          MR. GLUCK:  Your Honor, if I may have one moment to

15   check?  I think I'm finished.

16          I have no further questions.

17          THE COURT:  Thank you.  Redirect examination.

18          MR. WIDMAN:  Thank you, Your Honor.

19                    REDIRECT EXAMINATION

20   BY MR. WIDMAN:

21   Q.    Hello again, Ms. Perez.

22   A.    Hi.

23   Q.    Now, you've testified on cross-examination about the

24   circumstances surrounding you getting hired in Dr.

25   Patwardhan's office.  Do you remember that?

```
 1    A.    Yes.
 2    Q.    And I believe you testified that Jessica Young -- that
 3    you had one or more meetings with Jessica Young about that;
 4    is that right?
 5    A.    Right.
 6    Q.    Now, with respect to this resume', did you tell Jessica
 7    Young that you were still attending school?
 8    A.    Yes, I did.
 9    Q.    And turning to the second resume' that Mr. Gluck showed
10    you, I believe you testified that you sent it to a federal
11    law enforcement officer in New York --
12    A.    Yes.
13    Q.    -- is that right?
14    A.    Yes.
15    Q.    And I believe you testified also that you didn't -- that
16    you inadvertently attached it to an e-mail?
17    A.    Yes.
18    Q.    So is it fair to say that you didn't actually intend to
19    send this to anyone?
20    A.    That's right, yes.
21    Q.    I would also like to talk to you a little bit about that
22    performance review or notes concerning your performance that
23    were in the file.  Those notes have any bearing on your
24    willingness to come forward with the photographs to the
25    Government?
```

1             Would you like me to repeat the question?

2    A.   Yes.

3    Q.   Was there any connection between those notes being in

4    your file and your decision to come forward to the

5    authorities in this case?

6    A.   No.  I came here because the patients needed to know

7    what was happening.

8             MR. GLUCK:  Objection --

9             THE COURT:  The objection is overruled.

10   BY MR. WIDMAN:

11   Q.   Let me ask you this:  Why did you come forward?

12   A.   I came forward because there was a patient that

13   Dr. Patwardhan had.

14            MR. GLUCK:  Objection, Your Honor, 403.

15            THE COURT:  Sustained.

16   BY MR. WIDMAN:

17   Q.   Allow me to ask you more generally.  In general, why did

18   you come forward?

19   A.   Because it was wrong.

20            MR. WIDMAN:  No further questions, Your Honor, from

21   the United States.

22            THE COURT:  Thank you.

23            Thank you.  You're excused.  You may step down.

24            Do you have another witness for this afternoon?

25            MR. BEHNKE:  Yes, Your Honor, we have further

1    witnesses.

2              THE COURT:  Thank you.

3              MR. BEHNKE:  Government calls Katherine Walton.

4              THE CLERK:  Please raise your right hand.

5         PLAINTIFF'S WITNESS, KATHERINE WALTON, WAS SWORN

6              THE CLERK:  Please be seated.  Please state your

7    full name and spell it for the record.

8              THE WITNESS:  Katherine Ellen Walton.  The whole

9    name?  I'm sorry.  Katherine, K-A-T-H-E-R-I-N-E, Walton,

10   W-A-L-T-O-N.

11             THE COURT:  Thank you.  You may inquire.

12             MR. BEHNKE:  Thank you, Your Honor.

13                      DIRECT EXAMINATION

14   BY MR. BEHNKE:

15   Q.   Ms. Walton, in what city do you live?

16   A.   Apple Valley.

17   Q.   What do you do for a living?

18   A.   My husband and I run a small construction company.

19   Q.   At some point were you involved with taking care of your

20   mother?

21   A.   Yes.  She lived with us basically two and a half years

22   while she was undergoing treatment.

23   Q.   Treatment for what?

24   A.   Cancer, uterine cancer.

25   Q.   What was her name?

1    A.    Veronica Lin.

2    Q.    What was the time period when she was living with you?

3    A.    From July of '05 to around April of '06, and then the

4    beginning of '07 until her death.

5    Q.    Do you recall when that was?

6    A.    Her death?

7    Q.    Yes.

8    A.    December 24th, 2007.

9    Q.    During the time that she was living with you, did you

10   have some role in assisting her or overseeing her medical

11   care?

12   A.    Yeah.   I drove her to every single solitary doctor's

13   appointment, radiation, chemo, I was with her through

14   everything.   And I was her caretaker in my home.   I mean, I

15   prepared all her meals for her and took care of her.

16   Q.    At some point during that time was she under the care of

17   defendant Dr. Patwardhan?

18   A.    Yes, she was.

19   Q.    During what time was she under his care?

20   A.    He first saw her in the hospital in June of '05, and her

21   last time that she was in his office would have been November

22   of '07, but while she was hospitalized, the last 30 days of

23   her life we were in contact over the telephone.

24   Q.    When you say "we were in contact over the telephone,"

25   who are you talking about?

1    A.   My sister and I to Dr. Patwardhan's office and

2    Dr. Patwardhan himself.

3    Q.   So you and your sister had telephonic contact during the

4    last 30 days with Dr. Patwardhan?

5    A.   Correct.

6    Q.   Now, during the time that your mother was under Dr.

7    Patwardhan's care, did you ever have occasion to take her to

8    Dr. Patwardhan's office?

9    A.   Yes, every visit I drove her.

10   Q.   Approximately how many times did that happen?

11   A.   Oh, man, lots.  When she was undergoing treatment, it

12   was every week to get blood test results, but then she would

13   have her chemo treatments about every three weeks, and then

14   even when she wasn't undergoing chemo, she went once a month

15   to have checkups, so it was a lot.  I don't know the exact

16   number.

17   Q.   Did you actually go with her to her chemotherapy

18   treatment?

19   A.   Yes, and I stayed right with her each time.

20   Q.   During the time that she was being seen by

21   Dr. Patwardhan, did you ever have any communication with

22   Dr. Patwardhan about her care?

23   A.   Oh, yeah, every visit, mm-hmm.

24   Q.   Did he explain to you what treatment your mother was

25   receiving?

1    A.   Not -- you mean like specific?

2    Q.   What did he tell you about the treatment?

3    A.   Well, he told us -- he would tell us like how often she

4    would have to -- like say, if it was chemo, he would tell us

5    how often she would have to have it, and I don't know that he

6    ever -- I don't believe we were ever told any drug names of

7    the chemotherapy drugs.

8    Q.   Did some member of his staff in some way communicate to

9    you names of -- drug names that she was receiving?

10   A.   Well, they would be written on the bags that were

11   administered to her.

12   Q.   When you say "written on the bags," are you referring to

13   the IV bags?

14   A.   The chemo, uh-huh, yeah.

15   Q.   Do you recall any of the names that you saw on those

16   bags?

17   A.   Well, there would always be a saline solution, and they

18   would differ from time to time, but there was Zofran, or

19   Zofram, I'm not sure.  There was Taxotere.  There was I want

20   to say something starting with a "D".  I can't recall the

21   name.

22   Q.   These names that you're providing, you're just going off

23   memory?

24   A.   Yes.

25   Q.   In addition to the chemo treatments that your mother

1    received in Dr. Patwardhan's office, did Dr. Patwardhan or

2    some member of his staff also provide you with injections

3    that you had to take home?

4    A.    Yes.

5    Q.    How many times did that occur?

6    A.    Approximately 30.

7    Q.    Was this throughout the period that she was under his

8    care or was it during a particular portion of that care?

9    A.    It was when she was undergoing chemo and then we would

10   be sent home with the injections to boost like the white

11   blood cells or the red blood cells, and some of them had to

12   be given 7 days in a row and some of them were given once a

13   month, the day after chemo.  They varied depending on her CBC

14   counts.

15   Q.    Did Dr. Patwardhan or any member of his staff tell you

16   specifically what the drugs were that were being sent home?

17   A.    They would be in a little Ziploc baggy with the name

18   written on it.  There was one particular time I was given a

19   syringe that I had not recognized the name and it was Neupeg.

20   And I asked Norma the nurse, I said, "What is Neupeg?"  And

21   she said, "It's just like Neulasta."  But as far as them

22   being -- they would just be in a little Ziploc bag with the

23   name written on it.

24   Q.    So the drug that you were normally receiving and that

25   you were told you were receiving was Neulasta?

```
 1    A.    Correct.  Well, there was several different --
 2              MR. GLUCK:  Objection, misstates the evidence.
 3              THE COURT:  Sustained.
 4    BY MR. BEHNKE:
 5    Q.    Were you told by the staff at any time that you were
 6    receiving Neulasta?
 7    A.    Yeah, that's -- we were told numerous times.  On my
 8    mom's receipts also it would state Neulasta, but that's not
 9    what it was.
10    Q.    Now, you said "on your mom's receipts."  How was her
11    care paid for?
12    A.    She would -- the injections -- her out-of-pocket expense
13    was about 500-and-some-odd dollars, I think like $519 out of
14    pocket, so she would write a check to Dr. Patwardhan.
15    Q.    You say out-of-pocket expense, did she have private
16    insurance?
17    A.    Yes, she did.
18    Q.    So her portion of the coverage would be paid by a check?
19    A.    Correct, that day that she would get the injection, and
20    they varied in price.  I mean, if she had --
21              MR. GLUCK:  Objection.  There's no question
22    pending.
23              THE COURT:  Sustained.
24    BY MR. BEHNKE:
25    Q.    Was there a set amount that had to be paid for the take
```

1    home injections?

2    A.   Yes.

3    Q.   What was that amount?

4    A.   Well, for Neulasta it was, like I say, approximately

5    $519, but then Procrit or --

6         MR. GLUCK:  Objection, Your Honor, the same issue

7    we were discussing earlier, 403.

8         THE COURT:  What's the relevance?  Where are you

9    going with this, Mr. Behnke?

10        MR. BEHNKE:  I'm establishing that she was paying a

11   certain amount of money for a particular drug and then later

12   I'm going to establish that she was not actually receiving

13   the drug she was paying for.

14        THE COURT:  So this goes to the counts -- those are

15   counts charging the Medicare fraud?

16        MR. BEHNKE:  No, Your Honor.

17        THE COURT:  You want to approach, please.

18        (On-the-record discussion at sidebar:)

19        MR. BEHNKE:  This relates to intent to defraud

20   regarding the conspiracy to introduce misbranded drugs and

21   the introduction of misbranded drugs.  The defendant was --

22        THE COURT:  What difference does it make that she

23   -- as to what the patient paid for?

24        MR. BEHNKE:  Is the Court's concern with the dollar

25   amounts?

```
 1            THE COURT:  What difference does it -- I mean,

 2    right, the dollar amount that she was paying for something.

 3            MR. BEHNKE:  She was paying for something that she

 4    was told that she was receiving Neulasta, which is an

 5    FDA-approved drug, and she was paying him for that.  What he

 6    was actually giving her was the cheaper, unapproved Indian

 7    drug, which the Government is going to argue shows that she

 8    was being defrauded.

 9            THE COURT:  Mr. Gluck.

10            MR. GLUCK:  A couple of things.  First of all, she

11    was told it was just like -- I can get the name, it's just

12    like Neulasta.  Second, the Indictment, this goes back to an

13    issue we talked about a long time ago.  The Indictment claims

14    that the intent -- the importation was the intent to defraud

15    upon crossing the border and it was intent to defraud Customs

16    and Border Patrol and the FDA and/or Medicare.  She's not a

17    Medicare patient.  This is not the border crossing and it's

18    not relevant.

19            THE COURT:  Who is it that was -- who was the

20    intent to defraud, in other words?

21            MR. GLUCK:  This goes back to the issue we raised

22    earlier, the victims, and this is the wrong victim.

23            MR. BEHNKE:  The Indictment, first of all, doesn't

24    limit the entities or persons that the defendant intended to

25    defraud.  The Indictment simply specifies that he acted with
```

1    the intent to defraud, and it has been briefed extensively.

2    The case law says the defendant's intent to defraud in order

3    to satisfy this particular statute can be directed at

4    anybody.  It's not limited to defrauded Government entities.

5              MR. GLUCK:  Our response would be, it can be, so if

6    that's what's alleged, but also if you look at the dates in

7    the Indictment, this is well removed from what's alleged.

8    This is, essentially, a different fraud scheme, because the

9    Indictment is the importation into interstate commerce on

10   dates X, Y and Z.

11             THE COURT:  Well, the Indictment does allege

12   specific dates, does it not?

13             MR. BEHNKE:  The Indictment alleges a conspiracy to

14   commit this offense that began in 2004, I believe, or '5.

15             MR. GLUCK:  It's the '5 and earlier.

16             MR. BEHNKE:  Goes through 2008, which is I think --

17   I believe she's going to testify occurred in 2007.

18             THE COURT:  She did already testify as to the dates

19   when her mother was under treatment.

20             MR. GLUCK:  I should also point out the Indictment

21   alleges specific dates and specific drugs.

22             THE COURT:  Right.  That's the box, right, that's

23   what I was thinking, the box that you have in as to the -- to

24   which count is that?

25             MR. BEHNKE:  There is a conspiracy to commit the

```
 1   offense and then we also alleged a couple of substantive
 2   counts.
 3              THE COURT:  So your argument is that this comes in
 4   under the conspiracy count?
 5              MR. BEHNKE:  Yes, Your Honor.  And also it relates
 6   to the conspiracy, because the fact that he was misleading
 7   his patients about what they were actually getting also goes
 8   to show that he wanted this concealed as well from the
 9   Government, because if the patients knew -- if the patients
10   knew what they were getting, they could report it.  The
11   patients were defrauded.  The Government was defrauded.
12              THE COURT:  I think I understand your point.
13   Mr. Gluck.
14              MR. GLUCK:  That is in the Indictment and the
15   Indictment does say the reason he used the wrong words with
16   the patients was in order to defraud the United States,
17   because the United States would see the patient records, for
18   example, and that exactly I think supports what we're saying.
19   But if that's true, that's a different thing from saying, you
20   paid $500 for this and therefore --
21              THE COURT:  A different charge.
22              MR. GLUCK:  It would be one thing, I can understand
23   what Mr. Behnke is saying, that isn't it true that
24   Dr. Patwardhan never told you what you were getting, and the
25   argument is, because he didn't want you to go run off and
```

```
 1    tell it to the United States as is alleged in the conspiracy
 2    count in the Indictment.  But to say Dr. Patwardhan charged
 3    you $500 without telling you that what you bought, well,
 4    really costs $300, doesn't go to that.
 5              THE COURT:  But that's not what he's eliciting.
 6    He's eliciting testimony that the patient did not receive --
 7    she was not told that the medication she was receiving was
 8    not what she was charged for.
 9              MR. BEHNKE:  Well, the question -- I believe the
10    question that Mr. Gluck objected to did relate to just a
11    question regarding price.  I can't remember what it was, but
12    she was going -- I think she was starting to testify about
13    500 or so dollars.
14              MR. GLUCK:  Exactly.
15              MR. BEHNKE:  He didn't object to the questions,
16    just about --
17              MR. GLUCK:  Right.  I think I will object to it for
18    whatever, but I think that comes in as to what he told the
19    patients they were getting.
20              THE COURT:  All right.  I'm sorry.  The objection
21    is overruled.
22         (On-the-record discussion at sidebar is concluded.)
23              THE COURT:  You may ask the question again, Mr.
24    Behnke.
25    BY MR. BEHNKE:
```

1   Q.   We've been discussing how you received and then paid for

2   the take home injections that your mother received.  Do you

3   recall that?

4   A.   Mm-hmm.

5   Q.   I believe you testified earlier that the names of the

6   drugs that you were receiving was contained on the receipts.

7   Do you recall that?

8   A.   Yes.

9   Q.   If you'll look, it might be -- it's either on the table

10  right in front of you or it might be located to your right, a

11  binder, it should be binder No. 3, the black binders.

12  A.   This Exhibit No. 3?

13  Q.   Binder No. 3.

14  A.   A black one?

15  Q.   If you look on the back of the binder on the spine here.

16  A.   Yes, binder 3 of 3.

17  Q.   Binder 3 of 3.  Would you please look at Exhibit No.

18  120?

19  A.   Yes.  Oh, 120, yes, the receipts.

20  Q.   Do you recognize these?

21  A.   Yes.

22  Q.   What are these?

23  A.   These are receipts that my mother paid for Neulasta

24  injections, and the first two -- the third one is chemo and

25  Neulasta injection.

1    Q.   Were these receipts provided by someone in Dr.

2    Patwardhan's office?

3    A.   Yes.

4    Q.   Do you recall who that was?

5    A.   Well, there were several different girls.  Esther I

6    believe was the last -- I think Esther would have been the

7    one that signed these -- I am pretty sure it was Esther, the

8    receptionist.

9              MR. BEHNKE:  Your Honor, Government moves

10   Exhibit 120 into evidence.

11             THE COURT:  Any objection to 120?

12             MR. GLUCK:  None, Your Honor.

13             THE COURT:  Thank you.  Exhibit 120 is ordered

14   admitted.  You may publish.

15   BY MR. BEHNKE:

16   Q.   I'm now showing you on the monitor Exhibit 120 for

17   identification.  These are receipts you were just talking

18   about?

19   A.   Yes.

20   Q.   I'm going to focus in on the top receipt.

21   A.   Mm-hmm.

22   Q.   On the line that says 4, you see what I'm pointing to

23   there?

24   A.   Yes.

25   Q.   And then next to that there appears to be written

1    Neulasta?

2    A.    Correct.

3    Q.    Who wrote that on the receipt?

4    A.    Whoever wrote the receipt, if it's Esther, it would have

5    been Esther.

6    Q.    So someone from Dr. Patwardhan's staff wrote out these

7    receipts?

8    A.    Correct, mm-hmm.

9    Q.    Now, at some point did you notice some discrepancy

10   between what you had been told the injections were and what

11   you saw on the actual injections themselves?

12   A.    The one that I questioned was the receipt dated

13   10-9-07.  I questioned it because the syringe I was handed

14   had a label Neupeg, N-E-U-P-E-G, and I asked Norma, the

15   nurse, I said, "What is Neupeg?"  My mother had never had

16   that syringe before, that name.  And I asked Norma, the

17   nurse, I said, "What is Neupeg?"  And she said, "Oh, it's

18   just like Neulasta."

19   Q.    Did you receive more than one syringe that was labeled

20   Neupeg?

21   A.    No, that was the only one labeled Neupeg.  The other two

22   that were labeled or dated 8-28-07 and 9-18-07 that say

23   Neulasta, those were Neulastim, T-I-M, not Neulasta.

24   Q.    When you received the syringes on August 28th and

25   September 18th that were labeled Neulastim, did you say

1    anything to any of Dr. Patwardhan's staff about that

2    discrepancy?

3    A.   I did not.  I did not notice it at that time.

4    Q.   But you did raise the issue concerning the Neupeg?

5    A.   Correct.

6    Q.   Now, after you would use the take home injections, what

7    would you normally do with them?

8    A.   I had a hard sided plastic bottle that I put them in,

9    and originally I would return them back to Dr. Patwardhan's

10   office for proper disposal.

11   Q.   These last syringes that you received, August,

12   September, October 2007, did you return those back to

13   Dr. Patwardhan?

14   A.   I did not.

15   Q.   What did you do with those?

16   A.   I had them in this plastic container with several others

17   that I had up in my laundry room just in the cupboard.

18   Q.   You just kept them.  Was there a particular reason why

19   you kept them?

20   A.   No.

21   Q.   For how long did you keep them?

22   A.   Well, I had them in there until my brother had called me

23   and told me that -- I had totally forgot about them being in

24   my laundry room cupboard.

25   Q.   So you didn't intentionally keep them in there?

1   A.   Oh, absolutely not.  The last shot I gave my mom was in

2   October.  She was hospitalized in November and passed away in

3   December, and I just totally forgot about them.

4   Q.   Now, at some point did you -- at some point did you take

5   photographs of the syringes that were labeled Neupeg and

6   Neulastim, Neulasta?

7   A.   Yes, I did.

8   Q.   When did you take those photographs?

9   A.   September of '08.

10  Q.   In that binder, again, in front of you, would you please

11  look at Exhibit 134A and 135?

12  A.   Yes, they're here.

13  Q.   Let's start with 134A.  Do you recognize this?

14  A.   Yes.

15  Q.   What is this?

16  A.   That is one of the labels on the syringes labeled

17  Neulastim, T-I-M, that my mother received that I administered

18  to my mother.

19           MR. BEHNKE:  Thank you.  Your Honor, Government

20  moves Exhibit 134A into evidence.

21           THE COURT:  Any objection?

22           MR. GLUCK:  None.

23           THE COURT:  Thank you.  Exhibit 134A is ordered

24  admitted and you may publish.

25           MR. BEHNKE:  I'm going to get through a few more

1    before I publish, Your Honor.

2              THE COURT:  Go ahead.

3    BY MR. BEHNKE:

4    Q.   Could you turn to Exhibit 134B.  Do you recognize that?

5    A.   Yes.

6    Q.   What is this?

7    A.   That's the other part of the label.

8              MR. BEHNKE:  Government moves Exhibit 134B into

9    evidence.

10             THE COURT:  Any objection to 134B?

11             MR. GLUCK:  No.

12             THE COURT:  Thank you.  134B is ordered admitted.

13             MR. BEHNKE:  I'm sorry, Your Honor.  May I have a

14   moment?

15   BY MR. BEHNKE:

16   Q.   Again, I'm sorry, just to clarify, is Exhibit 134A and

17   134B photographs of the Neulastim that you had received?

18   A.   It looks to me like -- well, yes, that is the other

19   part, it had -- it's a flag that was attached to the syringe

20   itself.

21   Q.   Now, would you please turn to 136?

22   A.   Yes.

23   Q.   Do you recognize this?

24   A.   Yes.

25   Q.   What is this?

1    A.    That is a picture of two syringes labeled Neulastim

2    manufactured in India.

3    Q.    Are these photographs of the syringes that you received

4    for your mother?

5    A.    Correct.   I administered to my mother.

6    Q.    And 135, please, would you please turn to that.

7            MR. BEHNKE: I'm sorry, Your Honor, Government moves

8    Exhibit 136 into evidence.

9            THE COURT:  Any objection to 136?

10           MR. GLUCK:  No, Your Honor.

11           THE COURT:  136 is ordered admitted.

12           THE WITNESS:  Okay.  You said 135.

13   BY MR. BEHNKE:

14   Q.    Yes.

15   A.    Yes.

16   Q.    What is this?

17   A.    That is the empty syringe, Neupeg.

18   Q.    This is a photograph of the Neupeg that you received to

19   administer to your mother?

20   A.    Correct.

21           MR. BEHNKE:  Government moves Exhibit 135 into

22   evidence.

23           THE COURT:  Any objection?

24           MR. GLUCK:  No.

25           THE COURT:  Thank you.  135 is ordered admitted.

1   BY MR. BEHNKE:

2   Q.   I'm now going to show you Exhibit 135.  This is a

3   photograph of one of the syringes that you had to administer

4   to your mother?

5   A.   Correct.

6   Q.   Is this the syringe that you questioned Norma Franco

7   about?

8   A.   Yes, it is.

9   Q.   Now, showing you 136.  I believe you said these are

10  photographs of the syringes of Neulastim?

11  A.   Correct.

12  Q.   And showing you 134B, I believe you said this is the

13  rest of the label that was shown in 134A?

14  A.   Yes.

15           THE COURT:  Mr. Behnke?

16           MR. BEHNKE:  I'm sorry, Your Honor.  I have no

17  further questions.  This is a good time to break.

18           THE COURT:  How long do you think your

19  cross-examination will be?

20           MR. GLUCK:  I have about five minutes.

21           THE COURT:  Go ahead.

22                      CROSS-EXAMINATION

23  BY MR. GLUCK:

24  Q.   Good afternoon, Ms. Walton.

25  A.   Good afternoon.

1    Q.   I'm going to try to be very quick.  The exhibit that you

2    were just shown with the three receipts on it, which was

3    Exhibit 120, I believe, I'll put it up as soon as I can find

4    it, you talked for a minute about, I think you said Esther

5    Casillas would hand you those receipts?

6    A.   She usually was the one, yes.

7    Q.   And when would you be handed that receipt, while you

8    were in the office?

9    A.   On our way out to make the next appointment we would

10   stand at a counter and they would write-up the receipt and

11   take my mom's check.

12   Q.   And so as you are leaving an appointment that your

13   mother had just been seen, were you given the -- I'm not

14   going to go through them all again, but were you given the

15   medicine to take home before or after you were handed the

16   receipt?

17   A.   It was -- usually the receipt was written and then they

18   would go get the injection.

19   Q.   Okay.  So within how much -- how much time would pass

20   generally between those two, in other words, was it within a

21   few minutes?

22   A.   Minutes.

23   Q.   And you mentioned that at least -- well, I think you

24   said once you spoke to Norma Franco about the fact that what

25   was written on the injection was not the same thing that was

1   written on the receipt?

2   A.   I didn't question the difference.   I questioned the name

3   Neupeg, I had never seen it before.

4   Q.   But you saw Neupeg written on the injection?

5   A.   Correct.

6   Q.   And, in fact -- well, I don't need to put these all back

7   up again.   In fact, the Neulastim injections also had the

8   name written on that little flag that we saw?

9   A.   Yes, they did.

10  Q.   And I believe you said that you asked Norma Franco about

11  it and she said it's just like Neulasta?

12  A.   Mm-hmm.

13           MR. GLUCK:   If I can have one moment and I think

14  I'm finished.   I have no further questions.

15           THE COURT:   Thank you.   Redirect.

16           MR. BEHNKE:   Just one question, Your Honor.

17                    REDIRECT EXAMINATION

18  BY MR. BEHNKE:

19  Q.   Other than saying that the Neupeg is just like Neulasta,

20  did they tell you anything else about the drug?

21  A.   No.

22           MR. BEHNKE:   Nothing further, Your Honor.

23           THE COURT:   Thank you.   You may step down.

24           Thank you, ladies and gentlemen.   Remember the

25  instructions I have given you earlier, don't discuss the case

```
 1   with anyone in any fashion, that means any family members,
 2   anyone else, anything about the case.  Communicating means,
 3   of course, talking, e-mailing, blogging, bringing anything up
 4   on the Internet.  Communicating means sign language, talking,
 5   Twittering, Googling, researching means Googling,
 6   researching -- sometimes I have to tell younger people this,
 7   taking a book, opening it up, that's also considered
 8   research, besides looking on the Internet.  Don't make up
 9   your minds about the case or any aspect of the case.
10   Remember that you haven't heard all the evidence.
11             Thank you, ladies and gentlemen.  We'll see you
12   tomorrow morning at 9:00.
13                  (Out of the presence of the jury:)
14             THE COURT:  Let's take a short recess.  I have a
15   telephone conference, a status conference at 4:45, so I need
16   to take that, but I would like to talk to counsel about the
17   lineup of witnesses for tomorrow and a couple of other
18   things.  My telephonic matter shouldn't take very long, so
19   I'll see you back in about 15 minutes.
20             Thank you.  We're in recess.
21                       (Recess)
22             THE COURT:  We're on the record outside the
23   presence of the jury.  And to go back -- I don't need to hear
24   more argument on it -- but to go back just briefly to the
25   issue that we were discussing at sidebar, I just wanted to
```

1  make the record a little clearer as to the basis for my

2  ruling overruling the objection.

3          There were, I think a couple of bases for the

4  objection, but I think primarily the basis that the defense

5  made was Rule 403, and I overruled the objection.  The

6  evidence is admissible because it does go to the issue that

7  patients were being charged for and were paying for drugs

8  that were not FDA-approved, and that they were told by

9  someone working for the defendant were FDA-approved, which

10 goes to the counts in the Indictment both I think as to the

11 Medicare fraud count and to the conspiracy count, and also to

12 the count -- I wish I could -- I have a summary of the

13 Indictment here because I want to state on the record the

14 number.

15         Mr. Behnke, could you state on the record the

16 number of the counts in the Indictment that you were

17 referring to?

18         MR. BEHNKE:  Yes, Your Honor.  I was referring to

19 Count 1 which charges the conspiracy.

20         THE COURT:  That's the conspiracy count, correct?

21         MR. BEHNKE:  Yes, Your Honor.  There was reference

22 to the substantive counts as well.  And Counts 2 and 3 charge

23 substantive violations of introducing into interstate

24 commerce with intent to defraud misbranded drugs, and Counts

25 4 through 6 are the substantive charges of smuggling, a

1    violation of 545.

2              THE COURT:  All right.  Mr. Gluck.

3              MR. GLUCK:  Yes.  I hate to add complication but,

4    unfortunately, things are not quite that simple.  Count 1

5    charges nothing with respect -- well, Count 1 has four

6    objects, the first object is the violation --

7              THE COURT:  I really don't want to hear any further

8    argument.  If you want to state on the record the basis for

9    your objection.

10             MR. GLUCK:  Your Honor, I think it's important to

11   clarify.  Count 1, Object A, has nothing to do with

12   unapproved drugs.  It only has to do with mislabeled drugs.

13   And as the Ninth Circuit has ruled, there must be, in order

14   to show a violation of that section, there must be a nexus,

15   in other words, intent to defraud with respect to the fact

16   that it was mislabeled, otherwise, there is no nexus that

17   makes it -- in other words, if someone commits any fraud by

18   using a drug that is mislabeled, it does not fall under 331

19   unless that was what the fraud was about, he defrauded

20   someone about the fact that it was mislabeled.

21             So to say in this case that Dr. Patwardhan gave

22   this medicine to a patient and defrauded the patient about

23   whether it was unapproved is actually not charged anywhere in

24   the Indictment, even in the conspiracy count.

25             THE COURT:  But what the Government just argued,

1    when I say "just," at the sidebar a moment ago, and has

2    argued throughout this trial, is not exactly what you just or

3    is not only what you just stated or characterized.  It also

4    goes to mislabeling.

5            MR. GLUCK:  I'm sorry.  It goes to mislabeling or

6    unapproved?

7            THE COURT:  Mislabeling.

8            MR. GLUCK:  Well, I guess then in this case the

9    question would be whether Ms. Walton -- I guess it would have

10   to be stated, to be stated correctly, it has to be stated

11   that -- the question is whether Ms. Walton asked or whether

12   Ms. Walton was defrauded about whether this medicine had been

13   at one time packaged with a package insert, because that's

14   the issue the mislabeling is about, not about whether Ms.

15   Walton was misled about whether the FDA had put this drug

16   through its approval process, because that's a different

17   statute.  And that statute is only charged with respect to

18   the Klein conspiracy and to defraud Customs and Medicare,

19   which is, obviously, there is no Klein conspiracy to defraud

20   a private citizen.

21           So the relevance of the dealing with Ms. Walton, it

22   could only be relevant if it goes to the issue of whether she

23   was defrauded about the labeling.  And I have to make one

24   correction.  I said earlier it was a Ninth Circuit case, and

25   it's actually, the case that I'm referring to, which is in

 1    our jury instructions, is actually the Tenth Circuit, but

 2    there is no contrary law in the Ninth Circuit.

 3              THE COURT:  All right.  Mr. Behnke, do you wish to

 4    be heard further?

 5              MR. BEHNKE:  No, Your Honor.

 6              THE COURT:  All right.  Let's talk about the

 7    witnesses for a moment.  Well, who are your witnesses for

 8    tomorrow?

 9              MR. WIDMAN:  Your Honor, the Government will be

10    calling Dr. Charles Lee first.

11              THE COURT:  All right.  How long do you expect that

12    testimony to take?

13              MR. WIDMAN:  Our examination we expect 30 to 45

14    minutes.

15              THE COURT:  All right.  So another 30 minutes for

16    cross at the outside?

17              MR. GLUCK:  At the outside.

18              THE COURT:  All right.

19              MR. WIDMAN:  The second witness we expect is Velma

20    Yep.

21              THE COURT:  How long for Ms. Yep?

22              MR. WIDMAN:  Probably in the same neighborhood, 30

23    to 45 minutes, maybe upwards of an hour.

24              THE COURT:  So a total of two hours at the outside?

25              MR. GLUCK:  At the outside.

```
 1                THE COURT:  And next?  That would take us maybe
 2   through the morning.  So in the afternoon?
 3                MR. WIDMAN:  The next witness would be Sylvia
 4   Thomas.
 5                THE COURT:  All right.  Who is Ms. Thomas?
 6                MR. WIDMAN:  She works for the FDA at Los Angeles
 7   International, LAX.
 8                THE COURT:  All right.  And how long is her
 9   testimony?
10                MR. WIDMAN:  30 minutes approximately.
11                MR. GLUCK:  No more than 30 minutes.
12                THE COURT:  All right.  Next?
13                MR. WIDMAN:  The next witness tomorrow would be
14   Melisa Armijo from Customs and Border Protection.
15                THE COURT:  And how long for her?
16                MR. WIDMAN:  I think that would take more in the
17   neighborhood of 90 to 120 minutes.
18                THE COURT:  So what's your estimate?
19                MR. GLUCK:  I don't think it would be longer than
20   that.  I think it could be substantially less than that.
21                THE COURT:  All right.  So let's finish with her
22   tomorrow, that would probably take up the afternoon, those
23   two witnesses in the afternoon, don't you think?
24                MR. WIDMAN:  I think so.  I don't think we're going
25   to end up short.
```

```
 1              THE COURT:  All right.  What's the Government's

 2   current estimate as to all the rest of these witnesses?  You

 3   still think you're going to need all of these witnesses?

 4              MR. BEHNKE:  No, Your Honor.  We haven't worked out

 5   the lineup, but -- now I can't remember what we were just

 6   talking about, because we were just discussing this a few

 7   moments ago.  I'm pretty sure that the Government will

 8   probably end up wrapping up its case no later than sometime

 9   on Thursday.

10              THE COURT:  All right.  And how many days do you

11   think at this point?  What's your estimate for how many days

12   you will need to put on your case, just roughly?

13              MR. GLUCK:  Roughly, three, four, not more than

14   four days, probably three.  I'm just thinking --

15              THE COURT:  I'm just trying to get an estimate.  If

16   it's three or four, then that Friday will be the day we're

17   going to start at 8:00 and go until about 1:30.  So it's not

18   that much shorter a day.  It's a little compressed.  It's

19   about half an hour shorter.  That means Tuesday and Wednesday

20   and maybe Thursday of the next week, maybe half a day

21   Thursday.  Ideally then you would be putting on your closings

22   that Thursday afternoon, roughly, perhaps.

23              MR. GLUCK:  We're talking two weeks from today.  I

24   think that's a good estimate.

25              THE COURT:  That's well within what we told the
```

1    jury.

2           All right.  Anything else we need to take up this

3    afternoon?

4           Oh, let's go back to talking about the issue I

5    brought up about the character evidence.  Again, I bring it

6    up sua sponte because really under the framework of the

7    rules, none of what I perceive as what's perhaps coming in as

8    character evidence, specifically, for example -- I mean, I

9    think the only thing that's come in that I see really as,

10   strictly speaking, character evidence, the evidence about

11   whether Dr. Patwardhan wasn't charging patients the full

12   amount, that really should be coming in -- well, character

13   evidence only comes in once the defense -- in the defense

14   case-in-chief, and it comes in in the form of reputation

15   evidence.  So we're not even in the defense case-in-chief,

16   and it's not coming in in that form anyway, so what's -- Mr.

17   Gluck?

18          MR. GLUCK:  Your Honor, I appreciate the Court's

19   direction and we will submit on the Court's ruling.

20          To the extent that we have witnesses who are

21   testifying about how he was always pushing to make more

22   money, that was the impetus for that cross-examination, and I

23   would understand that the Court's ruling would be both ways.

24          THE COURT:  Right.  I think sort of both sides are

25   doing it and that is -- I wouldn't bring it up sua sponte

1    otherwise, but I think both sides have been, at the very

2    least, pushing the envelope on it.  If you're going to

3    continue to ask those sorts of questions, I'm going to

4    continue to let it come in on cross-examination.

5              MR. BEHNKE:  Your Honor, I understand the Court's

6    point, and we had asked questions along those lines of

7    witnesses and that's the reason why the Government wasn't

8    objecting to the defense response or attempts to respond to

9    those allegations.  The Government understands the Court's

10   position.

11             THE COURT:  All right.  Thank you.

12             MR. GLUCK:  Your Honor, may I ask one last thing?

13   If we're going to have Agent Armijo possibly tomorrow

14   afternoon, we had asked about discovery about whether she's

15   ever been trained on this FDA issue, we don't have any

16   response to that.

17             THE COURT:  I'm sorry.  Could you refresh my

18   memory.  This FDA issue is which one?

19             MR. GLUCK:  Actually, there are two Customs' agents

20   that the Government is planning on calling.  There is the

21   agent who is something of a percipient witness.  Agent Armijo

22   is also a percipient witness.  She's not been designated as

23   an expert.  She's going to talk about the way things work at

24   LAX.

25             THE COURT:  Is this the testimony we just talked

1   about the other day about her training?

2          MR. GLUCK:  This is one of them.  And I'm not

3   asking for her disciplinary file or commendations or

4   criticism or whatever, but to the extent she's going to be

5   testifying tomorrow about the way the Customs Service handles

6   drugs coming into the country, we've asked for discovery of

7   whether she has ever received training on this issue.

8          THE COURT:  And where do we stand with that?

9          MR. WIDMAN:  Where we stand, Your Honor, the reason

10  I'm looking at my device here is I'm trying to actually find

11  the e-mail so I can say exactly when I did, what I did with

12  respect to this request.  First of all, we didn't -- to be

13  perfectly honest, I didn't think Ms. Armijo was going to go

14  tomorrow.  I thought it was going to happen on Tuesday, so

15  that's why we haven't gotten back to the defense.

16          Now, with respect to what I did was, during like

17  the lunch break on the morning we discussed it, which I think

18  was the first day of trial or first day of jury selection, I

19  spoke with counsel at Customs and Border Protection and

20  explained what the Court was ordering or asking for.  And

21  then I wrote a confirmatory e-mail later that day, and I have

22  not received a response except to say, may have acknowledged

23  that he received it.

24          THE COURT:  Well, let me just say this:  If you

25  haven't gotten the material about her training, then call

1   another witness tomorrow and put her on Tuesday after you've

2   had a chance to get the information and give it to your

3   opposing counsel.  She's in Los Angeles, right?

4          MR. WIDMAN:  She actually lives, I think, in the

5   High Desert.

6          THE COURT:  Well, it's not as if she is in

7   Minneapolis or something.

8          MR. WIDMAN:  Oh, yes, she's in the Southern

9   California area.

10         MR. GLUCK:  Assuming that happens, the other

11   witness --

12         THE COURT:  Who would your other witness be if you

13   don't put her on?  Well, let Mr. Gluck know.  I take it you

14   can communicate tonight.

15         MR. WIDMAN:  Sure.  We will communicate tonight.

16         THE COURT:  All right.  Thank you very much.  See

17   you tomorrow.

18         MR. GLUCK:  Thank you, Your Honor.

19              (Proceedings adjourned)

20                   ---o0o---

21

22

23

24

25

# C E R T I F I C A T E

### DOCKET NO. EDCR 08-172(B) VAP

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and accurate transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.


/S/ Phyllis Preston
PHYLLIS A. PRESTON, CSR          DATED:  March 25, 2010
Federal Official Court Reporter
License No. 8701